UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AYRTON CAPITAL, LLC, <br><br> Plaintiff, <br><br> v. <br><br> BITDEER TECHNOLOGIES GROUP, <br><br> Defendant. | Case No. 24-5160 <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Ayrton Capital LLC ("Ayrton"), by and through its counsel, respectfully alleges as follows:

## INTRODUCTION

1. This action arises out of Defendant Bitdeer Technologies Group's ("Bitdeer") breach of its binding and unambiguous contractual obligations pursuant to a term sheet it executed on April 29, 2024 in solicitation of $100 million in financing from Ayrton (the "Term Sheet").

2. Bitdeer, a NASDAQ-traded technology company, is led by sophisticated individuals who publicly tout their wealth of experience in "management, business development and capital market transactions, including M&A, fundraising, initial public offerings, and restructurings." *See, e.g.*, https://ir.bitdeer.com/corporate/board-of-directors. In the spring of 2024, Bitdeer was raising $100 million and sought out Ayrton, a respected registered investment advisor. Bitdeer and Ayrton extensively negotiated the Term Sheet, which *twice* identified certain terms as "binding."

3. Those binding terms included, but are not limited to: (a) an exclusivity provision during which term Bitdeer could not solicit, negotiate or accept *any* proposals with respect to a

1

"financing transaction" for a period of thirty business days following the date Bitdeer and Ayrton agreed in writing to cease negotiations; (b) an agreement that, if Bitdeer breached its exclusivity obligations and entered into "any third party transaction" within a contractually defined period of time, Bitdeer would afford Ayrton the right to participate for 25% of that transaction; and (c) if Bitdeer breached either of these obligations, it would not only pay damages (among other remedies), but it would also "promptly reimburse" Ayrton for all costs, including attorney's fees, that Ayrton paid or incurred as a result thereof.

4. Notwithstanding these clear contractual obligations, and unbeknownst to Ayrton, at the same time Bitdeer was negotiating with Ayrton to complete the financing transaction contemplated by the Term Sheet, Bitdeer negotiated a financing transaction with a different party in brazen violation of its exclusivity obligations under the Term Sheet. Indeed, a mere two weeks after notifying Ayrton that it wanted to cease discussions, Bitdeer announced that it had entered into a $100 million financing agreement with that third party (the "Competing Transaction"). Not only did Bitdeer purposefully breach its obligation not to solicit, negotiate or accept any financing proposals within the exclusivity period, Bitdeer further failed to offer Ayrton the contracted-for right to participate in the Competing Transaction. Indeed, to this day, Bitdeer has never provided Ayrton with the specific terms, transaction documents, or structure of the Competing Transaction along with an offer to participate.

5. Ayrton promptly informed Bitdeer that it was in breach of the Term Sheet by negotiating and closing the Competing Transaction without providing Ayrton the right to participate in up to 25% (or $25,000,000) of that transaction. Rather than recognize its mistake and offer Ayrton the right to participate—which Ayrton would have accepted for the full 25%—Bitdeer took the unjustifiable position that it somehow did not breach the plain and unambiguous

2

terms of the Term Sheet because the Competing Transaction is an equity, not debt, financing transaction. But, under the Term Sheet, that is a distinction without a difference.

6. Indeed, the Term Sheet plainly states that, "The Company and/or its agents will not solicit, negotiate or accept any term sheets, proposals, transaction documents or agreements whether binding or non-binding from any other party **with respect to a financing transaction nor will the Company close a financing transaction** until 30 business days following the date the parties hereto agree in writing to cease negotiations of the transaction contemplated by this Term Sheet . . . ." (Emphasis added). The Term Sheet further provides that, if Bitdeer breaches this exclusivity provision, it shall "provide Ayrton the right to participate for 25% **in any third party transaction** executed by the Company from the date hereof until the 180 day anniversary of the Termination Date . . . ." (Emphasis added).

7. Thus, the Term Sheet provides that if Bitdeer breaches the exclusivity provision by soliciting, negotiating or accepting a financing transaction—which it did—it must offer Ayrton the right to participate in any transaction it closes, regardless of whether it is a financing transaction or not. But the Competing Transaction is unequivocally a financing transaction. Indeed, the title of Bitdeer's May 31, 2024 press release announcing the transaction states, "Bitdeer Announces Up to $150 Million Private Placement Financing". *See* https://ir.bitdeer.com/news-releases/news-release-details/bitdeer-announces-150-million-private-placement-financing.

8. By negotiating and closing the Competing Transaction and failing to honor Ayrton's right of participation, Bitdeer has breached the Term Sheet, deprived Ayrton of the benefit of its bargain, and caused Ayrton millions in damages. As a result of Bitdeer's material breach, Ayrton now brings this action for damages arising from Bitdeer's breach of its negotiated-for rights under the Term Sheet.

## JURISDICTION AND VENUE

9.  This Court has original jurisdiction of this action pursuant to 28 U.S.C. § 1332. The matter in controversy exceeds $75,000.

10.  This district is the proper venue for this action because a substantial part of the events giving rise to the claims, including without limitation the negotiation and execution of the Term Sheet, occurred in New York, New York.

11.  This Court has personal jurisdiction over Bitdeer because it has, *inter alia*, purposely directed its actions toward this forum by negotiating a Term Sheet in New York and entering into the Term Sheet in New York. The Term Sheet is also governed by New York law.

## THE PARTIES

12.  Ayrton is a limited liability company organized pursuant to the laws of the state of Delaware. Its principal place of business is Westport, Connecticut. Ayrton is an investment manager that, among other things, manages pooled investment vehicles by making investments and managing those investments. Ayrton does not have any members who are residents of foreign countries.

13.  Bitdeer is a Cayman Islands exempted company with its principal place of business in Singapore. Bitdeer's shares of Class A common stock are publicly traded on the NASDAQ under the symbol "BTDR." Bitdeer is a technology company for blockchain and high-performance computing that operates mining datacenters throughout the world, including in the United States.

## THE TERM SHEET

14.  In April 2024, Bitdeer was seeking additional capital to support its expansive growth plans. Bitdeer and Ayrton engaged in negotiations with respect to a potential financing at

4

this time, contemplating an investment of approximately $100 million subject to Ayrton's own diligence and approvals.

15. To provide a framework for the substantive financing negotiations, the parties, each represented by their own New York-based and nationally recognized counsel, negotiated for several weeks and entered into the Term Sheet on April 29, 2024. The Term Sheet is a straightforward two-page document.

16. Critically, although Ayrton's commitment to provide financing to Bitdeer was non-binding under the Term Sheet until definitive documentation was negotiated and executed by the parties, the parties carefully negotiated and specifically agreed to be bound by certain provisions in the Term Sheet. Among the binding provisions in the Term Sheet was an exclusivity provision.

17. Exclusivity provisions are critical to Ayrton when negotiating financing transactions for a variety of reasons. Among other reasons, exclusivity provisions (i) prevent companies from shopping the economic terms of an Ayrton proposal, thereby undercutting Ayrton, and (ii) recognize the opportunity cost of Ayrton's time and resources devoted to diligence and negotiations toward a definitive deal during the period in which a term sheet is effective. Thus, Ayrton routinely requires exclusivity provisions in its term sheets, as was the case here. Ayrton and Bitdeer specifically negotiated the exclusivity provision in the Term Sheet, with numerous revisions to the contractual language exchanged before final, binding language was agreed to. As agreed, the Term Sheet's "Confidentiality and Exclusivity" provision provides as follows:

> *[Bitdeer] and/or its agent will not solicit, negotiate, or accept any term sheets, proposals, transaction documents or agreements whether binding or non-binding from any other party with respect to a financing transaction nor will the Company close a financing transaction until 30 business days following the date the parties hereto agree in writing to cease negotiations of the transaction contemplated by this Term Sheet (the 31st day thereafter defined as the 'Termination Date').*

(Emphasis in original).

18. Thus, the exclusivity provision was specifically negotiated to remain in place for a period of thirty business days following the date that the parties ceased negotiations, which was specifically defined in the Term Sheet to be the Termination Date of the obligation. In the event of a breach of this exclusivity provision by Bitdeer—*i.e.,* to the extent Bitdeer negotiated or closed a third-party financing transaction before the Termination Date—the Term Sheet provides plain and unambiguous remedies for Ayrton: (i) a break-up fee of 0.75% of the redemption value of the subject notes, and (ii) "the right to participate for 25% in *any* third party transaction executed by [Bitdeer] from the date hereof until the 180 day anniversary of the Termination Date[.]"

19. Furthermore, the Term Sheet provides that Bitdeer will promptly reimburse Ayrton "for all costs, including attorney's fees, paid or incurred by [Ayrton] with respect to any claims arising as a result of a breach of the provisions" under the Confidentiality and Exclusivity section.

## BITDEER'S BREACH OF THE TERM SHEET

20. From early April through early May, Bitdeer and Ayrton extensively negotiated the terms of the proposed transaction. While the parties were negotiating the Term Sheet, the parties began discussing the structure of the proposed transaction. Those negotiations continued in the weeks that followed execution of the Term Sheet, with Ayrton evaluating and proposing several different structures to close the transaction and provide Bitdeer $100 million in financing. Ayrton invested significant time and resources conducting diligence into Bitdeer to progress the transaction.

21. As stated, the Term Sheet prohibited Bitdeer from soliciting, negotiating, accepting, or closing any financing transactions with third parties until the day following the Termination Date—*i.e.,* the 31st business day after termination. If Bitdeer breached the Confidentiality and

Exclusivity provision in the Term Sheet, Ayrton's contracted-for remedies were a break-up fee and a right to participate in any "third party transaction" executed by Bitdeer until 180 days after the Termination Date.

22. Notwithstanding Ayrton's efforts to close a transaction with Bitdeer, Bitdeer sent a written termination notice on May 13, 2024, terminating the Term Sheet. Based on the May 13, 2024 termination notice, the Termination Date, as defined by the Term Sheet, is June 26, 2024.

23. On May 22, 2024, less than ten days after Bitdeer provided notice of termination (and notwithstanding that the parties continued to engage in conversations to determine whether a transaction could be completed), Bitdeer informed Ayrton that it had, in fact, been negotiating a separate financing transaction at the same time with a third party, and that it was prepared to close that transaction. Bitdeer refused to identify the third party with which it was negotiating, nor did it provide Ayrton with the transaction documents or terms of the potential transaction other than to disclose that the third-party financing transaction would be an "equity" deal. Importantly, Bitdeer did not provide crucial structural terms to Ayrton including the issuance of warrants. These warrants included anti-dilution provisions that added significant value to the warrants. Such provisions are not customary for a company of Bitdeer's market capitalization, size, and scale, making the Competing Transaction a uniquely attractive investment opportunity for Ayrton. Indeed, Ayrton had sought during negotiations with Bitdeer "warrant coverage" of as low as 20% of the total transaction, an offer which was rejected by Bitdeer. In stark contrast, the Competing Transaction ultimately had approximately 30% warrant coverage—i.e., the Company accepted 50% *more* warrant coverage with the third-party than what it had previously rejected with Ayrton.

24. At no point prior to or on May 22, nor at any point that followed, did Bitdeer offer Ayrton an opportunity to participate in this undisclosed Competing Transaction.

25.     On or about May 31, 2024, just 13 business days after terminating the Term Sheet, Bitdeer issued a press release announcing the Competing Transaction. The announcement was the first time that Bitdeer disclosed to Ayrton (albeit in a public announcement) the specific terms of the Competing Transaction (in particular, the valuable anti-dilution provisions described above) or the identity of the counterparty in the Competing Transaction (a globally recognized platform in the stablecoin and digital asset markets, further increasing the attractiveness to Ayrton of participating in the Competing Transaction). Given the complexity and size of the Competing Transaction, Bitdeer was undoubtedly negotiating the Competing Transaction at the same time it represented that it was working in "good faith" to close a deal with Ayrton.

26.     As is stated above, Bitdeer did not offer Ayrton the right to participate in the Competing Transaction. Had Bitdeer offered Ayrton the right to participate on these same economic terms, alongside a marquee investor in the sector, it would have quickly availed itself of its participation rights in full, as would any rational economic actor.

27.     Notwithstanding that Bitdeer was prohibited under the Term Sheet from negotiating the Competing Transaction, nor that it was incumbent on Bitdeer under the plain language of the Term Sheet to offer Ayrton the right to participate in any third-party transaction that Bitdeer negotiated or closed prior to the Termination Date, Bitdeer refused to provide Ayrton with the right to participate in the Competing Transaction. Indeed, during a phone call with a Bitdeer representative on June 10, 2024, an Ayrton representative notified Bitdeer of the breach of the Term Sheet on account of the Competing Transaction and the resulting participation rights in that transaction that Ayrton was contractually owed. The Bitdeer representative responded that Ayrton was "incorrect," but that it would "verify with counsel."

28. Shortly thereafter, on or about June 12, 2024, after receiving no response with respect to Ayrton's verbal notice to Bitdeer, Ayrton sent written notice to Bitdeer of Bitdeer's breach of the Confidentiality and Exclusivity provision and reiterated its desire to exercise its right to participate in the Competing Transaction. Ayrton further notified Bitdeer of the breakup fee now owed as a result of Bitdeer's breach.

29. The notice from Ayrton to Bitdeer stated that "[i]n light of the company's breach of the Confidentiality and Exclusivity provisions outlined in the executed term sheet attached, Ayrton wishes to exercise the right to participate in the financing transaction announced on 5/30/2024. In addition, a break fee of $787,500.00 is owed to us."

30. Again, Bitdeer refused. It claimed that the Term Sheet only required Bitdeer to extend participation rights to Ayrton in a competing debt transaction. The Term Sheet unambiguously says nothing of the sort.

31. By refusing to pay the break-up fee and by depriving Ayrton of its participation rights, Bitdeer materially breached the binding Confidentiality and Exclusivity provision of the Term Sheet.

32. Bitdeer's counsel further claimed that, in any event, Ayrton failed to notify Bitdeer that the Competing Transaction and negotiations with respect to the Competing Transaction triggered Ayrton's right of participation. No such obligation to notify Bitdeer exists under the unambiguous terms of the Term Sheet. Indeed, it is not incumbent on Ayrton to advise Bitdeer, a public company represented by one of the most sophisticated law firms in the world, of Bitdeer's own contractual obligations under its own contracts. To the contrary, the Term Sheet plainly makes it ***incumbent upon Bitdeer*** to provide Ayrton the right to participate in any transaction it

negotiates or closes before the Termination Date. Indeed, that makes sense because Bitdeer is the party with the sole knowledge of other transactions to which it may be negotiating,

33. On or about June 7, 2024, Bitdeer filed a Form F-3 with the Securities and Exchange Commission relating to the resale or other disposition of the shares sold through the Competing Transaction.

34. Between the date of its June 7 filing and June 20, Ayrton repeatedly demanded that Bitdeer permit it to participate in 25% of the Competing Transaction. Bitdeer had ample opportunity in that period to provide Ayrton with its negotiated-for participation rights in the Competing Transaction and to amend the F-3 to include Ayrton's purchased securities. It refused.

35. Instead, the Form F-3 became effective on June 20, 2024, and the securities acquired by the third party in the Competing Transaction became registered and freely tradeable.

36. Had Bitdeer permitted Ayrton to participate in the Competing Transaction, given the extremely favorable terms, Ayrton would have exercised its rights and purchased 4,646,841 shares of Bitdeer's common stock and 1,250,000 warrants at a price of $5.38. In a transaction of this nature, Ayrton would aim to commence realizing gains at a profitable threshold, which in the instance of the Competing Transaction, Ayrton determined to be a stock price of $6.45. Ayrton would have executed this profit realization strategy by selling 10% of the daily trading value during market hours. To date, since the F-3 was declared effective on June 20, 2024, the stock price has traded materially above the profitable threshold and the realized profit from such sales of the common stock should have amounted to almost $19 million. The unrealized profit for the remaining unsold shares, based on the closing price of July 8, 2024, is currently estimated to be over $7 million. Additionally, applying the Black-Scholes model to assess the value of the warrants using inputs derived from the listed options market results in a warrant valuation of over

$6 million. Due to Bitdeer's breach of the Term Sheet and failure to provide Ayrton with its participation right, Ayrton has therefore suffered damages well in excess of $32 million.

37. Accordingly, by precluding Ayrton from participating in the Competing Transaction, Bitdeer deprived Ayrton of the benefit of its bargain and of substantial gains that Ayrton would have realized by selling shares of Bitdeer's stock that it received in the private placement. Bitdeer has also failed and refused to pay the break-up fee of $787,500.

## FIRST CAUSE OF ACTION

### Breach of Contract

38. Ayrton realleges and incorporates by reference all other allegations in this Complaint as if set forth fully herein.

39. The Term Sheet is a valid and binding contract. The Confidentiality and Exclusivity provision provides that "[Bitdeer] and/or its agent will not solicit, negotiate, or accept any term sheets, proposals, transaction documents or agreements whether binding or non-binding from any other party with respect to a financing transaction nor will the Company close a financing transaction until 30 business days following the date the parties hereto agree in writing to cease negotiations of the transaction contemplated by this Term Sheet (the 31st day thereafter defined as the 'Termination Date')."

40. As set forth above, Bitdeer breached the Term Sheet by negotiating and entering into the Competing Transaction on or about May 31, 2024, before the Termination Date, which is June 26, 2024. Bitdeer also undermined the purpose of the exclusivity section by not informing Ayrton of the terms of the Competing Transaction. In addition, Bitdeer failed to provide Ayrton with the transaction documents or the right to participate in this Competing Transaction and failed to pay the break-up fee.

11

41. Bitdeer again breached the Term Sheet by refusing to honor Ayrton's right to participate in the Competing Transaction both verbally on June 10, 2024, and post receipt of Ayrton's email on June 12, 2024, in which Ayrton sent written notice to Bitdeer regarding the breach of the Confidentiality and Exclusivity provision and its desire to exercise the contractual participation right.

42. As a direct, proximate, and foreseeable result of Bitdeer's breach, Ayrton has suffered losses in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Ayrton respectfully requests that the Court grant the following relief:

1. Judgment in favor of Ayrton and against Bitdeer on its cause of action for breach of contract;

2. Compensatory damages to be proven at trial;

3. An order awarding Ayrton all attorney's fees, expenses and costs, paid or incurred by Ayrton with respect to Bitdeer's breaches of the Term Sheet;

4. Pre-judgment and post-judgment interest at the rates prescribed by law; and

5. Such other relief, at law or in equity, as the Court finds just and proper.

## JURY DEMAND

Ayrton demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: July 8, 2024
                                                   FRESHFIELDS BRUCKHAUS DERINGER US LLP

                                                   */s/* Gayle R. Klein
                                                   Gayle R. Klein
                                                   Andrew D. Gladstein
                                                   Eunice Leong
                                                   Maylin Meisenheimer
                                                   3 World Trade Center
                                                   175 Greenwich Street, 51st Floor
                                                   New York, NY 10007
                                                   (212) 277-4000

                                                   *Attorneys for Plaintiff Ayrton Capital, LLC*