# EXHIBIT 12

# UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED PROVISIONALLY UNDER SEAL

# Deposition Transcript

Case Number: 24-5160 (LJL)
Date: February 12, 2025

In the matter of:

# AYRTON CAPITAL, LLC v BITDEER TECHNOLOGIES GROUP

# Haris Basit

CERTIFIED COPY

Reported by:
TENEJA SOLTAU

Steno
Official Reporters

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: Firm #108F

Emanuel, on behalf of the defendant.
MR. SISGOREO: Daniel Sisgoreo, Quinn Emanuel, on behalf of the defendant.
MS. KLEIN: And for the record, we also have Andrew Gladstein participating by Zoom on behalf of the plaintiff, as well as our plaintiff representative Daniel Altman, who is in-house counsel at Ayrton.
THE COURT REPORTER: Okay. And I'm just going to do a quick read on, and then I'll swear the witness in.
"The parties and their counsel further agree that while I am a licensed notary, the witness may be in a state where I am not licensed. The parties stipulate that this deposition may be taken before me. If any party does have an objection to this manner of reporting or anything stated above, please state so now.
MS. KLEIN: No objection.
MS. SHARMA: No objection.
THE COURT REPORTER: Hearing none, we can proceed.
///
///



H A R I S B A S I T, the witness herein, having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:
THE COURT REPORTER: Can I have your name and address?
**THE WITNESS: Haris Basit, 18640 Vista De Almaden, San Jose, California 95120.**
EXAMINATION BY
MS. KLEIN:
Q. Good morning, Mr. Basit.
**A. Good morning.**
Q. My name is Gayle Klein, and I represent the plaintiff Ayrton Capital, LLC.
Do you understand that?
**A. Yes.**
Q. Could you please state your name again for the record?
**A. Haris Basit.**
Q. And do you know -- do you understand that you're testifying under oath today?
**A. Yes.**
Q. Just as if you were in a court of law in front of a judge or jury?



**A. Yes.**
Q. Do you agree today to answer my questions truthfully?
**A. Yes.**
Q. If I ask you a question and you have not understood my question, will you agree to ask me to repeat it or rephrase it?
**A. Yes.**
Q. Therefore, if you don't ask me to repeat the question or rephrase it, I'm going to assume that you understood my question as asked; is that fair?
**A. I suppose so.**
Q. Are you currently taking any medication that would impair your ability to testify truthfully today?
**A. No.**
Q. Your testimony is being recorded not only by video but also by the court reporter who's sitting here to my left. So therefore we will need a verbal answer. Is that okay by you?
**A. Yes.**
Q. Also, so we don't drive her crazy, if you would please endeavor to let me finish my question before you start your answer, and I will try to



afford you the same courtesy of letting you finish your answer before I start my next question.
Is that agreeable?
**A. Sure.**
Q. Unless your counsel instructs you not to answer on the basis of privilege, you will need to answer my questions even if an objection is asserted. Do you understand that?
**A. Yes.**
Q. Have you ever been deposed before?
**A. Yes.**
Q. How many times?
**A. Once.**
Q. And when was that?
**A. A few months ago. I don't remember the date.**
Q. And what was the basis of the legal proceeding for which you were deposed?
**A. It's a civil suit between a startup company in Silicon Valley that I'm a shareholder of and Bitmain, a Chinese company.**
Q. How you to spell Bitmain?
**A. B-I-T-M-A-I-N.**
Q. And what is the name of the startup company?

Page 46

H. Basit

A. **I don't know if they did any formal due diligence.**

Q. Do you know if anyone at Tether communicated directly with anyone at Bitdeer regarding a proposed financing in May of 2024?

MS. SHARMA: Objection.

A. **In May of 2024?**

Q. Yup.

A. **Yeah, I assume they did.**

Q. Do you know how they communicated? Were you copied on any of those communications?

A. **No.**

Q. Who negotiated the Tether deal?

MS. SHARMA: Objection.

A. **This is secondhand information. I don't know firsthand. But my secondhand information was that it was Jihan Wu directly.**

Q. You were not involved directly in the negotiation of the Tether deal?

A. **No.**

Q. That was a bad question. Let me ask it again so it's clear on the record.

Were you involved in the negotiation of the Tether deal?

A. **No.**

Page 47

H. Basit

Q. Even though it was your responsibility for capital markets?

MS. SHARMA: Objection.

A. **Sure.**

Q. Other than Mr. Wu, do you know who was involved in the Tether deal?

A. **I do not.**

Q. Do you to know how that deal came about?

A. **I don't.**

Q. Do you communicate with anyone from Bitdeer on WhatsApp?

MS. SHARMA: Objection.

A. **WhatsApp. Could be, yeah.**

Q. Who?

A. **I'm not sure. It's -- those messenger apps sort of blend together. You know, I'm not sure if I was there so.**

Q. Okay. And have you communicated with your team via the Apple text messaging app since you started at the company?

MS. SHARMA: Objection.

A. **Yes.**

Q. And those communications continue through today?

A. **Yes.**

Page 48

H. Basit

Q. Okay. You first met individuals from Ayrton at a conference in March of 2024.

Do you recall that?

A. **I don't recall meeting them.**

Q. Do you recall where you first met Ayrton?

A. **No, I don't.**

Q. Do you recall how you were introduced to them?

A. **No, I don't. Other than from the session yesterday, I think there was an email that -- from our investor relations firm that might have introduced us to them.**

Q. Is your investor relations firm Orange Group Advisors?

A. **Yes.**

(Plaintiff's Exhibit 3, Calendar invite, was marked for identification.)

Q. Mr. Basit, I've put in front of you what's been marked as Ayrton Exhibit 3.

Is this a true and correct copy of a calendar invite from Louise Carey, at Orange Group Advisors to you, Mr. LaBerge, Yujia Zhai, Y-U-J-I-A, Z-H-A-I, Bates-labeled BIT 815 through 818.

A. **It looks to be.**

Page 49

H. Basit

Q. Does this refresh your recollection that you first met with individuals from Ayrton Capital in March of 2024 at Roth?

A. **Yeah, I mean, it does.**

Q. You don't have any reason to dispute that's where you met?

A. **No, I have no reason to dispute it. I mean, those meetings, there's usually like a dozen meetings in the same day, and I'm not necessarily sitting in every single one of them. Sometimes we alternate so, but there's a good chance I actually met them that day.**

Q. And you see it says, "Attachments - Ayrton Capital Tear Sheet.pdf"?

(Reporter clarification.)

Q. Do you see that?

A. **What are you pointing at?**

Q. On the first page it says, "Attachments," and then it says, Ayrton Capital Tear Sheet.pdf?

A. **Correct.**

Q. What is a tear sheet?

A. **It's like a one or two-page document that describes a company or a firm.**

Q. Okay. And if you look on the second page of Exhibit 3, which is BIT 816.

Q. And before you sent the term sheet to your CEO for binding signature, did you read the term sheet?
**A. I read the -- so the financial -- basic financial terms of it, yes.**
Q. I'm asking you, sir, the -- the term sheet, if you look on Exhibit 12, is two pages.
**A. Yeah.**
Q. Did you read the whole thing before you sent it to your CEO and asked the CEO of a publicly held company to bind the company?
MS. SHARMA: Objection. Asked and answered.
**A. I read the financial terms and skimmed the rest.**
Q. Yes or no, sir? Did you read the whole thing?
MS. SHARMA: Objection. Asked and answered.
**A. I don't recall reading the whole thing. My habit is to have the company's attorneys read the -- sort of the fine print. But my -- I would have checked to make sure the basic financial terms were correct.**
Q. Did you check to make sure that your



attorneys had read the whole thing before presenting it to your CEO for signature?
MS. SHARMA: Objection. That --
**A. I don't recall if I did or not.**
Q. You assume they did?
MS. SHARMA: Objection.
**A. You know, I don't remember if I did. We have a process, and I'm not sure exactly if that process was followed this time. But the process does include having the attorneys review it.**
Q. If neither you nor the attorneys have reviewed the term sheet before presenting it to the CEO for signature, wouldn't you have breached your fiduciary obligations to the shareholders?
MS. SHARMA: Objection. Hypothetical.
**A. I don't think so. I mean, I think -- I don't recall exactly what went on at that time and who read it, who didn't. But there were a lot more people reading it than me. My -- my thing was really to look at the financial part of it.**
Q. You're confident somebody read it before you presented it to Mr. Wu for signature, though, right?
MS. SHARMA: Objection.



**A. Sitting here today, you know, our process is such that a lawyer does have to look at it. I'm not confident that it was done then. There was some, you know, rush to get this done, so it might have slipped, but I doubt it. I think probably someone did read it.**
Q. "Someone" being the lawyers?
MS. SHARMA: Objection.
**A. Yeah. I mean, you're asking me to guess. I -- I -- I'm guessing that they did.**
Q. You would not, as an officer of a publicly held company, provide a document for your CEO to sign without having someone have read it first?
MS. SHARMA: Objection. Asked and answered.
**A. Normally not. But in this very specific case, I can't be 100 percent sure.**
Q. You don't have any reason to -- to doubt the fact that somebody, probably your attorneys, read it before you presented it to Mr. Wu for signature?
MS. SHARMA: Objection.
Q. "It" being the term sheet on Exhibit 12.
MS. SHARMA: Objection. Again, asked and answered several times at this



point.
**A. Yeah. I mean, normally we would do that. I'm not sure in this case if it was done. I'm not 100 percent sure.**
MS. KLEIN: My -- objection. Nonresponsive. Move to strike.
Q. My question to you, sir, is: Do you have any reason to doubt that your process was followed in having an attorney review the term sheet reflected on Exhibit 12 before presenting it to Mr. Wu for signature?
MS. SHARMA: Objection. He has -- that mischaracterizes his testimony. He has told you he doesn't --
(Simultaneous speakers.)
MS. KLEIN: You may use the objection, form, Ms. Sharma. That's all.
MS. SHARMA: I will note my objection for the record.
Q. And I'm going to repeat my question because I want a clear record.
My question to you, sir, is: Do you have any reason to doubt, as you sit here today, that Bitdeer's normal process in having an attorney review the term sheet was followed before you

presented the term sheet reflected on Exhibit 12 to Mr. Wu for signature?

**A. Yes.**

Q. What is your reason for doubting that the process was followed?

**A. Because there was more rush on this term sheet than normal. So that's my reason that I think maybe it wasn't followed.**

Q. And the rush was based on your urgent need for financing, right?

MS. SHARMA: Objection.

**A. It was based on our desire to get financing quickly, yes.**

Q. So if you didn't read it, it's not that you didn't have the opportunity. It's that you wanted it to get done?

MS. SHARMA: Objection.

**A. If I didn't read it, the fine print, it was because -- I had the opportunity to read it. Sure.**

Q. Okay. In fact, Mr. Wu had the opportunity to read it before he signed it?

MS. SHARMA: Objection.

**A. Sure.**

MS. KLEIN: Tab 42, please.

Q. You assume that Mr. Wu read the term sheet



before signing it?

MS. SHARMA: Objection.

**A. You know, I don't know if he read it or not or how carefully he read it. And whether he -- you know, which parts he focused on.**

MS. KLEIN: Tab 43, also.

Q. Is Mr. Wu's normal process to read things before signing it?

MS. SHARMA: Objection.

**A. I don't know what his normal process is.**

Q. Did you ask him to read it before he signed it?

MS. SHARMA: Objection.

**A. Not explicitly, no.**

(Plaintiff's Exhibit 13, Bates BIT 3543 through 3544, was marked for identification.)

Q. I've put in front of you what's been marked as Ayrton Exhibit 13.

Is Ayrton Exhibit 13 is true and correct copy of a Slack chat conversation dated April 28th through 29th between you, Mr. LaBerge, Mr. Wu, and Mr. Kong, dated -- I'm sorry -- Bates-labeled BIT 3543 through 3544?

**A. Yes, this appears to be.**



Q. Okay. And you see on page BIT 3544, Mr. LaBerge says, "I spoke with Ayrton today, and he reminded me that Monday and Tuesday are Jewish holidays, so if we think that this is something we want to move forward with, it might be helpful to have an executed term sheet by today."

Do you see that?

**A. Yes.**

Q. And it appears Mr. Wu does an okay emoji. Is that how you read that?

**A. I can't really tell what that emoji is.**

Q. But then he does say, "okay" in the next chat, correct?

**A. Yes.**

Q. And then you said what to Mr. Wu?

**A. "Jihan, I assume you are okay with the Ayrton term sheet. If so, please sign it at your earliest convenience."**

Q. What did you mean what you said, "I assume you're okay with the Ayrton term sheet"?

**A. That he's okay with the terms of the sheet -- of the deal.**

Q. In which case he needed to read the term sheet to understand what he was signing, correct?

MS. SHARMA: Objection.



**A. He needed to understand what the terms of the deal were. Whether, you know, he read the whole term sheet or not, I don't know.**

Q. And in fact, the next thing that happened was Mr. Wu signed the term sheet, correct?

MS. SHARMA: Objection.

**A. I don't know that that was the next thing that happened, but eventually it did happen.**

Q. I've put in front of you what's been marked as Exhibit 14.

(Plaintiff's Exhibit 14, executed term sheet, was marked for identification.)

Q. Is Exhibit 14 a true and correct copy of the executed term sheet as emailed to Mr. Gross from Mr. LaBerge on April 29, 2024?

**A. Yeah. It looks like it.**

Q. And in fact, Exhibit Ayrton 14 is a fully executed term sheet, correct?

**A. Yes.**

Q. Do you agree with me that immediately following the execution of the term sheet, that Ayrton was engaged and started the process of due diligence?

**A. I agree they were engaged; I don't know when they started due diligence.**

Page 114

H. Basit

are additional people who have joined the Zoom, including Mr. Gross, and perhaps others that we can't see.
Q. Do you recall whether the Rockdale lease was about to be renewed?
**A. Yes.**
Q. And do you recall having email discussions with Mr. LaBerge after the -- May 6th about what to do with the lease and Ayrton?
**A. I recall having discussions, yes.**
Q. Okay. And do you recall asking -- well, do you recall that China Renaissance introduced Bitdeer to Morgan Stanley?
**A. Yes. I recall that they spoke to us about Morgan Stanley.**
Q. And do you recall directing China Renaissance to press forward in negotiating with Morgan Stanley, despite the exclusivity provision of the Ayrton term sheet?
MS. SHARMA: Objection.
**A. No. I recall just asking them -- I don't know -- I don't remember exactly. Wouldn't -- wouldn't have been any kind of serious negotiation. It would have been some kind of a conversation or next-step type of thing. I don't recall any**

Page 115

H. Basit

**serious negotiation with Morgan Stanley.**
Q. Is working with a finance counterparty who's developing model assumptions negotiating to you?
**A. No.**
MS. SHARMA: Objection.
**A. Analysts develop models of our company all the time.**
Q. Is it your position that conversations with other potential lenders during the exclusivity provision does not violate the term sheet?
MS. SHARMA: Objection.
**A. I mean, I'm not a legal expert. But my experience is that you can continue to have conversations with potential lenders because there's thousands of potential lenders, and they serve multiple functions, right. So --**
Q. Did you have conversations with thousands of potential lenders during the exclusivity provision about potentially providing financing to Bitdeer?
**A. About potentially -- no.**
Q. How many lenders did you have conversations with regarding potentially providing financing to Bitdeer during the exclusivity period?

Page 116

H. Basit

**A. I mean, I don't think anybody really. The "potentially providing financing," it -- you know, there's all kinds of other financing, and I don't recall having any serious negotiations with anyone. Conversations, you know, I don't know how many there were.**
Q. Morgan Stanley?
**A. Morgan Stanley, we -- we were trying to get them, I think, just sort of comfortable with modeling our company.**
Q. Did you talk to BTIG?
**A. We talk to BTIG all the time.**
Q. Including potentially providing financing during the exclusivity provision -- period, right?
MS. SHARMA: Objection.
**A. I don't recall when we were talking about them providing financing.**
Q. What about Northland? Did you talk to them about the exclusivity provision about potentially providing financing?
MS. SHARMA: Objection.
**A. We talk to Northland all the time too. I'm not sure when we talked to them about potential financing.**
Q. You talked to Tether about finan- --

Page 117

H. Basit

potential financing.
That's why we're here, right?
**A. I personally didn't.**
Q. Mr. LaBerge did?
MS. SHARMA: Objection.
**A. I'm not sure he did, either.**
Q. Mr. Wu did?
**A. Probably, yes.**
Q. Someone at Bitdeer talked to somebody named Tel (phonetic) about financing --
MS. SHARMA: Objection.
Q. -- during the exclusivity provision, right?
**A. I don't recall that.**
Q. And you continued conversations with A.G.P., right?
MS. SHARMA: Objection.
**A. I think so.**
Q. During the exclusivity provision?
**A. I don't recall exactly when, but A.G.P. we had conversations with.**
MS. KLEIN: 48.
(Plaintiff's Exhibit 17, Bates BIT 2919 through 2920, was marked for identification.)
Q. I've put in front of you what's been marked

C E R T I F I C A T E

I, TENEJA SOLTAU, hereby certify that the Examination Before Trial of HARIS BASIT was held before me on the 12th day of February, 2025; that said witness was duly sworn before the commencement of his testimony; that the testimony was taken stenographically by myself and then transcribed by myself; that the party was represented by counsel as appears herein;

That the within transcript is a true record of the Examination Before Trial of said witness;

That I am not connected by blood or marriage with any of the parties; that I am not interested directly or indirectly in the outcome of this matter; that I am not in the employ of any of the counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this 28th day of February, 2025.

Teneja Soltau
_______________________________
TENEJA SOLTAU



ERRATA SHEET

STENO AGENCY, INC.

CASE NAME: Ayrton Capital v. Bitdeer Technologies

DATE OF DEPOSITION: February 12, 2025

WITNESS'S NAME: Haris Basit

| PAGE | LINE (S) | CHANGE | REASON |
| --- | --- | --- | --- |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

__________________
HARIS BASIT

SUBSCRIBED AND SWORN TO BEFORE ME

THIS ____ DAY OF ____________, 20__.

_________________ _______________________
(NOTARY PUBLIC) MY COMMISSION EXPIRES: