# EXHIBIT 13

# UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED PROVISIONALLY UNDER SEAL

# Deposition Transcript

Case Number: 24-5160 (LJL)
Date: March 28, 2025

In the matter of:

# AYRTON CAPITAL, LLC v BITDEER TECHNOLOGIES GROUP

# JEFF LABERGE

## CONFIDENTIAL

CERTIFIED COPY

Reported by:
PATRICIA Y. SCHULER

Steno
Official Reporters

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: Firm #108F

Technologies Group.

THE VIDEOGRAPHER: Will the reporter please introduce themselves and swear in the witness.

THE REPORTER: Patricia Schuler, CSR 11949. Would you please raise your right hand.

JEFF LABERGE,

having been administered an oath, was examined and testified as follows:

EXAMINATION

BY MR. GLADSTEIN:

Q. Good morning, Mr. LaBerge. How are you?
**A. Good morning. I am doing well. How are you?**
Q. LaBerge, pronunciation okay there?
Okay. Great.
**A. Right on.**
Q. Excellent.
My name is Andy Gladstein. We meet briefly outside and had a lovely conversation.
**A. We did.**
Q. But as you know, I am the attorney for Ayrton in this matter.



**A. Yes.**
Q. So we are going to be spending some time together today.
**A. Looking forward to it.**
Q. Me too.
Have you been deposed before?
**A. Yes.**
Q. How many times?
**A. Once, maybe twice.**
Q. When was the last time you were deposed?
**A. 12 years ago, maybe.**
Q. Okay. Long time?
**A. Yeah, long time ago.**
Q. All right. I'm just going to go over some of the ground rules. And I am sure you have been prepped by your counsel, and I'm sure what I am about to tell you is not going to be a surprise, but let's just try to get on the same page to make this as an efficient of a day as possible.
**A. Sounds good.**
Q. First and foremost, I'm asking questions, you're giving answers. Those responses and answers are going to be taken down by the stenographer and recorded. If we talk over each other, not only does she have a hard time doing that, but we're



going to get yelled at, okay?
So just wait for me to finish asking a question, then respond, and I will do the same; I'll wait for you to respond before I ask another question. And if we can get into that dynamic, I think it will be a lot easier on everybody here.
**A. Let's do it.**
Q. I will try my best not to interrupt you.
Does that work?
**A. That sounds good.**
Q. Okay. Is there any reason today why you can't give truthful testimony?
**A. No.**
Q. Okay. And you understand you just took an oath, right?
**A. I do, yes.**
Q. And that oath was to tell the truth, correct?
**A. Correct, yes.**
Q. And I think you describe yourself as a --
**A. I'm sorry?**
Q. We're already violating the rule --
**A. Oh, we are?**
Q. -- that I just went over, okay.
So let's try to get in this habit of wait



for me to finish and then respond. It's weird if you don't go through this process a lot. You'd be amazed, though, how quickly, instinctively, you just kind of respond to a question where you already know what the answer is before the question is finished.
It's just going to drive her mad.
Okay. So you took an oath, correct?
**A. Correct.**
Q. And that oath was to tell the truth, right?
**A. Yes.**
Q. And you understand that that means being transparent and open and honest with your answers today; is that fair?
**A. Yes.**
Q. Okay. You describe yourself as a straight shooter on your website, right?
**A. Yes.**
MR. SISGOREO: Objection; form.
BY MR. GLADSTEIN:
Q. Okay. You're a straight shooter?
**A. I think so, yes.**
Q. Okay. You'll be a straight shooter with me today?

**sense to look at debt for that reason as well.**
Q. Right. Because those mining operations provide revenue streams, which you could then leverage to pay down the debt that you had obtained?
**A. Correct.**
Q. Okay. All right. Let's take a look at a document.
**A. Let's do it.**
Q. Let's go with the Monroe term sheet, please.
MS. MEISENHEIMER: And this was used in the previous deposition, so it's labeled Exhibit 7.
MR. GLADSTEIN: And then Eunice, while -- I got it on the record -- Maylin, while we're doing that, can you also pull Tabs 9 and 10, please.
BY MR. GLADSTEIN:
Q. I'm going to put a few documents in front of you so we can talk about things in groups. I think it will just make it a little bit faster and more efficient.
MS. MEISENHEIMER: So this one was also used in the previous deposition, Exhibit 6. And then there's a new one I will label with the new exhibit.



This is going to be a new exhibit.
MR. GLADSTEIN: Thank you, Maylin.
MS. MEISENHEIMER: You're welcome.
BY MR. GLADSTEIN:
Q. Mr. LaBerge, I am going to start with the last document --
**A. The last one. And which one is that?**
Q. -- that you were handed. It is Bates -- it ends in Bates 2780.
**A. Okay.**
Q. Do you see that?
**A. I do.**
Q. Okay. This is an email from Mr. Basit, correct? Let me scratch that.
The top email of this chain is from Mr. Basit to you. In fact -- yes, I will leave it there.
**A. Yes.**
Q. And he's responding to an email, I think it looks like, that you sent to Jihan, correct?
**A. It appears that way, yes.**
Q. All right. And so the date of this email -- your email to Jihan is April 16, 2024 at 5:21 p.m.
Do you see that?



**A. Yes.**
Q. And then Mr. Basit responds -- and this is where things in your company get a little tricky, given the timezones, but at some point thereafter, presumably not before, even though that's what the timestamp says, correct?
**A. It appears that way, yes.**
Q. All right. And best guess as to the reason for that difference is timezones?
**A. That would be my best guess, yes.**
Q. Okay. And so on this email chain -- let me focus you on the very top -- from Mr. Basit, it's sent to you, and it's copying Jihan, who we talked about as the CEO, and Mr. Kong, who is the chief business operator, correct?
MR. SISGOREO: Objection to form.
**THE WITNESS: Correct.**
BY MR. GLADSTEIN:
Q. And the subject line is "Debt Options," right?
**A. Yes.**
Q. Does that subject option reflect what we've been discussing, that the company was exploring debt opportunities or options at the time?



**A. I believe so.**
Q. Okay. Any reason not to believe that was the case?
**A. No.**
Q. All right. Let's go to your email to Jihan.
Do you see that, 5:21 p.m.?
**A. Yes.**
Q. And you write to him, "Below is updated version on the debt terms that are on the table. We are presenting the best options for, one, straight debt, debt; two, debt with warrants, and, three, convertible debt. AGP, Option 3, is also included as a reference."
Do you see that?
**A. Yes.**
Q. Okay. And what you have below is a list of three entities that I just think you named, who were entities that you were engaged in conversations with about a debt transaction, right?
**A. Yes.**
Q. And those three entities are Ayrton Capital, Monroe Capital, and CVP, correct?
**A. Correct.**
Q. And what you're doing for Jihan here is

Page 94

you're laying out the advantages and disadvantages of each of these proposals relative to each other; fair?
A. **Let me read it real quick.**
Q. Please take your time.
A. **Okay.**
Q. Okay. Ready?
A. **Ready.**
Q. Okay. So my last question was: What you are explaining to Jihan -- and I want to be respectful here. Do you call him Mr. Wu or Jihan?
A. **Jihan is fine. I call him Jihan.**
Q. So what you're telling Jihan here is, "Here's the three options. Here are some of the advantages and disadvantages of each, and here is how we are thinking about it"; fair?
A. **We were looking at -- I think the -- sort of the mandate we had was to find the best debt terms available. And there were, in this case, three different types of debts that we were considering, you know, straight debt, debt with warrants, and convertible debt, straight debt being our best -- our most attractive option.**
**So what I believe I am doing here is presenting the most interesting options within**

Page 95

**those three. And there is AGP on the backside as well.**
Q. So this is your role, right?
A. **So there's four.**
Q. The mandate is, "find the best terms we can for debt financing." And you are calling the various points of contacts that you have through investment banks or contacts -- you're getting information about what people are willing to do, and you're proposing it to your superiors, right?
A. **Correct.**
Q. And the idea here is, we're not going to talk to one person, because that would limit us to whatever they are willing to offer. I mean, this isn't rocket science. If we talk to a bunch of different bankers or financiers, we're going to find more offers, and then we're going to have an ability to pick the best one, right?
MR. SISGOREO: Objection to form.
**THE WITNESS: Correct.**
BY MR. GLADSTEIN:
Q. So here it lays out Ayrton Capital. You say, "Low interest rate and nine-month amortization holiday", which means they were willing to forego any repayment on the debt until nine months after

Page 96

the debt was executed, right?
A. **Correct.**
Q. And you said, "Reasonable warrant coverage at 20 percent."
Do you see that?
A. **Yes.**
Q. What did you understand "warrant coverage" to mean?
A. **Warrant coverage would be the amount of warrants they would receive relative to the size of the debt.**
Q. Warrants are for what?
A. **A warrant is essentially an option to purchase the company's stock at a prescribed price at a future date.**
Q. Okay. So would another way of saying that be an option to purchase equity in the company?
A. **Yes, correct.**
Q. Okay. So fair to say from this email, as of April 16th, you understood that Ayrton was at least interested. I am not saying the company would agree, but Ayrton was interested in both debt and equity options?
MR. SISGOREO: Objection to form.

Page 97

**THE WITNESS: I would disagree with that. I think they were interested in a debt -- you know, again, a high-priced debt instrument that had equity -- essentially, a risk-free equity component attached to it as -- we would call it a sweetener. So...**
BY MR. GLADSTEIN:
Q. Okay. So they wanted a debt deal with an equity component, correct?
A. **Their initial proposal to us was a debt deal with warrants attached to it.**
Q. And is warrants attached to it an equity component? I am trying to use your words here.
A. **Warrants --**
MR. SISGOREO: Objection to form.
**THE WITNESS: -- would be considered equity.**
BY MR. GLADSTEIN:
Q. So they wanted a debt deal with an equity component, correct?
A. **Correct. Initially they did.**
Q. Okay. Again, not saying that the company would agree to this. I am just trying to establish what their initial demand was. Or request, whatever you want to say.

**pleasant bunch. But...**

MR. GLADSTEIN: Yeah, we are a pleasant bunch.

**THE WITNESS: You are. This was.**

MR. GLADSTEIN: We should probably go off the record.

MR. SISGOREO: So I'll just designate the transcript "Confidential" in accordance with the protective order, whatever that may be. And the witness is going to read and sign.

THE VIDEOGRAPHER: The time is 4:33 p.m. This concludes today's deposition of Jeff LaBerge. We're going off the record.

(The videotaped deposition of JEFF LABERGE concluded at 4:33 p.m.)



I, JEFF LABERGE, do hereby declare under the penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear noted, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

EXECUTED this _____ day of _________________, 20____, at ____________________, ________________.
(City) (State)

___________________________
JEFF LABERGE



I, Patricia Y. Schuler, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [X] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: April 4, 2025

Patricia Y. Schuler
PATRICIA Y. SCHULER
CSR NO. 11949



DEPOSITION ERRATA SHEET

CASE NAME: AYRTON CAPITAL, LLC V. BITDEER TECHNOLOGIES
DEPOSITION DATE: MARCH 28, 2025
WITNESS NAME: JEFF LABERGE
Reason Codes: 1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.
Page _____ Line ______ Reason Code ______
From ________________________ to ____________________
Page _____ Line ______ Reason Code ______
From ________________________ to ____________________
Page _____ Line ______ Reason Code ______
From ________________________ to ____________________
Page _____ Line ______ Reason Code ______
From ________________________ to ____________________
Page _____ Line ______ Reason Code ______
From ________________________ to ____________________
Page _____ Line ______ Reason Code ______
From ________________________ to ____________________
Page _____ Line ______ Reason Code ______
From ________________________ to ____________________
Page _____ Line ______ Reason Code ______
From ________________________ to ____________________
Page _____ Line ______ Reason Code ______
From ________________________ to ____________________
Page _____ Line ______ Reason Code ______