UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GMO GAMECENTER USA, INC. and GMO INTERNET GROUP, INC.

*Plaintiffs/Counterclaim Defendants,*

vs.

WHINSTONE US, INC.

*Defendants/Counterclaim Plaintiffs.*

No. 22-cv-5974-JPC-KHP

**MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR PROTECTIVE ORDER TO PREVENT THE DEPOSITION OF MASATOSHI KUMAGAI**

Michael B. Carlinsky
Meredith M. Shaw
Wing F. (Alex) Ng
Daniel M. Kelly
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
295 Fifth Avenue
New York, NY 10016

*Counsel for Whinstone US, Inc.*

# TABLE OF CONTENTS

**Page**


PRELIMINARY STATEMENT ....................................................................................1

BACKGROUND ....................................................................................................4

A. GMO's Allegations ....................................................................................4

B. Mr. Kumagai Drove and Signed Each of the Relevant Agreements for GMO ....................................................................................................4

C. Mr. Kumagai Was the Architect Behind GMO's "Low Risk, Low Return" Bitcoin Mining Strategy in Texas ..........................................................7

D. Mr. Kumagai Made Numerous Admissions Impacting Key Disputed Issues .......................................................................................................8

E. GMO Refuses to Answer RFAs Concerning Mr. Kumagai ........................10

ARGUMENT .....................................................................................................11

I. GMO HAS NOT MET AND CANNOT MEET ITS BURDEN TO OBTAIN THE "EXTRAORDINARY RELIEF" OF BARRING MR. KUMAGAI'S DEPOSITION ..........................................................................................11

A. Mr. Kumagai Has Extensive Personal Knowledge of Relevant Facts ..................13

B. Mr. Kumagai Has Extensive Unique Knowledge of Relevant Facts .....................18

C. The (Reasonable) Burden of a Deposition of Mr. Kumagai Does Not Provide a Basis to Deny Whinstone's Right to Depose Him ................................20

D. There Was No Agreement Not to Depose Mr. Kumagai ......................................22

II. WHINSTONE SHOULD BE AWARDED ITS COSTS AND FEES INCURRED IN OPPOSING GMO'S MERITLESS MOTION ............................................22

CONCLUSION ...................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*3M Co. v. ACS Indus.*,
2016 WL 9308317 (D. Minn. Mar. 10, 2016) ....................20

*Anthropologie, Inc. v. Forever 21, Inc.*,
2009 WL 690126 (S.D.N.Y. Mar. 13, 2009) ....................23

*Anthropologie, Inc. v. Forever 21, Inc.*,
2009 WL 723158 (S.D.N.Y. Mar. 11, 2009) ....................13

*Bernstein v. Bernstein*,
1993 WL 466402 (E.D.N.Y. Aug. 13, 1993)....................18

*Brennan v. Mylan Inc.*,
2023 WL 2445344 (W.D.N.Y. Mar. 10, 2023)....................16

*Bromfield v. Bronx Lebanon Special Care Ctr., Inc.*,
2021 WL 5847404 (S.D.N.Y. Dec. 9, 2021) ....................19

*CBS, Inc. v. Ahern*,
102 F.R.D. 820 (S.D.N.Y. 1984) ....................21

*Chevron Corp. v. Donziger*,
2013 WL 1896932 ....................12

*Clinton v. Jones*,
520 U.S. 681 (1997)....................21

*Digital Equipment Corp. v. System Industries, Inc.*,
108 F.R.D. 742 (D. Mass. 1986)....................13

*Fermin v. Rite Aid of New York*,
2012 WL 364035 (S.D.N.Y. Feb. 3, 2012)....................11

*In re Garlock*,
463 F. Supp. 2d 478 (S.D.N.Y. 2006)....................12

*GMO Gamecenter USA v. Whinstone US*,
2024 WL 3833882 (S.D.N.Y. Aug 14, 2024)....................11, 13, 19

*Guzman v. Newscorp*,
2012 WL 2511436 (S.D.N.Y. June 29, 2012) ....................17

*loanDepot.com, LLC v. CrossCountry Mortg., LLC*,
2024 WL 2154189 (S.D.N.Y. April 9, 2024) ........................................................12

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
2006 WL 3476735 (S.D.N.Y. Nov. 30, 2006) ........................................12, 13, 17

*Mendillo v. Prudential Ins. Co. of America*,
2013 WL 6511944 (D. Conn. Dec. 12, 2013) ........................................................19

*Naftchi v. New York Univ. Med. Center*,
172 F.R.D. 130 (S.D.N.Y. 1997) ........................................................12, 13, 21

*Oakley v. MSG Networks, Inc.*,
2024 WL 4134903 (S.D.N.Y. Sept. 10, 2024) (Sullivan, Circuit J.) ........................12

*Oakley v. MSG Networks, Inc.*,
2024 WL 4859024 (S.D.N.Y. Nov. 21, 2024) ........................................................17

*In re Parmalat Securities Litig.*,
258 F.R.D. 236 (S.D.N.Y. June 1, 2009) ........................................................11

*Pierce v. Underwood*,
487 U.S. 552 (1998) ........................................................22

*Scantibodies Lab'y, Inc. v. Church & Dwight, Co.*,
2016 WL 11271874 (S.D.N.Y. Nov. 4, 2016) ........................................................18

*Scott v. Chipotle Mexican Grill, Inc.*,
306 F.R.D. 120 (S.D.N.Y. 2015) ........................................................17

*Speadmark, Inc. v. Federated Dep't Stores*,
176 F.R.D. 116 (S.D.N.Y. 1997) ........................................................12

*Tiger Capital v. PHL Variable Life Ins. Co.*,
2013 WL 4517267 (S.D.N.Y. Aug. 26, 2013) ........................................................17

*Travel Cen. of Fairfield Cty., Inc. v. Royal Cruise Line Ltd.*,
2000 WL 306934 (D. Conn. Jan. 24, 2000) ........................................................13

**Rules**

Fed. R. Civ. P. 37(a)(5)(B) ........................................................22

**PRELIMINARY STATEMENT**

There is a reason that the apex doctrine does not automatically apply to each and every CEO, and that is because while some CEOs run their companies from a position far removed from the operations on the ground, others take a much more hands-on approach. Masatoshi Kumagai is a perfect example of the latter—a CEO who took a deep interest in the subject matter of this lawsuit; molding, directing, and influencing the very facts at its core. Application of the apex doctrine in these circumstances is not warranted and would in fact inhibit the ability of the Court to understand many of the key facts at issue in this case.

Mr. Kumagai may have been the "CEO of a giant conglomerate" (Mot. at 1), but he was down in the weeds directing the strategy and execution of GMO's Bitcoin mining operations in the United States. Mr. Kumagai authored over one hundred emails directing how GMO's Bitcoin mining business in Texas (and elsewhere) should be run; he chaired numerous Board and management meetings where critical decisions about GMO's Texas mining operations—and the very contract at issue in this case—were debated and decided; he curated what was *and was not* [redacted]; and he required his personal approval before subordinates could take any action of consequence at GMO's Texas mining operations—down to what miners could be purchased and when they could be powered down.

Perhaps because GMO's forays into Bitcoin mining were Mr. Kumagai's pet project; or because Mr. Kumagai was embarrassed by the "extraordinary losses"[1] GMO incurred mining in

---

[1] Ex. 1 at 1 ("GMO Internet, Inc. resolved at the meeting of the Board of Directors held today to post an extraordinary loss in the cryptocurrency mining business for the fourth quarter (October 1, 2018, to December 31, 2018) . . . . In-house mining . . . Approximately JPY 11.5 billion . . . Development, manufacture, and sales of mining machines . . . . Approximately JPY 24.0 billion)"; *see also* Ex. 2 (Yamashita Dep.) at 50:20-51:21, 56:16-57:15, 78:9-19.

Europe and thought he alone could drive better results in the U.S.[2]; or simply because reports that "Kumagai exercises too much control"[3] are true, Mr. Kumagai was personally, deeply and consistently involved in GMO's Bitcoin mining business in Texas. Mr. Kumagai did not simply execute the contract at issue—he pushed GMO to pursue mining in Texas urgently while simultaneously directing and implementing GMO's fatally flawed strategy to underinvest in those operations. And, contrary to his sworn declaration, Mr. Kumagai was so deep into the details of GMO's Texas mining operations that he even took to making (nonsensical) suggestions for cobbling together used machine parts to try to mine on the cheap in Texas. This is not a CEO who delegated and ruled from afar; this is a CEO who personally influenced key decisions on the ground.

Along the way, Mr. Kumagai made numerous admissions bearing on hotly contested issues in this case—including GMO's claims that it was Whinstone's conduct, not GMO's own bad strategy and execution, that resulted in GMO's lack of profitability. For example:

- As Mr. Kumagai and others at GMO considered whether to pursue mining in Texas, Mr. Kumagai wrote to GMO executive Masafumi Okumura: [redacted] Ex. 4 at GMO00573951 (emphasis added).
- During this same timeframe, Mr. Kumagai acknowledged [redacted] Ex. 5 at GMO00434989 (emphasis added).
- After entering into the Texas Agreement, Mr. Kumagai exhibited his belief that GMO could only achieve "revenue recovery" by running cheap, outdated miners

---

[2] Mr. Kumagai is quoted as stating: "The heads of each GMO business are the priests. And in that example, I guess I'm Jesus Christ." Ex. 3 at 2.

[3] *Id.* at 3.

[4] *See* note 1, *supra*.

into the ground (that had no hope of making money for GMO in the long run). Mr. Kumagai emphasized: "***The strategy of acquiring S9 or similar mining machines at minimal cost*** after the halving period ***is the key point for revenue recovery***." Ex. 6 at GMO00085060 (emphasis added).

- A year into GMO's operations in Texas, Mr. Kumagai acknowledged that GMO's lack of diligence in its Texas mining operations was not a winning business proposition: "Mr. Okumura mentioned that he is 'testing,' but the mindset mentioned by the Genesis Mining president, that 'when the machines arrive, we start installing and operating like the Olympics,' is completely opposite. ***We cannot win in business this way.*** Please reflect on this as well." Ex. 7 at GMO00078607 (emphasis added).

There is no immunity for being deposed on one's emails on disputed issues just because one holds the title of CEO. The apex doctrine is designed to protect the CEO up in the rafters who is not involved in the underlying issues, and is thus not subject to any proper inquiry. The documents make plain that is *not* Mr. Kumagai. There is simply no way GMO can meet its burden to obtain a protective order granting the extraordinary remedy of barring discovery from a key witness of the plaintiff who chose to sue in this Court and thus submit to its discovery rules.

In the face of copious evidence rendering it impossible for GMO to meet its burden, GMO forged ahead with its meritless if not frivolous motion—not only delaying Mr. Kumagai's deposition but forcing Whinstone to incur substantial costs opposing the motion. And to make matters worse, GMO filed in support of its motion yet another disingenuous affidavit from one of its high-ranking executives.[5] GMO's motion for a protective order should be denied, and the costs and fees incurred in opposing the motion should be awarded to Whinstone.

---

[5] *See* ECF 348-1 (Kumagai Declaration suggesting lack of involvement in GMO's Texas Bitcoin mining operations); ECF 319 at 4-6; ECF 308 (Kawasaki Declaration).

## BACKGROUND

### A. GMO's Allegations

GMO claims that Whinstone breached a colocation services agreement for Bitcoin mining in Texas (the "Texas Agreement"), and is seeking hundreds of millions of dollars in alleged lost profits associated with its mining operations in Texas and at a Whinstone mining facility in Louisiana. Among other things, GMO alleges that conditions at the Texas facility—due to its location, design and construction—caused GMO miners to encounter difficulties. Those allegations are made in spite of the fact that GMO (and Mr. Kumagai personally) was highly involved in the choice of location, design and construction of the Texas facility, and also that GMO refused to invest in what it knew was necessary maintenance for its miners in Texas. GMO further contends that if Whinstone had not terminated the Texas Agreement, GMO would have made hundreds of millions of dollars—despite GMO's abysmal track record every time it touches anything related to cryptocurrency, and despite GMO's strategy—chosen and driven by Mr. Kumagai himself—to limit its risk by investing meagerly in its Texas Bitcoin mining operations in exchange for meager potential profits. Put simply, GMO alleges that Whinstone is the sole reason for its failures in Texas, and that but for Whinstone this would have been a thriving investment (prior and existing failed forays into cryptocurrency notwithstanding).

### B. Mr. Kumagai Drove and Signed Each of the Relevant Agreements for GMO

Mr. Kumagai was involved in GMO's U.S. Bitcoin mining operations from the beginning, travelling to the U.S. to meet with Whinstone personnel about building a mining facility in Louisiana, and even choosing the site for the Louisiana facility itself. Ex. 8 (C. Harris Dep.) at 40:21-42:1, 71:16-72:1. When GMO and Whinstone decided to enter into a colocation agreement for Bitcoin mining in Louisiana (the "Louisiana Agreement"), Mr. Kumagai was the sole signatory for GMO. Ex. 9 at GMO-000040. Mr. Kumagai then carefully monitored the status of GMO's

mining operations in Louisiana, including assessing the number of miners GMO shipped to Louisiana and whether or not they were working. Ex. 10 at GMO00438999-9002[6]; Ex. 11.

When GMO then evaluated whether to pursue bitcoin mining with Whinstone in Texas, Mr. Kumagai was intimately involved in the decision. Mr. Kumagai assessed site options for the Texas facility and regularly requested and approved details of the planned operations on every topic from electricity to the facility's construction, design, and schedule. *See, e.g.*, Ex. 12 at GMO00087999[7]; Ex. 13; Ex. 14; Ex. 15 at GMO00434931[8]; Ex. 16. Mr. Kumagai [redacted] *See, e.g.*, Ex. 17 at GMO00601077[9]; Ex. 5 at GMO00434990.[10] Mr. Kumagai chaired key Board and other management meetings where the Texas Agreement and

---

[6] 6/20-26/19 Email Chain—Kumagai: "Please report on the status of the purchase of machines (replacements for the ones sold)"; "So, is it correct to understand that the purchased items are not working due to the other party's breach of contract?"; "A meeting will be held on this matter. TO: Secretary Please arrange today."

[7] 4/20-22/19 Email Chain "Regarding the Texas Candidate Site"—Yamashita: "Hi Representative Kumagai, . . . Thank you for your call earlier. I am sending the Google Map pin for the candidate site you requested. . . . I will also send photos of the candidate site as an attachment."

[8] 8/8/19 Email Exchange—Kumagai: "This is OK. It is difficult to have a meeting today, but I understood everything. Please move forward according to these minutes."

[9] 9/6/19 Email Chain—Kumagai: [redacted] (emphasis added).

[10] 8/25/19 Email Chain—Okumura reports on [redacted] (emphasis added).

operations were debated and decided upon. *See, e.g.*, Ex. 2 (Yamashita Dep.) at 287:24-288:16, 289:6-9, 344:14-345:5; Mot. at 1 (Kumagai as Chairman). Mr. Kumagai approved advancing a portion of the deposit GMO was to pay under the Texas Agreement months before that agreement was finalized, much less approved by the GMO Board and signed. Ex. 14 at GMO00438956.[11] Mr. Kumagai similarly approved the purchase of transformers for the Texas facility months before GMO (through Mr. Kumagai) even entered into the Texas Agreement. Ex. 18 at GMO00076241.[12]

In response to an email in which GMO executive Hirofumi Yamashita reported on, among other things, "Agreement Conditions for Texas (Rockdale)," and proposed (a) to "[s]top operations of approximately 3,500 units at the Louisiana Airline and relocate them to Texas (Rockdale)" and (b) to have Whinstone "compensate for the opportunity loss due to the non-operation in Louisiana," Mr. Kumagai directed Mr. Yamashita—the GMO Gamecenter, Inc. signatory to the Texas Agreement—to "do your utmost to coordinate the recovery of damages." Ex. 14 at GMO00438958-60. As the Court is aware, provisions in the Texas Agreement concerning "loss of profit" at the Louisiana facility lie at the heart of the parties' dispute.

Mr. Kumagai then executed the Texas Agreement and attendant Pledge and Security Agreement for Plaintiff GMO Internet, Inc. Ex. 19 at GMO-000108; Ex. 20 at GMO00323485. Mr. Kumagai's and others' signatures on these agreements are dated October 2019, but the parties continued to revise the agreements well into December 2019. *See, e.g.*, Ex. 21 at GMO00010085-

---

[11] 8/1/19 Email Chain—Matsui: "Dear Representative Kumagai, . . . I sincerely apologize for reaching out at this late hour. I would like to seek your approval for the following [JPY 9.9 million] loan."; Kumagai: "If there is stock collateral, that will be acceptable."

[12] 9/19/19 Email Chain—Yamashita: "Would it be possible to place an order for the transformers (25 units, totaling 62.5MW, with a total cost of approximately 98 million and a deposit of around 49 million) before the conclusion of the agreement mentioned in (1) below?"; Kumagai: "The order placed below is approved."

86.[13] On December 24, 2019, Hiro Tsukahara of GMO sent a new draft of the agreements to Whinstone, stating: "Have a look at the attached files . . . . These are pretty much the best we can do ***without additional board approval***." Ex. 22 at GMO00011900 (emphasis added). On December 26, 2019, Mr. Tsukahara wrote to Whinstone: "Please find attached the final version of the two agreements. Your requests have all been reflected and now it's time to get this over with. . . . Once you do and accept the changes in the word file . . . . We'll then pass it around the relevant departments within GMO to ***get Mark's[14] signature in early January***." Ex. 24 at GMO00010320 (emphasis added).

### C. Mr. Kumagai Was the Architect Behind GMO's "Low Risk, Low Return" Bitcoin Mining Strategy in Texas

GMO's fatally flawed strategy for Bitcoin mining in Texas was, in the words of a GMO executive, "Low Risk, Low Return." Ex. 25 at GMO00074705. Because it was "difficult to predict [the] cryptocurrency market," GMO "tend[ed] to choose low risk" in the form of using "OLD machine[s]" with a "shorter investment recovery but low profit after recovery." *Id.* As illustrated below, Mr. Kumagai was the architect of that strategy, which led to the unprofitable Bitcoin operations that GMO now tries to blame on Whinstone.

- In January 2020, Mr. Kumagai pressed Mr. Okumura to purchase cheap, used, outdated (S9) miners for use in Texas as he believed that was the way for GMO to achieve "revenue recovery" from Bitcoin mining in Texas. On January 24, 2020, Mr. Kumagai wrote to Mr. Okumura: "What is the available power capacity after the halving period? (***Strategy of purchasing a large number of S9 or similar mining machines at minimal cost to secure hash rate***)". Mr. Okumura responded that "[i]t will be about 20 MW." Mr. Kumagai pushed for more information and then reiterated the (lack of) investment strategy he wanted Mr. Okumura to execute upon: "Please provide a comprehensive description so that the overall context can be understood. ***The strategy of acquiring S9***

---

13 On December 20, 2019 GMO summarized new terms the parties had recently agreed to, including to "[a]dd another line that says along the lines of > After WH pays back all outstanding debts, GMO agrees to enter into discussion in good faith to renegotiate the agreement based on the general hosting agreement" and to "[t]ake out '2.85 no matter what'[.]"

14 Mr. Kumagai is often referred to as "Mark." *See, e.g.*, Ex. 23 (Makita Dep.) at 322:5-10.

***or similar mining machines at minimal cost after the halving period is the key point for revenue recovery***." Ex. 6 at GMO00085060 (emphasis added).

- On February 2, 2020, Mr. Kumagai reiterated the same direction to pursue the losing strategy of relying on used, as opposed to new, miners in Texas: "***Monitoring the used market is extremely important***." Ex. 26 at GMO00085063 (emphasis added).

- In June of 2020, Mr. Okumura sought Mr. Kumagai's review and approval of "the proposal document for the Management Meeting" regarding "the relocation of machines in Iceland" to Texas—in other words, shipping old, used, rusty miners from GMO's failed Iceland facility to the Texas facility. Ex. 27 at GMO00075498.

- In April 2021, Mr. Kumagai [redacted] Ex. 28 at GMO00071645 (emphasis added).

- In March of 2021, Mr. Kumagai was even making (wholly unworkable) suggestions about how to cobble together miner parts for use at the Texas facility. On March 1, 2021, Masaya Yanagi of GMO wrote to Whinstone's Chad Harris: "***Is that possible to gather two C13 outlet of current PDU and make one outlet to increase Ampere capacity? CEO Mark is thinking that way to use newest mining machine with current electricity Panel, wire and PDU***. It seems logically possible but seems more expensive than replace current PDU. Mark [Kumagai] care about lead time of these electricity parts. Which is longer lead time to prepare. I think Mark's idea is more expensive and longer lead time because it's totally customized parts." Mr. Harris responded: "I understand what Mark is trying to accomplish but that will not work. There are other factors that need consideration at the panel board and the internal wiring of the PDU. It will be cheaper and faster to order new PDU's." Mr. Yanagi responded: "***I think best way to explain it to Mark is due to follow safety guidelines. How dangerous if we proceed Mark's idea? He has knowledge about electricity so I need a concrete reason to decline his idea.***" Ex. 29 at WUS0010446-48 (emphasis added).

Notably, Mr. Kumagai's approval was required for any GMO expenditure for the Texas facility that was below 30 or 50 million dollars. Ex. 2 (Yamashita Dep.) at 318:18-319:3.

### D. Mr. Kumagai Made Numerous Admissions Impacting Key Disputed Issues

Not only was Mr. Kumagai personally involved in driving the strategy and execution of GMO's Bitcoin mining operations in Texas, he made numerous admissions and other statements

bearing on key disputed issues in this case—including GMO's claims that it lost profits due to Whinstone's actions, as opposed to GMO's own decisions (amid market conditions). For example:

- As GMO was considering whether to enter into the Texas Agreement in August 2019, Mr. Kumagai directed Mr. Okumura [redacted] Ex. 4 at GMO00573950-51 (emphasis added).

- Despite these financial projections, Mr. Kumagai drove the GMO team to move forward urgently with the Texas Agreement—despite acknowledging that [redacted] Ex. 5 at GMO00434989 (emphasis added).

- In November and December 2019, Mr. Kumagai [redacted]

[15] *See* note 1, *supra*.

[redacted] Ex. 30 at GMO00434925-27 (emphasis added).

- In May of 2020, Mr. Kumagai chastised his GMO reports for GMO—not Whinstone—causing delay regarding completion of the Texas facility. On May 16, 2020, Mr. Okumura reported that they had "encountered a delay while working towards the operation scheduled for May 16 on-site" due to funds "for the electricity fee" not being delivered. Mr. Kumagai responded: "***I believe that the issue is not with the bank's procedures, but rather that the transfer was made late. There seems to be a lack of awareness regarding the daily delay costs that are accruing. Those involved in the transfer need to reflect deeply on this matter***. (Initially, I was considering asking for a chronological report of everyone involved in the transfer, but I will refrain from doing so to avoid adding more stress.)" Ex. 31 at GMO00075530 (emphasis added).

- In May of 2021, Mr. Kumagai again chastised his GMO reports for not proceeding diligently—testing miners instead of putting them to work as soon as they arrive: "***Mr. Okumura mentioned that he is 'testing,'*** but the mindset mentioned by the Genesis Mining president, that 'when the machines arrive, we start installing and operating like the Olympics,' is completely opposite. ***We cannot win in business this way.*** Please reflect on this as well." Ex. 7 at GMO00078607 (emphasis added).

- In August of 2019, Mr. Kumagai [redacted] Ex. 32 at GMO00434957-58 (emphasis added).

Notably, numerous of these email exchanges were between Mr. Kumagai and Mr. Okumura, who, as the Court is aware, is not available to sit for an oral deposition due to his health. *See, e.g.*, ECF 257.

**E. GMO Refuses to Answer RFAs Concerning Mr. Kumagai**

On April 28, 2025, GMO served its objections and responses to Whinstone's Requests for Admissions ("RFAs"). GMO refused to answer a number of RFAs pertaining to Mr. Kumagai on the ground that the requests were "being used as a discovery device to obtain new information"—

*i.e.*, that Whinstone should not use RFAs, but rather another discovery device, like depositions, to obtain the requested admissions. Specifically, GMO refused to answer RFAs that asked GMO to:

- "Admit that Masatoshi Kumagai was in favor of GMO's Board approving the proposal for GMO to relocate its Bitcoin mining operations to the Texas Facility." Ex. 33 at 19-20 (RFA 26).
- "Admit that in April 2021, Masatoshi Kumagai was involved in GMO's decision to replace GMO's broken and/or failing miners at the Texas Facility with used machines instead of new machines." *Id*. at 68 (RFA 116).
- "Admit that Masatoshi Kumagai did not review a Japanese translation of the entire Texas Agreement before he signed it." *Id*. at 92 (RFA 150).
- "Admit that Masatoshi Kumagai supported the decision to commence this Action against Whinstone." *Id*. at 130-31 (RFA 215).

## <u>ARGUMENT</u>

### I. GMO HAS NOT MET AND CANNOT MEET ITS BURDEN TO OBTAIN THE "EXTRAORDINARY RELIEF" OF BARRING MR. KUMAGAI'S DEPOSITION

GMO misstates the burdens applicable to its motion, arguing that Whinstone is required to prove that a deposition of Mr. Kumagai is appropriate. While GMO is correct that courts have, in some instances, employed that framework, the federal rules are clear that "[t]he party opposing disclosure must make a particular and specific demonstration of fact showing that disclosure would result in an injury sufficiently serious to warrant protection." *In re Parmalat Securities Litig.*, 258 F.R.D. 236, 244 (S.D.N.Y. June 1, 2009); *see also, e.g.*, *Fermin v. Rite Aid of New York*, 2012 WL 364035, at *1 (S.D.N.Y. Feb. 3, 2012) (similar). Accordingly, this Court properly held earlier in this case that "where a party seeks to avoid an apex deposition, it bears the burden of showing good cause for why the deposition should not be allowed." *GMO Gamecenter USA v. Whinstone US*, 2024 WL 3833882, at *4 (S.D.N.Y. Aug 14, 2024).

Because "principles relating to apex witnesses are in tension with the broad availability of discovery, it is important to excuse a witness from giving testimony in only compelling

Case 1:24-cv-05971-JPO-KHP Document 63 Filed 05/22/25 Page 16 of 28

circumstances." *Oakley v. MSG Networks, Inc.*, 2024 WL 4134903, at *2 (S.D.N.Y. Sept. 10, 2024) (Sullivan, Circuit J.) (quoting *Chevron Corp. v. Donziger,* 2013 WL 1896932, at *1) ("*Oakley I"*). Indeed, ***"[b]arring a party from taking a deposition is an extraordinary form of relief***. The party seeking this relief 'bears the ***burden of proving that the proposed deponent has nothing to contribute***.'" *loanDepot.com, LLC v. CrossCountry Mortg., LLC*, 2024 WL 2154189, at *1 (S.D.N.Y. April 9, 2024) (quoting *Speadmark, Inc. v. Federated Dep't Stores*, 176 F.R.D. 116, 118 (S.D.N.Y. 1997)) (emphasis added); *see also Oakley I*, 2024 WL 4134903, at *2 ("[T]he opposing party 'bears the burden of proving that the proposed deponent has nothing to contribute'") (quoting *Speadmark*); *In re Garlock*, 463 F. Supp. 2d 478, 481 (S.D.N.Y. 2006) (denying motion to quash a subpoena where proponents "never actually say that the deponents know nothing relevant to the pending action"). "[I]t is exceedingly difficult to demonstrate an appropriate basis for an order barring the taking of a deposition." *Naftchi v. New York Univ. Med. Center*, 172 F.R.D. 130, 132 (S.D.N.Y. 1997); *see also Oakley I*, 2024 WL 4134903, at *2 (same).

GMO also misstates the scope of its burden: Because it bears the burden of showing that Mr. Kumagai has "nothing to contribute," *Oakley I*, 2024 WL 4134903, at *2; *loanDepot.com*, 2024 WL 2154189, at *1; *Speadmark*, 176 F.R.D. at 118, in order to prevail on its motion for a protective order, GMO must show that Mr. Kumagai has "no personal knowledge of the relevant facts ***and*** no unique knowledge of those facts." *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 2006 WL 3476735, at *12 (S.D.N.Y. Nov. 30, 2006) (emphasis added) (collecting cases); *see also, e.g.*, *Chevron Corp. v. Donziger*, 2013 WL 1896932, at *1 (S.D.N.Y. May 7, 2013) (ordering deposition of Chevron CEO where "there is little doubt that [CEO] has relevant knowledge" notwithstanding the fact that "[t]he extent to which [CEO's] knowledge of relevant matters is unique is not clear"). Indeed, "[w]hen a witness has personal knowledge of facts relevant to the

lawsuit, even a corporate president is subject to deposition." *Travel Cen. of Fairfield Cty., Inc. v. Royal Cruise Line Ltd.*, 2000 WL 306934, at *3 (D. Conn. Jan. 24, 2000) (quoting *Digital Equipment Corp. v. System Industries, Inc.,* 108 F.R.D. 742, 744 (D. Mass. 1986)). As this Court put it when denying a motion for a protective order preventing the deposition of non-party Northern Data's CEO—who was Whinstone's signatory to the Texas Agreement—"[c]ourts will grant apex depositions when the executive has first-hand knowledge of important facts." *GMO*, 2024 WL 3833882, at *4.

Because Mr. Kumagai's personal "knowledge of important facts" is both extensive and unique, GMO cannot discharge its burden and obtain the extraordinary relief of barring Whinstone from taking Mr. Kumagai's deposition.

**A. Mr. Kumagai Has Extensive Personal Knowledge of Relevant Facts**

GMO's contention that it has satisfied its burden because Mr. Kumagai "submitted a sworn declaration demonstrating that he does not have unique personal knowledge of important facts in this case," Mot. at 10, can be dismissed out of hand. "[T]he party seeking the discovery is entitled to test the asserted lack of knowledge." *Naftchi*, 172 F.R.D. at 132; *see also Louis Vuitton*, 2006 WL 3476735, at *13 ("There is simply no basis for compelling [defendant] to take at face value an assertion of lack of memory made in an affidavit by a witness.").

Moreover, the documentary record (*see* Background §§ B-D, *supra*), belies GMO's and Mr. Kumagai's protestations that he was at best peripherally involved in GMO's bitcoin mining operations. *See Anthropologie, Inc. v. Forever 21, Inc.*, 2009 WL 723158, at *1 (S.D.N.Y. Mar. 11, 2009) (denying motion for protective order where "contrary to the representations in the declaration of [witness] . . . documents . . . indicate that she was directly involved in" relevant events). Mr. Kumagai's own emails (*see* Background §§ B-D, *supra*) show over and over again that he has extensive personal knowledge about relevant events and other facts ranging from

formation of the Texas Agreement, to GMO's investment strategy for its Texas Bitcoin mining operations, to GMO's projected profits (or lack thereof) for its Texas Bitcoin mining operations, to the design of the Texas facility GMO now claims is faulty. Indeed, Mr. Kumagai's role as the architect and driver of GMO's "low risk, low return" mining strategy in Texas (*id.* § C) is reason enough to deny GMO's motion. That fatally flawed approach to Bitcoin mining is central to a hotly disputed issue in this case: GMO's claimed damages.[16] While GMO's decision to purchase outdated, end-of-life machines, was a major factor in the failure of its Bitcoin mining operations, GMO claims astronomical damages that bear no relationship whatsoever to actual realizable revenue with the machines that Mr. Kumagai directed GMO to use—and depend on allegations of power shortages when the miners GMO deployed could not even use the power undisputedly supplied. Whinstone is entitled to probe Mr. Kumagai's understanding of the risks, rewards, and consequences of that investment strategy as he directed it to be implemented. In fact, it was Mr. Kumagai's own actions that set these very events in motion—the motivations and rationale for doing so are inquiries that only Mr. Kumagai can answer.

Mr. Kumagai's role as the signatory of the Texas Agreement for GMO Internet, Inc. is also reason enough to deny GMO's motion. Mr. Kumagai is undisputedly not a fluent English speaker;[17] indeed, Mr. Yamashita, the signatory of the Texas Agreement for GMO Gamecenter, Inc., who required an interpreter for his deposition, confirmed that he (Mr. Yamashita) does not speak English and testified that Mr. Kumagai only speaks "[a] little more" English than he does. Ex. 2 (Yamashita Dep.) at 14:6-8, 342:13-14. Whinstone is entitled to inquire what, if any,

---

[16] Moreover, GMO's damages rest, in part, on claimed delays in opening the Texas facility, for which GMO blames Whinstone. However, Mr. Kumagai [redacted] *See, e.g.,* Ex. 31; Ex. 32. Whinstone is entitled to depose him on those key admissions alone.

[17] *See* GMO's Responses and Objections to Whinstone's RFA No. 152.

Japanese-language documents Mr. Kumagai reviewed that translated or summarized the Texas Agreement (which is in English) in advance of binding GMO Internet, Inc. to it. Whinstone must also be able to question Mr. Kumagai about *when* he signed the Texas Agreement, his understanding of *what* he signed, and his authority to enter into the Texas Agreement, given that (i) the Texas Agreement is dated as signed in October 2019 but does not appear actually to have been signed by Mr. Kumagai until January 2020 (ii) significant changes were made to the draft Texas Agreement between October 2019 and January 2020; and (iii) documents suggest that the GMO Board (of which Mr. Kumagai was a member) was not asked to approve those post-October 2019 revisions.[18] Whinstone is further entitled to inquire into what Mr. Kumagai believed the "damages" stemming from Louisiana operations to be when he directed Mr. Yamashita to "do [his] utmost to coordinate the recovery of damages" in connection with the "Agreement Conditions for Texas (Rockdale)." Ex. 14 at GMO00438958-59.

Mr. Kumagai's assertion that he did not have "responsibility for the day-to-day decision-making" with respect to GMO's Bitcoin operations is a red herring; Whinstone has not suggested that Mr. Kumagai was involved in micromanaging every detail of GMO's day-to-day Bitcoin operations and does not seek to depose him on such minutiae.[19] Rather, Whinstone seeks to depose Mr. Kumagai concerning the issues as to which even he has obliquely admitted knowledge—and regarding which the documents reveal he has considerably more detailed knowledge than he

[18] *See, e.g.*, Ex. 24; Ex. 22; Ex. 34.

[19] In any case, the record shows that Mr. Kumagai did engage in strict oversight of the day-to-day operations of GMO's Bitcoin mining. For example, on November 7, 2020, Mr. Kumagai directed Mr. Okumura to obtain his permission before shutting down machines in the future. Ex. 35 at GMO00075494. And on May 9, 2021, Mr. Kumagai chastised his subordinates for not updating him appropriately on ongoing issues with GMO's mining operations, reminding them that "reporting is the 'blood of the organization'" and directing them to provide thorough reports in the future. Ex. 7 at GMO00078607. Mr. Kumagai also offered suggestions as to how to cobble together parts to create makeshift miners for the Texas facility. *See* Ex. 29 at WUS0010447-48.

admits—including the *decisions* he made and the strategy he directed based on "receipt of reports from and discussions with those directly involved" on the ground. Dkt. 348-1 ¶ 15. In GMO's opposition to the motion for a protective order to bar the deposition of Northern Data's CEO, GMO cited *Brennan v. Mylan Inc.*, 2023 WL 2445344, at *3 (W.D.N.Y. Mar. 10, 2023) for the proposition that a CEO "'directly involved [in] decision-making and contracting with respect to EpiPen purchases,' which conduct was at the center of the litigation," should be deposed. ECF 154 at 6-7. The same principle applies to GMO's CEO here.

Contrary to GMO's motion—which claims that testimony of other GMO deponents suggests Mr. Kumagai was "in fact, was not making decisions," Mot. at 13–14—the documents themselves tell quite a different story. Deposition testimony is riddled with evidence of GMO's witnesses' impulses to explain away and avoid any acknowledgment of Mr. Kumagai's involvement—despite the plain text of documents making such an aversion nonsensical.[20] That GMO's witnesses have contorted themselves to minimize the role of their mercurial boss in the catastrophic business failure that was GMO's cryptocurrency business ventures is, on some level, understandable from a purely human perspective. No one wants to be the unlucky person who confirmed that Mr. Kumagai needs to be deposed, but GMO cannot rewrite history to protect Mr. Kumagai.

Mr. Kumagai's depth and breadth of involvement stands in stark contrast to the

---

[20] Indeed, many of the witness's disavowals of Mr. Kumagai's involvement utterly lack credibility. One witness even testified that a written reference to Mr. Kumagai was apparently synecdochic and was intended to refer to the entire Board. *See* Ex. 23 (Makita Dep.) at 380:6-381:14 (reference in email to "meeting with our CEO" in fact referenced a meeting with the GMO board, but Makita wrote "CEO" because "it's easier to understand"). Meanwhile Masafumi Okumura claimed that to the best of his recollection "Mr. Kumagai, as a member of the Board, received occasional updates" concerning GMO's bitcoin mining business, Ex. 36 at 9 (answers to questions 69–71), despite the fact that he personally engaged in numerous communications directly with Mr. Kumagai (and not other Board members) regarding the business.

circumstances in the cases on which GMO relies to resist his deposition. This case is a far cry from *Guzman v. Newscorp* (Mot. at 10), for example, in which the Court denied a deposition of Rupert Murdoch in an employment discrimination action by a former employee of the *New York Post* where there was no evidence that Murdoch was involved in, participated, or had knowledge of the relevant events. 2012 WL 2511436, at *2 (S.D.N.Y. June 29, 2012). In *Tiger Capital v. PHL Variable Life Ins. Co.* (Mot. at 10), the executive's deposition was denied because the executive appeared to have done little more than receive reports regarding "the status of assets and opportunities and didn't play an active role" in the relevant business line. 2013 WL 4517267, at *4 (S.D.N.Y. Aug. 26, 2013). Mr. Kumagai did not just receive reports, he *acted* on those reports and approved courses of conduct relevant to this lawsuit based on them. Whinstone is entitled to depose not only the individuals who carried out the orders, but the individual who gave them. There is a material difference between the knowledge possessed by both groups.

The documents reveal Mr. Kumagai to be the prototypical "engaged executive" whom courts have held must sit for deposition. *Scott v. Chipotle Mexican Grill, Inc.*, 306 F.R.D. 120, 123 (S.D.N.Y. 2015). As in *Louis Vuitton*, 2006 WL 3476735, at *13, "[t]his scenario is simply not equivalent to those encountered in cases in which a senior executive has not participated in any activity relevant to the issues in the case." Mr. Kumagai "has concededly participated directly in [at least] a pertinent event, and hence he is appropriately subject to questioning about his participation." *Id.* And, as in *Oakley v. MSG Networks, Inc.*, 2024 WL 4859024, at *2 (S.D.N.Y. Nov. 21, 2024) ("*Oakley II*"), Mr. Kumagai "had a courtside seat to the action, and is alleged to have been a participant in the conduct at issue. . . . Therefore, the apex doctrine is plainly inapplicable here."

Case 1:24-cv-05971-JHR-KHP Document 91-3 Filed 06/18/25 Page 22 of 28

### B. Mr. Kumagai Has Extensive Unique Knowledge of Relevant Facts

Although Mr. Kumagai's extensive personal knowledge alone requires denial of GMO's motion, the fact that much of such knowledge is unique to Mr. Kumagai only underscores that Whinstone has the right to depose him. Mr. Kumagai's knowledge about what he reviewed and understood in connection with signing the Texas Agreement (*see* Argument § I.A, *supra*), for example, is unique to him. Moreover, Mr. Kumagai is the only person who is able to testify to the meaning and intent of his numerous statements on contested [redacted] (*see* Background § D, *supra*). It is axiomatic that a party is entitled to depose the author of relevant documents regarding their contents; indeed, courts routinely permit parties to reopen depositions when new relevant documents are produced upon which the witness was not previously questioned. *See, e.g.*, *Bernstein v. Bernstein*, 1993 WL 466402, at *2 (E.D.N.Y. Aug. 13, 1993) ("Even if . . . the defendants did thoroughly question Mr. Phillips in the past, defendants could not have fully questioned him about documents that have only recently been produced. Defendants should thus have an opportunity to depose Mr. Phillips about the documents."); *see also Scantibodies Lab'y, Inc. v. Church & Dwight, Co.*, 2016 WL 11271874, at *38 (S.D.N.Y. Nov. 4, 2016) (permitting party to reopen depositions after the close of fact discovery to question witnesses about newly produced documents).

GMO's suggestion (Mot. at 17-19) that Whinstone is not entitled to depose Mr. Kumagai about his emails because it could have deposed other witnesses who *received* them misses the mark entirely. Whinstone, like every party, is entitled to question email authors about their statements, not just persons who were copied on them. Moreover, such questioning would necessarily detract from limited time that could otherwise be spent questioning those witnesses on communications they themselves authored. And, when Whinstone did question GMO witnesses about positions

taken by Mr. Kumagai, they unsurprisingly professed ignorance. *See, e.g.*, Ex. 37 (Yanagi Dep.) at 237:25-239:25, 240:18-241:19 ("Q. . . . [Y]ou say to Mr. Harris: . . . Mark forcefully disagree with this monthly operation cost. . . . And that reflects Mr. Kumagai forcefully disagreeing with monthly operational costs for the project, correct? . . . A. I can't quite recall that. . . ."). And GMO's 30(b)(6) witness did not speak to Mr. Kumagai to obtain his knowledge to prepare for his testimony. Ex. 38 (Makita 30(b)(6) Dep.) at 50:15-17.

GMO also ignores entirely that many of the most critical communications were between Mr. Kumagai and Masafumi Okumura. *See* Background § D, *supra*. Due to his health, GMO produced Mr. Okumura only for deposition by written questions, which this Court previously recognized is a poor substitute for live testimony. *See GMO*, 2024 WL 3833882, at *5 (noting that live testimony is more efficient because "written answers to question are often prepared by counsel and may not provide complete answers, whereas parties can ask follow-up and clarifying questions during a deposition to obtain clear and complete answers."); *see also, e.g.*, *Bromfield v. Bronx Lebanon Special Care Ctr., Inc.*, 2021 WL 5847404, at *5 (S.D.N.Y. Dec. 9, 2021) (collecting cases). Thus, if GMO is able to shirk its obligation to produce Mr. Kumagai for deposition, Whinstone will be unable to obtain live testimony from either party to key communications in the record.

GMO also asserts in its letter that the fact that GMO's lower-level employees were purportedly unable to recall important details regarding critical events is no reason to permit Whinstone to depose Mr. Kumagai. Mot. at 19-20. But Courts routinely order senior executives to be deposed where "subordinates are unable to testify in a meaningful fashion at their depositions." *Mendillo v. Prudential Ins. Co. of America*, 2013 WL 6511944, at *2 (D. Conn. Dec. 12, 2013) (permitting deposition of executive where lower level employees were unable to recall details of

conversations with executive). The fact that Mr. Kumagai's subordinates who were made available for deposition claimed to be unable to provide testimony on a number of key issues[21] therefore only emphasizes the need for a deposition of Mr. Kumagai.

GMO's claim (Mot. at 17) that Whinstone should have obtained relevant information regarding Mr. Kumagai's involvement through written discovery is particularly disingenuous given that GMO has refused to provide answers to written discovery that Whinstone propounded with respect to Mr. Kumagai. *See* Background § E, *supra*. And, as just noted, written discovery is no substitute for live testimony in any case.[22]

### C. The (Reasonable) Burden of a Deposition of Mr. Kumagai Does Not Provide a Basis to Deny Whinstone's Right to Depose Him

GMO's assertion that Mr. Kumagai is simply too busy to give testimony is no reason to bar his deposition. "[T]he fact that the witness has a busy schedule is simply not a basis for

[21] *See, e.g.*, Ex. 39 (Tsukahara Dep.) at 274:2-25 ("Q. Do you recall anything that was said -- A. Anything that was said. Q. -- at the GMO board meetings that you attended at which the Texas agreement was discussed? . . . A. No. It's been a long time. . . . Q. Was it your understanding that there was some disagreement among the members of the GMO board as to whether to go forward with the Texas agreement or not? . . . A. That, I do not remember as well.") (objections omitted), 277:23-278:3 ("Q. Did you ever provide a written or oral summary of the final Texas agreement or any portion of it to Mr. Kumagai? A. I do not remember that either."); Ex. 2 (Yamashita Dep.) at 84:13-85:7 ("Q. Could you please state for the record the names that appear on the cover of Exhibit 19B? . . . A. Masatoshi -- M-A-S-A-T-O-S-H-I -- is the first name, Kumagai -- K-U-M-A-G-A-I -- . . . . Q. Does that indicate to you those two individuals delivered this presentation? A. I don't recall. Q. Can you think of any other reason why those two names would be on the cover of Exhibit 19B? A. I don't know."); Ex. 40 (Matsumoto Dep.). at 58:2-12 ("Q. You don't remember anything about provisions in the Texas agreement about amounts that Whinstone had to pay? A. No. Q. Because you spent a lot of time interacting around this issue in the documents. You don't recall anything about it? . . . A. I don't remember.").

[22] The weakness of GMO's argument is further emphasized by the sole out-of-circuit case on which it relies to support this point, *3M Co. v. ACS Indus.,* 2016 WL 9308317, at *2 (D. Minn. Mar. 10, 2016). There, a court precluded an apex deposition where the executive had merely verified interrogatory responses and there was no indication whatsoever that he had any "personal knowledge of the facts in 3M's possession prior to commencing suit" or the "sources of 3M's responses to the interrogatories," discrete factual matters particularly suited to written discovery.

foreclosing otherwise proper discovery." *CBS, Inc. v. Ahern*, 102 F.R.D. 820, 822 (S.D.N.Y. 1984); *see also Naftchi*, 172 F.R.D. at 132 ("Nor, in ordinary circumstances, does it matter that the proposed witness is a busy person . . . ."); *Clinton v. Jones*, 520 U.S. 681, 704–05 (1997) (noting that sitting presidents have complied with orders to give testimony, including by deposition). That is especially true given that GMO has cited the need for Mr. Kumagai to prepare for deposition as contributing to that burden. How much Mr. Kumagai decides to prepare for his deposition is up to Mr. Kumagai and GMO, and cannot be a basis to deny Whinstone testimony. In fact, Mr. Kumagai could have applied the time he spent on his self-serving declaration in support of GMO's meritless motion to prepare for his deposition.

In all events, although Whinstone noticed Mr. Kumagai's deposition for New York, in view of his busy schedule, Whinstone is willing to hold his deposition at a more convenient location for Mr. Kumagai, such as in Los Angeles, or even at the consulate in Japan if available (or another location in Asia) if Mr. Kumagai would prefer.[23] With the Court's permission, Mr. Kumagai's deposition could also proceed during the Obon holiday in August, when GMO has historically, like most Japanese businesses, closed for a full week.[24]

---

[23] Mr. Kumagai is, according to public reporting, one of the wealthiest men in Japan with a net worth of more than $1 billion; he does not need to fly commercial. Indeed, Mr. Kumagai has written articles documenting his journey to obtaining a license to pilot a private jet (Gulfstream G650). https://www.kumagai.com/?eid=10862 (English summary available at: https://www.kumagai.com/profile/en/ (linking to "'I decided to fly' Season 2: my path to acquiring a private jet pilot certificate"). And Mr. Kumagai has extolled his love of international travel, noting he has travelled overseas over 200 times. *Id.*

[24] The dates of the Obon festival change each year, as it is tied to the lunar calendar. This year it runs from August 13 to August 16. However, most Japanese businesses close for the entire week. In 2024, Obon ran from August 16 to 18, but GMO was closed from August 13 to August 19, with resumption of business on August 20. *See* https://internet.gmo/ir_archive/article/549/. GMO has not yet announced its closure schedule for this year.

### D. There Was No Agreement Not to Depose Mr. Kumagai

Finally, Whinstone never agreed not to depose Mr. Kumagai. As even the filing GMO relies upon to try to conjure such an agreement makes clear, the parties did agree not to seek ***documents*** from their respective CEOs, but never agreed not to depose them. In a joint February 28, 2025 letter to the Court concerning ***document search terms***, GMO stated in a footnote: "Based on Whinstone's withdrawal of its retributory threat to seek discovery from GMO's Group CEO, whose relevant ***documents*** are encompassed by prior collections in any event, GMO is reserving its rights to seek ***documents*** from Whinstone's current CEO, Jason Les. In the event Whinstone reverses course, then GMO will request this Court to apply the ordered search terms to Mr. Les's ***documents*** for the ordered period." ECF 286 at 2 n.4 (cited in Mot. at 7) (emphasis added). GMO's off-hand reference to "discovery" in the first sentence of the footnote does not change the parties' agreement, which the balance of the footnote makes plain was about documents. Whinstone never agreed not to depose Mr. Kumagai, and GMO cannot show otherwise.

## II. WHINSTONE SHOULD BE AWARDED ITS COSTS AND FEES INCURRED IN OPPOSING GMO'S MERITLESS MOTION

GMO's request for fees for bringing its meritless motion (Mot. at 22-23) is beyond brazen. It is Whinstone who is entitled to recover its costs and fees.

Under Rule 37(a)(5)(B), after denying a motion for a protective order like GMO's, the court "must, after giving an opportunity to be heard, require the movant, the attorney filing the motion, or both to pay the party . . . who opposed the motion its reasonable expenses . . . including attorney's fees." Fed. R. Civ. P. 37(a)(5)(B). That rule is mandatory unless "the motion was substantially justified or other circumstances making an award of expenses unjust." *Id.* A motion is substantially justified so as to warrant relief from the requirement to pay fees only "if reasonable people could differ" as to whether it is appropriate under the circumstances. *Pierce v. Underwood*,

487 U.S. 552, 565 (1998) (collecting cases). GMO's motion was nowhere near substantially justified. It is at odds with both the law and the facts. While GMO argues that Mr. Kumagai sat at a remove from the action with no meaningful involvement in the issues relevant to this dispute, the evidence—of which GMO was keenly aware before bringing its motion—demonstrates the opposite to be true. And none of the authority on which GMO relies (much of it out of circuit) involves executives nearly as involved as Mr. Kumagai.

Whinstone respectfully requests that the Court award Whinstone its costs and fees incurred in opposing GMO's motion. *See, e.g.*, *Anthropologie, Inc. v. Forever 21, Inc.*, 2009 WL 690126, at *4 (S.D.N.Y. Mar. 13, 2009) (holding award of fees in connection with opposing unsuccessful protective order motion "eminently justified").

## CONCLUSION

Whinstone respectfully requests that GMO's motion be denied and that Whinstone be awarded its costs and fees incurred in opposing the motion.

Dated: May 21, 2025

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

By: *__/s/ Meredith M. Shaw__*
Michael B. Carlinsky
Meredith M. Shaw
Wing F. (Alex) Ng
Daniel M. Kelly

295 Fifth Avenue
New York, NY 10016
Tel: 212-849-7253

michaelcarlinsky@quinnemanuel.com
meredithshaw@quinnemanuel.com
alexng@quinnemanuel.com
danielkelly@quinnemanuel.com

*Counsel for Whinstone US, Inc.*

**CERTIFICATE OF COMPLIANCE**

I, Daniel M. Kelly, hereby certify that Whinstone's foregoing Memorandum of Law in Support of Whinstone's Motion to Compel Production of Improperly Withheld Documents complies with the word limits set forth in Rule 7.1(c) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York. According to the word count of the word-processing program used to prepare the memorandum, and exclusive of the portions of it that are excluded by Local Rule 7.1(c), this memorandum contains 8,670 words.

Dated: May 21, 2025

/s/ *Daniel M. Kelly*
Daniel M. Kelly