**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

AYRTON CAPITAL, LLC,

*Plaintiff*,

v.

BITDEER TECHNOLOGIES GROUP,

*Defendant*.

Case No. 24-cv-05160 (LJL)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT BITDEER TECHNOLOGIES GROUP'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....1

BACKGROUND ....3

A. Ayrton and Bitdeer Execute the Term Sheet. ....3

B. Ayrton Backs out of the $100-Million Debt Financing, Contrary to Its Prior Representations. ....4

C. Ayrton Traps Bitdeer in an Onerous Exclusivity Obligation....5

D. Ayrton Seeks Windfall Profits. ....6

ARGUMENT ....7

I. THE TERM SHEET IS VOID FOR LACK OF CONSIDERATION. ....8

A. The Term Sheet Imposes No Obligations on Ayrton....8

B. If this Court Finds an Ambiguity, Extrinsic Evidence Supports Bitdeer's Position. ....11

II. THE EXCLUSIVITY PROVISION IS AN UNENFORCEABLE PENALTY. ....12

A. Ayrton's Damages from a Breach of Exclusivity Were Readily Ascertainable....13

B. The Penalties Are Grossly Disproportionate to Ayrton's Foreseeable Losses....15

C. The Confidentiality and Exclusivity Provision Is Unenforceable Unless It Is a Liquidated Damages Clause. ....18

III. BITDEER PROVIDED AYRTON A RIGHT TO PARTICIPATE IN THE TETHER TRANSACTION. ....21

IV. AYRTON CANNOT RECOVER DAMAGES ON BEHALF OF THE ALTO FUND....24

CONCLUSION....25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*139 Fifth Ave. Corp. v. Giallelis*,
1996 WL 154108 (S.D.N.Y. Apr. 3, 1996)....................13

*172 Van Duzer Realty Corp. v. Globe Alumni Student Assistance Ass'n, Inc.*,
24 N.Y.3d 528 (2014)....................18

*42-50 21st St. Realty LLC v. First Cent. Savs. Bank*,
2022 WL 1004187 (E.D.N.Y. Apr. 4, 2022)....................25

*Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*,
145 F.3d 543 (2d Cir. 1998)....................12

*Alpha Cap. Anstalt v. Imaging3, Inc.*,
2018 WL 3597520 (S.D.N.Y. July 26, 2018)....................22

*Alpha Cap. Anstalt v. Oxysure Sys., Inc.*,
216 F. Supp. 3d 403 (S.D.N.Y. 2016)....................22

*Alpha Cap. Anstalt v. Real Goods Solar, Inc.*,
311 F. Supp. 3d 623 (S.D.N.Y. 2018)....................8

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....................7

*Atlantis Mgmt. Grp. II LLC v. Nabe*,
216 A.D.3d 526 (1st Dep't 2023)....................17, 20

*Beekman Inv. Partners, L.P. v. Alene Candles, Inc.*,
2006 WL 330323 (S.D.N.Y. Feb. 14, 2006)....................12

*Bradford v. New York Times Co.*,
501 F.2d 51 (2d Cir. 1974)....................17, 19

*Brecher v. Laikin*,
430 F. Supp. 103 (S.D.N.Y. 1977)....................19

*Bristol Inv. Fund, Inc. v. Carnegie Int'l Corp.*,
310 F. Supp. 3d 556 (S.D.N.Y. 2003)....................15

*Candid Prods., Inc. v. Int'l Skating Union*,
530 F. Supp. 1330 (S.D.N.Y. 1982)....................24

*Cent. Irrigation Supply v. Putnam Country Club Assoc., LLC*,
57 A.D.3d 934 (2d Dep't 2008) ....................16

*Chiapparelli v. Baker, Kellogg & Co.*,
252 N.Y. 192 (1929) ....................10

*Clarex Ltd. v. Natixis Sec. Am. LLC*,
2012 WL 4849146 (S.D.N.Y. Oct. 12, 2012) ....................25

*Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*,
74 N.Y.2d 475 (1989) ....................23

*Consol. Edison, Inc. v. Ne. Utils.*,
426 F.3d 524 (2d Cir. 2005)....................12

*Creaciones Con Idea, S.A. de C.V. v. Mashreqbank PSC*,
232 F.3d 79 (2d Cir. 2000)....................25

*DAR & Assocs., Inc. v. Uniforce Servs., Inc.*,
37 F. Supp. 2d 192 (E.D.N.Y. 1999) ....................14

*Deutsche Bank Sec., Inc. v. Rhodes*,
578 F. Supp. 2d 652 (S.D.N.Y. 2008)....................8

*Diesenhouse v. Soc. Learning & Payments, Inc.*,
2022 WL 3100562 (S.D.N.Y. Aug. 3, 2022) (Liman, J.) ....................8

*Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*,
66 N.Y.2d 38 (1985) ....................25

*Garrity v. Lyle Stuart, Inc.*,
40 N.Y.2d 354 (1976) ....................12

*Goodstein Const. Corp. v. City of N.Y.*,
80 N.Y.2d 366 (1992) ....................13

*Hamer v. Sidway*,
124 N.Y. 538 (1892) ....................8

*Hudson Optical Corp. v. Cabot Safety Corp.*,
1998 WL 642471 (2d Cir. Mar. 25, 1998)....................25

*Int'l Bus. Machs. Corp. v. United Microelectronics Corp.*,
764 F. App'x 9 (2d Cir. 2019) ....................11

*Interocean Shipping Co. v. Nat'l Shipping & Trading Corp.*,
462 F.2d 673 (2d Cir. 1972)....................23

*JMD Holding Corp. v. Cong. Fin. Corp.*,
4 N.Y.3d 373 (2005) ....................13, 15, 17

*L-7 Designs, Inc. v. Old Navy, LLC*,
647 F.3d 419 (2d Cir. 2011)....................13, 14

*LG Cap. Funding, LLC v. Accelera Innovations, Inc.*,
2018 WL 5456670 (S.D.N.Y. 2018)....................18

*LG Cap. Funding, LLC v. M Line Holdings, Inc.*,
422 F. Supp. 3d 739 (E.D.N.Y. 2018) ....................14

*NML Cap. v. Republic of Argentina*,
621 F.3d 230 (2d Cir. 2010)....................18

*In re O.P.M. Leasing Services, Inc.*,
23 B.R. 104 (Bankr. S.D.N.Y. 1982)....................20

*Oscar Gruss & Son, Inc. v. Hollander*,
337 F.3d 186 (2d Cir. 2003)....................24

*Oscar Schlegel Mfg. Co. v. Peter Cooper's Glue Factory*,
231 N.Y. 459 (1921) ....................8, 11

*Prada USA Corp. v. 724 Fifth Fee Owner LLC*,
2021 WL 2126109 (N.Y. Sup. Ct. May 25, 2021)....................16

*Process Am., Inc. v. Cynergy Holdings, LLC*,
839 F.3d 125 (2d Cir. 2016)....................24

*Quaker Oats Co. v. Reilly*,
274 A.D.2d 565 (2d Dep't 2000)....................14

*Rattigan v. Commodore Int'l Ltd.*,
739 F. Supp. 167 (S.D.N.Y. 1990) ....................14

*RDF Agent, LLC v. Electric Red Ventures, LLC*,
227 A.D.3d 424 (1st Dep't 2024) ....................11, 17

*Register.com, Inc. v. Verio, Inc.*,
356 F.3d 393 (2d Cir. 2004)....................8

*Rhee v. SHVMS, LLC*,
2024 WL 4589656 (S.D.N.Y. Oct. 28, 2024)....................25

*Schaffer v. Coral Reef Cap., LLC*,
2020 WL 7315529 (N.Y. Sup. Ct. Dec. 10, 2020) ....................20

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
528 F. Supp. 3d 219 (S.D.N.Y. 2021)....................7

*Sharma v. Skaarup Ship Mgmt. Corp.*,
916 F.2d 820 (2d Cir. 1990) ("New York courts have expressly refused to adopt [a] 'wait and see' theory of damages.") ....................23

*Space Imaging Eur., Ltd. v. Space Imaging L.P.*,
38 F. Supp. 2d 326 (S.D.N.Y. 1999)....................9

*SPG Cap. Partners LLC v. Cascade 553 LLC*,
2023 WL 126127 (N.Y. Sup. Ct. Jan. 6, 2023)....................9, 10

*Tenor Opportunity Master Fund, Ltd. v. Oxygen Biotherapeutics, Inc.*,
2012 WL 2849384 (S.D.N.Y. July 11, 2012) ....................22

*Topken, Loring & Schwartz v. Schwartz*,
249 N.Y. 206 (1928) ....................9

*Truck Rent-A-Ctr., Inc. v. Puritan Farms 2nd, Inc.*,
41 N.Y.2d 420 (1977) ....................12, 14

*U.S. Fidelity & Guar. Co. v. Braspetro Oil Servs. Co.*,
369 F.3d 34 (2d Cir. 2004)....................12, 15

*Union Cap. LLC v. Vape Holdings Inc.*,
2017 WL 1406278 (S.D.N.Y. Mar. 31, 2017) ....................12

*Wells Fargo Bank, N.A. v. Wright Mill Holdings, LLC*,
127 F. Supp. 3d 156 (S.D.N.Y. 2015)....................23

*Wetzler v. Roosevelt Raceway, Inc.*,
208 A.D.2d 120 (1st Dep't 1995) ....................12

*Wilhelmina Models, Inc. v. Fleisher*,
19 A.D.3d 267 (1st Dep't 2005) ....................25

*Wood v. Lucy, Lady Duff-Gordon*,
222 N.Y. 88 (1917) ....................10, 11

**Rules / Statutes**

Fed. R. Civ. P. 56(a) ....................7

Fed. R. Civ. P. 56(c) ....................7

## Other Authorities


11 CORBIN ON CONTRACTS § 58.18 ....................................................................................18, 19

14 WILLISTON ON CONTRACTS § 7:7 (4th ed.) .............................................................................10

14 WILLISTON ON CONTRACTS § 42:10 (4th ed.) .........................................................................19

14 WILLISTON ON CONTRACTS § 65:18 (4th ed.) .........................................................................16

RESTATEMENT (2D) OF CONTRACTS § 77 cmt. a..........................................................................10

RESTATEMENT (2D) OF CONTRACTS § 356 cmt. c........................................................................19

## PRELIMINARY STATEMENT

In 2024, Plaintiff Ayrton Capital, LLC and Defendant Bitdeer Technologies Group signed a term sheet (the "Term Sheet") to begin exploring a potential financing transaction. The Term Sheet obligated Ayrton to do nothing at all, while purporting to prohibit Bitdeer from negotiating an alternative financing agreement with any third party. If Ayrton refused to close a deal with Bitdeer, as happened here, Bitdeer remained subject to exclusivity. And if Bitdeer breached the purported exclusivity obligation, Ayrton obtained—in exchange for nothing—a break-up fee of $787,500 and the "right to participate for 25% in any third-party transaction" executed by Bitdeer for a period of time Ayrton could prevent from ever concluding. Despite suffering no actual harm, and incurring no out-of-pocket costs that Bitdeer did not reimburse, Ayrton claims that it is entitled to over $30 million for an alleged breach of exclusivity. ***This amount is millions more than any annual profit Ayrton has ever made in its history.*** Ayrton is trying to use this litigation to convert the Term Sheet—for which it spent none of its own money and committed no capital—into a transformative windfall. This Court should grant summary judgment to Bitdeer and decline to enforce the punitive and unlawful remedy that Ayrton seeks to impose on Bitdeer.

*First*, the Term Sheet is void for lack of consideration. Although the Term Sheet identifies certain terms as binding, none require Ayrton to do anything. In fact, the Term Sheet's only reference to purported obligations owed by Ayrton states that any such obligations are subject to Ayrton's own approval, in its sole discretion. Given the Term Sheet's express rejection of any obligation binding upon Ayrton, the Term Sheet is not an enforceable contract.

*Second*, even if the Term Sheet is a contract, it provides for an unenforceable penalty. New York law is clear that if a defendant breaches an exclusive negotiation contract, the plaintiff can only recover its out-of-pocket costs incurred in negotiating with the defendant. Here, the Term Sheet already required Bitdeer to cover all of Ayrton's due diligence and legal fees—and Ayrton

admits that Bitdeer's payments exceeded Ayrton's costs. Despite having made a profit in the negotiations, Ayrton claims an additional entitlement to a $787,500 break-up fee and $32 million in damages for being allegedly deprived of an opportunity to participate in a transaction Bitdeer concluded in May 2024. Because Ayrton has admittedly suffered no damages apart from those mandated by the unenforceable penalty provision, Ayrton's claim fails.

*Third*, even if the Term Sheet is enforceable, Bitdeer complied with its obligation to "provide Ayrton the right to participate for 25%" in the relevant third-party transaction. Bitdeer notified Ayrton of the transaction more than one week before it closed. Although Ayrton and its affiliates have previously moved for injunctive relief to enforce a participation right in similar circumstances, here, Ayrton never once voiced a desire to participate before the transaction closed. Instead, Ayrton monitored Bitdeer's stock price for weeks before seeking to participate, only bringing suit after Bitdeer's share price doubled. There is no basis under the law or the Term Sheet to reward this opportunistic behavior.

*Finally*, even if the Term Sheet is enforceable and Bitdeer is found to have breached it, Ayrton should not be permitted to recover the purported damages of its affiliate fund, the Alto Opportunity Master Fund. Although Ayrton would like to make off with a windfall profit, discovery has shown that if Ayrton had "participated," it would have done so through the assets of the Alto Fund, a non-party to this litigation. Ayrton's sole interest in that investment would have been limited to the management and performance fees it could extract from the Fund. Because any damages award should at most put Ayrton in the same economic position as if there had been no breach, this Court should rule that Ayrton can only recover the management and performance fees Ayrton would have earned had the Alto Fund participated in the transaction.

For all of these reasons, this Court should grant summary judgment to Bitdeer.

## BACKGROUND

### A. Ayrton and Bitdeer Execute the Term Sheet.

Ayrton was introduced to Bitdeer at a capital markets conference in March 2024. *See* Rule 56.1 Statement of Undisputed Material Facts in Support of Bitdeer Technologies Group's Motion for Summary Judgment ("Bitdeer's Rule 56.1 Statement") at ¶ 13. Ayrton and Bitdeer negotiated and ultimately signed a Term Sheet on April 29, 2024 to provide a framework for future negotiations over a $100-million debt investment by Ayrton in Bitdeer. *Id.* at ¶¶ 14-15. The Term Sheet set out some (but not all) features of the contemplated investment. *Id.* at ¶ 20.

No provision of the Term Sheet obligated Ayrton to do anything. *Id.* at ¶¶ 23, 25, 27, 29, 30. To the contrary, the transaction terms included in the Term Sheet were "for discussion purposes only" and did not "represent or constitute an offer, undertaking or commitment on the part of Ayrton . . . to arrange or provide financing to Bitdeer." *Id.* at ¶ 22. The Term Sheet stated that it was "intended to be a summary of economic terms only" that could not be "construed to compel Ayrton to commit to purchase securities of [Bitdeer] or secure financing on behalf of [Bitdeer] by third parties." *Id.* To the extent the Term Sheet imposed "any obligation or commitment" upon Ayrton at all, such an obligation (if any) was "subject to . . . investment committee and other internal approvals . . . in each case as may be satisfactory to Ayrton at its sole discretion." *Id.*

Although the Term Sheet obligated Ayrton to do nothing at all, it purported to impose several "binding" obligations on Bitdeer. The Diligence and Legal Fees clause (identified as binding in the preamble, *id.* at ¶ 22) purportedly required Bitdeer to "pay for all of the Investor's [Ayrton's] due diligence and legal fees in relation to the transactions proposed in this Term Sheet," beginning with an initial non-refundable deposit of $125,000, *see id.* at ¶ 26. The Confidentiality and Exclusivity Provision (also identified as binding, *id.* at ¶ 22) stated that Bitdeer must not

"disclose the terms contained herein to any other person or entity;" "solicit, negotiate or accept any term sheets" or similar documents; or "close a financing transaction." *Id.* ¶ 24. This Provision likewise purported to fix the consequences of Bitdeer's breach by imposing two penalties, a break-up fee of $787,500 and the obligation to "provide Ayrton the right to participate for 25% in any third party transaction" executed by Bitdeer for a 180-day period beginning 31 business days after "the parties hereto agree in writing to cease negotiations" of the contemplated transaction. *Id.*

### B. Ayrton Backs out of the $100-Million Debt Financing, Contrary to Its Prior Representations.

After Ayrton and Bitdeer executed the Term Sheet, Bitdeer promptly paid the $125,000 diligence deposit and the parties began to negotiate the transaction contemplated by the Term Sheet. *Id*. ¶ 36. But those negotiations quickly stalled when Ayrton claimed to have identified problems with Bitdeer's lease over one of its US-based cryptocurrency mining facilities, such that Ayrton claimed the property was inadequate collateral. *Id.* at ¶ 37. By May 9, 2024, Ayrton sent Bitdeer a draft term sheet for an alternative convertible note transaction. *Id.* at ¶ 42.

Ayrton's changed position came as a surprise to Bitdeer. *Id.* at ¶ 38. Prior to executing the Term Sheet, Bitdeer repeatedly sought Ayrton's assurances that Ayrton was willing to close a financing transaction quickly, and Ayrton represented on ***at least four occasions*** that it could close within "2-3 weeks." *Id.* at ¶¶ 40-41. Having reviewed Bitdeer's securities filings (which contained the lease agreements) before executing the Term Sheet, *id.* at ¶ 39, Ayrton's chief negotiator represented to Bitdeer on April 26, 2024 that "there is adequate information in the public domain" for Ayrton to believe it could close the transaction, *id.* at ¶ 40. Despite these representations, Ayrton ultimately refused to close the transaction because it determined the collateral was inadequate ***based solely*** on the contents of the public lease documents. *Id.* ¶ 37. Ayrton either

misrepresented that it had reviewed public information about Bitdeer's collateral or misrepresented its findings from that review, in either case misleading Bitdeer into signing the Term Sheet.

Discovery has confirmed that irrespective of any claimed issues involving the collateral, Ayrton could never have closed the $100-million debt-financing with Bitdeer—whether in "2-3 weeks" or ever. Ayrton's assets under management between April 2024 and July 2024 ranged from [redacted] to [redacted] million. *Id.* ¶ 48. Investing between [redacted] percent and [redacted] percent of Ayrton's total assets in a single transaction would have exposed Ayrton to significant risk, making such a transaction highly improbable for an investor that apparently considered a senior secured debt transaction too risky to close. This is particularly so given that funding the $100-million transaction would have required Ayrton to [redacted] *Id.* ¶ 52. In fact, Ayrton has never invested more than [redacted] million in any one company. *Id.* ¶¶ 49-51. Apart from an alleged conversation between Ayrton's principal and one potential co-investor (for which there is no documentary evidence), Ayrton took no steps to secure additional funds to close the investment. *Id.* ¶ 53. Ayrton's chief negotiator had likewise never solicited third-party capital for any investment in his five years at Ayrton. *Id.* at ¶ 54.

### C. Ayrton Traps Bitdeer in an Onerous Exclusivity Obligation.

Having lured Bitdeer into the Term Sheet with unfulfilled promises of a speedy close, all while knowing that Bitdeer hoped to obtain financing quickly, Ayrton was content to wait and see if it could collect massive profits through the Confidentiality and Exclusivity Provision. In fact, as Ayrton's corporate representative and chief negotiator admitted, Ayrton intended all along for the Term Sheet to bind Ayrton to no obligation, yet entitle Ayrton to windfall profits if Ayrton refused to close a transaction and Bitdeer went on to find an alternative. *Id.* at ¶¶ 31-32. Ayrton intended for the exclusivity restriction to apply "even in the scenario where a day after the term sheet is signed Ayrton decides it doesn't want to do the deal." *Id.*

Ayrton's scheme proceeded seamlessly. Bitdeer advised Ayrton on May 13, 2024 that it was terminating negotiations under the Term Sheet effective May 9, 2024, but Ayrton never responded. *Id.* at ¶¶ 44-45. Ayrton's silence meant that the clock that terminates Bitdeer's exclusivity obligations never started to run. *See id.* at ¶ 24 (clock begins to run on the day the parties "agree in writing to cease negotiations of the transaction contemplated by" the Term Sheet). To this day, Ayrton has never agreed in writing to cease negotiations of the transaction contemplated by the Term Sheet. *Id.* at ¶ 46.

**D. Ayrton Seeks Windfall Profits.**

Bitdeer personnel met with representatives of Tether International Ltd. ("Tether") in Bhutan on May 14, 2024 (being the morning of May 15, 2024 in Bhutan) to continue discussing a contemplated joint venture. *Id.* at ¶ 55. As discussions unfolded, Tether agreed instead to purchase $100 million in Bitdeer's common stock at the May 14 closing price, and Bitdeer agreed to issue Tether warrants to purchase 5,000,000 shares at $10.00 per share, exercisable for one year. *Id.* at ¶¶ 56-57. The parties then reduced their oral agreement to writing and the transaction closed on May 30, 2024. *Id.* at ¶ 58. The transaction was announced publicly the next day. *Id.*

Bitdeer informed Ayrton that Bitdeer had secured a $100-million equity investment on May 22, 2024. *Id.* at ¶ 60. Ayrton congratulated Bitdeer. *Id.* at ¶ 61. During this conversation, Ayrton did not advise Bitdeer that it believed Bitdeer had breached the Term Sheet or invoke any purported "right to participate." *Id.* at ¶ 62. Ayrton also did not rush into court to enjoin the Tether transaction from closing without Ayrton's participation, as Ayrton's constituent fund did in 2020 to enforce purported participation rights in an issuance of new shares. *Id.* at ¶ 70.

It was not until weeks later, on June 10, 2024, that Ayrton advised Bitdeer that it believed Bitdeer had breached the Term Sheet and demanded to participate in the Tether transaction. *Id.* at ¶ 63. Whereas Bitdeer's share price opened at $5.90 per share on May 22, 2024, the share price

had risen to a high of $7.42 on June 10, 2024. *Id.* at ¶¶ 77, 80. When Ayrton filed suit on July 8, 2024, Bitdeer's share price had risen to a high of $12.85 per share. *Id.* at ¶ 80.

Although Ayrton could have bought Bitdeer stock during this period, *id.* at ¶ 68, Ayrton's chief negotiator preferred instead to monitor the share price, hoping that Ayrton's belated enforcement of its participation rights would fix Ayrton's recent poor financial performance. *Id.* at ¶ 69 (Ayrton's chief negotiator hoping, on June 13, 2024, that [redacted]"); *see also id.* at ¶ 64. When Ayrton filed suit, it hoped to collect windfall profits of $32 million, *see* ECF No. 1 ("Compl.") at ¶ 36, roughly [redacted] percent more than Ayrton's best-ever firm-wide annual profits, *see* Bitdeer's Rule 56.1 Statement at ¶ 10. In fact, although the investment fund that Ayrton manages would have provided capital to Bitdeer had the transaction closed and reaped any associated profits, Ayrton has not even informed its fund investors of this litigation. *Id.* at ¶ 74.

**ARGUMENT**

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see* Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 528 F. Supp. 3d 219, 229 (S.D.N.Y. 2021) (quotations omitted). Once satisfied, the burden shifts and the non-movant "must produce evidence in the record showing the existence of a genuine issue of material fact" without "rely[ing] simply on conclusory statements." *Id.* (quotations omitted).

## I. THE TERM SHEET IS VOID FOR LACK OF CONSIDERATION.

Summary judgment is proper because the Term Sheet imposes no obligations upon Ayrton and is therefore void for lack of consideration. To the extent there is any ambiguity in the Term Sheet and the Court considers extrinsic evidence, Ayrton's chief negotiator and corporate representative confirmed he intended for Ayrton to have no obligations under the Term Sheet.

### A. The Term Sheet Imposes No Obligations on Ayrton.

"Under New York law, consideration is required for a contract to be valid." *Deutsche Bank Sec., Inc. v. Rhodes*, 578 F. Supp. 2d 652, 660 (S.D.N.Y. 2008) (citing *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004)). Consideration is "some right, interest, profit or benefit accruing to one party, or some forbearance, detriment, loss, or responsibility given, suffered, or undertaken by the other." *Alpha Cap. Anstalt v. Real Goods Solar, Inc.*, 311 F. Supp. 3d 623, 630 (S.D.N.Y. 2018) (quoting *Hamer v. Sidway*, 124 N.Y. 538, 545 (1892)). "It is hornbook law that to establish that the parties formed a contract, a plaintiff must allege that both parties provided valid consideration." *Diesenhouse v. Soc. Learning & Payments, Inc.*, 2022 WL 3100562, at *4 (S.D.N.Y. Aug. 3, 2022) (Liman, J.). In other words, "[u]nless both parties to a contract are bound, so that either can sue the other for a breach, neither is bound." *Oscar Schlegel Mfg. Co. v. Peter Cooper's Glue Factory*, 231 N.Y. 459, 462 (1921).

Ayrton provided no consideration to Bitdeer. The Term Sheet's Preamble is clear that "[e]xcept for this preamble, the epilogue . . . captioned 'Confidentiality and Exclusivity' and the sections captioned 'Diligence and Legal Fees' and 'Governing Law', all terms set out herein are non-binding." Bitdeer's Rule 56.1 Statement ¶ 22. Among the binding provisions, the Confidentiality and Exclusivity Provision and the Diligence and Legal Fees Provision each impose obligations on Bitdeer, while none of the "binding" provisions imposes any obligation upon Ayrton. *Id.* at ¶¶ 22-30. To the contrary, the preamble expressly disclaims any obligation binding

on Ayrton, stating: "any obligation or commitment of Ayrton or any of its affiliates is subject to the completion of due diligence, investment committee and other internal approvals and the execution and delivery of definitive transaction documentation . . . , in each case as may be satisfactory to Ayrton at its sole discretion." *Id.* at ¶ 22. In the absence of any language requiring Ayrton to do anything or refrain from doing anything, the Term Sheet lacks consideration and cannot be enforced. *Topken, Loring & Schwartz v. Schwartz*, 249 N.Y. 206, 211 (1928) (no contract formed "if a discretion were left to one of the parties to perform or not perform"); *see also, e.g.*, *Space Imaging Eur., Ltd. v. Space Imaging L.P.*, 38 F. Supp. 2d 326, 337-38 (S.D.N.Y. 1999) (declining to enforce "extremely important and valuable" "right of first refusal" on summary judgment because defendant "received no tangible consideration for the Provision").

When Bitdeer sought to assert an additional defense of lack of consideration, Ayrton argued that Bitdeer's proposed defense was futile because this Court could imply an obligation of good faith to cure the Term Sheet's facial lack of consideration. ECF No. 67 at 12-13. The New York Supreme Court recently rejected Ayrton's argument, concluding that a similar term sheet in which "virtually all the obligations" "fell upon defendants" was void for lack of consideration. *SPG Cap. Partners LLC v. Cascade 553 LLC*, 2023 WL 126127, at *7 (N.Y. Sup. Ct. Jan. 6, 2023). As is the case here, "the exclusivity provision" in *SPG Capital* "bound [the defendant] to refrain from seeking other financing without regard to whether plaintiff moved forward with its due diligence in a timely fashion." *Id*. And although the defendant, like Bitdeer, was obligated to pay a due diligence deposit, the court declined to infer that the deposit imposed a "due diligence requirement" "sufficient to create mutuality of obligation." *Id*. The court specifically rejected Ayrton's argument that "the due diligence requirement 'impose[d] an obligation on the parties to negotiate in good faith.'" *Id.* The only distinction between the term sheet in *SGP Capital* and the

Term Sheet here is that the Term Sheet identifies certain obligations as binding, whereas the term sheet in *SGP Capital* did not state that any of its terms were binding. But that distinction supports Bitdeer's position, because all binding obligations impose obligations ***only upon Bitdeer***.

The other case law Ayrton cites cannot cure the Term Sheet's lack of consideration. Ayrton relies primarily on *Wood v. Lucy, Lady Duff-Gordon*, in which Justice Cardozo ruled that courts can imply consideration where "[a] promise may be lacking, and yet the whole writing may be 'instinct with an obligation,' imperfectly expressed." 222 N.Y. 88, 91 (1917). There, the plaintiff promised to remit half of any profits derived from an exclusive right to sell the defendant's endorsement of certain fashion items, but did not promise to sell any endorsements. *Id.* at 90. Given a host of contractual provisions setting out parameters for the parties' business dealings, Justice Cardozo found that the plaintiff's "promise to pay the defendant one-half of the profits and revenues resulting from the exclusive agency and to render accounts monthly was a promise to use reasonable efforts to bring profits and revenues into existence." *Id.* at 92. Here, the problem for Ayrton is that the Term Sheet is not "instinct with an obligation, imperfectly expressed" because the Term Sheet expressly states that "any obligation or commitment of Ayrton" is subject to various factors each of which must be "satisfactory to Ayrton at its sole discretion." Bitdeer's Rule 56.1 Statement at ¶ 22; *Chiapparelli v. Baker, Kellogg & Co.*, 252 N.Y. 192, 200 (1929) ("Where a promisor retains an unlimited right to decide later the nature or extent of his performance, the promise is too indefinite for legal enforcement."); RESTATEMENT (2D) OF CONTRACTS § 77 cmt. a ("Words of promise which by their terms make performance entirely optional with the 'promisor' do not constitute a promise."); 14 WILLISTON ON CONTRACTS § 7:7 (4th ed.) (similar). Where, as here, "[t]here is not in the letter a single obligation from which it

can fairly be inferred that the plaintiff was to do or refrain from doing anything whatever," there is no contract. *Oscar Schlegel*, 231 N.Y. at 464 (declining to extend the principle in *Wood*).

Another case upon which Ayrton has relied, *RDF Agent, LLC v. Electric Red Ventures, LLC*, further proves the point. 227 A.D.3d 424 (1st Dep't 2024). In that case, the court rejected a defendant's attempt to invalidate an exclusivity clause as lacking consideration, concluding that the clause "requires plaintiff to proceed in good faith towards consummating the loan and to pursue in good faith the transaction contemplated by the term sheet." *Id.* at 426. This obligation was not, however, implied; the contract itself expressly provided for it. *See* Ex. 34[1] at 9 ("If this Exclusivity provision is violated, . . . then *unless Agent shall have failed to pursue in good faith the transaction contemplated herein*, Borrower and Guarantor shall" pay a fee (emphasis added)). Here, conversely, the Term Sheet not only fails to require Ayrton to negotiate in good faith, its plain terms disclaim any obligation on Ayrton to do anything at all. For all of these reasons, the Term Sheet lacks consideration and is therefore not a contract.

### B. If this Court Finds an Ambiguity, Extrinsic Evidence Supports Bitdeer's Position.

To the extent this Court finds that the Term Sheet is ambiguous as to whether it is supported by consideration, extrinsic evidence confirms that it is not. *Int'l Bus. Machs. Corp. v. United Microelectronics Corp.*, 764 F. App'x 9, 16 (2d Cir. 2019) ("If a contract is found to be ambiguous, extrinsic evidence may be used to resolve the ambiguity."). Ayrton's corporate representative and chief negotiator of the Term Sheet testified unequivocally and repeatedly that he intended for Ayrton to be bound by no obligations whatsoever under the Term Sheet. Bitdeer's Rule 56.1 Statement at ¶ 31 ("Q. So you understand, cause I think you told me, that Ayrton is not legally

[1] All exhibits cited herein are exhibits to the November 12, 2025 Declaration of Renita Sharma.

bound under this term sheet to do anything. Do you agree with that? A. Agreed, yup."); *id.* ("It's a nonbinding term sheet. So, of course, I'm not committing to anything."); *id.* at ¶ 32 (agreeing that "even in the scenario where a day after the term sheet is signed Ayrton decides it doesn't want to do the deal, Ayrton's position . . . is the 30-day [exclusivity] restriction applies even in that scenario."). In these circumstances, any ambiguity as to the existence of consideration must be resolved in Bitdeer's favor. *See Beekman Inv. Partners, L.P. v. Alene Candles, Inc.*, 2006 WL 330323, at *7 (S.D.N.Y. Feb. 14, 2006) (enforceability of preliminary agreements depends on "the intent of the parties: whether the parties intended to be bound, and if so, to what extent" (quoting *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 548-49 (2d Cir. 1998)); *Consol. Edison, Inc. v. Ne. Utils.*, 426 F.3d 524, 529 (2d Cir. 2005) (implied obligation of good faith "exists to serve the intent of the parties, and does not operate at cross-purposes to that intent").

## II. THE EXCLUSIVITY PROVISION IS AN UNENFORCEABLE PENALTY.

Under New York law, "public policy is firmly set against the imposition of penalties or forfeitures for which there is no statutory authority." *Truck Rent-A-Ctr., Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 424 (1977); *see also Garrity v. Lyle Stuart, Inc.*, 40 N.Y.2d 354, 360 (1976) ("The freedom of contract does not embrace the freedom to punish, even by contract."); *Wetzler v. Roosevelt Raceway, Inc.*, 208 A.D.2d 120, 126 (1st Dep't 1995) ("It is well settled that the imposition of a penalty is exclusively the prerogative of the sovereign and that a contractual provision that operates as a penalty is unenforceable."). Courts will enforce penalties only if they amount to liquidated damages, *i.e.*, "where (1) actual damages are difficult to determine and (2) the amount of damages awarded pursuant to the clause is not clearly disproportionate to the potential loss." *Union Cap. LLC v. Vape Holdings Inc.*, 2017 WL 1406278, at *7 (S.D.N.Y. Mar. 31, 2017) (citing *U.S. Fidelity & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34, 70-71 (2d Cir. 2004)); *see also Truck*, 41 N.Y.2d at 424. While Bitdeer bears the burden to show that the

Exclusivity Provision is an unenforceable penalty, *JMD Holding Corp. v. Cong. Fin. Corp.*, 4 N.Y.3d 373, 380 (2005), "if there is any reasonable doubt as to whether the clause imposes a penalty, courts should construe the provision as a penalty," *139 Fifth Ave. Corp. v. Giallelis*, 1996 WL 154108, at *4 (S.D.N.Y. Apr. 3, 1996). If Bitdeer succeeds in invalidating the provision, Ayrton can only recover its actual damages from Bitdeer's alleged breach. *Id.*

The Term Sheet's Confidentiality and Exclusivity Provision fails both prongs of the liquidated damages analysis: Ayrton's damages for breach of the obligations contained therein were readily ascertainable at the time of contracting and the Provision's penalties are grossly disproportionate to those foreseeable damages. Because Ayrton seeks no damages other than those mandated by the unenforceable penalty provision, summary judgment to Bitdeer is proper.

**A. Ayrton's Damages from a Breach of Exclusivity Were Readily Ascertainable.**

Ayrton's damages from Bitdeer's breach of the Confidentiality and Exclusivity Provision were readily ascertainable at the time of contracting. The relevant damages are the compensation Ayrton could recover from Bitdeer's breach of exclusivity, in the absence of the penalties mandated by the Provision. Under New York law, a plaintiff suing for breach of an exclusive negotiating agreement can recover only its out-of-pocket costs from negotiating with the defendant. *See, e.g.*, *Goodstein Const. Corp. v. City of N.Y.*, 80 N.Y.2d 366, 373 (1992) ("To allow the profits that plaintiff might have made under the prospective [transaction] as the damages for breach of the exclusive negotiating agreements would be basing damages not on the exclusive negotiating agreements but on the prospective terms of a nonexistent contract which the [defendant] was fully at liberty to reject."); *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 431 (2d Cir. 2011) ("Although lost profits are not available where no agreement is reached, out-of-pocket costs incurred in the course of good faith partial performance are appropriate."). As these

cases hold, lost profit damages are only available when parties have agreed to a binding definitive agreement and not, as is the case here, when they merely signed an exclusivity agreement. *Id.*

Ayrton's out-of-pocket expenses, *i.e.* its diligence costs and legal fees, were not "incapable or difficult of precise estimation," as is required to enforce liquidated damages. *Truck*, 41 N.Y.2d at 425. The Term Sheet called for Bitdeer to cover "all of [Ayrton's] due diligence and legal fees" beginning with "an initial deposit of $125,000." Bitdeer's Rule 56.1 Statement at ¶ 26. Bitdeer also agreed to cover additional diligence and legal fees if Ayrton "provide[d] documentation," *id.*—a concession within the Term Sheet that all diligence costs and legal fees are ascertainable by tallying the relevant invoices. This case is thus akin to those in which courts declined to enforce penalties where the law provides an easy way to quantify plaintiff's foreseeable losses. *See, e.g.*, *LG Cap. Funding, LLC v. M Line Holdings, Inc.*, 422 F. Supp. 3d 739, 748 (E.D.N.Y. 2018) (penalty for failure to sell securities unenforceable because underlying damages "were ascertainable" at time of contracting); *Quaker Oats Co. v. Reilly*, 274 A.D.2d 565, 566 (2d Dep't 2000) (penalty for failure to repay a note unenforceable because losses were ascertainable "by calculating the interest accrued from the time of the breach [and] by submitting receipts for court costs."). Conversely, where courts have enforced liquidated damages, the difficulty of quantifying actual losses was far greater. *See, e.g.*, *DAR & Assocs., Inc. v. Uniforce Servs., Inc.*, 37 F. Supp. 2d 192, 200 (E.D.N.Y. 1999) (plaintiff would face "enormous" burden in "establishing" damages from "a complete temporary loss of the clients and temporary employees it had developed" in Maryland); *Rattigan v. Commodore Int'l Ltd.*, 739 F. Supp. 167, 172 (S.D.N.Y. 1990) (enforcing liquidated damages given difficulties calculating "the present value of earnings under the contract minus what the employee has earned or expects to earn at another job").

The Confidentiality and Exclusivity Provision is thus unenforceable for the independent reason that Ayrton's foreseeable losses were readily ascertainable at the time of contracting.

**B. The Penalties Are Grossly Disproportionate to Ayrton's Foreseeable Losses.**

The Confidentiality and Exclusivity Provision is also an unenforceable penalty because it would result in damages "conspicuously disproportionate" to Ayrton's foreseeable losses from any breach by Bitdeer of the obligations contained in the Provision. *See JMD*, 4 N.Y.3d at 380.

*First*, the Term Sheet is structured to guarantee that Ayrton will never incur any compensable damages from a breach of exclusivity by Bitdeer. As discussed above, *see supra*, 13-14, Ayrton's only available damages from any alleged breach of exclusivity are Ayrton's out-of-pocket costs in negotiating with Bitdeer. But the Term Sheet already required Bitdeer to "pay for all of [Ayrton's] due diligence and legal fees." Bitdeer's Rule 56.1 Statement at ¶ 26. Bitdeer must therefore already cover the only damages that Ayrton could ever claim as a result of Bitdeer's alleged breach. "Under no circumstances . . . will liquidated damages be allowed where the contractual language and attendant circumstances show that the contract provides for the full recovery of actual damages, because liquidated damages and actual damages are mutually exclusive remedies under New York law." *U.S. Fidelity & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34, 71 (2d Cir. 2004) (invalidating penalty); *see, e.g.*, *Bristol Inv. Fund, Inc. v. Carnegie Int'l Corp.*, 310 F. Supp. 3d 556, 558 (S.D.N.Y. 2003) (invalidating penalty where contract already provided default fee and interest). As the Term Sheet reflects, and as Ayrton's corporate representative and chief negotiator admitted, the penalties in the Term Sheet do not have "any direct correlation to any damages that have been suffered." Bitdeer's Rule 56.1 Statement at ¶ 33.

*Second*, the penalties are grossly disproportionate because Ayrton in fact sustained no damages. Bitdeer paid the initial, non-refundable diligence deposit of $125,000, *see* Bitdeer's Rule 56.1 Statement at ¶ 36, and that deposit exceeded Ayrton's costs in negotiating with Bitdeer,

*id.* at ¶ 47, meaning that Ayrton made a profit on the deposit. In cases where the plaintiff in fact sustained no actual damages, courts have declined to enforce penalty provisions as grossly disproportionate. *See, e.g.*, *Cent. Irrigation Supply v. Putnam Country Club Assoc., LLC*, 57 A.D.3d 934, 935 (2d Dep't 2008) (penalty to compensate for delays repairing a golf course grossly disproportionate where golf course "was never required to be closed by reason of the delay"); *Prada USA Corp. v. 724 Fifth Fee Owner LLC*, 2021 WL 2126109, at *2 (N.Y. Sup. Ct. May 25, 2021) (declining to enforce $5-million penalty for suspension of a tenancy where tenant never had to "surrender . . . occupancy" of the premises). Having sustained no actual damages, Ayrton cannot collect a penalty consisting of a $787,500 fine and the right to "participate" in ***all of Bitdeer's "third party transactions"***[2] for a six-month period that does not begin until Ayrton says so.

*Third*, the Confidentiality and Exclusivity Provision calls for a grossly disproportionate penalty because it applies to breaches of multiple distinct obligations. *See* 14 WILLISTON ON CONTRACTS § 65:18 (4th ed.) ("[W]here potential damages from a breach of various covenants differ in amount, one stipulated fixed sum of liquidated damages cannot be construed as a reasonable approximation for breach of each covenant, and is generally construed as a penalty."). The Provision obligates Bitdeer not to: (i) "disclose the terms contained herein to any other person or entity;" (ii) "solicit, negotiate or accept any term sheets, proposals, transaction documents or agreements whether binding or non-binding from any other party with respect to a financing transaction;" or (iii) "close a financing transaction." Bitdeer's Rule 56.1 Statement at ¶ 24. The penalties, in turn, are triggered "if the Company [Bitdeer] breaches *any* of the confidentiality and

[2] Far from attempting to read down the breadth of this language—which is not even a standard term for Ayrton, *see* Bitdeer's Rule 56.1 Statement at ¶ 35—Ayrton embraces the language in all of its absurdity. *See* Compl. at ¶ 7 (Bitdeer "must offer Ayrton the right to participate in any transaction it closes, regardless of whether it is a financing transaction or not.").

exclusivity prohibitions outlined in this section." *Id.* (emphasis added). Accordingly, if Bitdeer, for example, "disclose[s] the terms contained [in the Term Sheet] to any other person," such as a third-party accountant, Ayrton gets the break-up fee and a right to participate—even if the parties negotiate and ultimately execute the transaction contemplated by the Term Sheet. Because the Provision imposes a single, extreme consequence for three distinct breaches that do not cause comparable harm, the Provision cannot reasonably approximate Ayrton's foreseeable losses. *See, e.g.*, *Atlantis Mgmt. Grp. II LLC v. Nabe*, 216 A.D.3d 526, 527 (1st Dep't 2023) (invalidating penalty purporting to remedy "any act in contravention of the [contracts], without limitation"); *Bradford*, 501 F.2d at 57 ("a fixed amount for any breach irrespective of its gravity or the probable damage to be contemplated might well classify the clause as an unenforceable penalty.").

Ayrton has repeatedly suggested that the Confidentiality and Exclusivity Provision is enforceable based on the First Department decision in *RDF Agent*. Again, that case is inapposite. There, the relevant provision fixed liquidated damages at "1% of the maximum loan amount." 227 A.D.3d at 428; *see also* Ex. 34 at 9. The court enforced the provision given New York case law that fees of "1-2%" in lending agreements approximate the actual costs a lender may incur when setting aside funds to lend or otherwise limiting its activities in reliance on a financing term sheet. *RDF Agent*, 227 A.D.3d at 428 (*citing JMD*, 4 N.Y.3d at 377 (early termination fee of 1-2% of maximum loan amount was not an unenforceable penalty where lender demonstrated it had set aside funds for lending and incurred costs as a result)). Of course, here, Ayrton seeks damages in excess of ***30 percent*** of the Term Sheet's contemplated loan amount. Bitdeer is aware of no case in which a court has considered, let alone enforced, the extreme remedy that Ayrton seeks here.

The Confidentiality and Exclusivity Provision is therefore unenforceable because it calls for grossly disproportionate damages compared with Ayrton's foreseeable actual losses.

### C. The Confidentiality and Exclusivity Provision Is Unenforceable Unless It Is a Liquidated Damages Clause.

Ayrton has primarily defended the enforceability of the Confidentiality and Exclusivity Provision on the basis that the "right to participate" provision affords Ayrton no more than a freestanding, non-punitive contractual right to invest money in Bitdeer. Ayrton's position is contradicted by the plain language of the Term Sheet and case law analyzing penalty provisions.

The terms of the Confidentiality and Exclusivity Provision demonstrate that it is intended to operate as a penalty. As discussed above, *see supra*, 16-17, the Provision imposes three distinct confidentiality and exclusivity obligations on Bitdeer. The Provision then sets the penalties at issue here, which are triggered "*if [Bitdeer] breaches any of the confidentiality and exclusivity prohibitions outlined in this section*." Bitdeer's Rule 56.1 Statement at ¶ 24 (emphasis added). By the Provision's plain terms, the penalties that Ayrton seeks to enforce are triggered only upon Bitdeer's breach, making the Provision a classic penalty clause that can only be enforced if it is a liquidated damages clause. *See NML Cap. v. Republic of Argentina*, 621 F.3d 230, 236-37 (2d Cir. 2010) (penalty provisions are those triggered by an underlying breach); *LG Cap. Funding, LLC v. Accelera Innovations, Inc.*, 2018 WL 5456670, at *14 n.12 (S.D.N.Y. 2018) (where higher interest rate was "activated upon a defined breach," it was "subject to the same level of scrutiny as other varieties of liquidated damages provisions" (internal quotations and citation omitted)); *see also, e.g.*, *172 Van Duzer Realty Corp. v. Globe Alumni Student Assistance Ass'n, Inc.*, 24 N.Y.3d 528, 536 (2014) (lease acceleration clause "subject to judicial scrutiny" as "a penalty otherwise proscribed by the law").

The plain language likewise demonstrates the parties did not intend for the Confidentiality and Exclusivity Provision to permit Bitdeer to choose between two alternative forms of performance. *See* 11 CORBIN ON CONTRACTS § 58.18. The Term Sheet does not afford Bitdeer

the option of ***either*** honoring its confidentiality and exclusivity obligations ***or*** paying the break-up fee and providing the right to participate; instead, the Term Sheet ***requires*** Bitdeer to honor its obligations ***or else*** incur the penalties mandated by the provision.[3] *See Bradford v. New York Times Co.*, 501 F.2d 51, 56 (2d Cir. 1974) (non-compete clause did not provide for alternative performances where "the Times reserved the right to withhold stock payments" "[i]n the event the contract was breached."). Even if the language supported an interpretation whereby the Provision contemplated alternative performances, the relative value of each alternative confirms the Provision operates as a penalty. *See, generally*, RESTATEMENT (2D) OF CONTRACTS § 356 cmt. c ("In determining whether a contract is one for alternative performances, the relative value of the alternatives may be decisive."); 11 CORBIN ON CONTRACTS § 58.18; 14 WILLISTON ON CONTRACTS § 42:10 (4th ed.). One form of performance requires Bitdeer to preserve confidentiality and exclusivity, but entitles Ayrton to no deal, while the other claimed form of performance entitles Ayrton to $787,500 and a "right to participate for 25% in any third party transaction" executed by Bitdeer for six months from a date that Ayrton can prevent from ever occurring, *see supra*, 15-16. *See Brecher v. Laikin*, 430 F. Supp. 103, 106 (S.D.N.Y. 1977) (a contractual clause that "operate[s] as a means to compel performance" will be "deemed a penalty and will not be enforced"). As Ayrton admitted, it intended not only to secure the right to participate in a competing transaction, but also in any transaction at all or even in multiple transactions, including transactions that involve no financing. Bitdeer's Rule 56.1 Statement at ¶¶ 34, 73; Compl. ¶ 7. The Provision thus does not provide for enforceable alternatives to performance.

---

[3] This difference is not merely semantic. Among other distinctions, "the performance of either alternative completely discharges the promisor's duty and earns the performance that was promised in exchange. The payment of damages for breach of a promise never entitles the wrongdoer to the performance promised in exchange." 11 CORBIN ON CONTRACTS § 58.18.

Nor is there any merit to Ayrton's contention that the Confidentiality and Exclusivity Provision does not extract a penalty because it involves an investment by Ayrton in Bitdeer. Under New York law, a contingent right to participate in the ownership of an entity is an asset to the holder of that right, and a contingent liability of the entity. *See, e.g.*, *Schaffer v. Coral Reef Cap., LLC*, 2020 WL 7315529, at *4 (N.Y. Sup. Ct. Dec. 10, 2020) ("The entitlement to carried interest and the ownership of investments that Plaintiff alleges he earned during his employment are assets that have present value, even if the right to payment has yet to be realized."). Because a "right to participate" can constrain a company's ability to deal with only those third parties it wants to deal with, a "right to participate" is a valuable right given up by a company to a potential investor. And Ayrton itself seeks damages in excess of $30 million, Compl. at ¶ 36, despite having made no investment in Bitdeer, effectively conceding that its purported right to participate in the Tether transaction is extremely valuable. Moreover, even if Bitdeer had permitted Ayrton to invest in the Tether transaction when Ayrton first voiced a desire to do so, weeks after the transaction closed, Ayrton's "participation" would have required Bitdeer to forfeit stock at a significant discount, far in excess of the discount Tether received when the Transaction closed.

It is likewise immaterial that the penalties do not take the form of a simple monetary fine, as courts routinely invalidate forfeitures as unenforceable penalties. For example, in *Atlantis*, the court invalidated a penalty permitting plaintiff to buy back defendant's interest in a business at a below-market price because that penalty was "not a reasonable measure of the anticipated harm arising from a breach but was instead punitive in nature, serving to propel performance by the [defendants] rather than to merely compensate for a loss." 216 A.D.3d 526, 526 (1st Dep't 2023). Similarly, in *In re O.P.M. Leasing Services, Inc.*, the court invalidated the plaintiff's option, activated on defendant's breach, of renewing a lease at a below-market monthly rent as an

unenforceable penalty. 23 B.R. 104, 110-15 (Bankr. S.D.N.Y. 1982). As these cases show, the mere fact that the Confidentiality and Exclusivity Provision mandates certain rights alongside a monetary fee does not exempt the Provision from scrutiny as an unenforceable penalty.

For all of these reasons, unless the Confidentiality and Exclusivity Provision's penalties are liquidated damages, they cannot be enforced.

## III. BITDEER PROVIDED AYRTON A RIGHT TO PARTICIPATE IN THE TETHER TRANSACTION.

If this Court concludes that Bitdeer breached its exclusivity obligations and that the Confidentiality and Exclusivity Provision is enforceable, this Court should conclude that Bitdeer did not breach its obligation to provide Ayrton the right to participate in the Tether transaction. As Ayrton has admitted repeatedly, Bitdeer notified Ayrton that it was negotiating a $100-million equity transaction with a third party more than a week before the Tether transaction closed. Bitdeer's Rule 56.1 Statement at ¶ 60. In other litigation it filed in early 2020, Ayrton, through the Alto Opportunity Master Fund (the "Alto Fund") that it manages and controls, rushed into court to enjoin an issuance of shares by a company in which Ayrton claimed a "right to participate." *Id.* at ¶ 70. But here, conversely, Ayrton did not rush into court or even demand a right to participate in the Tether transaction; instead, Ayrton congratulated Bitdeer on the deal. *Id.* at ¶ 61. After the transaction closed on May 30, 2024 and the complete terms were filed publicly with the Securities and Exchange Commission the next day, *id.* at ¶¶ 58-59, Ayrton opportunistically waited another ***ten days***, until June 10, 2024, before it invoked any right to participate, *id.* at ¶¶ 60-63. During this period, Ayrton watched Bitdeer's stock price increase more than 27 percent from a low of $5.81 per share on May 22, 2024 through a high of $7.42 on June 10, 2024, because, to quote its chief negotiator and corporate representative, Ayrton "did have the opportunity" "and the option" to participate. *Id.* at ¶¶ 69, 77, 80. To the extent Ayrton enjoyed a contractual "right to

participate for 25%" in the Tether transaction, Bitdeer's notification to Ayrton of the transaction fulfilled any obligation Bitdeer had to "provide" Ayrton the right to participate.

There is no textual basis in the Term Sheet for Ayrton to demand anything more from Bitdeer to fulfill Bitdeer's purported obligation to "provide a right to participate." Whereas Ayrton's principal has previously been involved in litigation over participation rights included in another term sheet which listed specific actions a borrower must take to provide a right to participate, no such required actions are specified in this Term Sheet. *Compare Tenor Opportunity Master Fund, Ltd. v. Oxygen Biotherapeutics, Inc.*, 2012 WL 2849384, at *2 (S.D.N.Y. July 11, 2012) (five-part "right to participate" provision requiring company to give notice of a deal, investor to respond within one day, company to offer 50-percent participation and full deal terms, and investor to respond within 24 hours) *with* Bitdeer's Rule 56.1 Statement at ¶ 24 ("provide Ayrton the right to participate for 25% in any third party transaction," full stop). The handful of reported cases involving enforcement of other "rights to participate" likewise involved more elaborate provisions governing the parties' respective rights and obligations. *See, e.g.*, *Alpha Cap. Anstalt v. Imaging3, Inc.*, 2018 WL 3597520, at *3 (S.D.N.Y. July 26, 2018) (company required to give 10 business days' notice prior to closing a Qualified Financing, investor permitted to participate "upon the same terms and conditions (except with respect to purchase price), in such Qualified Financing at a purchase price determined by" a defined mathematical formula); *Alpha Cap. Anstalt v. Oxysure Sys., Inc.*, 216 F. Supp. 3d 403, 407 (S.D.N.Y. 2016) (company required to give seven days' notice prior to closing a Subsequent Financing, and "each Purchaser shall have the right to participate in up to an amount of the Subsequent Financing equal to 100% of the Subsequent Financing on the same terms, conditions and price provided for in the subsequent financing"). Had Ayrton wanted such protections, it was free to negotiate them, as its principal has done before.

Ayrton's contrary interpretation—whereby it is permitted to wait and see how Bitdeer's stock price performs before opportunistically choosing to "participate" on terms more favorable than those given to Tether—is absurd and commercially unreasonable. "It is black-letter law that courts must reject interpretations of agreement provisions that are commercially unreasonable or illogical." *Wells Fargo Bank, N.A. v. Wright Mill Holdings, LLC*, 127 F. Supp. 3d 156, 173 (S.D.N.Y. 2015). Permitting Ayrton to wait and see how a transaction performs before voicing any desire to participate would permit Ayrton to participate on more favorable terms than those offered to a counter-party, who assumed the risk that the transaction would under-perform. Such an approach would also serve only to inflate Ayrton's damages for breach, contrary to established principles. *See Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 826 (2d Cir. 1990) ("New York courts have expressly refused to adopt [a] 'wait and see' theory of damages."). Accordingly, the only reasonable interpretation of Bitdeer's obligation to "provide a right to participate" to Ayrton is that Bitdeer must give advance notice to Ayrton of a third party transaction, such that Ayrton is afforded a reasonable opportunity to participate before that transaction closes.

If there is any ambiguity as to whether Bitdeer fulfilled its obligation to "provide a right to participate," that is because the Term Sheet is too indefinite to be enforced. "If an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract." *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 74 N.Y.2d 475, 482 (1989); *Interocean Shipping Co. v. Nat'l Shipping & Trading Corp.*, 462 F.2d 673, 676 (2d Cir. 1972) ("Under the general principles of contract law, there is no contract if the parties fail to agree on all the essential terms or if some of the terms are too indefinite to be enforceable."). The failure of the parties to specify any of the following makes it impossible for the Court to rule in Ayrton's favor: whether Bitdeer is required to give advance notice of a third-party transaction; whether Ayrton is permitted

to wait and see how the transaction performs (and if so, for how long) before participating; whether Ayrton gets the same terms as the third party; whether Ayrton gets the same price as the third party, or the same percentage premium. It is likewise unclear whether, in the context of the Tether transaction, Ayrton's "participat[ion] for 25%" entitles Ayrton to invest $25 million (*i.e.* 25 percent of Tether's $100-million investment) or $33.33 million (*i.e.* 25 percent of an overall $133.33-million deal with a $100-million contribution by Tether and a $33.33-million contribution by Ayrton). "[I]f the terms of the agreement are so vague and indefinite that there is no basis or standard for deciding whether the agreement had been kept or broken, or to fashion a remedy, and no means by which such terms may be made certain, then there is no enforceable contract." *Candid Prods., Inc. v. Int'l Skating Union*, 530 F. Supp. 1330, 1333-34 (S.D.N.Y. 1982).

## IV. AYRTON CANNOT RECOVER DAMAGES ON BEHALF OF THE ALTO FUND.

If this Court enforces the Term Sheet and finds Bitdeer liable, the Court should rule that Plaintiff Ayrton Capital, LLC is not permitted to recover damages on behalf of the Alto Fund, the investment fund that Ayrton manages. Bitdeer's Rule 56.1 Statement at ¶ 4. It is black-letter law that "[d]amages for breach of contract should put the plaintiff in the same economic position he would have occupied had the breaching party performed the contract." *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 143 (2d Cir. 2016) (quoting *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 196 (2d Cir. 2003)). Here, had Ayrton "participated" in the Tether transaction, its capital contribution would have come from the Alto Fund. Bitdeer's Rule 56.1 Statement at ¶ 6. Ayrton's only interest in the investment would have been limited to the management and performance fees it earns as manager of the Alto Fund: a 2.35-percent fee on all of the assets under management, combined with a 20-percent performance fee triggered whenever the fund outperforms its past best performance. *Id.* at ¶ 8. To award Ayrton the damages that properly belong to the Alto Fund, whose partners have never been informed of this litigation, *id.*

at ¶ 73, would be to "provide [Ayrton] with a windfall or place [Ayrton] in a better position than if the contract had been performed," contrary to established principles. *Rhee v. SHVMS, LLC*, 2024 WL 4589656, at *10 (S.D.N.Y. Oct. 28, 2024).

The fact that Ayrton and the Alto Fund are affiliates does not solve Ayrton's lack of standing to recover damages on behalf of the Fund. "It is black-letter law that one corporation cannot assert an affiliate's legal rights." *Clarex Ltd. v. Natixis Sec. Am. LLC*, 2012 WL 4849146, at *6 (S.D.N.Y. Oct. 12, 2012) (collecting cases); *see also Hudson Optical Corp. v. Cabot Safety Corp.*, 1998 WL 642471, at *3 (2d Cir. Mar. 25, 1998) (parent company "had no standing to assert [its subsidiary's] legal rights"); *Wilhelmina Models, Inc. v. Fleisher*, 19 A.D.3d 267, 268-69 (1st Dep't 2005). As the Term Sheet is between "Ayrton Capital LLC as Investment Manager for Alto Opportunity Master Fund, SPC – Segregated Master Portfolio B" and Bitdeer, *see* Bitdeer's Rule 56.1 Statement at ¶ 16, the Alto Fund could also have brought claims against Bitdeer but did not do so. *See 42-50 21st St. Realty LLC v. First Cent. Savs. Bank*, 2022 WL 1004187, at *13 (E.D.N.Y. Apr. 4, 2022) (third party permitted to sue under contract that disclosed "an intent to permit enforcement by the third party" (quoting *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*, 66 N.Y.2d 38, 45 (1985)). While Bitdeer does not know why Ayrton chose not to include the Alto Fund as a co-plaintiff,[4] Ayrton and the Alto Fund must live with the consequences.

## CONCLUSION

For the reasons stated above, Bitdeer's Motion for Summary Judgment should be granted.

---

[4] If Ayrton tried to assert claims on behalf of the Alto Fund, this Court would lack diversity jurisdiction as the Alto Fund and Bitdeer are both Cayman Islands citizens. Bitdeer's Rule 56.1 Statement at ¶¶ 2, 5; *Creaciones Con Idea, S.A. de C.V. v. Mashreqbank PSC*, 232 F.3d 79, 82 (2d Cir. 2000) ("[E]ven if a corporation organized under the laws of a foreign nation maintains its principal place of business in a State, and is considered a citizen of that State, diversity is nonetheless defeated if another alien party is present on the other side of the litigation.").

Dated: New York, New York
November 12, 2025

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By: */s/ Renita Sharma*

Michael B. Carlinsky
Renita Sharma
Anil Makhijani
Daniel Sisgoreo
295 Fifth Avenue
New York, New York 10016
Telephone: (212) 849-7000
michaelcarlinsky@quinnemanuel.com
renitasharma@quinnemanuel.com
anilmakhijani@quinnemanuel.com
danielsisgoreo@quinnemanuel.com

*Attorneys for Defendant*
*Bitdeer Technologies Group*