UNITED STATES U.S. DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AYRTON CAPITAL, LLC,

*Plaintiff*,

v.

BITDEER TECHNOLOGIES GROUP,

*Defendant*.

Case No. 24-5160 (LJL)

**ORAL ARGUMENT REQUESTED**

**PLAINTIFF AYRTON CAPITAL, LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS


**Page**

**TABLE OF AUTHORITIES** ... ii

**PRELIMINARY STATEMENT** ... 1

**SUMMARY OF UNDISPUTED FACTS** ... 2

**APPLICABLE LEGAL STANDARDS** ... 8

**ARGUMENT** ... 9

I. AYRTON HAS ESTABLISHED LIABILITY ON ITS BREACH OF CONTRACT CLAIM ... 9

A. The Term Sheet's Exclusivity Provision is Valid and Binding ... 9

B. Bitdeer Breached the Term Sheet By Failing To Provide Ayrton The Right To Participate In The Executed Tether Transaction ... 11

C. The Breach of Ayrton's Participation Right Occurred Upon Bitdeer's Rejection of Ayrton's Participation Demand ... 13

D. Bitdeer is Liable for Ayrton's Attorney's Fees and Costs ... 15

II. BITDEER'S AFFIRMATIVE DEFENSES ARE LEGALLY AND FACTUALLY BASELESS ... 15

A. Unenforceable Penalty, Unconscionability, and Contrary to Public Policy (Affirmative Defense Nos. 1, 2, and 7) ... 15

B. Equitable Doctrines of Estoppel, Laches, Waiver, Unclean Hands, or Bad Faith (Affirmative Defense Nos. 3 and 4) ... 17

C. Failure of a Condition Precedent (Affirmative Defense No. 5) ... 19

D. No Legally Cognizable Injury or Damages (Affirmative Defense No. 6) ... 20

E. Comparative Fault (Affirmative Defense No. 8) ... 20

F. Attorneys' Fees Are Not Recoverable (Affirmative Defense No. 9) ... 20

G. Impossibility of Performance (Affirmative Defense No. 10) ... 20

H. Ambiguity (Affirmative Defense No. 11) ... 21

I. Failure to State a Claim (Affirmative Defense No. 13) ... 21

J. Fraud in the Inducement (Affirmative Defense No. 14 ....................21

**CONCLUSION** ....................25

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*159 MP Corp. v. Redbridge Bedford, LLC*,
33 N.Y.3d 353 (2019) ....................1

*500 W. 43rd Street Realty, LLC v. Thukral*,
2025 WL 315375 (S.D.N.Y. Jan. 28, 2025) ....................17

*Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.*,
404 F.3d 566 (2d Cir. 2005)....................17, 18

*Alpha Capital Anstalt v. Imaging3, Inc.*,
2018 WL 3597520 (S.D.N.Y. July 26, 2018) ....................13

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....................8

*Apfel v. Prudential-Bache Sec. Inc.*,
81 N.Y.2d 470 (1993) ....................25

*Assure Global, LLC v. Anderson*,
763 F. Supp. 3d 476 (S.D.N.Y. 2025)....................8

*Boyce v. Soundview Tech. Grp., Inc.*,
464 F.3d 376 (2d Cir. 2006)....................13

*Bruce v. Martin*,
1993 WL 148904 (S.D.N.Y. Apr. 30, 1993)....................22, 24

*CDS Bus. Servs., Inc. v. H.M.C., Inc.*,
2023 WL 3847415 (E.D.N.Y. Apr. 28, 2023) ....................11

*Commonwealth Assocs. v. Palomar Med. Tech., Inc.*,
982 F. Supp. 205 (S.D.N.Y. 1997) ....................13

*Congelados del Cibao v. 3 Kids Corp.*,
2022 WL 1321397 (S.D.N.Y. May 3, 2022) ....................23

*Crescit Mortgage Capital, LLC v. Emerald Bay Apartments, LLC*,
2024 WL 5340718 (S.D.N.Y. Dec. 27, 2024) ....................16

*CVS Pharmacy, Inc. v. Press. Am., Inc.*,
377 F. Supp. 3d 359 (S.D.N.Y. 2019)....................11

*Deutsche Bank Nat'l Tr. Co. v. Marino*,
227 N.Y.S.3d 270 (1st Dep't 2025) ....................18

**Page(s)**

*DiStefano v. Maclay*,
102 F. App'x 188 (2d Cir. 2004) ....................17–18

*DNV Investment P'ship v. Field*,
2020 WL 2539029 (S.D.N.Y. May 19, 2020) ....................22

*Dorchester Pub. Co. v. Lanier*,
2006 WL 4388035 (S.D.N.Y. Mar. 19, 2006) ....................21

*Echostar Satellite L.L.C. v. ESPN, Inc.*,
914 N.Y.S.2d 35 (1st Dep't 2010) ....................17, 18, 19

*Eletson Holdings, Inc. v. Levona Holdings Ltd.*,
731 F. Supp. 3d 531 (S.D.N.Y. 2024)....................20

*Exodus Partners, LLC v. Cooke*,
2007 WL 120053 (S.D.N.Y. Jan. 17, 2007) ....................20

*FCS Advisors, Inc. v. Fair Finance Co., Inc.*,
2009 WL 1403869 (S.D.N.Y. May 19, 2009) ....................16

*Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt*., *L.P.*,
7 850 N.E.2d 653 (N.Y. 2006)....................12

*GE Oil & Gas, Inc. v. Turbine Gen. Servs., L.L.C.*,
93 N.Y.S.3d 5 (1st Dep't 2019) ....................22, 23

*Gillman v. Manhattan Chase Bank, N.A.*,
73 N.Y.2d 1 (1988) ....................16–17

*Hermanowski v. Acton Corp.*,
580 F. Supp. 140 (E.D.N.Y. 1983) ....................13

*Hidden Pond Schodack, LLC v. Hidden Pond Homes, Inc.*,
138 N.Y.S.3d 215 (3d Dep't 2020)....................24

*Howard Univ. v. Borders*,
588 F. Supp. 3d 457 (S.D.N.Y. 2022)....................21

*Jacobs v. Citibank, N.A.*,
459 N.Y.S.2d 781 (1st Dep't 1983) ....................11

*Jaramillo v. Weyerhaeuser Co.*,
536 F.3d 140 (2d Cir. 2008)....................15

*Jet Acceptance Corp. v. Quest Mexicana S.A. de C.V.*,
929 N.Y.S.2d 206 (1st Dep't 2011) ....................16

**Page(s)**

*JMD Holding Corp. v. Congress Fin. Corp.*,
4 N.Y.3d 373 (N.Y. 2005) ....................16

*Kirby v. United States*,
260 U.S. 423 (1922)....................11

*Lee v. Canada Goose US, Inc.*,
2021 WL 6881256 (S.D.N.Y. Oct. 19, 2021) ....................17

*LoanStreet, Inc. v. Troia*,
2023 WL 5836237 (S.D.N.Y. Sept. 8, 2023)....................23

*Lucente v. Int'l Bus. Machines Corp.*,
146 F. Supp. 2d 298 (S.D.N.Y. 2001)....................13

*Maxim Grp. LLC v. Life Partners Holdings, Inc.*,
690 F. Supp. 2d 293 (S.D.N.Y. 2010)....................8

*Medacist Sols. Grp., LLC v. CareFusion Sols., LLC*,
2021 WL 293568 (S.D.N.Y. Jan. 28, 2021) ....................20

*Messina v. Ocean Repair Serv. Co.*,
1993 WL 427443 (S.D.N.Y. Oct. 19, 1993) ....................18

*Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.*,
86 N.Y.2d 685 (1995) ....................1, 19

*RDF Agent, LLC v. Elec. Red Ventures, LLC*,
211 N.Y.S.3d 283 (1st Dep't 2024) ....................9, 10, 21, 25

*Red Tree Invs., LLC v. Petroleos de Venezuela, S.A.*,
82 F.4th 161 (2d Cir. 2023) ....................20, 21

*In re Riodizio, Inc.*,
204 B.R. 417 (Bankr. S.D.N.Y.1997)....................13

*Simon v. Electrospace Corp.*,
28 N.Y.2d 136 (1971) ....................13

*Unicorn Crowdfunding, Inc. v. New Street Enter., Inc.*,
507 F. Supp. 3d 547 (S.D.N.Y. 2020)....................18

*Wild Bunch, SA v. Vendian Entm't, LLC*,
2018 WL 1365690 (S.D.N.Y. Feb. 26, 2018)....................22

*Wistron NeWeb Corp. v. Genesis Networks Telecom Servs*., *LLC*,
2023 WL 5211352 (S.D.N.Y. Aug. 14, 2023)....................15

**Page(s)**

*Wood v. Lucy, Lady Duff-Gordon*,
222 N.Y. 88 (1917) ........................................................................................................10

## PRELIMINARY STATEMENT

In New York, the enforcement of commercial contracts "according to the terms adopted by the parties" is a "pillar of the common law."[1] For sophisticated parties "dissatisfied with the consequences of their agreement," the State's highest court explains that "the time to say so [is] at the bargaining table."[2] In this straightforward breach of contact case, Defendant Bitdeer Technologies Group ("Bitdeer") seeks to avoid the consequences of a term sheet it executed with Ayrton Capital, LLC ("Ayrton"). But there is no genuine dispute that Bitdeer breached the term sheet by closing a third-party financing transaction and denying Ayrton's bargained-for rights to participate in that transaction and to receive a break-up fee. Summary judgement in favor of Ayrton on liability should respectfully be entered.

Bitdeer is a multi-billion dollar publicly traded cryptocurrency company advised by global elite law firm Cooley LLP. In April 2024, Bitdeer executed a two-page term sheet with Ayrton in contemplation of a [redacted] secured $100 million financing transaction. The obligation of the parties to close the financing transaction was non-binding, and subject to, among other things, due diligence and the negotiation of definitive transaction documents.

The term sheet also contained a binding exclusivity provision. Pursuant to that provision, Bitdeer agreed that it would negotiate with Ayrton only, until 30 business days after termination of the term sheet. In the event Bitdeer *did* negotiate or close a third-party financing transaction during this period, the parties agreed that Bitdeer would (i) pay Ayrton a break-up fee of 0.75% of the transaction and (ii) "provide Ayrton the right to participate in up to 25% of any third-party financing transaction executed" for a six-month period.

There is no dispute that Bitdeer executed a third-party financing transaction for $100

[1] *159 MP Corp. v. Redbridge Bedford, LLC*, 33 N.Y.3d 353, 259 (2019).
[2] *Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 695 (1995).

million with Tether International Ltd. ("Tether") while under exclusivity with Ayrton. Bitdeer then breached the very rights Ayrton had bargained for, by rejecting Ayrton's demands to participate in the transaction and for payment of the break-up fee.

For reasons that are hard to comprehend, rather than accept a $25 million investment from Ayrton, Bitdeer chose to throw the kitchen sink at Ayrton instead. Since Ayrton's demand for participation, Bitdeer has manufactured numerous arguments to excuse itself from its contractual obligations, including that the scope of the exclusivity clause is limited to "debt" transactions only, that Ayrton's participation right is actually an unenforceable penalty, that the term sheet lacks consideration and mutuality, that Ayrton was unable to perform on its own or on the schedule allegedly promised, and that Ayrton fraudulently induced Bitdeer to sign the Term Sheet. These are precisely the types of arguments, however, that New York courts routinely reject in the face of an unambiguous agreement to be bound.

More perplexing is Bitdeer's decision to force Ayrton to pursue discovery that calls into question any good-faith basis for its defenses. Bitdeer's own internal communications reflect that when Ayrton raised concerns with Bitdeer's proposed collateral for the financing transaction, Bitdeer CEO Jihan Wu instructed his employees to [redacted]. Proceeding with [redacted] while under exclusivity with Ayrton led one Bitdeer executive to ask: "[redacted]" When Ayrton did make a demand, Bitdeer employees [redacted] This lawsuit followed.

## SUMMARY OF UNDISPUTED FACTS

### A. Bitdeer Negotiates Financing With Potential Lenders in April 2024

Bitdeer is a multi-billion dollar publicly traded cryptocurrency company headquartered in

Singapore. Joint SUMF ¶ 1; SUMF ¶¶ 1–2.[3] Its Chief Executive Officer and Chairman is billionaire Jihan Wu. Joint SUMF ¶ 2. With the exception of Bitdeer's audit committee, Mr. Wu is the chairman of every executive committee at the Company. SUMF ¶ 2. He also holds 75.1% of Bitdeer's voting power, while the remainder of the officers and directors of Bitdeer collectively hold 0.4%. SUMF ¶ 3.

Ayrton is an investment manager based in Westport, Connecticut that is managed by its principal, Waqas Khatri. Joint SUMF ¶¶ 3–4. Ayrton regularly invests in public companies through negotiated private placements. Ex. 2 at 461:13-464:18.

[redacted], Bitdeer sought an infusion of capital [redacted]. Joint SUMF ¶¶ 6–7. Jeff LaBerge, Bitdeer's Vice President of Capital Markets, was [redacted]. SUMF ¶¶ 4–6. Mr. LaBerge [redacted], including Ayrton. SUMF ¶¶ 4–6.

Mr. LaBerge's primary point of contact at Ayrton was senior analyst Jarryd Gross. Ex. 2 at 99:8–14; Ex. 5 at 157:13–15, 219:16–24. On April 7, 2024, Mr. Gross circulated a draft term sheet to Mr. LaBerge. SUMF ¶ 7. The term sheet proposed a $100 million [redacted] debt investment from Ayrton. Ex. 11 at -862. The proposed transaction would be subject to due diligence and binding only upon execution of definitive transaction documents, with certain exceptions. Joint SUMF ¶¶ 7–8. One such exception was the exclusivity provision. Ex. 11 at -863.

Bitdeer also received a term sheet [redacted]

[3] Citations to "Ex. _" refer to the exhibits to the concurrently filed Declaration of Andrew D. Gladstein. Citations to "Joint SUMF _" refer to the Joint Rule 56.1 Statement of Undisputed Material Facts. Citations to "SUMF _" refer to Ayrton's Rule 56.1 Statement of Undisputed Material Facts.

[redacted]. Ex. 18 at 4234; Ex. 5 at 80:7–13. Like Ayrton's proposal, [redacted]. SUMF ¶ 5. However, the scope of [redacted]. SUMF ¶ 5. Ultimately, the term sheet with [redacted]. SUMF ¶ 6.

Bitdeer's corporate counsel, Cooley LLP, notes on its own webpage that investors commonly demand exclusivity during the negotiation of financing transactions:

> In a term sheet for a private placement, M&A transaction or other transaction, there is commonly a requirement for temporary exclusivity that requires one or both parties to negotiate exclusively with the other for a limited time or under certain conditions so that the investment of resources and time into due diligence and negotiations intended to finalize the agreement does not get interrupted or wasted because of an interloping offer.

Ex. 62 at 1.

Negotiations with Ayrton, which continued throughout April 2024, centered on exclusivity. SUMF ¶¶ 8-10. As initially proposed by Ayrton, for a [redacted], if Bitdeer entered into a third-party financing transaction, Ayrton would have a [redacted] right of participation and be entitled to a break-up fee of [redacted]. SUMF ¶ 8.

Over the course of two weeks, Bitdeer pushed back on these numbers, first by dropping the participation percentage from [redacted] to 25% and the break-up fee from [redacted] to 0.5%, SUMF ¶ 8, and then by attempting to remove the participation provision altogether, SUMF ¶ 9.

Within days of [redacted], Mr. Wu made the decision to proceed with Ayrton's term sheet. Ex. 6 at 78:12–17, 81:18–23; Ex. 26 at -3544.

### B. Bitdeer Executes the Term Sheet with Ayrton and Agrees to Binding Exclusivity

Bitdeer and Ayrton settled on final terms and fully executed the term sheet on April 29,

2024 (the "Term Sheet"). Joint SUMF ¶ 6; SUMF ¶ 14. Mr. Wu signed the Term Sheet [redacted]. SUMF ¶ 14.

The Term Sheet was non-binding with the exception of four provisions: (i) the preamble, (ii) the Confidentiality and Exclusivity provision (the "Exclusivity Provision"), (iii) the Diligence and Legal Fees provision, and (iv) the Governing Law provision (for which the parties agreed on New York law). Ex. 27 at 1827–28. Under the terms of the Exclusivity Provision, (i) Bitdeer agreed not to "solicit, negotiate or accept" other financings, or "close a financing transaction," until "30 business days following the date" the parties "agree in writing to cease negotiations of the transaction," and (ii) to the extent Bitdeer did so, it would (a) "pay Ayrton a break-up fee of 0.75%," and (b) "provide Ayrton the right to participate for 25% in any third party transaction executed by the Company" for a 180-day period. Joint SUMF ¶ 8.

The relevant language of the Exclusivity Provision is as follows:

> The Company will not disclose the terms contained herein to any other person or entity unless approved by Ayrton. The Company and/or its agents will not solicit, negotiate or accept any term sheets, proposals, transaction documents, or agreements whether binding or non-binding from any other party with respect to a financing transaction nor will the Company close a financing transaction until 30 business days following the date the parties hereto agree in writing to cease negotiations of the transaction contemplated by this Term Sheet (the 31st day thereafter defined as the "Termination Date"). From the date hereof until the Termination Date, if the Company breaches any of the confidentiality and exclusivity prohibitions outlined in this section, the Company agrees to (a) pay Ayrton a break-up fee of 0.75% of the Redemption Value of the Notes (along with any collection or enforcement fees thereof) and (b) provide Ayrton the right to participate for 25% in any third party transaction executed by the Company from the date hereof until the 180 day anniversary of the Termination Date (such transaction a "Competing Transaction").

*Id.*

**C. Bitdeer Negotiates With Tether While Under Exclusivity to Ayrton**

Days after executing the Term Sheet and beginning due diligence, Ayrton raised a concern associated with the key collateral that Bitdeer proposed to back the loan. SUMF ¶ 36. A lease to Bitdeer's most valuable U.S. property contained assignment and sale restrictions, meaning Ayrton would be unable to collateralize the lease in the event of a default by the company. Ex. 2 at 264:9–266:3–1613; SUMF ¶ 35.

When Ayrton brought the issue to Bitdeer's attention, Bitdeer's contemporaneous emails predicted that [redacted]. SUMF ¶ 35. Nonetheless, Mr. Wu instructed his employees [redacted]. Ex. 36 at -3788; Ex. 4 at 161:16–19.

On May 13, 2024, Bitdeer provided notice of termination of the Term Sheet to Ayrton. Joint SUMF ¶ 11. Bitdeer's email noted that it intended to "[redacted]." *Id.*

Bitdeer began negotiating with Tether on [redacted], SUMF ¶ 21, while [redacted], *see, e.g.*, SUMF ¶¶ 18–19. One Bitdeer executive pondered during this period: "[redacted]" SUMF ¶ 17.

**D. Bitdeer Executes the Tether Transaction and Rejects Ayrton's Demand to Participate**

Emails between Bitdeer and Tether reflect that the terms of the Tether Transaction were negotiated [redacted]. SUMF ¶ 22. The Tether Transaction closed on May 30, 2024 after the close of market trading, and was announced before market open the next day, on May 31, 2024. Joint SUMF ¶ 14; Ex. 59.

Mr. LaBerge and Bitdeer's head of U.S. strategy, Haris Basit, both conceded that [redacted] in the transaction with Tether ("Tether

Transaction"), because they [redacted]. SUMF ¶ 24; Ex. 1 at 155:22–25 (Q. "[redacted] A. [redacted]."); Ex. 5 at 257:7–9 ("[redacted].").

As the parties continued negotiating a proposed debt transaction in the first week of June, SUMF ¶ 25, Mr. Gross was evaluating the Tether Transaction when he learned during a June 10, 2024 phone call with Mr. LaBerge that, in light of Bitdeer's incoming influx of capital, it had no need to do a deal with Ayrton on the financing terms previously discussed. Ex. 2 at 109:22–110:11. Mr. Gross responded by noting Ayrton's right to participate in the Tether Transaction on that call, SUMF ¶ 26, and then by making a demand in writing on June 12, 2024, Joint SUMF ¶ 15.

Counsel for Ayrton reiterated Ayrton's demand during a telephone call with Brian French, Bitdeer's counsel at Cooley, on June 17, 2024. SUMF ¶ 27. During that call, Mr. French told Mr. Gladstein, in sum and substance, that market practice does not include equity participation rights in a debt deal and that Ayrton had known the company was planning to close an equity transaction but said nothing. Gladstein Decl. ¶ 3. He further informed Mr. Gladstein that Bitdeer was working on an alternative proposal and would respond sometime later that week. *Id.*

Just after 7:00 AM the following morning, on June 18, 2024, Bitdeer's counsel filed a request with the SEC to *accelerate* registration of the underlying Tether shares. SUMF ¶ 28.

Ayrton's counsel followed up with Bitdeer that afternoon by email, noting that it was "[redacted]. Ex. 55 at -45.

On June 19, 2024, Mr. Wu directed his employees to "[redacted]. Ex. 53 at -3516. In an email recounting his conversation with Mr.

Wu, Matt Kong, Mr. Wu's second-in-command, stated that Mr. Wu believed that Bitdeer [redacted]. *Id.* Mr. Kong openly discussed with Mr. Basit [redacted]" Ex. 54 at -3426.

On July 8, 2024, Ayrton filed suit in this Court, seeking damages arising from Bitdeer's breach of the Exclusivity Provision. ECF No. 1.

**APPLICABLE LEGAL STANDARDS**

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and the admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that [the party is] entitled to judgment as a matter of law." *Maxim Grp. LLC v. Life Partners Holdings, Inc.*, 690 F. Supp. 2d 293, 298 (S.D.N.Y. 2010) (citations omitted). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Here, Ayrton bears the burden of showing that there is no genuine dispute as to a material fact with respect to each of the well-known elements for breach of contract. "To prevail on a breach-of-contract claim in New York, a plaintiff must prove: (1) the existence of a contract, (2) performance by the party seeking recovery, (3) nonperformance by the other party, and (4) damages attributable to the breach." *Assure Global, LLC v. Anderson*, 763 F. Supp. 3d 476, 484 (S.D.N.Y. 2025) (Liman, J.) (quotations and citations omitted).

## ARGUMENT

### I. AYRTON HAS ESTABLISHED LIABILITY ON ITS BREACH OF CONTRACT CLAIM

#### A. The Term Sheet's Exclusivity Provision is Valid and Binding

In no uncertain terms, the Term Sheet reflects the Parties' unambiguous agreement to be bound by the Exclusivity Provision. The language of the provision states as follows: "Upon execution of the Term Sheet by the Company, this Confidentiality and Exclusivity section shall be binding[.]" Ex. 27 at -1828. Similarly, the preamble of the Term Sheet recognizes the binding nature of the exclusivity provision, by carving out from the non-binding provisions of the Term Sheet the Exclusivity Provision. *Id.* at -1827. Thus, the Term Sheet, which the parties do not dispute was fully executed on April 29, 2024, contains a valid and binding agreement. *See, e.g., RDF Agent, LLC v. Elec. Red Ventures, LLC*, 211 N.Y.S.3d 283, 287–88 (1st Dep't 2024) (enforcing binding exclusivity provision in a non-binding term sheet).

Bitdeer's Amended Answer and Counterclaim asserts that the Exclusivity Provision is unenforceable because it lacks mutuality and consideration. ECF No. 80 at 10. This is precisely the argument that was recently rejected by the First Department in *RDF Agent.* There, the parties agreed to binding exclusivity in connection with the execution of an otherwise non-binding term sheet. *RDF Agent*, 211 N.Y.S.3d at 286. After the defendant found alternative financing, the plaintiff sued for a contractual break-up fee and was thereafter awarded summary judgment on its claim. *Id.* In affirming, the First Department held that the binding exclusivity provision could not be set aside for lack of consideration and mutuality:

> Defendants also argue that the exclusivity provision lacks consideration and mutuality of obligation. This argument is unavailing. . . . Absent fraud or unconscionability, the adequacy of consideration is not a proper subject for judicial scrutiny[.]"

*Id.* at 287 (quoting *Apfel v. Prudential-Bache Sec. Inc.*, 81 N.Y.2d 470, 476 (1993)).

To be sure, the term sheet in *RDF Agent* required the plaintiff to proceed in good faith towards consummating the loan in question, which the First Department noted was itself adequate mutuality and consideration for a binding agreement to exist. *Id.* Critically, however, the First Department went on to say that its ruling would be unchanged even in the absence of such language, given the separate and explicit agreement of the parties to be bound: "In any event, 'an interpretation that renders a contract illusory and therefore unenforceable is disfavored and enforcement of a bargain is preferred, particularly where . . . the parties have expressed their intent to be contractually bound in writing." *Id.* (citing *Credit Suisse First Boston v. Utrecht-Am. Fin. Co.*, 80 A.D.3d 485, 488–89 (1st Dep't 2011)) (rejecting argument that agreement was unenforceable); *see also Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88, 91 (1917) (Cardozo, J.) ("A promise may be lacking, and yet the whole writing may be 'instinct with an obligation,' imperfectly expressed[.]").

This construct—of binding exclusivity during non-binding deal negotiations—is not only permissible under decades of New York law, it is also ubiquitous in the financing market. Bitdeer's own transaction counsel, Cooley LLP, notes on its own website that "there is commonly a requirement for temporary exclusivity . . . so that the investment of resources and time into due diligence and negotiations . . . does not get interrupted or wasted because of an interloping offer." Ex. 62 at 1. Moreover, [redacted]. Ex. 18 at -4233.

Bitdeer also claims that the Term Sheet is invalid as an unenforceable penalty. ECF No. 80 ¶¶ 41–45. Not so. New York courts analyzing unenforceable penalties recognize that a penalty is a fixed cost that a counterparty must pay in the event of a breach. *See, e.g.*, *CVS Pharmacy, Inc.*

*v. Press. Am., Inc.*, 377 F. Supp. 3d 359, 365 (S.D.N.Y. 2019) (describing payments for breach as "penalty"); *Jacobs v. Citibank, N.A.*, 459 N.Y.S.2d 781, 782 (1st Dep't 1983) ("To constitute a penalty the stipulated sum must be disproportionate to the injury[.]"). Conversely, a contractual provision that operates without respect to the payment of a fixed sum for a breach is not a penalty provision. *See, e.g.*, *CDS Bus. Servs., Inc. v. H.M.C., Inc.*, 2023 WL 3847415, at *7 (E.D.N.Y. Apr. 28, 2023) (finding that fee "cannot be considered a liquidated damages clause subject to review as an excessive penalty because it operated without respect to damages for a breach") (internal quotations omitted); *Kirby v. United States*, 260 U.S. 423, 427 (1922) (contract provision was not "a penalty . . . [since it] was not to be paid for any breach of contract, but as compensation").

Here, Ayrton's participation right did not require Bitdeer to pay Ayrton *anything*. To the contrary, the participation right provides Ayrton the right to *pay Bitdeer.* Ayrton did not become entitled to the damages it now claims as a result of Bitdeer's decision to execute the Tether Transaction, but as a result of Bitdeer's independent decision to deny Ayrton the right to participate in that transaction. Had Bitdeer provided Ayrton the right to participate, there would be no damages on account of a breach of that right of any kind. That is plainly not a liquidated damages provision.

### B. Bitdeer Breached the Term Sheet By Failing To Provide Ayrton The Right To Participate In The Executed Tether Transaction

Ayrton has also established a breach of the binding Exclusivity Provision. The Term Sheet's exclusivity period ran for a period of 30 business days following termination. Ex. 27 at -1828. Bitdeer noticed termination of the Term Sheet as of [redacted], meaning exclusivity expired on June 21, 2024. Ex. 35 at -451. The Tether Transaction was executed well before June 21, 2024, on May 30, 2024. Ex. 50 at -5416.

While executing the Tether Transaction constituted a "breach," doing so was well within Bitdeer's contractual rights, and is not the "breach" for which Ayrton complains. It is rather Bitdeer's failure to comply with its obligations (i) to pay a negotiated break-up fee to Ayrton and (ii) to provide Ayrton a 25% participation right in any third-party transaction executed during a six-month period, that serve as the basis for Ayrton's claim. Ex. 27 at -1828.

Bitdeer's suggestion that it *did* offer Ayrton the right to participate, by informing Mr. Gross during a May 22 call that an equity transaction with an undisclosed investor was imminent, is likewise insufficient to raise a factual dispute. First, a waiver of a contractual right must involve a clear and knowing relinquishment of that right. *See Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 7 850 N.E.2d 653, 658 (N.Y. 2006) ("[W]aiver 'should not be lightly presumed' and must be based on 'a clear manifestation of intent' to relinquish a contractual protection."). Sophisticated parties understand how to obtain waivers in commercial transactions. By asking. Here, there is no evidence in the record of any manifestation by Ayrton to relinquish its contractual right of participation. Second, both Mr. LaBerge and Mr. Basit testified that [redacted] a right to participate in the Tether Transaction. Ex. 1 at 155:22–25; Ex. 5 at 257:2–9. They (mistakenly) believed that [redacted].[4] Now, having realized that argument is dead in the water, Bitdeer cannot credibly change course.

---

[4] Notably, this recollection would have been [redacted] by Bitdeer. Ex. 18 at -4233. But no such limitation exists in the Term Sheet executed with Ayrton, which plainly applies to all financing transactions. Ex. 27 at -1828. Mr. Wu himself testified at his deposition that the definition of [redacted]." Ex. 6 at 12:16–13:2.

### C. The Breach of Ayrton's Participation Right Occurred Upon Bitdeer's Rejection of Ayrton's Participation Demand

While the amount of recoverable damages is a question of fact, the measure of damages upon which the factual computation is based is a question of law. *See Boyce v. Soundview Tech. Grp., Inc.,* 464 F.3d 376, 384 (2d Cir. 2006). "It is settled Second Circuit law that in a breach of contract case, damages are calculated at the time of the breach." *Id.*; *see also Alpha Capital Anstalt v. Imaging3, Inc.*, 2018 WL 3597520, at *4, *9 (S.D.N.Y. July 26, 2018) (breach occurred when defendant "refused to honor the Notice of Exercise"); *Commonwealth Assocs. v. Palomar Med. Tech., Inc.,* 982 F. Supp. 205, 208 (S.D.N.Y. 1997) (breach occurred not when defendant failed to issue warrants, but when defendants refused "to honor the demand of [plaintiff]"); *Simon v. Electrospace Corp.,* 28 N.Y.2d 136, 145 (1971) ("The rule is precisely the same when the breach of contract is nondelivery of shares of stock.") (citations omitted). The Court should respectfully hold that the measure of damages is the date of Bitdeer's rejection of Ayrton's election to participate.

Under the plain language of the Exclusivity Provision, the breach at issue occurred not when Bitdeer negotiated or closed the Tether Transaction, which it was contractually entitled to do, but when it refused Ayrton's election to participate in the transaction, which it was contractually prohibited from doing. In this sense, the right of participation is akin to an option, the breach of which occurs upon the refusal to perform. *See, e.g., Hermanowski v. Acton Corp.*, 580 F. Supp. 140, 143 (E.D.N.Y. 1983) (holding that an option contract binds defendant to perform at the election of the plaintiff who is free to make his election as he sees fit); *Lucente v. Int'l Bus. Machines Corp.*, 146 F. Supp. 2d 298, 309 (S.D.N.Y. 2001) (same); *In re Riodizio, Inc.,* 204 B.R. 417, 422 (Bankr. S.D.N.Y.1997) ("An option contract is essentially an enforceable promise not to revoke an offer . . . the optionor must keep the option open."); *Alpha Capital*, 2018 WL 3597520,

at *9 (breach occurred upon failure to deliver shares following receipt of exercise notices).

Indeed, the plain language of the Exclusivity Provision is entirely consistent with Ayrton's position. Specifically, the second sentence of the Exclusivity Provision states that Bitdeer would not "close a financing transaction. . . ." Ex. 27 at -1828. In the event that Bitdeer did "close a financing transaction," it was required to "*provide* Ayrton the right to participate for 25% in any third party transaction *executed* by the Company[.]" *Id.* (emphases added.) Thus, on its face, the provision contemplates that Bitdeer would "provide" (active tense) Ayrton the right to participate in a third-party transaction "executed" (past tense). Bitdeer was required to provide Ayrton the option to participate, irrespective of whether Bitdeer had already executed transaction documents with its counterparty.

Bitdeer could have easily complied with Ayrton's June 12, 2024 election to participate in the Tether Transaction, either by notifying the SEC and amending its registration statement to include Ayrton in the equity issuance, or by offering Ayrton the same economic terms at any point before registration with the SEC went effective. Instead, Bitdeer's counsel at Cooley indicated during a June 17 telephone call that Ayrton did not have a legal right to participate in the Tether Transaction, and that Bitdeer was still considering Ayrton's demand. Gladstein Decl. ¶ 3. Bitdeer then filed a request with the SEC to *accelerate* registration of the shares underlying the Tether Transaction just after 7:00 AM the next morning. Ex. 8. One day after registration of the shares, Bitdeer's counsel emailed again to reiterate its rejection of Ayrton's demand. Ex. 55 at –42-44.

Ultimately, Bitdeer's predicament is one of its own doing. Seeking a written election or waiver of Ayrton's right to participate was a matter of a single communication from a multibillion dollar company with world class corporate counsel. Instead, Bitdeer rolled the dice, in the hopes that it could extract better terms from Ayrton once exclusivity had expired. Bitdeer must now

account for its own decision.

### D. Bitdeer is Liable for Ayrton's Attorney's Fees and Costs

The Exclusivity Provision sets forth in unmistakably clear terms that Bitdeer "will promptly reimburse the Investor [Ayrton] for all costs, including attorney's fees, paid or incurred by the Investor with respect to any claims arising as a result of a breach of the provisions under this section." Ex. 27 at -1828. This is not a provision that is "susceptible to third party claims" as the only claims that could "arise[] as a result of a breach" are directly between the parties. *Wistron NeWeb Corp. v. Genesis Networks Telecom Servs.*, *LLC*, 2023 WL 5211352, at *7 (S.D.N.Y. Aug. 14, 2023) (Liman, J.) (citations and quotations omitted). Moreover, "courts have routinely held that where the indemnification is broad, in the absence of limiting language, both intra-party and third party claims are covered." *Id.* at *8 (collecting cases). Finally, and in any event, the Term Sheet explicitly requires Bitdeer to pay "any collection or enforcement fees" relating to the break-up fee. Ex. 27 at -1828. Accordingly, Ayrton respectfully submits that the Court should enter summary judgment holding Bitdeer liable for Ayrton's attorney's fees and costs, subject to findings on the issue at a later date.

## II. BITDEER'S AFFIRMATIVE DEFENSES ARE LEGALLY AND FACTUALLY BASELESS

In response to a single claim for breach of contract arising out of a two-page term sheet, Bitdeer asserts 14 affirmative defenses. Each of these defenses is legally infirm or factually unsupported. *See Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (on summary judgement, moving party must only demonstrate "a lack of evidence to go to the trier of fact on an essential element of the non-movant's claim").

### A. Unenforceable Penalty, Unconscionability, and Contrary to Public Policy (Affirmative Defense Nos. 1, 2, and 7)

Bitdeer's assertion that the Exclusivity Provision is unenforceable, unconscionable, and

contrary to public policy is without merit. First and foremost, a right of participation *is not a penalty*. *Supra* at 10–11. Further, there is nothing unconscionable about Ayrton's bargained-for right to provide Bitdeer with that funding. Indeed, Bitdeer's own head of U.S. strategy recommended Ayrton's Term Sheet after reviewing "dozens of proposals" for financing because, as he wrote: "[t]his is a very good term sheet compared to anything we have seen." Ex. 25 at -3539. *See Jet Acceptance Corp. v. Quest Mexicana S.A. de C.V.*, 929 N.Y.S.2d 206, 212 (1st Dep't 2011) ("[T]he doctrine of unconscionability rarely applies in a commercial setting, where the parties are presumed to have equal bargaining power.").

Second, the break-up fee of 0.75% is well within a range that New York courts routinely deem permissible. *E.g.*, *FCS Advisors, Inc. v. Fair Finance Co., Inc.*, 2009 WL 1403869, at *11 (S.D.N.Y. May 19, 2009) (2% break-up fee not a penalty); *Crescit Mortgage Capital, LLC v. Emerald Bay Apartments, LLC*, 2024 WL 5340718, at *2, 5 (S.D.N.Y. Dec. 27, 2024) (1% fee); *JMD Holding Corp. v. Congress Fin. Corp.*, 4 N.Y.3d 373, 377 (N.Y. 2005) (fee of 1–2% not an unenforceable penalty).

Finally, Bitdeer's claim that "Ayrton made revisions to drafts of the Term Sheet without calling Bitdeer's attention to those revisions" does not create a factual issue that could preclude summary judgement. Ex. 57 at 9.[5] This bald assertion is not only unsupported by evidence in the record,[6] it is also irrelevant. *Gillman v. Manhattan Chase Bank, N.A.*, 73 N.Y.2d 1, 11 (1988) (rejecting argument that defendant was "unaware of the terms . . . , that the [] agreement was never called to [its] attention, that [it] never read [the Term Sheet], [or] that no one read it to

[5] To the extent Bitdeer relies on assertions that Ayrton misrepresented its ability to close in "2-3 weeks," *id.*, these arguments fail for the same reason as Bitdeer's fourteenth affirmative defense, for fraud in the inducement, *infra* at 22–25.
[6] Ex. 24 at -1913 (reflecting that Bitdeer had more than two days to review final Term Sheet before it was executed).

[defendant].”).

**B. Equitable Doctrines of Estoppel, Laches, Waiver, Unclean Hands, or Bad Faith (Affirmative Defense Nos. 3 and 4)**

Bitdeer’s estoppel, laches, waiver, unclean hands, and bad faith defenses all fail because they are unavailable where, as here, the claim is for money damages. *See 500 W. 43rd Street Realty, LLC v. Thukral*, 2025 WL 315375, at *7 (S.D.N.Y. Jan. 28, 2025) (Liman, J.) (collecting cases); *see also Lee v. Canada Goose US, Inc.*, 2021 WL 6881256, at *2 (S.D.N.Y. Oct. 19, 2021) (Liman, J.) (“The equitable defenses of laches and unclean hands are not defenses to claims at law for money damages.”); *Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 607 (2d Cir. 2005) (unclean hands affirmative defense did not “bar the entry of summary judgment”).

Bitdeer’s third and fourth affirmative defenses also fail because no genuine issue of material fact exists:

**Equitable Estoppel.** “A party will be estopped from invoking a contractual right” against a person “who, in justifiable reliance upon the opposing party’s words or conduct, has been misled into acting upon the belief that such enforcement would not be sought[.]’” *Echostar Satellite L.L.C. v. ESPN, Inc.*, 914 N.Y.S.2d 35, 40 (1st Dep’t 2010). To the extent that Bitdeer relies on its assertion that Ayrton did not “voice an interest in ‘participating’ in the Tether Transaction at the earliest opportunity,” Ex. 57 at 12, Bitdeer was not justified in its reliance. For a party to relinquish a contractual right, there must be waiver—which did not occur here. *Infra* at 18. Bitdeer suffers no “injustice [in] having to honor an obligation negotiated into the agreement[] at arms length.” *Echostar*, 914 N.Y.S.2d at 40.

**Laches.** Bitdeer’s laches defense fails because it complains of a delay in the exercise of a contract right. Laches “bars a plaintiff from initiating a lawsuit when [its] unreasonable delay has prejudiced the other party; it does not apply to the [allegedly] delayed exercise of a contractual

right." *DiStefano v. Maclay*, 102 F. App'x 188, 190 (2d Cir. 2004).

**Waiver.** Nor can Bitdeer identify facts to show that Ayrton waived its rights under the Term Sheet. "A waiver is an intentional and voluntary relinquishment of a known right, and a waiver of contractual rights will not be inferred absent a clear intent to waive." *Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 607 (2d Cir. 2005) (internal citation omitted). Bitdeer contends that Ayrton learned on a phone call with Mr. LaBerge that Bitdeer was closing a transaction with an unnamed investor and did not indicate an intent to participate on that call. *See* Ex. 57 at 18. But even accepting that assertion as true, Bitdeer is unable to bring forward *any* evidence of Ayrton's clear and unequivocal relinquishment. *See Messina v. Ocean Repair Serv. Co.*, 1993 WL 427443, at *10 (S.D.N.Y. Oct. 19, 1993) ("Evidence of a clear and unequivocal intention to relinquish a known right is required to establish a waiver."); *see also Echostar*, 914 N.Y.S.2d at 39 ("[M]ere silence or inaction . . . are insufficient to establish an intent to waive a known right[.]").

**Unclean Hands or Bad Faith.** An affirmative defense of unclean hands requires "immoral or unconscionable" actions. *Deutsche Bank Nat'l Tr. Co. v. Marino*, 227 N.Y.S.3d 270, 273 (1st Dep't 2025) (affirming summary judgment); *see also Unicorn Crowdfunding, Inc. v. New Street Enter., Inc.*, 507 F. Supp. 3d 547, 577–78 (S.D.N.Y. 2020) ("[T]he doctrine of unclean hands is 'never used unless the plaintiff is guilty of immoral, unconscionable conduct and even then only when the conduct relied on is directly related to the subject matter in litigation and the party seeking to invoke the doctrine was injured by such conduct.'").

Notwithstanding that Mr. LaBerge advised his colleagues to [redacted]," Ex. 44 at -3501, Bitdeer claims that "Ayrton lulled Bitdeer into believing that the Tether Transaction did not violate the Provision"

because it "congratulat[ed] Bitdeer on the Tether Transaction," Ex. 57 at 11–12. Congratulating a counterparty on closing a transaction is by no means immoral or unconscionable. And Bitdeer, "a sophisticated party if ever there was one, could not have been surprised by" Ayrton's invocation of its right to participate, *Echostar*, 914 N.Y.S.2d at 39, particularly when its own executives and a separate investment bank expressed warnings about Ayrton's contractual right to do precisely that. *See, e.g.*, Ex. 33 at -3453, Ex. 34 at -2696, -2701–03.

### C. Failure of a Condition Precedent (Affirmative Defense No. 5)

"A condition precedent is an act or event . . . which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises." *Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 690 (1995). Bitdeer has cited three alleged conditions precedent: "(i) Ayrton having itself performed under the Term Sheet, (ii) Bitdeer having breached the obligations contained in the Confidentiality & Exclusivity Provision, and (iii) Ayrton having invoked in a timely manner a right to participate in the May 2024 transaction with Tether." Ex. 57 at 13. Bitdeer cannot raise a triable issue of fact with respect to any of these alleged conditions.

First, there is no evidence to suggest Ayrton failed its duty to perform under the Term Sheet. The evidence is to the contrary: Mr. LaBerge conceded he had no recollection of discussing sale restrictions relating to Bitdeer's proposed collateral with Ayrton prior to the execution of the Term Sheet. Ex. 5 at 191:22–192:5. Within days of Ayrton raising these concerns, Bitdeer was on the ground in Bhutan negotiating with Tether (and others). *Supra* at 6. Second, there is no genuine dispute that Bitdeer breached the Term Sheet by executing the Tether Transaction without providing Ayrton with its bargained-for rights. *Supra* at 6–8. Third, Bitdeer's argument that Ayrton was required to "invoke[] in a timely manner a right to participate" merely repackages its meritless equitable affirmative defenses. *Supra* at 17–19.

**D. No Legally Cognizable Injury or Damages (Affirmative Defense No. 6)**

Bitdeer's contention that Ayrton has suffered no legally cognizable injury or damages is likewise without basis. *See Eletson Holdings, Inc. v. Levona Holdings Ltd.*, 731 F. Supp. 3d 531, 571 (S.D.N.Y. 2024) (Liman, J.) ("The right of a party to sue for breach of contract, regardless of harm done, has deep [] roots in the law."); *see also Medacist Sols. Grp., LLC v. CareFusion Sols., LLC*, 2021 WL 293568, at *13 (S.D.N.Y. Jan. 28, 2021) ("[n]ominal damages are always available in breach of contract actions"). Bitdeer's own expert report concedes in the event liability is established that there are no scenarios in which Ayrton's damages could be zero. Ex. 60 ¶¶ 58, 72.

**E. Comparative Fault (Affirmative Defense No. 8)**

Bitdeer's eighth affirmative defense fails as a matter of law. "[T]he doctrine of comparative fault does not apply to contract claims." *Exodus Partners, LLC v. Cooke*, 2007 WL 120053, at *14 n.17 (S.D.N.Y. Jan. 17, 2007).

**F. Attorneys' Fees Are Not Recoverable (Affirmative Defense No. 9)**

As set forth, *supra* at 15, the Term Sheet entitles Ayrton to attorney's fees in connection with Bitdeer' breach.

**G. Impossibility of Performance (Affirmative Defense No. 10)**

The defense of impossibility is available to a party whose performance "is made impracticable without [the party's] fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made." *Red Tree Invs., LLC v. Petroleos de Venezuela, S.A.*, 82 F.4th 161, 170–71 (2d Cir. 2023). Here, Bitdeer claims that "Ayrton's unwillingness and inability to effectuate the $100-million transaction contemplated by the Term Sheet" rendered "the parties' performance thereunder impossible." Ex. 57 at 16. That is not a proper claim of impossibility. Evcn if it was, any obligation to "effectuate the $100-million

transaction" was non-binding. *Red Tree Invs.*, 82 F.4th at 170 ("impossibility must be produced by an unanticipated event that could not have been foreseen or guarded against in the contract"). Bitdeer next argues that "Ayrton's waiver of the right to participate in the transaction with Tether" rendered participation in that transaction impossible. Ex. 57 at 16. Once again, however, Bitdeer is unable to bring forth evidence that Ayrton knowingly and clearly relinquished any contractual right. *Supra* at 17–19.

**H. Ambiguity (Affirmative Defense No. 11)**

Bitdeer is unable to raise an ambiguity that could preclude summary judgement on liability. "When a summary judgment motion concerns a question of a contract's ambiguity, 'summary judgment may be granted when its words convey a definite and precise meaning.'" *Dorchester Pub. Co. v. Lanier*, 2006 WL 4388035, at *7 (S.D.N.Y. Mar. 19, 2006) (quoting *Seiden Assoc's., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992)). A contract is not rendered ambiguous merely because it "does not say what defendant[] want[s] it to say." *RDF Agent*, 211 N.Y.S.3d at 287. Here, the Term Sheet plainly requires Bitdeer, upon the execution of a third-party financing, to provide Ayrton the right to participate and pay a break-up fee to Ayrton. Bitdeer did neither.

**I. Failure to State a Claim (Affirmative Defense No. 13)**

Bitdeer's thirteenth affirmative defense fails for the same reasons Ayrton prevails on its breach of contract claim. *Supra* at 9–15. This defense cannot survive because "it would 'relitigate the legal sufficiency of claims already decided.'" *Howard Univ. v. Borders*, 588 F. Supp. 3d 457, 481 (S.D.N.Y. 2022) (Liman, J.).

**J. Fraud in the Inducement (Affirmative Defense No. 14)**

Bitdeer's fraudulent inducement defense fails on virtually every element. "[T]o establish a fraudulent inducement claim, a plaintiff must prove '(1) a misrepresentation or omission of

material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Wild Bunch, SA v. Vendian Entm't, LLC*, 2018 WL 1365690, at *3 n.1 (S.D.N.Y. Feb. 26, 2018) (quoting *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001)). "Courts apply heightened scrutiny to [parties] claiming fraud in transactions between sophisticated entities." *DNV Investment P'ship v. Field*, 2020 WL 2539029, at *8 (S.D.N.Y. May 19, 2020).

Bitdeer alleges that Mr. Gross misrepresented that "Ayrton could close a transaction with Bitdeer within '2-3 weeks' after executing the Term Sheet." ECF No. 80 at 11. Bitdeer further alleges that (1) Ayrton could not, in fact, close a $100 million investment in Bitdeer on the "promised timeframe," and that (2) although "Ayrton represented that information about Bitdeer's collateral as contained in the public record was sufficient for Ayrton to conclude that it could close a transaction with Bitdeer on the promised timeframe," Ayrton later took the position that the Rockdale Lease "made that facility inadequate for collateralization[.]" *Id.* at 11–12.

First, Mr. Gross's alleged statements are plainly nonactionable statements of prediction or expectation and insufficient to state a claim. *See Wild Bunch*, 2018 WL 1365690, at *3; *see also GE Oil & Gas, Inc. v. Turbine Gen. Servs., L.L.C.*, 93 N.Y.S.3d 5, 6 (1st Dep't 2019) (alleged "promise that [plaintiff] would provide funding as agreed in the term sheet . . . is not a misrepresentation of fact but a nonactionable statement of prediction or expectation"); *Bruce v. Martin*, 1993 WL 148904, at *5 (S.D.N.Y. Apr. 30, 1993) ("Fraudulent inducement involves 'a misrepresentation of present fact, not of future intent, collateral to a contract[.]'").

Second, Bitdeer cannot point to any facts showing that Mr. Gross's statement was false at the time it was made. Bitdeer alleges that "Ayrton took no steps to secure third-party capital to close on a $100-million investment in Bitdeer on the promised timeframe." ECF No. 80 at 11–12.

The fact that Ayrton allegedly took no steps toward closing the transaction after raising concerns about the collateral proposed for the transaction does not create a genuine dispute that Ayrton knew it could not close the transaction in 2–3 weeks with or without third-party co-investors. To the contrary, Mr. Gross testified that Ayrton could have easily closed the transaction, either on its own or with co-investors. *See, e.g.*, Ex. 2 at 289:22–291:5, 293:17–25. More importantly, however, Mr. LaBerge conceded that he had no recollection of discussing the lease restrictions that derailed negotiations prior to the execution of the Term Sheet. Ex. 5 at 191:22–192:5. Thus, there is no evidence that Ayrton's representation of its ability to close a transaction was false when made.

Third, Bitdeer cannot show scienter. There is no evidence that Mr. Gross knew that his anticipated timing to close was false when made, because there is no evidence that Mr. Gross was aware of the sale restrictions that plagued Bitdeer's collateral. *See, e.g., Congelados del Cibao v. 3 Kids Corp.*, 2022 WL 1321397, at *9 (S.D.N.Y. May 3, 2022) (Liman, J.) (rejecting fraud in the inducement claim where facts did not demonstrate intent).

Fourth, any claim for reliance is directly contradicted by the unambiguous language of the Term Sheet, which reflected that any transaction was subject to Ayrton's due diligence. *See GE Oil & Gas*, 93 N.Y.S.3d at 6 (fraud claim "fail[ed] for lack of justifiable or reasonable reliance, because the term sheet explicitly required 'definitive documentation' before it would constitute a contractual commitment"); *LoanStreet, Inc. v. Troia*, 2023 WL 5836237, at *8 (S.D.N.Y. Sept. 8, 2023) ("Where, as here, there is a meaningful conflict between an express provision in a written contract and a prior alleged oral representation, the conflict negates a claim of reasonable reliance upon the oral representation") (internal quotations omitted). The Term Sheet explicitly states that it "does not represent or constitute an offer, undertaking or commitment on the part of Ayrton . . .

to arrange or provide financing to Bitdeer" and that, with the exception of, *inter alia*, the Exclusivity Provision, it is "non-binding and any obligation or commitment of Ayrton . . . is subject to the completion of due diligence[.]" Ex. 27 at -1827. This conflict between the idea of a "promised timeframe" to close, ECF No. 80 at 11–12, and the lack of an obligation to close, Ex. 27 at -1827, negates any genuine dispute on reliance.

Furthermore, "[j]ustifiable reliance does not exist where the party possesses the means to determine the true nature of the transaction by exercising ordinary intelligence and fails to make use of those means." *Hidden Pond Schodack, LLC v. Hidden Pond Homes, Inc.*, 138 N.Y.S.3d 215, 219 (3d Dep't 2020). Bitdeer now claims that Ayrton lacked sufficient assets under management to close a transaction on the promised timeframe, but Bitdeer could have easily inquired about Ayrton's assets under management before agreeing to execute the Term Sheet. Ex. 15 at -815. This information is publicly available information. Ex. 58 at 8. Bitdeer thus cannot claim fraud. *See* ECF No. 80 at 11.

Fourth, Bitdeer has not suffered any damages. "Fraud in the inducement of a contract under New York law requires allegations of special damages traceable to the material misrepresentation made at the time, and not a separate breach of contract." *Bruce*, 1993 WL 148904, at *9. Bitdeer asserts that "[t]he consideration Bitdeer was fraudulently induced to provide to Ayrton under the Term Sheet was of greater value than the consideration Bitdeer received from Ayrton, if any." ECF No. 80 at 12. However, "[u]nder the traditional principles of contract law, the parties to a contract are free to make their bargain, even if the consideration exchanged is grossly unequal or of dubious value." *Apfel v. Prudential-Bache Secs. Inc.*, 81

N.Y.2d 470, 475 (1993).[7]

## CONCLUSION

For the foregoing reasons, Ayrton requests that the Court grant its motion and enter summary judgment in favor of Ayrton on liability and act and dismissing Bitdeer's affirmative defenses and counterclaim.

Dated: November 12, 2025
New York, NY

Respectfully submitted,

**FRESHFIELDS US LLP**
*/s/ Andrew D. Gladstein*
Gayle R. Klein
Andrew D. Gladstein
Eunice Leong
Maylin Meisenheimer
FRESHFIELDS US LLP
3 World Trade Center
175 Greenwich Street
New York, New York 10007
(212) 277-4000

*Counsel for Plaintiff Ayrton Capital, LLC*

[7] For this reason, Bitdeer's twelfth affirmative defense, for lack or failure of consideration and lack of mutuality of obligation, also fails. Indeed, "mutuality of obligation 'does not mean equality of obligation.'" *RDF Agent, LLC*, 211 N.Y.S.3d at 287.