**sUNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

AYRTON CAPITAL, LLC,

*Plaintiff*,

v.

BITDEER TECHNOLOGIES GROUP,

*Defendant*.

Case No. 24-cv-05160 (LJL)

**DEFENDANT BITDEER TECHNOLOGIES GROUP'S**
**MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFF AYRTON CAPITAL, LLC'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**


PRELIMINARY STATEMENT ....................1

BACKGROUND ....................2

A. Ayrton Promises to Do Nothing under the Term Sheet. ....................2

B. Within Days, Ayrton Abandons the $100-Million Debt Financing. ....................3

C. Ayrton Traps Bitdeer in an Onerous Exclusivity Obligation. ....................5

D. Ayrton Seeks Windfall Profits. ....................6

ARGUMENT ....................7

I. AYRTON'S BREACH-OF-CONTRACT CLAIM FAILS AS A MATTER OF LAW. ....................7

A. The Term Sheet Is Not an Enforceable Contract. ....................8

B. The Exclusivity Provision Is an Unenforceable Penalty. ....................10

II. UNDISPUTED FACTS PRECLUDE AYRTON'S WINDFALL RECOVERY ....................12

A. Bitdeer Provided Ayrton a Right to Participate in the Tether Transaction. ....................12

B. If There Was a Breach, It Occurred On May 14 and Certainly No Later than May 30, 2024. ....................14

C. Bitdeer Is Not Liable for Ayrton's Attorney's Fees. ....................17

III. TRIABLE ISSUES PREVENT SUMMARY JUDGMENT IN AYRTON'S FAVOR. ....................18

A. Triable Issues Preclude a Determination that Ayrton Fulfilled Its Obligations (If Any) under the Term Sheet. ....................18

B. Triable Issues Preclude a Ruling on Bitdeer's Affirmative Defense of Fraudulent Inducement. ....................21

C. Triable Issues Preclude a Determination of Ayrton's Entitlement to Damages for Alleged Breach of the Right to Participate. ....................24

CONCLUSION ....................25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*172 Van Duzer Realty Corp. v. Globe Alumni Student Assistance Ass'n, Inc.*,
24 N.Y.3d 528 (2014) ....10

*ACE Secs. Corp. Home Equity Loan Tr., Series 2007-HE3 v. DB Structured Prods., Inc.*,
5 F. Supp. 3d 543 (S.D.N.Y. 2014) ....19

*Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*,
145 F.3d 543 (2d Cir. 1998)....19

*Advanced Analytics, Inc. v. Citigroup Glob. Mkts., Inc.*,
2025 WL 1375392 (2d Cir. May 13, 2025) ....18

*ADYB Engineered for Life, Inc. v. EDAN Admin. Servs. (Ireland) Ltd.*,
2024 WL 2125431 (S.D.N.Y. May 10, 2024) ....13

*Alpha Cap. Anstalt v. Imaging3, Inc.*,
2018 WL 3597520 (S.D.N.Y. July 26, 2018) ....15

*Alpha Cap. Anstalt v. Real Goods Solar, Inc.*,
311 F. Supp. 3d 623 (S.D.N.Y. 2018)....8

*Arbordale Hedge Invs., Inc. v. Clinton Grp. Inc.*,
1999 WL 1000939 (S.D.N.Y. Nov. 4, 1999)....18

*Atlantis Mgmt. Grp. II LLC v. Nabe*,
216 A.D.3d 526 (1st Dep't 2023) ....11

*Bausch & Lomb Inc. v. Bressler*,
977 F.2d 720 (2d Cir. 1992)....24

*Blinds to Go (U.S.), Inc. v. Times Plaza Dev., L.P.*,
191 A.D.3d 939 (2d Dep't 2021) ....17

*Blue Sage Cap., L.P. v. Alfa Laval U.S. Holding, Inc.*,
168 A.D.3d 645 (1st Dep't 2019) ....17

*Boyce v. Soundview Tech. Grp. Inc.*,
464 F.3d 376 (2d Cir. 2006)....14

*Breslin v. Frankel*,
167 A.D.3d 692 (2d Dep't 2018) ....13

*Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*,
98 F.3d 13 (2d Cir. 1996)....................................................................................22

*Caruso Mgmt. Co. v. Int'l Council of Shopping Ctrs.*,
403 F. Supp. 3d 191 (S.D.N.Y. 2019)....................................................................7

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)................................................................................................7

*Centauro Liquid Opportunities Master Fund, L.P. v. Bazzoni*,
2019 WL 4464242 (S.D.N.Y. Sept. 18, 2019)......................................................22

*Chiapparelli v. Baker, Kellogg & Co.*,
252 N.Y. 192 (1929) ................................................................................................9

*Commonwealth Assocs. v. Palomar Med. Tech., Inc.*,
982 F. Supp. 205 (S.D.N.Y. 1997) (cited at Br. 13) .............................................15

*De Sole v. Knoedler Gallery, LLC*,
139 F. Supp. 3d 618 (S.D.N.Y. 2015)..................................................................24

*Deerfield Commc'ns Corp. v. Chesebrough–Ponds, Inc.*,
68 N.Y.2d 954 (1986) ...........................................................................................21

*Diesel Props S.r.l. v. Greystone Bus. Cred. II LLC*,
631 F.3d 42 (2d Cir. 2011)....................................................................................25

*ERC 16W Ltd. P'ship v. Xanadu Mezz Holdings LLC*,
95 A.D.3d 498 (1st Dep't 2012) ............................................................................14

*Fitzpatrick v. Woodruff*,
96 N.Y. 561 (1884) ...............................................................................................13

*Gallo v. Prudential Residential Servs., L.P.*,
22 F.3d 1219 (2d Cir. 1994)....................................................................................7

*Gummo v. Vill. of Depew*,
75 F.3d 98 (2d Cir. 1996)........................................................................................7

*Hermanowski v. Acton Corp.*,
580 F. Supp. 140 (E.D.N.Y. 1983) .......................................................................15

*Hinson v. Phillips Auctioneers LLC*,
2019 WL 6334715 (S.D.N.Y. Oct. 29, 2019) ..........................................................8

*Impax Lab'ys v. Turing Pharms. AG*,
2017 WL 4357893 (S.D.N.Y. Sept. 29, 2017)......................................................19

*Int'l CableTel Inc. v. Le Groupe Videotron Ltee*,
978 F. Supp. 483 (S.D.N.Y. 1997) ....................22

*Jacobs v. Citibank, N.A.*,
92 A.D.2d 786 (1st Dep't 1983) ....................11

*JMD Holding Corp. v. Cong. Fin. Corp.*,
4 N.Y.3d 373 (2005) ....................12

*Johnson v. D.M. Rothman Co.*,
861 F. Supp. 2d 326 (S.D.N.Y. 2012)....................7

*Krofft Ent., Inc. v. CBS Songs, a Div. of CBS, Inc.*,
653 F. Supp. 1530 (S.D.N.Y. 1987)....................25

*L-7 Designs, Inc. v. Old Navy, LLC*,
647 F.3d 419 (2d Cir. 2011)....................19

*Lama Holding Co. v. Smith Barney Inc.*,
88 N.Y.2d 413 (1996) ....................24

*Lerner v. Fleet Bank, N.A.*,
459 F.3d 273 (2d Cir. 2006)....................23

*LG Cap. Funding, LLC v. Accelera Innovations, Inc.*,
2018 WL 5456670 (E.D.N.Y. 2018)....................10

*Lucente v. Int'l Bus. Machs. Corp.*,
146 F. Supp. 2d 298 (S.D.N.Y. 2001)....................15

*Maxim Grp. LLC v. Life Partners Holdings, Inc.*,
690 F. Supp. 2d 293 (S.D.N.Y. 2010)....................15

*Moreno-Godoy v. Kartagener*,
7 F.4th 78 (2d Cir. 2021) ....................16

*Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*,
392 F.3d 520 (2d Cir. 2004)....................24, 25

*Nestor v. McDowell*,
81 N.Y.2d 410 (1993) ....................17

*NML Cap. v. Republic of Argentina*,
621 F.3d 230 (2d Cir. 2010)....................10

*In re O.P.M. Leasing Servs., Inc.*,
23 B.R. 104 (Bankr. S.D.N.Y 1982)....................11

*Oscar Schlegel Mfg. Co. v. Peter Cooper's Glue Factory*,
231 N.Y. 459 (1921) ........................................................................................1, 8

*Park Lane IBS, LLC v. Unbnd Grp. Pty Ltd.*,
2024 WL 4123515 (S.D.N.Y. Sept. 9, 2024)....................................................................18

*Penguin Grp. (USA) Inc. v. Steinbeck*,
2009 WL 857466 (S.D.N.Y. Mar. 31, 2009) ...............................................................19, 20

*Point Prods. A.G. v. Sony Music Ent., Inc.*,
215 F. Supp. 2d 336 (S.D.N.Y. 2002)...........................................................................25

*Raskin v. Wyatt Co.*,
125 F.3d 55 (2d Cir. 1997)..............................................................................................9

*RDF Agent, LLC v. Elec. Red Ventures, LLC*,
227 A.D.3d 424 (1st Dep't 2024) ....................................................................................8

*Reeves Ent. Grp. v. LBS Commc'ns, Inc.*,
1991 WL 135476 (S.D.N.Y. July 18, 1991) .....................................................................8

*In re Riodizio, Inc.*,
204 B.R. 417 (Bankr. S.D.N.Y. 1997) ...........................................................................15

*Rousey v. Jacoway*,
544 U.S. 320 (2005).........................................................................................................16

*Scher v. Llorente*,
1993 WL 426840 (S.D.N.Y. Oct. 22, 1993) ...................................................................19

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001)...............................................................................................23

Sha*piro v. N.Y. Univ.*,
640 F. Supp. 2d 411 (S.D.N.Y. 2009)...............................................................................7

*Sharma v. Skaarup Ship Mgmt. Corp.*,
916 F.2d 820 (2d Cir. 1990)............................................................................................16

*Silvercreek Mgmt., Inc. v. Citigroup, Inc.*,
346 F. Supp. 3d 473 (S.D.N.Y. 2018)..............................................................................24

*Simon v. Electrospace Corp.*,
28 N.Y.2d 136 (1971) ......................................................................................................15

*SPG Cap. Partners LLC v. Cascade 553 LLC*,
2023 WL 126127 (N.Y. Sup. Ct. Jan. 6, 2023)..................................................................9

*State St. Glob. Advisors Tr. Co. v. Visbal*,
431 F. Supp. 3d 322 (S.D.N.Y. 2020)....................21

*Sykes v. RFD Third Ave. I Assocs., LLC*,
39 A.D.3d 279 (1st Dep't 2007)....................17

*TD Waterhouse Inv. Servs., Inc. v. Integrated Fund Servs., Inc.*,
2003 WL 42013 (S.D.N.Y. Jan. 6, 2003)....................25

*Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*,
670 F. Supp. 491 (S.D.N.Y. 1987)....................19

*Truck Rent-a-Ctr., Inc. v. Puritan Farms 2nd, Inc.*,
41 N.Y.2d 420 (1977)....................11

*Venture Assocs. Corp. v. Zenith Data Sys. Corp.*,
96 F.3d 275 (7th Cir. 1996)....................19

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*,
127 F. Supp. 3d 156 (S.D.N.Y. 2015)....................14

*Wild Bunch, SA v. Vendian Ent., LLC*,
256 F. Supp. 3d 497 (S.D.N.Y. 2017)....................22

*Willis v. Ronan*,
249 A.D.2d 299 (2d Dep't 1998)....................13

*Wistron NeWeb Corp. v. Genesis Networks Telecom. Servs., LLC*,
2023 WL 5211352 (S.D.N.Y. Aug. 14, 2023) (Liman, J.)....................17

## Rules / Statutes

Fed. R. Civ. P. 56(a)....................7

## Other Authorities

11 CORBIN ON CONTRACTS § 58.1....................10

1 WILLISTON ON CONTRACTS § 5:20 (4th ed.)....................13

**PRELIMINARY STATEMENT**

The April 2024 Term Sheet between Plaintiff Ayrton Capital, LLC and Defendant Bitdeer Technologies Group purports to entitle Ayrton to certain penalties—a break-up fee of $787,500 and a right to participate in Bitdeer's third-party transactions—should Bitdeer breach "any" of the Term Sheet's "confidentiality and exclusivity prohibitions." Ayrton has asserted those exclusivity prohibitions are "critical" because they "prevent companies from shopping the economic terms of an Ayrton proposal" and "recognize the opportunity cost of Ayrton's time and resources devoted to diligence and negotiations toward a definitive deal." ECF No. 1 ("Compl.") at ¶ 17. Ayrton's Motion for Summary Judgment, however, makes no claim that Bitdeer "shopped" Ayrton's terms or that Ayrton suffered any "opportunity cost" in negotiating with Bitdeer for ten days. To the contrary, the evidence shows that Ayrton did not suffer any harm as a result of its "diligence" or "negotiations" and Ayrton admits that Bitdeer did nothing wrong by executing the Tether Transaction. ECF No. 120 ("Br.") at 12. Nevertheless, Ayrton asks this Court to award it windfall damages of more than $32 million—as compensation for no harm, under a Term Sheet that obligated Ayrton to do nothing, and after ten days of negotiations that cost Ayrton $0.

This Court should deny Ayrton's Motion as a matter of law and preclude it from recovering the windfall it seeks. *First*, the Term Sheet lacks consideration and therefore is unenforceable. Ayrton has had at least two opportunities to articulate some consideration that it was required to provide under the Term Sheet, but it still cannot do so. Instead, Ayrton claims it is entitled to the Term Sheet's penalties simply because the Term Sheet describes those penalties as "binding." Ayrton's position is inconsistent with the black-letter principle that "[u]nless both parties to a contract are bound, so that either can sue the other for a breach, neither is bound." *Oscar Schlegel Mfg. Co. v. Peter Cooper's Glue Factory*, 231 N.Y. 459, 462 (1921). *Second*, even if the Term Sheet is a contract, its penalty provision remains unenforceable. Penalties are only enforceable if

they are liquidated damages clauses, but Ayrton readily admits that the penalty here "is plainly not a liquidated damages provision." Br. 11. This admission disposes of this Action, because Ayrton seeks no damages other than those flowing from the penalty. And even if Ayrton were to recover nominal damages from any breach, Ayrton cannot recover attorneys' fees under settled New York law denying fees to plaintiffs falling well short of a significant damages claim.

*Third*, triable issues likewise preclude summary judgment in Ayrton's favor. If this Court infers that Ayrton had some obligation of good faith under the Term Sheet, a jury will have to consider whether Ayrton performed that obligation, as required sue for breach. Similarly, a jury will need to weigh conflicting evidence regarding Bitdeer's defense of fraudulent inducement. Finally, a jury will need to consider whether Bitdeer's alleged breach caused Ayrton's damages, given record evidence that Ayrton would never have participated in the Tether transaction.

For all of these reasons, Ayrton's Motion should be denied.

## BACKGROUND

### A. Ayrton Promises to Do Nothing under the Term Sheet.

No provision of the April 29, 2024 Term Sheet between Bitdeer and Ayrton obligated Ayrton to do anything. ECF No. 109 ("Bitdeer's Rule 56.1 Statement") at ¶¶ 14-15, 23, 25, 27, 29, 30. The transaction terms included in the Term Sheet were "for discussion purposes only" and did not "represent or constitute an offer, undertaking or commitment on the part of Ayrton . . . to arrange or provide financing to Bitdeer." *Id.* at ¶ 22. The Term Sheet stated that it was "intended to be a summary of economic terms only" that could not be "construed to compel Ayrton to commit to purchase securities of [Bitdeer] or secure financing on behalf of [Bitdeer] by third parties." *Id.* To the extent the Term Sheet imposed "any obligation or commitment" upon Ayrton at all, such an obligation (if any) was "subject to . . . investment committee and other internal approvals . . . in each case as may be satisfactory to Ayrton at its sole discretion." *Id.*

Although the Term Sheet obligated Ayrton to do nothing at all, it purported to impose several "binding" obligations on Bitdeer. The "binding" Diligence and Legal Fees clause purportedly required Bitdeer to "pay for all of the Investor's [Ayrton's] due diligence and legal fees in relation to the transactions proposed in this Term Sheet," beginning with an initial non-refundable deposit of $125,000. *Id.* at ¶ 26. The "binding" Confidentiality and Exclusivity Provision stated that Bitdeer must not "disclose the terms contained herein to any other person or entity;" "solicit, negotiate or accept any term sheets" or similar documents; or "close a financing transaction." *Id.* ¶ 24. This Provision likewise imposed two penalties for Bitdeer's breach: A break-up fee of $787,500 and the obligation to "provide Ayrton the right to participate for 25% in any third party transaction" executed by Bitdeer for a 180-day period beginning 31 business days after "the parties hereto agree in writing to cease negotiations." *Id.*

### B. Within Days, Ayrton Abandons the $100-Million Debt Financing.

After Bitdeer signed the Term Sheet and paid Ayrton the $125,000 diligence deposit, the parties' negotiations ended within days, when Ayrton claimed that a subset of Bitdeer's proposed collateral—a data center in Rockdale, Texas—was inadequate because of Bitdeer's leasehold interest in the property. *Id.* at ¶¶ 36, 37. By May 9, 2024, Ayrton sent Bitdeer a draft term sheet for an alternative transaction, which the parties negotiated from then onward. *Id.* at ¶ 42.

Ayrton's changed position came as a surprise to Bitdeer. *Id.* at ¶ 38. Before executing the Term Sheet, Bitdeer repeatedly sought Ayrton's assurances that Ayrton was willing to close a financing transaction quickly, and Ayrton represented on ***at least four occasions*** that it could close within "2-3 weeks." *Id.* at ¶¶ 40-41. Having reviewed Bitdeer's public securities filings (which contained the Rockdale lease) before executing the Term Sheet, *id.* at ¶ 39, Ayrton's chief negotiator represented to Bitdeer on April 26, 2024 that "there is adequate information in the public domain" for Ayrton to believe it could close the transaction, *id.* at ¶ 40. In deposition, Ayrton's

chief negotiator admitted that he knew of Bitdeer's leasehold interest in the Rockdale facility before signing the Term Sheet, *see* Sharma Decl. Ex. 3 at 90:25-91:10, given extensive conversations between Bitdeer and Ayrton about that facility, *see* Gladstein Decl. Ex. 5 at 180-81, 188-89.[1] Despite Ayrton's representations, Ayrton refused to close the transaction because of the contents of the leases, not because of any subsequent discovery of non-public information regarding the facility. Bitdeer's Rule 56.1 Statement at ¶ 37. Accordingly, Ayrton either misrepresented that it had reviewed public information about Bitdeer's collateral or misrepresented its findings from that review, in either case misleading Bitdeer into signing the Term Sheet.

Ayrton's changed position was particularly unreasonable given that Bitdeer is a multi-billion-dollar technology company and the transaction contemplated by the Term Sheet would have granted Ayrton a "senior secured" loan that took priority ***over all other debts of Bitdeer and all of its fourteen subsidiaries.*** Bitdeer's Rule 56.1 Counter-Statement at ¶ 35. And in any event, Ayrton's claim that the lease prohibited use of the property as collateral was unfounded. While the lease permitted the landlord to terminate upon a change of control in the tenant or its immediate corporate parent, but did not permit termination in the event of changes of control or foreclosure actions higher up Bitdeer's corporate chain. *Id.* at ¶ 36. The lease could therefore have been pledged by Bitdeer in connection with a debt transaction.

Discovery has since confirmed that irrespective of any claimed issues involving the collateral, Ayrton could never have closed a $100-million debt deal with Bitdeer—whether in "2-3 weeks" or ever. Ayrton's assets under management between April 2024 and July 2024 ranged

---

[1] Exhibits to the Declarations of Renita Sharma dated November 12, 2025 (ECF No. 110) and November 26, 2025 (filed concurrently with this Opposition) are identified as "Sharma Decl." exhibits. Exhibits to the Declaration of Andrew Gladstein filed November 13, 2025 (ECF No. 122) are identified as "Gladstein Decl." exhibits.

from $203 to $231 million. Bitdeer's Rule 56.1 Statement at ¶ 48. Investing almost half of Ayrton's total assets (and ***all*** of its liquid assets) in a single transaction would have exposed Ayrton to significant risk, making such a transaction highly improbable for an investor that considered even a senior secured debt transaction in a multi-billion dollar company too risky. *Id.* ¶ 52; Bitdeer's Rule 56.1 Counter-Statement at ¶ 35. In fact, Ayrton has never invested more than [redacted] in any one company. *Id.* ¶¶ 49-51. Ayrton also took no steps to secure third-party capital, apart from a single alleged conversation between Ayrton's principal and one potential co-investor (for which there is no documentary evidence). *Id.* ¶ 53. Ayrton's chief negotiator had likewise never solicited third-party capital for any investment in his five years at Ayrton. *Id.* at ¶ 54.

### C. Ayrton Traps Bitdeer in an Onerous Exclusivity Obligation.

Having lured Bitdeer into the Term Sheet with unfulfilled promises of a speedy close, all while knowing that Bitdeer hoped to obtain financing quickly, Ayrton was content to wait and see if it could collect massive profits through the Confidentiality and Exclusivity Provision. In fact, as Ayrton's corporate representative and chief negotiator admitted, Ayrton intended all along for the Term Sheet to bind Ayrton to no obligation, yet entitle Ayrton to windfall profits if Ayrton refused to close a transaction and Bitdeer went on to find an alternative. *Id.* at ¶¶ 31-32. Ayrton intended for the exclusivity restriction to apply "even in the scenario where a day after the term sheet is signed Ayrton decides it doesn't want to do the deal." *Id.* at ¶ 32.

Ayrton's scheme proceeded seamlessly. Bitdeer advised Ayrton on May 13, 2024 that it was terminating negotiations under the Term Sheet effective May 9, 2024, but Ayrton never responded. *Id.* at ¶¶ 44-45. Ayrton's silence meant that the clock that terminates Bitdeer's exclusivity obligations never started to run. *See id.* at ¶ 24 (clock begins to run on the day the parties "agree in writing to cease negotiations of the transaction contemplated by" the Term Sheet). To this day, Ayrton has never agreed in writing to cease negotiations of the transaction

contemplated by the Term Sheet, *id.* at ¶ 46, even though Ayrton all but abandoned that transaction after May 9, 2024, *id.* at ¶ 42-43; *see also* ECF No. 115 ("Joint Rule 56.1 Statement") at ¶ 12.

**D. Ayrton Seeks Windfall Profits.**

Bitdeer personnel met with representatives of Tether International Ltd. ("Tether") in Bhutan on May 14, 2024 (the morning of May 15, 2024 in Bhutan) to continue discussing a contemplated joint venture. *Id.* at ¶ 55. As discussions unfolded, Tether agreed instead to purchase $100 million in Bitdeer's common stock at the May 14 closing price, and Bitdeer agreed to issue Tether five million warrants to purchase shares at $10.00 per share over the next year. *Id.* at ¶¶ 56-57. The parties then reduced their oral agreement to writing and the transaction closed on May 30, 2024. *Id.* at ¶ 58. The transaction was announced publicly the next day. *Id.*

On May 22, 2024, Bitdeer informed Ayrton that Bitdeer had secured a $100-million equity investment from Tether. *Id.* at ¶ 60. Ayrton congratulated Bitdeer. *Id*. at ¶ 61. During this conversation, Ayrton did not advise Bitdeer that it believed Bitdeer had breached the Term Sheet or invoke any purported "right to participate." *Id.* at ¶ 62. Ayrton also did not rush into court to enjoin the Tether transaction from closing without Ayrton's participation, as Ayrton's fund did in 2020 to enforce purported participation rights in an issuance of new shares. *Id.* at ¶ 70.

It was not until weeks later, on June 10, 2024 (11 days after the Tether transaction closed), that Ayrton advised Bitdeer that it believed Bitdeer had breached the Term Sheet, and demanded to participate in the Tether transaction. *Id.* at ¶ 63. Whereas Bitdeer's share price opened at $5.90 per share on May 22, 2024, the share price had risen to a high of $7.42 on June 10, 2024. *Id.* at ¶¶ 77, 80. When Ayrton filed suit on July 8, 2024, Bitdeer's share price attained a high of $12.85 per share. *Id.* at ¶ 80. Ayrton's demand came despite the parties' ongoing negotiations over the alternative term sheet that Ayrton sent on May 9, 2024, all while Bitdeer remained willing to close the transaction contemplated by the Term Sheet. Bitdeer's Rule 56.1 Counter-Statement at ¶ 23.

Ayrton could have bought Bitdeer stock during this period, Bitdeer's Rule 56.1 Statement at ¶ 68, but Ayrton's chief negotiator preferred instead to monitor the share price, hoping that Ayrton's belated enforcement of its participation rights would fix its recent poor performance. *Id.* at ¶ 69 (chief negotiator musing, on June 13, 2024: "$25mn bitdeer at 5.50 will make many problems go away"); *see also id.* at ¶ 64. When Ayrton filed suit, it hoped to collect windfall profits of $32 million, *see* Compl. ¶ 36, roughly [redacted] than Ayrton's best-ever firm-wide annual profits, *see* Bitdeer's Rule 56.1 Statement at ¶ 10. In fact, although the fund Ayrton manages would have provided capital to Bitdeer had the transaction closed and reaped any associated profits, Ayrton has not informed its fund investors of this litigation. *Id.* at ¶ 74.

## **ARGUMENT**

A court may grant summary judgment only if there exists "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Johnson v. D.M. Rothman Co.*, 861 F. Supp. 2d 326, 330- 31 (S.D.N.Y. 2012). The moving party bears the burden of demonstrating the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1223 (2d Cir. 1994). In determining whether disputed issues exist, a court must view the evidence in the light most favorable to the non-moving party. *See, e.g.*, Sha*piro v. N.Y. Univ.*, 640 F. Supp. 2d 411, 418 (S.D.N.Y. 2009). If "there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Caruso Mgmt. Co. v. Int'l Council of Shopping Ctrs.*, 403 F. Supp. 3d 191, 200 (S.D.N.Y. 2019) (citing *Gummo v. Vill. of Depew*, 75 F.3d 98, 107 (2d Cir. 1996)).

### **I. AYRTON'S BREACH-OF-CONTRACT CLAIM FAILS AS A MATTER OF LAW.**

This Court should deny Ayrton's summary judgment motion, and instead grant summary judgment to Bitdeer, because the Term Sheet is not enforceable in whole or in part.

### A. The Term Sheet Is Not an Enforceable Contract.

According to Ayrton, the Term Sheet is a contract because certain of its provisions are labeled "binding." Br. 9. But no such provision imposes any obligations upon Ayrton. *See* ECF No. 108 ("Bitdeer's Br.") at 8-9. Accordingly, notwithstanding its "binding" provisions, the Term Sheet is unenforceable because it lacks consideration. *Hinson v. Phillips Auctioneers LLC*, 2019 WL 6334715, at *3 (S.D.N.Y. Oct. 29, 2019) ("The elements of contract formation are: . . . (3) consideration, . . . ***and*** (5) mutual intent to be bound." (emphasis added)); *see also, e.g.*, *Reeves Ent. Grp. v. LBS Commc'ns, Inc.*, 1991 WL 135476, at *6 (S.D.N.Y. July 18, 1991) ("Even if an intent to be bound is found, the contract is void for lack of consideration."); *Oscar Schlegel*, 231 N.Y. at 462 ("Unless both parties to a contract are bound, so that either can sue the other for a breach, neither is bound."). Despite having briefed this issue twice, *see* Br. 9-11; ECF No. 67 at 12-14, Ayrton still cannot identify any required "forbearance, detriment, loss, or responsibility, given, suffered, or undertaken" under the Term Sheet. *See Alpha Cap. Anstalt v. Real Goods Solar, Inc.*, 311 F. Supp. 3d 623, 630 (S.D.N.Y. 2018) (defining consideration).

Nevertheless, Ayrton urges this Court to follow a decision in which the First Department enforced a non-binding term sheet. *See* Br. at 9-10 (citing *RDF Agent, LLC v. Elec. Red Ventures, LLC*, 227 A.D.3d 424 (1st Dep't 2024)). But Ayrton admits that that case is readily distinguishable because "the term sheet in *RDF Agent*"—unlike the Term Sheet here—"required the plaintiff to proceed in good faith towards consummating the loan in question." Br. 10. Ayrton instead relies on the principle in *RDF Agent* that "an interpretation that renders a contract illusory and therefore unenforceable is disfavored and enforcement of a bargain is preferred." *Id.* (quoting *RDF Agent*, 227 A.D.3d at 427). Ayrton, however, does not explain how its proffered "interpretation" (whatever that may be) is available on the face of the Term Sheet, which contains a "binding" Preamble that accords Ayrton the "sole discretion" to withhold performance of "any obligation or

commitment" under the Term Sheet. Joint Rule 56.1 Statement at ¶ 7; *Chiapparelli v. Baker, Kellogg & Co.*, 252 N.Y. 192, 200 (1929) ("Where a promisor retains an unlimited right to decide later the nature or extent of his performance, the promise is too indefinite for legal enforcement.").

Effectively conceding the lack of consideration, Ayrton rests on a thinly veiled policy argument based on the assertion that one-sided exclusivity agreements are "ubiquitous in the financing market." Br. 10. Ayrton cites only inadmissible hearsay, having failed to adduce any expert evidence on the ubiquity of exclusivity agreements devoid of consideration. *See Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment."). Ayrton's only other "evidence" is a term sheet Bitdeer signed with another lender, but that term sheet imposed confidentiality obligations on the lender (unlike here), required the lender to forfeit a due diligence deposit if it was "unable to offer the Facility" (unlike here), and obligated the lender to waive exclusivity if it "no longer wants to pursue the transaction" (unlike here). Gladstein Ex. 18 at -32--33. Like the enforceable term sheet in *RDF Agent*, this term sheet reflects obligations by the lender and losses the lender would incur if it refused to pursue the contemplated transaction—all of which are absent here. Faced with a one-sided exclusivity obligation like the one here, the New York Supreme Court declined to enforce it. *See SPG Cap. Partners LLC v. Cascade 553 LLC*, 2023 WL 126127, *7 (N.Y. Sup. Ct. Jan. 6, 2023) (declining to enforce term sheet that "bound [defendant] to refrain from seeking other financing without regard to whether plaintiff moved forward with its due diligence in a timely fashion."). If this Court declines to enforce the Term Sheet, the "financing market" will not collapse as Ayrton insinuates, Br. 10, just as it did not collapse after *SPG Capital*.

To the extent there is any ambiguity as to the existence of consideration, the undisputed record requires summary judgment in Bitdeer's favor. *See* Bitdeer's Br. at 11-12.

### B. The Exclusivity Provision Is an Unenforceable Penalty.

Bitdeer's summary judgment motion explained why the Confidentiality and Exclusivity Provision mandates unenforceable penalties. *See id*. at 12-21. Bitdeer respectfully refers the Court to those arguments and focuses, here, on rebutting Ayrton's counter-arguments.

*First*, Ayrton claims that the "right to participate" clause is not a penalty because it "is plainly not a liquidated damages provision." Br. 11. Ayrton's argument has it exactly backwards. The right to participate is triggered upon Bitdeer's breach of its various underlying obligations and is therefore a penalty ***unless*** it is a liquidated damages clause. *See NML Cap. v. Republic of Argentina*, 621 F.3d 230, 236-37 (2d Cir. 2010) (penalty provisions are those triggered by an underlying breach); *LG Cap. Funding, LLC v. Accelera Innovations, Inc.*, 2018 WL 5456670, at *14 n.12 (E.D.N.Y. 2018) (where higher interest rate was "activated upon a defined breach," it was "subject to the same level of scrutiny as other varieties of liquidated damages provisions" (cleaned up)); *see also, e.g.*, *172 Van Duzer Realty Corp. v. Globe Alumni Student Assistance Ass'n, Inc.*, 24 N.Y.3d 528, 536 (2014) (lease acceleration clause triggered upon breach is "subject to judicial scrutiny" as "a penalty otherwise proscribed by the law"). Having admitted that the right to participate does not even purport to liquidate Ayrton's damages, Ayrton cannot enforce the provision. 11 CORBIN ON CONTRACTS § 58.1 ("While parties are not empowered to provide for penalties in the event of a breach, they can under certain conditions determine in advance what damages will be assessed in the event of a breach."). Just as the court in *CVS Pharmacy, Inc. v. Press Am., Inc.* (cited at Br. 10-11) invalidated a penalty where "[n]o evidence has been presented that suggests the amount correlates with IBM's anticipated actual damages," the right to participate ought to be invalidated here. 377 F. Supp. 3d 359, 376 (S.D.N.Y 2019).

*Second*, Ayrton claims that penalties must always be a "fixed cost" or a "fixed sum." Br. at 11. But the cases Ayrton cites say nothing of the sort. Two of Ayrton's cases involved penalties

in the form of monetary payments, but neither says that penalties must be fixed monetary sums. *See* Br. 11 (citing *CVS Pharm.*, 377 F. Supp. 3d at 365, and *Jacobs v. Citibank, N.A.*, 92 A.D.2d 786, 786 (1st Dep't 1983)). Meanwhile, in *CDS Business Services, Inc. v. H.M.C., Inc.* (cited at Br. 11), the court determined that certain fees were not penalties because they were owed "from day one," *i.e.*, they were bargained-for consideration rather than penalties triggered upon breach. 2023 WL 3847415, at *7 (E.D.N.Y. Apr. 28, 2023). Similarly, in *Kirby v. United States* (cited at Br. 11), the Supreme Court, applying Montana law, found that payments required whenever a lessee allowed cattle to graze on the leased property were bargained-for consideration, and "neither a penalty nor liquidated damages." 260 U.S. 423, 427 (1922). Here, conversely, the right to participate applies only "if [Bitdeer] breaches" certain underlying obligations. Joint Rule 56.1 Statement at ¶ 8. It is therefore a penalty, unlike the bargained-for consideration in Ayrton's cases.

*Third*, Ayrton claims that the right to participate is not a penalty because it merely "provides Ayrton the right to *pay Bitdeer*." Br. 11 (emphasis in original). This argument is belied by Ayrton's claim that the penalty entitles it to over $30 million in damages, *see* Compl. ¶ 37. While the penalty purports to require Ayrton to give Bitdeer cash, it also purports to require Bitdeer to give Ayrton stock that, according to Ayrton, is worth tens of millions more than the cash. Forfeitures of this kind are classic penalties. *See Truck Rent-a-Ctr., Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 424 (1977) ("public policy is firmly set against the imposition of penalties or forfeitures for which there is no statutory authority."); *see also, e.g.*, *Atlantis Mgmt. Grp. II LLC v. Nabe*, 216 A.D.3d 526, 527 (1st Dep't 2023) (invalidating penalty permitting plaintiff to buy back defendant's interest in a business at below-market prices); *In re O.P.M. Leasing Servs., Inc.*, 23 B.R. 104, 110-15 (Bankr. S.D.N.Y 1982) (invalidating penalty permitting plaintiff to renew a lease at a below-market rent).

*Fourth*, Ayrton claims that the "break-up fee of 0.75% is well within a range that New York courts routinely deem permissible." Br. 16. But Ayrton's invocation of this case law is puzzling given Ayrton seeks combined damages of more than $32 million, plus attorneys' fees, for breach of the Term Sheet's exclusivity obligation. That figure is ***30 percent*** of the value of the $100-million financing contemplated by the Term Sheet. Bitdeer's Rule 56.1 Statement at ¶ 10.

Accordingly, the Term Sheet's penalties are unenforceable. Without those penalties, Ayrton can only collect its actual damages sustained as a result of Bitdeer's alleged breach. *See JMD Holding Corp. v. Cong. Fin. Corp.*, 4 N.Y.3d 373, 380 (2005) ("If the clause is rejected as being a penalty, the recovery is limited to actual damages proven."). But Ayrton's claim fails because it concedes it suffered no damages beyond those mandated by the unenforceable penalties. *See* Br. 12 ("While executing the Tether Transaction constituted a 'breach,' doing so was well within Bitdeer's contractual rights, and is not the 'breach' for which Ayrton complains."); *see also* Bitdeer's Rule 56.1 Statement at ¶ 47 (admitting that Ayrton "did not incur any [out-of-pocket] fees in excess of the [$125,000] amount wired" by Bitdeer).[2]

## II. UNDISPUTED FACTS PRECLUDE AYRTON'S WINDFALL RECOVERY.

While the legal issues above dispose of Ayrton's claim as a matter of law, the undisputed facts foreclose Ayrton's entitlement to the windfall damages it seeks in this Action.

### A. Bitdeer Provided Ayrton a Right to Participate in the Tether Transaction.

Ayrton claims that Bitdeer breached its obligation to "provide Ayrton with a right to participate for 25%" but does not explain why Bitdeer's May 22, 2024 call notifying Ayrton of the

[2] Ayrton highlights that Bitdeer's expert did not opine that "Ayrton's damages could be zero." Br. 20. But Bitdeer's expert assumed that the Term Sheet was enforceable. Gladstein Decl. Ex. 60 at ¶ 4. He also only calculated Ayrton's damages flowing from the unenforceable penalties, not from any underlying breach of the Term Sheet's exclusivity obligation.

Tether transaction did not satisfy Bitdeer's purported obligations under the Term Sheet. *See* Bitdeer's Br. 21-24. Ayrton admits that this call occurred ***eight days*** before the Tether transaction closed, Br. 12, and likewise admits that Ayrton congratulated Bitdeer on the transaction without ever demanding to participate, *id.* 18-19. As Ayrton's corporate representative conceded, by the time the transaction closed, Ayrton "did have the opportunity" "and the option." Bitdeer's Rule 56.1 Statement at ¶ 69. Instead of explaining its delay in seeking to participate, Ayrton argues only that its silent inaction did not effect a waiver of any legal right. Br. 12. Ayrton therefore advances an interpretation of the Term Sheet whereby it can choose whether or not to participate in Bitdeer's third-party transactions for an indefinite period of time.

Ayrton's interpretation is not only commercially unreasonable, *see* Bitdeer's Br. 23, it runs contrary to principles governing option contracts. *See* Br. 13 ("the right of participation is akin to an option"). "[W]here an option to be exercised . . . is not limited by the agreement, then such option must be acted upon . . . or abandoned within a 'reasonable time.'" *Fitzpatrick v. Woodruff*, 96 N.Y. 561, 565 (1884); *Willis v. Ronan*, 249 A.D.2d 299, 300 (2d Dep't 1998) ("Where, as here, no time limit it set forth in the agreement, an option must be exercised within a reasonable time."); *Breslin v. Frankel*, 167 A.D.3d 692, 694 (2d Dep't 2018) (same); *ADYB Engineered for Life, Inc. v. EDAN Admin. Servs. (Ireland) Ltd.*, 2024 WL 2125431, at *10 (S.D.N.Y. May 10, 2024) ("Because 'no time [was] stated' for exercising the option, it needed to be exercised 'within a reasonable time.'" (quoting 1 WILLISTON ON CONTRACTS § 5:20 (4th ed.)). Ayrton nowhere justifies how it could possibly be reasonable for the holder of an "option" of the kind Ayrton claims it holds here to choose to "participate" in a transaction only ***after*** the transaction closes. Having failed to negotiate for specific timing parameters for the exercise its purported "right to participate," *see* Bitdeer's Br. 22 (discussing other term sheets negotiated by Ayrton's principal),

Ayrton cannot now impose a commercially unreasonable interpretation on Bitdeer. *See Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 173 (S.D.N.Y. 2015) ("[C]ourts must reject interpretations of agreement provisions that are commercially unreasonable or illogical."); *ERC 16W Ltd. P'ship v. Xanadu Mezz Holdings LLC*, 95 A.D.3d 498, 503 (1st Dep't 2012) (disfavoring interpretations that "would give one party an unfair and unreasonable advantage over the other, or that would place one party at the mercy of the other.")

### B. If There Was a Breach, It Occurred On May 14 and Certainly No Later than May 30, 2024.

Under New York law, damages for failure to deliver publicly traded stock are the difference between the purchase price of the stock and its fair market value on the date of the breach. *Boyce v. Soundview Tech. Grp. Inc.*, 464 F.3d 376, 385 (2d Cir. 2006) (fair market value is "the mean between the highest and lowest quoted selling prices" on the date of the breach). In arguing that Bitdeer's alleged breach occurred on some unspecified date in June 2024, Br. 14, Ayrton's objective is simple: convince the Court to pick a breach date that maximizes Ayrton's damages. While Tether agreed on the evening of May 14 (Eastern time) to purchase Bitdeer stock at that day's market price and obtain certain warrants, *see* Bitdeer's Rule 56.1 Statement at ¶¶ 55-57, Ayrton wants to do better than Tether. Ayrton seeks to "participate" at the May 14 market price ($5.38 per share), *id.* at ¶ 57, but on a breach date a month after May 14, when a $5.38 price trailed the market value of Bitdeer stock by more than $2 per share, *id.* at ¶ 79—all without ever shouldering any of the risk that Tether accepted in a $100-million market-price transaction. This Court should reject Ayrton's argument and determine that the breach occurred either on May 14, the date Tether and Bitdeer agreed upon the transaction, or May 30, the date the transaction closed.

New York courts routinely reject efforts, like Ayrton's, to artificially inflate damages. In *Oscar Gruss & Son, Inc. v. Hollander*, the Second Circuit considered whether the plaintiff's

damages for the defendant's failure to honor a warrant occurred on the date the defendant failed to deliver the warrant or years later, when the plaintiff sought to exercise the warrant it never received to artificially inflate its damages. 337 F.3d 186, 197 (2d Cir. 2003) ("Not surprisingly, [plaintiff] contends that it should get the benefit of the higher valuation of the warrants at the date of the tender offer because it would have held the warrants longer."). The court rejected the argument Ayrton advances here, holding that "the relevant breach occurred when [defendant] failed to deliver the warrants" because plaintiff "knew immediately" at that time that defendant "had breached." *Id.* at 197-98. In so concluding, the court expressly distinguished case law setting later breach dates for failure to honor an option where plaintiff "did not learn" of the breach until the date of exercise. *Id.* at 197 (distinguishing *Commonwealth Assocs. v. Palomar Med. Tech., Inc.*, 982 F. Supp. 205, 208 (S.D.N.Y. 1997) (cited at Br. 13));[3] *see also Maxim Grp. LLC v. Life Partners Holdings, Inc.*, 690 F. Supp. 2d 293, 300 (S.D.N.Y. 2010) (date of breach is date plaintiff "had notice of the breach").

Much like the plaintiff in *Oscar Gruss*, who opportunistically waited to exercise warrants it knew the defendant had never issued and sought damages as of the exercise date, Ayrton waited eight days for the Tether transaction to close without its participation (*i.e.* in alleged breach of its right to participate) to see how Bitdeer's stock price would change before claiming an entitlement

[3] Ayrton's other cases all support Bitdeer's arguments or are similarly distinguishable. *Simon v. Electrospace Corp.*, 28 N.Y.2d 136, 146 (1971) (plaintiff's "cause of action should not and may not be converted into carrying a market 'call' or 'warrant' to acquire the stock on demand if the price rose above its value"); *Hermanowski v. Acton Corp.*, 580 F. Supp. 140, 146 (E.D.N.Y. 1983) (breach occurred when "plaintiff learned that the defendant breached the agreement"); *Lucente v. Int'l Bus. Machs. Corp.*, 146 F. Supp. 2d 298, 316 (S.D.N.Y. 2001) (breach occurred when defendant repudiated contract, not on subsequent date of exercise); *Alpha Cap. Anstalt v. Imaging3, Inc.*, 2018 WL 3597520, at *4, *9 (S.D.N.Y. July 26, 2018) (no finding that plaintiff knew of defendant's breach before defendant "refused to honor the Notice of Exercise"); *In re Riodizio, Inc.*, 204 B.R. 417 (Bankr. S.D.N.Y. 1997) (no discussion of breach date).

to damages. This Court should reject Ayrton's proposed "'wait and see' theory of damages," in which "subsequent changes in value" are used to alter an award. *Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 826 (2d Cir. 1990); *Moreno-Godoy v. Kartagener*, 7 F.4th 78, 86 (2d Cir. 2021) (rejecting "damages awards calculated with the benefit of hindsight."). Ayrton's arguments to the contrary are each unavailing.

*First*, Ayrton claims that the relevant breach did not occur when "Bitdeer negotiated or closed the Tether Transaction" because Bitdeer was "contractually entitled to" negotiate and close the Tether transaction. Br. 13; *see also* Br. 12 ("While executing the Tether Transaction constituted a 'breach,' doing so was well within Bitdeer's contractual rights"). This argument makes no sense. The Term Sheet purports to prevent Bitdeer from "negotiat[ing] or accept[ing] any term sheets" and from "clos[ing] a financing transaction." Joint Rule 56.1 Statement at ¶ 8; Compl. at ¶ 40 ("Bitdeer breached the Term Sheet by negotiating and entering into the Competing Transaction on or about May 31 [*sic*], 2024"); *see also Rousey v. Jacoway*, 544 U.S. 320, 328 (2005) ("a contracting party has [no] unrestricted right to breach a contract simply because the price of doing so is the payment of damages."). Ayrton's contradictory position that Bitdeer was "well within [its] contractual rights" to negotiate with Tether while still claiming those very negotiations were a breach is a transparent attempt to delay the date of the breach.

*Second*, Ayrton claims that it could have exercised its right to participate at any time before the shares that Bitdeer issued to Tether on May 30, 2024 were registered by the Securities and Exchange Commission on June 20. Br. 14. Ayrton never explains why the registration process is at all relevant to determining the date of the breach. As Ayrton admits, Tether acquired unregistered shares on May 30, 2024. *See* Joint Rule 56.1 Statement at ¶ 14. The Tether transaction agreements did not provide that the registration of the shares was a closing condition

or otherwise permit Tether to return the shares if they remained unregistered. *See, generally*, Gladstein Ex. 50 at -16 (Subscription Agreement); *id.* at -84 (Registration Rights Agreement). The timing of Bitdeer's registration of the shares is simply irrelevant to the date of the breach.

**C. Bitdeer Is Not Liable for Ayrton's Attorney's Fees.**

Even if this Court awards judgment in Ayrton's favor, Ayrton cannot recover its attorney's fees. "Ordinarily, only a prevailing party is entitled to attorney's fees," which requires a showing that the party has "prevailed with respect to the central relief sought." *Nestor v. McDowell*, 81 N.Y.2d 410, 415-16 (1993). "Such a determination requires an initial consideration of the true scope of the dispute litigated, followed by a comparison of what was achieved within that scope." *Blinds to Go (U.S.), Inc. v. Times Plaza Dev., L.P.*, 191 A.D.3d 939, 942 (2d Dep't 2021) (quotations omitted); *Sykes v. RFD Third Ave. I Assocs., LLC*, 39 A.D.3d 279, 279 (1st Dep't 2007) (prevailing party must "prevail on the central claims advanced, and receive substantial relief in consequence thereof."); *see, e.g.*, *Blue Sage Cap., L.P. v. Alfa Laval U.S. Holding, Inc.*, 168 A.D.3d 645, 646 (1st Dep't 2019) (no fees for party obtaining a "net judgment" in its favor where "a significant portion" of that party's "litigation goals" were "thwarted"). This standard applies even where, as here, a contract contains a one-way fee-shifting provision rather than a provision awarding fees to the "prevailing party." *See Nestor*, 81 N.Y.2d at 415 (applying "prevailing party" standard where lease required tenant to cover "'[such] expenses as the landlord may incur for legal expenses' as a result of any breach of the lease"). Ayrton does not acknowledge these standards, and instead offers non-sequiturs regarding indemnification clauses when the Term Sheet contains no such clause. *See* Br. 15 (quoting *Wistron NeWeb Corp. v. Genesis Networks Telecom. Servs., LLC*, 2023 WL 5211352, at *7 (S.D.N.Y. Aug. 14, 2023) (Liman, J.)).

The "prevailing party" standards, however, preclude Ayrton's recovery of attorneys' fees in any number of situations. For example, if this Court invalidates the Term Sheet's penalties but

finds that Bitdeer breached an enforceable exclusivity obligation (which Bitdeer disputes, *see infra*, 18-24), Ayrton will have failed in its primary objective of reaping a windfall from its purported "right to participate" and will therefore not be a prevailing party. *See, e.g.*, *Park Lane IBS, LLC v. Unbnd Grp. Pty Ltd.*, 2024 WL 4123515, at *7 (S.D.N.Y. Sept. 9, 2024) (arbitrator correctly declined to award fees where plaintiff obtained certain warrants but was denied its entire damages claim); *id.* ("A 'prevailing party' inquiry does not present a binary choice" where "neither party" may amount to a "prevailing party"); *Arbordale Hedge Invs., Inc. v. Clinton Grp. Inc.*, 1999 WL 1000939, at *3 (S.D.N.Y. Nov. 4, 1999) (no fees where defendant paid "a substantial sum of money" damages but plaintiff "received far less than it initially sought"). Similarly, if the Court enforces the Term Sheet's penalties but limits Ayrton's recovery to the fees it would have extracted from the Alto Fund, *see* Bitdeer's Br. 24-25, Ayrton would not be a prevailing party. *See* Sharma Ex. 33 at ¶¶ 59-72 (Bitdeer's expert opining that Ayrton, as opposed to the Alto Fund, cannot recover more than $18,506 in damages); *Advanced Analytics, Inc. v. Citigroup Glob. Mkts., Inc.*, 2025 WL 1375392, at *4 (2d Cir. May 13, 2025) (affirming denial of attorney's fees where plaintiff "prevailed on a limited breach of contract claim" that "generated only nominal damages.").

For all of these reasons, if this Court grants summary judgment to Bitdeer on any ground advanced in Bitdeer's motion, Ayrton cannot recover attorneys' fees.

## III. TRIABLE ISSUES PREVENT SUMMARY JUDGMENT IN AYRTON'S FAVOR.

The Motion must be denied because a jury must resolve factual issues regarding Ayrton's performance, Bitdeer's fraudulent inducement defense, and causation for Ayrton's damages.

### A. Triable Issues Preclude a Determination that Ayrton Fulfilled Its Obligations (If Any) under the Term Sheet.

The Motion should be denied because Ayrton has not proven its own performance under the Term Sheet. "A plaintiff's entitlement to sue for breach of contract depends on whether it has

performed its own obligations." *ACE Secs. Corp. Home Equity Loan Tr., Series 2007-HE3 v. DB Structured Prods., Inc.*, 5 F. Supp. 3d 543, 561 (S.D.N.Y. 2014); *see also Impax Lab'ys v. Turing Pharms. AG*, 2017 WL 4357893, at *16 (S.D.N.Y. Sept. 29, 2017) (granting defendant's summary judgment motion where plaintiff "has failed to perform its own contractual obligations."). Although Ayrton claims "there is no evidence to suggest Ayrton failed in its duty to perform under the Term Sheet," Br. 19, Ayrton neither describes what the Term Sheet obligated it to do, nor offers facts supporting its performance (because the Term Sheet obligated it to do nothing, *see, supra*, 8-9). Even assuming Ayrton had to negotiate in good faith with Bitdeer (despite the Term Sheet's express language to the contrary), triable issues abound regarding Ayrton's performance.

A party obligated to negotiate in good faith is barred "from renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement." *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 498 (S.D.N.Y. 1987); *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 432 (2d Cir. 2011) (preliminary agreements protect against "the other party's foot-dragging or change of heart or taking advantage of a vulnerable position created in the negotiation." (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 96 F.3d 275, 278 (7th Cir. 1996)); *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 548 (2d Cir. 1998) (parties must "ma[k]e a good faith effort to close the deal" and "not insist[] on conditions that do not conform to the preliminary writing."). "The linchpin of negotiation is not that one side capitulates to the other, but that there is a good faith, honest, articulation of interests, positions, or understandings." *L-7 Designs*, 647 F.3d at 431 (quoting *Penguin Grp. (USA) Inc. v. Steinbeck*, 2009 WL 857466, at *2 (S.D.N.Y. Mar. 31, 2009)). Whether a party negotiated in good faith is a classic jury question. *See, e.g.*, *Scher v. Llorente*, 1993 WL 426840, at *3 (S.D.N.Y. Oct. 22, 1993) (finding triable issues "as to bad faith because

Llorente terminated negotiations immediately after receiving plaintiffs' first draft"); *Penguin*, at *3 (S.D.N.Y. Mar. 31, 2009) (denying summary judgment where parties disputed "whether defendant met his obligation to negotiate in good faith.").

Ayrton's Rule 56.1 statement contains just two purportedly undisputed facts regarding Ayrton's alleged attempt at good-faith negotiation: that Ayrton "accessed the data room created for Ayrton's due diligence of the proposed transaction" and that Bitdeer connected Ayrton "to Bitdeer's lawyers" to discuss Ayrton's alleged concerns regarding Bitdeer's collateral. *See* Bitdeer's Rule 56.1 Counter-Statement at ¶¶ 15, 37. These facts do not establish that Ayrton fulfilled any purported "good faith" obligation. Instead, Ayrton's claim that Bitdeer's collateral was inadequate raises the specter of bad faith because Ayrton both knew Bitdeer's facility was a leased property before executing the Term Sheet and had access to the relevant lease. *See* Bitdeer's Rule 56.1 Statement at ¶¶ 38-39. The Term Sheet nowhere identifies the Rockdale facility as collateral, and instead contemplates that Ayrton will obtain a senior debt obligation over all assets of Bitdeer—a "multi-billion dollar" company, Br. 1—and all of its fourteen subsidiaries. Sharma Decl. Ex. 9 at -02. Against this backdrop, a jury might well conclude that Ayrton's singular focus on a single asset was a bad-faith delay tactic to avoid investing in Bitdeer, particularly given the relevant lease provision did not prohibit foreclosure actions at the ultimate parent level such that the Rockdale facility could have been collateralized in any lending relationship between the parties. *See* Bitdeer's Rule 56.1 Counter-Statement at ¶ 36.

If anything, the undisputed facts disclose that Ayrton ***did not*** negotiate in good faith. Ayrton lacked the capital needed to invest in Bitdeer and took virtually no steps to obtain that capital. Bitdeer's Rule 56.1 Statement at ¶¶ 52-53. The undisputed facts likewise show that Ayrton incurred no out-of-pocket costs in negotiating with Bitdeer, and instead profited off

Bitdeer's $125,000 due diligence deposit. *Id.* at ¶ 47. Ayrton also admitted it did not pay any fees to its diligence vendor while negotiating with Bitdeer. Sharma Decl. Ex. 11 at No. 5. Finally, Ayrton admitted that it had never previously pursued a transaction even half the size of the $100-million transaction contemplated by the Term Sheet, challenging its good faith in claiming that it could quickly close such a transaction with Bitdeer. Bitdeer's Rule 56.1 Statement at ¶¶ 49-51.

### B. Triable Issues Preclude a Ruling on Bitdeer's Affirmative Defense of Fraudulent Inducement.

Ayrton argues that Bitdeer's fraudulent inducement defense fails, but raises no factual or legal basis upon which the Court could reject the defense. In fact, Bitdeer's fraudulent inducement defense will require a jury to weigh conflicting evidence regarding what Ayrton knew about Bitdeer's available collateral when it represented to Bitdeer that it could close a transaction within "2-3 weeks," and whether Ayrton had the ability and genuine interest in investing $100 million in Bitdeer—whether in "2-3 weeks" or ever. Ayrton's arguments to the contrary are wrong.

*First*, Ayrton incorrectly asserts that its misrepresentations are "plainly nonactionable statements of prediction or expectation and insufficient to state a claim." Br. 22. Ayrton's misrepresentations that it had reviewed public information about Bitdeer and believed it could close, *see* Bitdeer's Rule 56.1 Statement at ¶¶ 38-41, are "material misrepresentation[s] of a presently existing or past fact" regarding Ayrton's assessment of Bitdeer's collateral. *State St. Glob. Advisors Tr. Co. v. Visbal*, 431 F. Supp. 3d 322, 352 (S.D.N.Y. 2020). Ayrton either misrepresented that it had reviewed public information about Bitdeer or that it believed the collateral was adequate based on that review. Such "representation[s] of present fact" were "the inducement for the contract," *Deerfield Commc'ns Corp. v. Chesebrough–Ponds, Inc.*, 68 N.Y.2d 954, 956 (1986), are "not duplicative" of any obligation in the Term Sheet, and are therefore "collateral or extraneous" to the Term Sheet and permissible grounds for a defense of fraudulent

inducement. *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996); *see also Int'l CableTel Inc. v. Le Groupe Videotron Ltee*, 978 F. Supp. 483, 487 (S.D.N.Y. 1997) ("if a promise was made with a preconceived and undisclosed intention of not performing it, it constitutes a misrepresentation of a material existing fact" sufficient for fraud in the inducement, so long as the promise is "collateral or extraneous to the terms [of] an enforceable agreement in place between the parties" (internal quotations omitted)).

*Second*, Ayrton argues that its misrepresentations as to its ability to close were not false given its self-serving testimony that Ayrton "could have easily closed the transaction." Br. 23. A jury must decide whether to believe this testimony given: (i) Ayrton would have had to sell all of its liquid assets to invest $100 million in Bitdeer, *see* Bitdeer's Rule 56.1 Statement at ¶ 52; (ii) Ayrton has never invested $100 million in one company, *id.* at ¶ 50; (iii) such an investment would have amount to half of Ayrton's portfolio when no other debt investment exceeds 15 percent of its portfolio, *id.* at ¶¶ 48-49; and (iv) Ayrton took no steps to obtain third-party capital beyond one alleged conversation for which there is no documentary evidence, *id.* at ¶ 53. A jury may well find that Ayrton misrepresented its ability to close. *Wild Bunch, SA v. Vendian Ent., LLC*, 256 F. Supp. 3d 497, 506 (S.D.N.Y. 2017) ("[F]alse statements about a party's present financial condition or current ability to perform . . . will support a claim of fraudulent inducement. Such statements are not promissory statements of what will be done in the future." (cleaned up)); *Centauro Liquid Opportunities Master Fund, L.P. v. Bazzoni*, 2019 WL 4464242, at *10 (S.D.N.Y. Sept. 18, 2019) ("misleading statements made by CTEL regarding its current and future business activities which relate to CTEL's capacity to perform" sufficient for fraudulent inducement).

*Third*, Ayrton incorrectly asserts that Bitdeer cannot show scienter because "there is no evidence that Mr. Gross was aware of the sale restrictions that plagued Bitdeer's collateral."

Br. 23. Ayrton was admittedly aware of Bitdeer's leasehold interest in the property, *see* Sharma Decl. Ex. 3 at 90:25-91:10, given extensive conversations between Ayrton and Bitdeer regarding Bitdeer's collateral before execution of the Term Sheet, *see* Gladstein Decl. Ex. 5 at 180-81, 188-89. Ayrton likewise was aware of all of the non-public facts cited above regarding its own inability to close a $100-million transaction. These facts permit a jury to conclude that Ayrton "had both motive and opportunity to commit fraud" or that Ayrton engaged in "conscious misbehavior or recklessness." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006). As to motive and opportunity, Ayrton knew that Bitdeer hoped to close a transaction quickly, and it stood to gain by trapping Bitdeer in an exclusivity obligation and then retrading on the deal terms, as happened here, *see* Bitdeer's Rule 56.1 Statement at ¶¶ 42-43. As to circumstantial evidence of conscious misbehavior, Ayrton "knew facts" regarding its (1) ability to close, (2) failure to line up third-party capital, and (3) history of never before soliciting such capital or otherwise completing a similarly sized investment. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001).

*Fourth*, Ayrton's arguments against Bitdeer's reliance all fail. The first is that the Term Sheet says a transaction is "subject to the completion of due diligence," such that Bitdeer should not have relied on Ayrton's representations of its assessment of the collateral. Br. 23-24. But the language Ayrton cites refers to the ***completion*** of due diligence, because the parties understood that Ayrton had done due diligence based on public information (which included the lease for the Rockdale facility) and would be hiring a vendor for site visits (which never happened). Bitdeer's Rule 56.1 Statement at ¶ 41. Ayrton likewise claims that Bitdeer should have more diligently investigated Ayrton's inability to close, Br. 24, but Ayrton nowhere claims that Bitdeer could have discovered Ayrton's cash balances and investment strategy through ordinary diligence. As Ayrton has represented to the Court, it views its investment practices and cash balance information as

confidential and competitive information. *See* ECF No. 64 (Ayrton's motion to seal in full all docket entries concerning Ayrton's financial performance); ECF No. 131 at 1 (Ayrton arguing that such information implicates Ayrton's "highly confidential investment strategy"). There is no basis on this record to depart from the Court's general reluctance "to summarily dispose of fraud claims on the basis of unreasonable reliance." *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 346 F. Supp. 3d 473, 484 (S.D.N.Y. 2018); *see also De Sole v. Knoedler Gallery, LLC*, 139 F. Supp. 3d 618, 643 (S.D.N.Y. 2015) (reasonable reliance "not usually amenable to summary judgment.").

*Finally*, Ayrton claims Bitdeer has not suffered damages. Br. 24. Damages for fraudulent inducement are the "difference between the value of the bargain which a plaintiff was induced by fraud to make and the amount or value of the consideration exacted as the price of the bargain." *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421 (1996). Ayrton has conceded that Bitdeer paid the $125,000 due diligence deposit, and that Ayrton's out-of-pocket costs did not exceed that amount. *See* Bitdeer's Rule 56.1 Statement at ¶ 47. Bitdeer paid those fees in reliance on Ayrton's representations that it could close a transaction. Because those representations were false, Bitdeer received no valuable consideration, and suffered damages of at least $125,000.

For these reasons, summary judgment as to the fraudulent inducement defense is improper.

### C. Triable Issues Preclude a Determination of Ayrton's Entitlement to Damages for Alleged Breach of the Right to Participate.

Triable issues preclude a finding that Bitdeer caused Ayrton's damages. *See Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004) ("Causation is an essential element of damages in a breach of contract action; and, as in tort, a plaintiff must prove that a defendant's breach *directly and proximately caused* his or her damages." (emphasis in original)). A plaintiff must show that its damages "were caused by and are directly traceable to the [defendant's] breach." *Bausch & Lomb Inc. v. Bressler*, 977 F.2d 720, 731 (2d Cir. 1992); *see*

*also Point Prods. A.G. v. Sony Music Ent., Inc.*, 215 F. Supp. 2d 336, 343-44 (S.D.N.Y. 2002) (plaintiff must prove that "defendant's breach of contract was sufficiently connected to the plaintiff's damage that it could reasonably be said to have caused the injury."). "Recovery is not allowed if the claimed losses are the result of other intervening causes." *Diesel Props S.r.l. v. Greystone Bus. Cred. II LLC*, 631 F.3d 42, 53 (2d Cir. 2011) (quotations omitted).

Even if this Court concludes that Bitdeer failed to provide Ayrton a right to participate in the Tether transaction, a jury must decide whether Ayrton would have exercised that right. *See, e.g.*, *Krofft Ent., Inc. v. CBS Songs, a Div. of CBS, Inc.*, 653 F. Supp. 1530, 1534-35 (S.D.N.Y. 1987) (ordering trial of causation for breach-of-contract damages). Given Ayrton considered a secured loan that was senior to ***all other obligations of Bitdeer and all of its fourteen subsidiaries*** to be too risky, a jury could reasonably conclude that Ayrton would not have pooled a quarter of its liquid assets into an unsecured equity transaction as part of one of its largest-ever investments. *See* Bitdeer's Rule 56.1 Statement at ¶¶ 43, 49-52. A jury could also reasonably conclude that Ayrton would never have "participated" given the lack of any obvious upside to Ayrton from the Tether transaction, which entailed a market-price purchase of stock with warrants exercisable at a price that Bitdeer's shares had not attained on any date between January 3, 2024 and June 13, 2024. *Id.* at ¶¶ 57-58, 81. A jury could infer from Ayrton's admitted failure to ever request to participate between May 22, 2024 and May 30, 2024 that Ayrton would ***not*** have participated. *Id.* at ¶¶ 61-62; *see Nat'l Mkt.*, 392 F.3d at 530 (district court properly considered the role of plaintiff's principal in causing plaintiff's damages); *TD Waterhouse Inv. Servs., Inc. v. Integrated Fund Servs., Inc.*, 2003 WL 42013 at *9 (S.D.N.Y. Jan. 6, 2003) (no causation where plaintiff's "'damages' arose from its own voluntary decisions").

## <u>CONCLUSION</u>

For the reasons stated above, Ayrton's Motion for Summary Judgment should be denied.

Dated: New York, New York
November 26, 2025

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By: */s/ Renita Sharma*
Michael B. Carlinsky
Renita Sharma
Anil Makhijani
Daniel Sisgoreo
295 Fifth Avenue
New York, New York 10016
Telephone: (212) 849-7000
michaelcarlinsky@quinnemanuel.com
renitasharma@quinnemanuel.com
anilmakhijani@quinnemanuel.com
danielsisgoreo@quinnemanuel.com

*Attorneys for Defendant*
*Bitdeer Technologies Group*