UNITED STATES U.S. DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AYRTON CAPITAL, LLC,<br>*Plaintiff*,<br>v.<br>BITDEER TECHNOLOGIES GROUP,<br>*Defendant*. | Case No. 24-5160 (LJL)<br>**ORAL ARGUMENT REQUESTED** |

**PLAINTIFF AYRTON CAPITAL, LLC'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT BITDEER TECHNOLOGIES GROUP'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS


TABLE OF CONTENTS ..... i

PRELIMINARY STATEMENT ..... 1

CORRECTIVE STATEMENT OF FACTS ..... 2

ARGUMENT ..... 5

I. BITDEER'S SUMMARY JUDGMENT MOTION SHOULD BE DENIED ..... 5

A. The Exclusivity Provision Is Binding ..... 5

1. Bitdeer's Reliance On Parol Evidence Is Improper ..... 8

B. The Exclusivity Provision Is Enforceable ..... 10

1. The Right Of Participation Is Not A Penalty ..... 11

2. Bitdeer's Claim That Damages Are Limited To Out-Of-Pocket Expenses Is Meritless ..... 12

3. The Participation Right Is Not Grossly Disproportionate ..... 14

C. Ayrton Was Denied Its Right To Participate In The Tether Transaction ..... 16

D. As Signatory Of The Term Sheet, Ayrton Is The Proper Plaintiff For Its Breach Of Contract Claim ..... 18

CONCLUSION ..... 19

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.*,
404 F.3d 566 (2d Cir. 2005)....16

*Alessi Equip., Inc. v. Am. Piledriving Equip., Inc.*,
578 F. Supp. 3d 467 (S.D.N.Y. 2022)....6

*Apfel v. Prudential-Bache Sec. Inc.*,
81 N.Y.2d 470 (1993)....7

*Atlantis Mgmt. Grp. II LLC v. Nabe*,
190 N.Y.S.3d 13 (1st Dep't 2023)....11

*Beekman Inv. Partners, L.P. v. Alene Candles, Inc.*,
2006 WL 330323 (S.D.N.Y. Feb. 14, 2006)....8, 9

*Bradford v. New York Times Co.*,
501 F.2d 51 (2d Cir. 1974)....11

*Cent. Irrigation Supply v. Putnam Country Club Assoc., LLC*,
871 N.Y.S.2d 319 (2d Dep't 2008)....15

*Chiapparelli v. Baker, Kellogg & Co.*,
252 N.Y. 192 (1929)....7

*Clarex Ltd. v. Natixis Sec. Am. LLC*,
2012 WL 4849146 (S.D.N.Y. Oct. 12, 2012)....18–19, 8

*Consol. Edison, Inc. v. Ne. Utils.*,
426 F.3d 524 (2d Cir. 2005)....9

*Crescit Mortg. Cap., LLC v. Emerald Bay Apartments, LLC*,
2024 WL 5340718 (S.D.N.Y. Dec. 27, 2024)....13, 16

*Diesenhouse v. Soc. Learning & Payments, Inc.*,
2022 WL 3100562 (S.D.N.Y. Aug. 3, 2022)....7

*Echostar Satellite L.L.C. v. ESPN, Inc.*,
914 N.Y.S.2d 35 (1st Dep't 2010)....16–17

*Faust Harrison Pianos Corp. v. Allegro Pianos, LLC*,
2013 WL 2292050 (S.D.N.Y. 2013)....7

*FCS Advisors, Inc. v. Fair Finance Co, Inc.*,
2009 WL 1403869 (S.D.N.Y. May 19, 2009)....11, 13, 14, 16

**Page(s)**

*Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*,
7 N.Y.3d 96 (2006) ....................16

*Goodstein Const. Corp. v. City of N.Y.*,
80 N.Y.2d 366 (1992) ....................12

*Hales v. HSBC Bank USA, N.A.*,
2008 WL 11435681 (S.D.N.Y. June 10, 2008) ....................13

*Hudson Optical Corp. v. Cabot Safety Corp.*,
1998 WL 642471 (2d Cir. Mar. 25, 1998) ....................19

*Int'l Bus. Machs. Corp. v. United Microelectronics Corp.*,
764 F. App'x 9 (2d Cir. 2019) ....................7, 9

*JMD Holding Corp. v. Congress Fin. Corp.*,
4 N.Y.3d 373 (2005) ....................16

*Kinley Corp. v Ancira*,
859 F Supp 652 (W.D.N.Y. 1994) ....................6

*L-7 Designs, Inc. v. Old Navy, LLC*,
647 F.3d 419 (2d Cir. 2011) ....................12

*LG Capital Funding, LLC v. M Line Holdings, Inc.*,
422 F. Supp. 3d 739 (E.D.N.Y. 2018) ....................14

*Morgan Stanley High Yield Secs., Inc. v. Seven Circle Gaming Corp.*,
269 F. Supp. 2d 206 (S.D.N.Y. 2003) ....................9

*NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*,
772 F.3d 740 (2d Cir. 2014) ....................18

*Nissho Iwai Eur. PLC v. Korea First Bank*,
756 N.Y.S.2d 140 (1st Dep't 2003) ....................9

*In re O.P.M. Leasing Servs., Inc.*,
23 B.R. 104 (Bankr. S.D.N.Y. 1982) ....................11

*Oscar Schlegel Mfg. Co. v. Peter Cooper's Glue Factory*,
231 N.Y. 459 (1921) ....................7

*Prada USA Corp. v. 724 Fifth Fee Owner LLC*,
2021 WL 2126109 (N.Y. Sup. Ct. May 25, 2021) ....................15

*Quaker Oats Co. v. Reilly*,
711 N.Y.S.2d 498 (2d Dep't 2000) ....................14

**Page(s)**

*RDF Agent, LLC v. Elec. Red Ventures, LLC*,
211 N.Y.S.3d 283 (1st Dep't 2024) ....................7, 8, 13, 15

*Schaffer v. Coral Reef Capital, LLC*,
2020 WL 7315529 (N.Y. Sup. Ct. Dec. 10, 2020) ....................15

*Space Imaging Europe, Ltd. v Space Imaging L.P.*,
38 F. Supp. 2d 326 (S.D.N.Y. 1999)....................7

*SPG Cap. Partners LLC v. Cascade 553 LLC*,
2023 WL 126127 (N.Y. Sup. Ct. Jan. 6, 2023)....................8

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*,
487 F.3d 89 (2d Cir. 2007)....................17

*In re United Merchants and Manufacturers, Inc.*,
674 F.2d 134 (2d Cir. 1982)....................15

*Vinifera Imports Ltd. v. Societa Agricola Castello Romitorio SRL*,
2020 WL 1184962 (E.D.N.Y. March 12, 2020) ....................6

*WCA Holdings III, LLC v. Panasonic Avionics Corp.*,
704 F. Supp. 3d 473 (S.D.N.Y. 2023)....................7

*Wilhelmina Models, Inc. v. Fleisher*,
797 N.Y.S.2d 83 (1st Dep't 2005) ....................19

*Wood v. Lucy, Lady Duff-Gordon*,
222 N.Y. 88 (1917) ....................6

## PRELIMINARY STATEMENT

It is perhaps no surprise that Bitdeer's motion does not so much as mention the first principle of contract law—to give effect to the parties' intent. Indeed, in moving for summary judgment on Ayrton's breach of contract claim, Bitdeer seeks to invalidate a binding exclusivity clause that it willingly negotiated and agreed to. Bitdeer is not the first commercial counterparty to resort to litigation in the hopes of escaping contractual obligations it no longer wishes to honor. New York courts routinely reject such challenges, however. Respectfully, the same result should follow here.

Bitdeer's assertion that the Term Sheet's[1] Exclusivity Provision was non-binding is contradicted by the unambiguous language of the Term Sheet: "Upon execution of the Term Sheet by the Company, this Confidentiality and Exclusivity section shall be *binding*." Notwithstanding this unequivocal expression of intent, Bitdeer argues that it cannot be held to the promise it made, because the promise lacks consideration and mutuality of obligation. Under New York law, however, where parties express an unambiguous intent to be bound, adequacy of consideration and mutuality of obligation are not proper subjects for judicial scrutiny. And, in any event, the evidence confirms that Ayrton committed to allocating its time and resources to conduct due diligence and negotiate final transaction documents in good faith, which is precisely what it did.

Bitdeer also contends that the Exclusivity Provision is an unenforceable penalty, primarily by distorting Ayrton's participation right into a form of liquidated damages. Bitdeer does not, because it cannot, offer legal authority to support this argument. A liquidated damages provision is a fixed sum owed by the breaching party upon the occurrence of a breach. Ayrton's right of

[1] Capitalized terms not otherwise defined herein shall have the same definitions ascribed to them in Ayrton's Memorandum of Law in Support of Its Motion for Summary Judgment, ECF No. 120.

participation did not require Bitdeer to pay a fixed sum, or, for that matter, anything at all. It entitled Bitdeer to *receive* money from Ayrton. That Ayrton's right of participation was contingent on the execution of a third-party transaction does not magically convert Ayrton's participation right into a penalty.

Finally, while its arguments may be rejected on the basis of the law, Bitdeer's papers are littered with factual assertions that are plainly disputed. It portrays itself as the victim of an arms-length negotiation, and accuses Ayrton of attempting to "lure" Bitdeer into exclusivity so this it could reap "windfall" profits. Bitdeer's own internal communications put the lie to these assertions. They reflect that Bitdeer employees fully understood their binding exclusivity obligations to Ayrton, and were instructed to disregard those obligations by Bitdeer's CEO, Jihan Wu, after Ayrton discovered that Bitdeer's proposed collateral—upon which the entire proposed transaction was premised—could not be collateralized. Worse, those same employees then schemed to leverage the Tether Transaction to obtain better terms from Ayrton, once Ayrton's period of exclusivity had expired.

Having now been caught, Bitdeer cannot manufacture a basis to avoid its unambiguous contractual obligations. Summary judgment should be entered in favor of Ayrton.

## CORRECTIVE STATEMENT OF FACTS

The parties have submitted a joint Rule 56.1 Statement of Undisputed Facts and their own Rule 56.1 Statements. In an effort to avoid burdening the Court with duplicative briefing, Ayrton respectfully incorporates its own Rule 56.1 Statement and "Summary of Undisputed Facts" in its Memorandum of Law. ECF Nos. 118, 119. Ayrton responds below only to certain mischaracterizations of "undisputed" facts by Bitdeer.

For example, Bitdeer claims that Ayrton "could never have closed the $100-million debt-

financing with Bitdeer." DMOL at 5.[2] Ayrton's managing member testified unequivocally that he was "prepared to [invest $100 million]" in the proposed transaction because he believed it was a "very compelling opportunity." PEx. 65 at 61:12–20. Ayrton's lead analyst testified that Ayrton had approximately $100 million in cash and liquid securities available. DEx. 3 at 127:23–128:2. Ayrton had also contemplated syndicating the transaction to other potential investor partners and had begun exploring discussions with co-investors to participate at the time it discovered issues with its collateral. DEx. 2 at 26:6–10, 26:21–27:8, 27:19–28:4.

Bitdeer also suggests that "negotiations [of the transaction] quickly stalled when Ayrton claimed to have identified problems with Bitdeer's lease over one of its US-based cryptocurrency mining facilities[.]" DMOL at 4. It asserts that Ayrton "either misrepresented that it had reviewed public information about Bitdeer's collateral or misrepresented its findings from that review, in either case misleading Bitdeer into signing the Term Sheet." *Id.* at 4–5.

The facility referred to by Bitdeer is the Rockdale facility, the lease for which Bitdeer represented could be used as collateral for the loan. Bitdeer's Mr. LaBerge told Ayrton's Mr. Gross that the collateral was worth approximately $250 million.

The lease itself is 87 pages long, PEx. 69-1 at -3555, not including eight amendments over

[2] Citations to "DMOL" refer to the Memorandum of Law in Support of Defendant Bitdeer Technologies Group's Motion for Summary Judgment, ECF No. 108. Citations to "PMOL" refer to Plaintiff Ayrton Capital, LLC's Memorandum of Law in Support of Its Motion for Summary Judgment, ECF No. 120. Citations to "PEx. _" refer to the exhibits to the Declaration of Andrew D. Gladstein, ECF No. 122, or the concurrently filed Declaration of Andrew D. Gladstein, Esq., in Support of Ayrton's Opposition to Bitdeer's Motion for Summary Judgment. Citations to "DEx. _" refer to the exhibits to the Declaration of Renita Sharma, ECF No. 113. Citations to "Joint SUMF ¶ _" refer to the Joint Rule 56.1 Statement of Undisputed Material Facts, ECF No. 115. Citations to "Ayrton SUMF ¶ _" refer to Ayrton's Rule 56.1 Statement of Undisputed Material Facts, ECF No. 118. Citations to "Bitdeer SUMF ¶ _" refer to Bitdeer's Rule 56.1 Statement of Undisputed Material Facts, ECF No. 112. Citations to "Response to Bitdeer SUMF ¶ _" refer to the concurrently filed Plaintiff Ayrton Capital, LLC's Response to Defendant Bitdeer Technologies Group's Rule 56.1 Statement.

five years, PEx. 14 at -3754. *See also* PEx. 71 at -3449 (Mr. LaBerge describing the Rockdale facility as [redacted]). Bitdeer's own witnesses confirmed that (i) [redacted], PEx. 66 at 119:8–22, 177:14–19; (ii) [redacted], *id.* at 196:3–17, 203:25–204:8; and (iii) when Ayrton raised the issue, Bitdeer noted in internal communications that it would be an issue for "any senior secured lender," PEx. 29 at -3000; PEx. 66 at 206:16–207:10.

More remarkably, Bitdeer suggests that Ayrton "lured Bitdeer into the Term Sheet with unfulfilled promises of a speedy close" because Ayrton was "content to wait and see if it could collect massive profits through the Confidentiality and Exclusivity Provision." DMOL at 5. The documents tell a far different story. Upon discovering the issue with the Rockdale lease, it was Ayrton that pressed Bitdeer with proposals for alternative solutions. PEx. 62 at ¶ 14.

Notwithstanding its efforts to find a workaround for the problem, when he learned that Ayrton had raised this issue, Bitdeer's CEO instructed his employees to terminate the Term Sheet and to "breach" Bitdeer's exclusivity obligations to Ayrton. PEx. 36 at -3788; *see also* PEx. 4 at 161:16–19. With respect to a different debt financing that Bitdeer was exploring, Mr. Basit asked Mr. LaBerge, "[c]an we work on the [redacted] before the 30 days is over? Can we work on both Ayrton and [redacted] at the same time?" PEx. 37 at -2253. With respect to Tether, one day after terminating the Term Sheet with Ayrton, Bitdeer representatives were on the ground in Bhutan negotiating an equity transaction with Tether. PEx. 4 at 168:4–12. Ayrton was ignorant of these discussions and continued communicating proposals to Bitdeer. *See, e.g.* PEx. 39 at -480–481.

Finally, Bitdeer contends that when it was informed of a $100 million equity investment on May 22, "Ayrton did not advise Bitdeer that it believed Bitdeer had breached the Term Sheet

or invoke any purported 'right to participate.'" DMOL at 6. Mr. Gross testified that Bitdeer refused to disclose the basics of the transaction, including the name of the counterparty and whether the offering included highly attractive warrants. PEx. 64 at 102:4–103:3. Days later, Mr. LaBerge and his boss, Haris Basit, wrote a joint presentation noting that Bitdeer could leverage the capital in the Tether Transaction to negotiate better terms from Ayrton once exclusivity had expired. PEx. 46 at –3819 ("We recommend slowing/pausing the [redacted] Ayrton loan in order to leverage the positive impact from the Tether announcement and negotiate a better deal").

Between May 22 and June 10, the day that Mr. Gross requested to participate in the Tether Transaction, Mr. Gross continued to negotiate in good faith. On May 30, 2024, Mr. Gross forwarded to Ayrton's counsel a draft [redacted] Bitdeer provided. PEx. 68 at -1719. On June 3, 2024, Mr. Gross sent an email to Mr. LaBerge outlining Ayrton's proposed amendments to the Rockdale lease, PEx. 75-1 at -177–177_0002, and continued to coordinate with counsel regarding the potential lease amendments, PEx. 74 at -353. On June 10, Mr. LaBerge told Mr. Gross, in light of the Tether Transaction, Bitdeer no longer had any need for a transaction around the terms originally discussed. PEx. 62 ¶ 18. Mr. Gross invoked Ayrton's right to participate in the Tether Transaction. At no point prior to this conversation did Bitdeer offer Ayrton the right to participate in the Tether Transaction.

## ARGUMENT

### I. BITDEER'S SUMMARY JUDGMENT MOTION SHOULD BE DENIED

#### A. The Exclusivity Provision Is Binding

Bitdeer first claims that the Exclusivity Provision is non-binding because it lacks consideration and mutuality of obligation. This argument ignores both the plain language of the Exclusivity Provision and the context for its inclusion in the Term Sheet.

Bitdeer protests that the Term Sheet required Ayrton "to do nothing." DMOL at 1. Ayrton,

like almost all sophisticated lenders evaluating a financing transaction with a company, requires exclusivity around its negotiations to protect the opportunity cost of its commitment. Indeed, the Term Sheet was negotiated for three weeks before it was executed, and contemplated the commitment of Ayrton's time and resources through due diligence and the negotiation of final transaction documents. Tellingly, Bitdeer's Mr. LaBerge [redacted]. PEx. 66 at 167:13–18. The evidence confirms Mr. Gross did exactly that.

Bitdeer attempts to seize on the fact that the Exclusivity Provision does not memorialize Ayrton's commitment to diligencing and negotiating the proposed transaction. But this was the entire purpose of the Term Sheet. Courts have recognized, "exclusivity terms impliedly obligate both parties to 'use their best efforts . . .'." *Vinifera Imports Ltd. v. Societa Agricola Castello Romitorio SRL*, 2020 WL 1184962, at *6 (E.D.N.Y. March 12, 2020). For this reason, in exclusive contractual relationships, "[a] promise may be lacking, and yet the whole writing may be 'instinct with an obligation' imperfectly expressed." *Wood v. Lucy, Lady Duff–Gordon*, 222 N.Y. 88, 91 (1917). Thus, "the failure of [such] an agreement explicitly to require one party to promise to purchase from the party who has promised to sell does not render the agreement unenforceable for lack of consideration or mutuality." *Alessi Equip., Inc. v. Am. Piledriving Equip., Inc.,* 578 F. Supp. 3d 467, 501 (S.D.N.Y. 2022); *see also Kinley Corp. v Ancira*, 859 F Supp 652, 657 (W.D.N.Y. 1994) ("It is enough that something is promised, done, forborne, or suffered by the party to whom the promise is made as consideration for the promise made to him.").

In any event, the language of the Term Sheet is clear. "Upon execution of the Term Sheet," the parties agreed that the Exclusivity Provision "shall be binding." DEx. 9 at -3003. Where the parties memorialize their intention to be bound in this way, the agreement may be invalidated only

in the case of fraud or unconscionability. *See, e.g., Apfel v. Prudential-Bache Sec. Inc.*, 81 N.Y.2d 470, 476 (1993) ("Absent fraud or unconscionability, the adequacy of consideration is not a proper subject for judicial scrutiny.") (citing *Spaulding v. Benenati*, 57 N.Y.2d 418, 423 (1982)); *see also RDF Agent, LLC v. Elec. Red Ventures, LLC*, 211 N.Y.S.3d 283, 287 (1st Dep't 2024) (same).

The logic of these cases is easy to comprehend, since the fundamental principle of contract law is to give effect to the parties' intent. *See, e.g.*, *Faust Harrison Pianos Corp. v. Allegro Pianos, LLC*, 2013 WL 2292050, at *11 (S.D.N.Y. 2013) ("[I]t is 'well-settled' that New York courts 'will not adopt an interpretation that renders a contract illusory when it is clear that the parties intended to be bound thereby.'"); *see also WCA Holdings III, LLC v. Panasonic Avionics Corp.*, 704 F. Supp. 3d 473, 495 (S.D.N.Y. 2023) ("[A]n interpretation that renders a contract illusory and therefore unenforceable is disfavored . . . particularly where . . . the parties have expressed their intent to be contractually bound in a writing.") (quoting *Credit Suisse First Bos. v. Utrecht-Am. Fin. Co.*, 915 N.Y.S.2d 531, 535 (1st Dep't 2011)).

Bitdeer's authority is not to the contrary. In each of the cases it cites on this point, there is no expressed agreement to be bound. *See, e.g., Chiapparelli v. Baker, Kellogg & Co.*, 252 N.Y. 192, 200 (1929) (oral agreement unsupported by consideration); *Oscar Schlegel Mfg. Co. v. Peter Cooper's Glue Factory*, 231 N.Y. 459, 461-462 (1921) (one-way letter agreement contained no expression of intent to be bound); *Diesenhouse v. Soc. Learning & Payments, Inc.*, 2022 WL 3100562, at *4 (S.D.N.Y. Aug. 3, 2022) (promise of assignment of membership interests by email did not constitute a binding contract); *Space Imaging Europe, Ltd. v Space Imaging L.P.*, 38 F. Supp. 2d 326, 330 (S.D.N.Y. 1999) (letter of intent explicitly disclaimed *any* binding obligations among the parties); *Int'l Bus. Machs. Corp. v. United Microelectronics Corp.*, 764 F. App'x 9, 13 (2d Cir. 2019) (no explicit language indicating a condition precedent in an amended contract);

*Beekman Inv. Partners, L.P. v. Alene Candles, Inc.*, 2006 WL 330323, at *7 (S.D.N.Y. Feb. 14, 2006) (letter of intent disclaimed intent to be bound, and no cause of action stated with respect to the binding exclusivity provision).

The same is true of *SPG Cap. Partners LLC v. Cascade 553 LLC*, 2023 WL 126127, at *7 (N.Y. Sup. Ct. Jan. 6, 2023), which Bitdeer claims "recently rejected" Ayrton's argument. DMOL at 9. For obvious reasons, Bitdeer glosses over the fact that renders the entirety of its analysis infirm. It claims that "[t]he only distinction between the term sheet in *SGP* [*sic*] *Capital* and the Term Sheet here is that the Term Sheet identifies . . . [the Exclusivity Provision] as binding, whereas the term sheet in *SGP* [*sic*] *Capital* did not state that any of its terms were binding." DMOL at 9–10. *That is precisely the point.*

Unwilling to make even the slightest concession, Bitdeer doubles down by claiming that *RDF Agent*—a case that stands squarely against Bitdeer's position—"further proves [its] point." DMOL at 11. It argues that the agreement at issue in *RDF Agent* required the plaintiff to proceed in good faith, whereas the Term Sheet here did not. *Id.* That observation may be true, but it is in no way dispositive. In fact, Bitdeer does not address the very next sentence in the opinion of *RDF Agent*, which makes clear, in light of the parties' unambiguous agreement to be bound, that "in any event, an interpretation that renders a contract illusory and therefore unenforceable is disfavored and enforcement of a bargain is preferred, particularly where ... the parties have expressed their intent to be contractually bound in a writing." *RDF Agent*, 211 N.Y.S.3d at 287 (internal quotations omitted).

**1. Bitdeer's Reliance On Parol Evidence Is Improper**

Bitdeer does not suggest any ambiguity in the phrase "this Confidentiality and Exclusivity section shall be *binding*[.]" DEx. 9 at -3003 (emphasis added). Nevertheless, it argues that if the Court determines extrinsic evidence is necessary on the question of consideration, the testimony

of Jarryd Gross, senior analyst for Bitdeer, confirms no such consideration exists. DMOL at 11–12. Bitdeer is wrong on the law and the facts.

Because there is nothing ambiguous about the parties' agreement to be bound, parol evidence is improper. *See, e.g.*, *Nissho Iwai Eur. PLC v. Korea First Bank*, 756 N.Y.S.2d 140, 140 (1st Dep't 2003) (where "the disputed terms are not ambiguous, [] parol evidence cannot be used to create an ambiguity where none exists upon the face of the instrument"); *Morgan Stanley High Yield Secs., Inc. v. Seven Circle Gaming Corp.*, 269 F. Supp. 2d 206, 218–20 (S.D.N.Y. 2003) (rejecting contradictory parol evidence where "each party represents and warrants to the other that this Agreement is its legal, valid and binding obligation").

Unsurprisingly, none of the authority cited by Bitdeer actually stands for the proposition that a court should consider extrinsic evidence to determine the sufficiency of consideration exchanged in an agreement. *See Int'l Bus. Machs. Corp*, 764 F. App'x at 16 (addressing ambiguity in the context of a damages cap, not consideration). Indeed, Bitdeer's authority is to the contrary. *See, e.g.*, *Beekman Inv. Partners, L.P. v. Alene Candles, Inc.*, 2006 WL 330323, at *3 (S.D.N.Y. Feb. 14, 2006) ("But '[w]here the contract is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument, and not from extrinsic evidence.'"); *Consol. Edison, Inc. v. Ne. Utils.*, 426 F.3d 524, 527 (2d Cir. 2005) ("Our 'fundamental objective' is to determine the intent of the contracting parties 'as derived from the language employed in the contract.' ").

Moreover, Mr. Gross flatly rejects Bitdeer's contention that Ayrton had no obligations under the Term Sheet.[3] PEx. 62 ¶¶ 8–10. Mr. Gross testified that he spent nearly half of his time

[3] Bitdeer disingenuously distorts the testimony of Mr. Gross to provide the appearance that he disclaimed any obligations of any kind. Factually, that is simply not true. Response to Bitdeer

working on the Bitdeer transaction before June 10. *Id.* ¶ 6. Mr. Gross's emails reflect that he was relentless in attempting to find a path forward even after he discovered issues with Bitdeer's collateral, incorporating feedback from Mr. LaBerge on each turn of the new draft term sheet "in the interest of getting a deal done[.]" PEx. 38 at -681; *see also* PEx. 62 ¶ 7. Mr. Gross's counterpart, Mr. LaBerge, testified that he believed Mr. Gross [redacted] PEx. 66 at 209:11–210:7, 211:11–25.

Bitdeer's attempt to render its unambiguous agreement to be bound by the Exclusivity Provision illusory should be rejected.

**B. The Exclusivity Provision Is Enforceable**

Ayrton demonstrated in its own Motion for Summary Judgment two fundamental points. *First*, the only break-up fee or "liquidated damages" provision in the Term Sheet was for 0.75% of the transaction value—nearly two-thirds *less* than amounts routinely upheld by New York courts. PMOL at 16. *Second,* Ayrton's independent right of participation entitled Ayrton to pay *Bitdeer*. *Id.* at 11. That is not a penalty.

Bitdeer's entire argument is premised on its conclusion that the right of participation is a penalty. Among other things, it claims that "[c]ourts will enforce penalties *only* if they amount to liquidated damages," and that the damages sought by Ayrton here are 30% of the value of the contemplated loan, thus making the Exclusivity Provision an unenforceable penalty provision. DMOL at 12, 17. Bitdeer offers no support for the first argument, and the second is fundamentally flawed. Ayrton's damages flowing from the denial of its participation right do not arise from

SUMF ¶¶ 23–32. At his deposition, Mr. Gross was asked a series of questions about his understanding of the Term Sheet's requirement that the parties close a transaction. Mr. Gross observed there was no such obligation to close and fund the transaction unless and until definitive documents were agreed to and diligence was completed. PEx. 62 ¶ 8–10. Bitdeer spins this to be a disclaimer of any and all obligations of any kind.

Bitdeer's failure to execute the financing transaction contemplated by the Term Sheet, but separately from Bitdeer's denial of Ayrton's right to participate in a competing transaction.

At bottom, if Bitdeer's position were correct, parties could never include contingent participation or first refusal rights in term sheets, since, according to Bitdeer, all remedies must be limited to liquidated damages. But such provisions are commonplace in commercial negotiations, and that is plainly not the law.

**1. The Right Of Participation Is Not A Penalty**

It is Bitdeer's burden to establish that Ayrton's right of participation is a penalty provision. *See FCS Advisors, Inc. v. Fair Finance Co, Inc.*, 2009 WL 1403869, at *11 (S.D.N.Y. May 19, 2009). Bitdeer fails to do so.

Challenges to liquidated damages overwhelmingly arise in the context of provisions requiring the payment of a fixed sum upon the occurrence of a breach. Here, the overwhelming majority of Ayrton's damages arise not from a fixed payment that was due upon Bitdeer's breach, but from the denial of Ayrton's participation right. Bitdeer identifies a total of three cases in which a penalty provision did not require the payment of a fixed sum of cash upon a breach. DMOL at 17, 20–21.

Two of these cases required the forfeiture of stock or membership interest upon a breach. *See Bradford v. New York Times Co.*, 501 F.2d 51, 57 (2d Cir. 1974) (liquidated damages provision required the outright forfeiture of defendant's stock upon a breach); *Atlantis Mgmt. Grp. II LLC v. Nabe*, 190 N.Y.S.3d 13, 15 (1st Dep't 2023) (liquidated damages provision required the defendant to forfeit his partnership interest for $1 per share, irrespective of the actual value of that interest). The third case required the defendant, upon a breach, to provide plaintiff its equipment for a 59-month period, worth over $100,000, for an exercise price of $1. *In re O.P.M. Leasing Servs., Inc.*, 23 B.R. 104, 108–10 (Bankr. S.D.N.Y. 1982). Thus, in each of these cases, the provisions operated

as a traditional penalty, the only difference being that the penalty was in the form of the forfeiture of a tangible property interest—stock or membership interest or use of a company machine—rather than cash.

Here, that is simply not the case. By providing Ayrton the right to participate in the Tether Transaction, Bitdeer was required to forfeit nothing. To the contrary, it was Bitdeer that stood to gain the amount of the participation right that was exercised by Ayrton. Bitdeer has provided no support for its assertion that Ayrton's right of participation is an unenforceable penalty.[4]

**2. Bitdeer's Claim That Damages Are Limited To Out-Of-Pocket Expenses Is Meritless**

On the assumption that Ayrton's right of participation is a penalty provision, Bitdeer asserts that Ayrton's damages are "readily ascertainable" and therefore limited to its out-of-pocket costs. DMOL at 13. In support, Bitdeer relies primarily on "agreement to agree" cases, in which courts have limited damages arising from a defendant's failure to consummate a contemplated transaction to out-of-pocket expenses.[5] Applied here, had Ayrton sued Bitdeer for failing to consummate the transaction contemplated in its own Term Sheet, Bitdeer might have a point.

That is *not* the basis for Ayrton's claim, however. Ayrton's participation right was a separate obligation, one that was triggered by the execution of the Tether Transaction. The damages flowing from Bitdeer's failure to honor Ayrton's participation right are not based on any agreement to agree. To the contrary, the right of participation is "an offer [Ayrton] could convert

---

[4] Nor does the fact that Ayrton's right of participation was contingent upon a breach a breach of the Exclusivity Provision turn the participation right into a penalty. Rights of first refusal, rights of participation, and options are all contractual rights that ripen upon the happening of a contingency. The contingency here is the closing of a third-party transaction during exclusivity. That does not render the right unenforceable.

[5] *Goodstein Const. Corp. v. City of N.Y.*, 80 N.Y.2d 366, 373 (1992) (denying damages where parties had only signed negotiation letters); *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 431 (2d Cir. 2011) (holding that lost profits are not available where no agreement is reached).

into a binding contract simply by accepting it." *Hales v. HSBC Bank USA, N.A.*, 2008 WL 11435681, at *7 (S.D.N.Y. June 10, 2008) (rejecting argument that option was an agreement to agree), *aff'd sub nom*. 347 F. App'x 698 (2d Cir. 2009).[6]

Indeed, if Bitdeer were correct, the law on liquidated damages would be dramatically different. A hypothetical illustrates the point. Two parties execute a term sheet in contemplation of $2 billion in financing. The term sheet contains a 2% liquidated damages provision in the event that Party A terminates the term sheet with Party B. One day after the term sheet is executed, Party A terminates the term sheet, entitling Party B to $40 million in liquidated damages. According to Bitdeer, notwithstanding the unambiguous agreement of the parties, Party B would have no right to the damages it bargained for in the term sheet, because its out-of-pocket expenses would be nowhere near $40 million.

That is not the law. *See, e.g., RDF Agent*, 227 211 N.Y.S.3d at 288 (awarding a percentage of the full transaction value); *FCS Advisors*, 2009 WL 1403869, at *11 ("The LOI contemplated a $75 million transaction, and with a transaction that size, Brevet's profits surely would have reached $1.5 million, more or less. Under these circumstances, a $1.5 million break-up fee is not unreasonable as a matter of law."); *Crescit Mortg. Cap., LLC v. Emerald Bay Apartments, LLC*, 2024 WL 5340718, at *5 (S.D.N.Y. Dec. 27, 2024), *report and recommendation adopted*, 2025 WL 239143 (S.D.N.Y. Jan. 17, 2025) (awarding negotiated break-up fee, due diligence expenses, and costs).[7]

---

[6] Indeed, a necessary pre-condition of any participation right in a third-party transaction is the existence of a third-party transaction. By definition, Ayrton's right was to accept or waive participation in that agreed-to transaction. *See* DEx. 9 at -3003. There was no requirement to negotiate and agree. *Id.*

[7] Bitdeer claims " [t]his case is . . . akin to those in which courts declined to enforce penalties

At bottom, Bitdeer's argument ignores a fundamental purpose of exclusivity. Investors such as Ayrton negotiate exclusivity provisions because they "invest[] substantial time and resources—at the opportunity cost of not pursuing other deals[.]" *FCS Advisors*, 2009 WL 1403869, at *8. Bitdeer's own corporate counsel explains that exclusivity is commonly demanded so that the "investment of resources and time into due diligence and negotiations intended to finalize the agreement does not get interrupted or wasted because of an interloping offer." PEx. 61. Mr. Gross, who devoted more than half of his time during the relevant time period to the proposed Bitdeer transaction, testified that Ayrton has limited personnel to work on potential transactions and must focus its efforts on the deals to which it is committed, to the exclusion of other deals. PEx. 62 ¶ 4.

### 3. The Participation Right Is Not Grossly Disproportionate

Bitdeer's claim that Ayrton's right of participation is "grossly disproportionate" again ignores the nature of Ayrton's contractual right. In exchange for devoting its time and resources towards executing a financing transaction with Bitdeer, Ayrton bargained for the right to participate in any other third-party financing transaction that Bitdeer completed during the period of exclusivity. To the extent that Bitdeer breached exclusivity by closing a competing transaction, Ayrton was protected insomuch as it would have the right to participate in a portion of that competing transaction. Thus, the participation right in the Term Sheet is definitionally a *proportionate* remedy.

---

where the law provides an easy way to quantify plaintiff's foreseeable losses." DMOL at 14. In support, it cites *LG Capital Funding, LLC v. M Line Holdings, Inc.*, 422 F. Supp. 3d 739 (E.D.N.Y. 2018), and *Quaker Oats Co. v. Reilly*, 711 N.Y.S.2d 498 (2d Dep't 2000). *Id.* Each case involved a liquidated damages provision for failure to repay a loan, where calculating damages was merely a matter of "calculating the interest accrued from the time of the breach," *Quaker Oats Co.*, 711 N.Y.S.2d at 498, or multiplying a fixed amount that "does not purport to have any relationship to Plaintiff's actual or expected damages" with the number of days since the breach, *LG Cap. Funding*, 422 F. Supp. 3d at 748. Far from being akin to this case, these cases are inapposite.

Nonetheless, Bitdeer claims that "Ayrton seeks damages in excess of 30 percent of the Term Sheet's contemplated loan amount," DMOL at 17, and compares that to the holding in *RDF Agent*, where the court held that fees of "1-2%" were reasonable for a break-up fee. *RDF Agent*, 211 N.Y.S.3d at 288.

Had Bitdeer honored Ayrton's participation right, it would have been forced to pay nothing beyond Ayrton's small break-up fee. That Bitdeer now complains that Ayrton's damages have increased on account of its refusal to permit Ayrton participation is not a valid basis to unwind the bargain it accepted. That would be true even if Ayrton's right of participation *was* a form of liquidated damages. "Under New York law ... the actual damages suffered by the party for whose benefit the clause is inserted in the contract have little relevance to the validity of a liquidated damages clause. The soundness of such a clause is tested in light of the circumstances existing as of the time that the agreement is entered into rather than at the time that the damages are incurred or become payable.... It thus makes no difference whether the actual damages are ultimately higher or lower than the sum stated in the clause…'" *In re United Merchants and Manufacturers, Inc.*, 674 F.2d 134, 141 (2d Cir. 1982).

Bitdeer also cites *Schaffer v. Coral Reef Capital, LLC*, 2020 WL 7315529 (N.Y. Sup. Ct. Dec. 10, 2020), to argue that the participation right is a penalty, but this case does nothing to advance its argument. DMOL at 20. The issue in *Schaffer* was whether a "live controversy" existed to support the issuance of a declaratory judgment. 2020 WL 7315529, at *4. The court held that a "right or asset that can be repurchased has present value." *Id.* There is no mention of a penalty provision in that case, nor is the holding applicable to any of Bitdeer's arguments.[8] If

[8] The remainder of the authority cited by Bitdeer is inapposite and unrelated to Ayton's claims. *See Cent. Irrigation Supply v. Putnam Country Club Assoc., LLC*, 871 N.Y.S.2d 319, 320 (2d

anything, it supports Ayrton's claim that a participation right carries value, and Bitdeer deprived Ayrton of its right to that value.

Finally, as to Ayrton's break-up fee, Bitdeer does not even argue that it exceeds amounts permitted by New York courts in numerous other cases. *See, e.g., FCS Advisors*, 2009 WL 1403869, at *11 ($1.5 million break-up fee on $75 million transaction); *Crescit Mortg. Cap.,* 2024 WL 5340718, at *2, 5 (1% fee); *JMD Holding Corp. v. Congress Fin. Corp.*, 4 N.Y.3d 373, 377 (2005) (fee of 1–2% not an unenforceable penalty).

### C. Ayrton Was Denied Its Right To Participate In The Tether Transaction

Bitdeer argues that it told Ayrton about the Tether Transaction and that Ayrton "did not rush into court or even demand a right to participate...." DMOL at 21. In making this fact-based argument, Bitdeer concedes that Ayrton never actually waived its contractual right of participation. Nonetheless, Bitdeer claims that summary judgment in its favor on this issue is appropriate. It is wrong again.

A contractual right must be clearly and knowingly relinquished for there to be waiver of that right. *See Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 7 N.Y.3d 96, 104 (2006) ("[W]aiver 'should not be lightly presumed' and must be based on 'a clear manifestation of intent' to relinquish a contractual protection."); *Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 607 (2d Cir. 2005) ("A waiver is an intentional and voluntary relinquishment of a known right, and a waiver of contractual rights will not be inferred absent a clear intent to waive.") (internal citation omitted). "[M]ere silence or inaction . . . are insufficient

---

Dep't 2008) (holding that there were no actual damages where a golf course remained open); *Prada USA Corp. v. 724 Fifth Fee Owner LLC*, 2021 WL 2126109, at *2 (N.Y. Sup. Ct. May 25, 2021) (holding that plaintiff is not entitled to relief based on a suspension of a lease when the suspension did not occur).

to establish an intent to waive a known right[.]" *Echostar Satellite L.L.C. v. ESPN, Inc.*, 914 N.Y.S.2d 35, 39 (1st Dep't 2010).

Bitdeer now relies on the assertion that Ayrton waived its right since Mr. Gross "congratulated Bitdeer on the deal." DMOL at 21. That is not evidence of Mr. Gross clearly and knowingly relinquishing Ayrton's contractual right of participation, however, it is evidence that Mr. Gross is a mensch.

Indeed, there is no evidence in the record of any manifestation by Ayrton to relinquish its contractual right of participation, and both Mr. Basit and Mr. LaBerge testified that Bitdeer "never even thought" to provide Ayrton a right to participate in the Tether Transaction. PEx. 1 at 155:23–25; PEx. 5 at 257:2–9 ("I didn't believe . . . he had any right to [participate]."). They (mistakenly) believed that Ayrton did not have a right to participate in equity financings. Now, having realized their folly, Bitdeer cannot credibly argue the opposite.

Furthermore, Bitdeer attempts to invalidate the participation right by pointing to other agreements containing participation rights. Bitdeer argues that other term sheets have "more elaborate provisions," so this provision is invalid. DMOL at 22. That is not correct. *See Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 95 (2d Cir. 2007) ("[A]t some point virtually every agreement can be said to have a degree of indefiniteness, but parties…should be held to their promises.") (internal citation omitted).

Here, the nature of the participation right requires almost no additional color. It was between Bitdeer and Tether to negotiate the terms of the transaction, and it was that negotiated transaction which triggered Bitdeer's obligation to provide the participation right to Ayrton. Ayrton did not have a right to negotiate the transaction terms, and Bitdeer has set forth no authority holding a right of participation as unenforceable for want of a material term. Tellingly, Bitdeer

itself concedes that just one month after this dispute arose, Bitdeer closed another issuance, and then provided Ayrton the right to participate, which Ayrton accepted. DEx. 35 at 3.

### D. As Signatory of the Term Sheet, Ayrton Is the Proper Plaintiff for Its Breach of Contract Claim

Bitdeer's final argument contemplates that Alto B, the fund managed by Ayrton, and not Ayrton, would have ultimately executed transaction documents. As a result, Ayrton can only recover damages in the form of profits it would have realized as manager of Alto B. To begin with, Bitdeer does not suggest that the Alto B Fund was a signatory to the Term Sheet or held a right to enforce its terms. DMOL at 24. That contractual right was held by Ayrton and Ayrton alone. DEx. 9 at -3003. But even if Bitdeer were correct and the Alto B Fund was ultimately the party that would have executed the transaction documents, the Second Circuit has observed in the context of similar Delaware law that it does not change the result.

> As a general proposition, a party that obtains the contractual commitment of another may sue to remedy a breach of that contractual commitment. When the commitment is to render a benefit to a third party, the doctrine of third-party beneficiary contract allows the benefitted third party also to sue to enforce the promise, notwithstanding that it was not a party to the contract. But the rule that allows a third-party beneficiary to sue in order to preserve the promised benefit to itself does not disable the party to which the contractual commitment was made from suing to enforce the commitment made to it. *See* 13 Williston on Contracts § 37:55 (4th ed.) ("Despite the apparent difficulties caused by the promisor being potentially liable to two parties, most courts have found it simpler to allow both the promisee and the beneficiary to sue the promisor to enforce the third party beneficiary contract.").

*NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, 772 F.3d 740, 747 (2d Cir. 2014), *certified question answered*, 118 A.3d 175 (Del. 2015).

Bitdeer cites not one case in which the party that was precluded from seeking relief on behalf of another was the party to the contract at issue. In *Clarex*, the court held that plaintiffs did not have standing since there was "insufficient evidence to establish that the claims to the warrants

were reassigned" to plaintiffs at the time of the breach. *Clarex Ltd. v. Natixis Sec. Am. LLC*, 2012 WL 4849146 (S.D.N.Y. Oct. 12, 2012). The plaintiffs in *Clarex* were neither owners of the warrants nor contractual counterparties of the defendants. Bitdeer's other cases fail for the same reasons. *See e.g., Hudson Optical Corp. v. Cabot Safety Corp.*, 1998 WL 642471, at *3 (2d Cir. Mar. 25, 1998) (holding that plaintiff could not assert claims of a subsidiary corporation where contract was between plaintiff and defendant); *Wilhelmina Models, Inc. v. Fleisher*, 797 N.Y.S.2d 83, 85 (1st Dep't 2005) (holding that claims were insufficiently pled where plaintiffs were "separate entities from the potential borrower" and "could not directly profit from the loan proceeds").

Here, there is no question that the contractual commitment was made to Ayrton. Thus, there can be no question that Ayrton has standing to sue for the damages arising from the breach of that contractual commitment.

## CONCLUSION

For the reasons stated above, Bitdeer's Motion for Summary Judgment should be denied.

Dated: November 26, 2025
New York, NY

Respectfully submitted,

**FRESHFIELDS US LLP**
*/s/ Andrew D. Gladstein*
Gayle R. Klein
Andrew D. Gladstein
Eunice Leong
Maylin Meisenheimer
FRESHFIELDS US LLP
3 World Trade Center
175 Greenwich Street
New York, New York 10007
(212) 277-4000

*Counsel for Plaintiff Ayrton Capital, LLC*