# Redacted Version of ECF No. 163

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AYRTON CAPITAL, LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>BITDEER TECHNOLOGIES GROUP,<br><br>*Defendant*. | Case No. 24-5160 (LJL)<br><br>**ORAL ARGUMENT REQUESTED** |

**PLAINTIFF AYRTON CAPITAL, LLC'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF CONTENTS ..... i

PRELIMINARY STATEMENT ..... 1

ARGUMENT ..... 2

I. BITDEER CANNOT INVALIDATE BINDING EXCLUSIVITY FOR LACK OF CONSIDERATION ..... 2

II. A RIGHT OF PARTICIPATION IS NOT AN UNENFORCEABLE PENALTY ..... 4

III. BITDEER FAILS TO RAISE OTHER GENUINE ISSUES OF MATERIAL FACT ..... 5

- A. There Is No Triable Issue That Bitdeer Provided Ayrton Participation Or That Ayrton Failed To Perform Its Obligations ..... 5
- B. The Date Of Breach Is The Date Bitdeer Refused Ayrton's Participation ..... 7
- C. Ayrton Is Entitled To Attorney's Fees ..... 8
- D. Bitdeer's Fraudulent Inducement Defense Fails ..... 8

CONCLUSION ..... 10

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*ADYB Engineered for Life, Inc. v. EDAN Admin Servs. (Ireland). Ltd.*,
2024 WL 2125431 (S.D.N.Y. May 10, 2024)....................8

*Anstalt v. ShiftPixy, Inc.*,
2020 WL 1330216 (S.D.N.Y. Mar. 23, 2020)....................8

Apfel v. Prudential-Bache Secs. Inc.,
81 25 N.Y.2d 470 (1993)....................11

*Breslin v. Frankel*,
90 N.Y.S.3d 99 (2d Dep't 2018)....................7

*Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Hum. Res.*,
532 U.S. 598 (2001)....................8

*Centauro Liquid Opportunities Master Fund, L.P. v. Bazzoni*,
2019 WL 4464242 (S.D.N.Y. Sept. 18, 2019)....................9

*Creative Waste Mgmt., Inc. v. Capitol Env't Servs., Inc.*,
495 F. Supp. 2d 353 (S.D.N.Y. 2007)....................5

*Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc.*,
68 N.Y.2d 954 (1986)....................9

*Fitzpatrick v. Woodruff*,
96 N.Y. 561 (1884)....................7

*GE Oil & Gas, Inc. v. Turbine Gen. Servs., LLC*,
93 N.Y.S.3d 5 (1st Dep't 2019)....................9, 10

*HP Hotel Sponsor, LLC v. Strategic Cap. Sols., LLC*,
2010 WL 3815242 (Sup. Ct. Aug. 26, 2010)....................10

*Lerner v. Fleet Bank, N.A.*,
459 F.3d 273 (2d Cir. 2006)....................10

*Oscar Gruss & Son, Inc. v. Hollander*,
337 F.3d 186 (2d Cir. 2003)....................7

*Paper Corp. of U.S. v. Schoeller Tech. Papers, Inc.*,
807 F. Supp. 337 (S.D.N.Y. 1992)....................3

*Prospect St. Ventures I, LLC v. Eclipsys Sols. Corp.*,
804 N.Y.S.2d 301 (1st Dep't 2005)....................6

*RDF Agent, LLC v. Elec. Red Ventures, LLC*,
211 N.Y.S.3d 283 (1st Dep't 2024)........................................................................2

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001)...........................................................................................10

Silvercreek Mgmt., Inc. v. Citigroup, Inc.,
346 F. Supp. 3d 473 (S.D.N.Y. 2018)........................................................................10

*State St. Glob. Advisors Tr. Co. v. Visbal*,
431 F. Supp. 3d 322 (S.D.N.Y. 2020)..........................................................................9

*Wild Bunch, SA v. Vendian Ent., LLC*,
256 F. Supp. 3d 497 (S.D.N.Y. 2017)..........................................................................9

*Wild Bunch, SA v. Vendian Entm't, LLC*,
2018 WL 1365690 (S.D.N.Y. Feb. 26, 2018)...............................................................9

*Willis v. Ronan*,
670 N.Y.S.2d 875 (2d Dep't 1998)...............................................................................7

**Other Authorities**

Black's Law Dictionary (7th ed. 1999)...........................................................................8

## PRELIMINARY STATEMENT[1]

In its Opening Memorandum, Ayrton established that (i) Bitdeer committed to pay Ayrton a break-up fee and to provide Ayrton a right of participation in the event it closed a third-party transaction during exclusivity, (ii) Bitdeer refused to honor both of these bargained-for rights when it closed the Tether Transaction during exclusivity, and (iii) Bitdeer's CEO instructed his employees to "breach" the Term Sheet, who questioned whether Ayrton would "sue us if we breach the 25% provisions."

Nonetheless, Bitdeer asserts that it cannot be liable for breach of contract. Unsurprisingly, Bitdeer's Opposition offers after-the-fact lawyers' arguments that are plainly intended to excuse its own knowing breach. It claims that the Term Sheet obligated Ayrton to "do nothing" while simultaneously accusing Ayrton of failing to fulfill its obligations to negotiate the transaction, notwithstanding the substantial evidence in the record of Ayrton's efforts in pursuit of a deal. Bitdeer also argues that the right of participation it spent three weeks negotiating was grossly unfair such that it is an unenforceable penalty. However, it cannot produce a single case—not one—that supports its theory. And Bitdeer objects that it did provide Ayrton participation, while ignoring testimony of its own witnesses that they *never considered* doing so.

Finally, after asserting 14 different affirmative defenses in its Amended Answer, Bitdeer attempts to hang on to just one—fraudulent inducement—purportedly because Ayrton should have had a crystal ball to anticipate issues it would discover during due diligence. The Term Sheet and the evidence belie this assertion. The collateral that Bitdeer promised Ayrton it could sell in the event of default could not be sold at all. That does not suffice for a claim of fraud to survive.

---

[1] Capitalized terms not otherwise defined herein shall have the same definitions ascribed to them in Ayrton's Memorandum of Law in Support of Its Motion for Summary Judgment, ECF No. 120.

## ARGUMENT

### I. BITDEER CANNOT INVALIDATE BINDING EXCLUSIVITY FOR LACK OF CONSIDERATION

Bitdeer's primary claim is that in exchange for exclusivity, Ayrton "promise[d] to do nothing." D. Opp. at 2.[2] It argues that if Ayrton had memorialized its intention to devote its good faith efforts towards negotiating a transaction, the parties would be bound. Absent that contractual language, however, there is no consideration, and no binding agreement. That is wrong.

Bitdeer does not dispute that it intended to be bound by the Exclusivity Provision, nor that New York courts do not question the sufficiency of consideration where a party manifests such an intent. Thus, the premise of Bitdeer's argument is that Ayrton provided no consideration at all, since even according to Bitdeer, the existence of *any* consideration in light of Bitdeer's agreement will suffice. *See, e.g., RDF Agent, LLC v. Elec. Red Ventures, LLC*, 211 N.Y.S.3d 283, 287 (1st Dep't 2024) ("the adequacy of consideration is not a proper subject for judicial scrutiny[.]").

That the parties contemplated the commitment of Ayrton's time and resources towards negotiating a transaction in exchange for exclusivity is not controversial. "The mutual obligations, or promises, of the parties do not necessarily have to be expressly set forth in an agreement, but may be implied by the duty of good faith that is implied in any agreement. The boundaries of the duty of good faith are defined by the parties' intentions and reasonable expectations in entering into the agreement and preclude each party from engaging in conduct that will deprive the other

[2] Citations to "D. Opp." refer to Defendant Bitdeer Technologies Group's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment, ECF No. 135. Citations to "P. Opp." refer to Plaintiff Ayrton Capital, LLC's Memorandum of Law in Opposition to Summary Judgment, ECF No. 146. Citations to "PEx. _" refer to the exhibits to the Declarations of Andrew D. Gladstein, ECF No. 122, ECF No. 145, or the currently filed Declaration of Andrew D. Gladstein, Esq. in Support of Plaintiff Ayrton Capital, LLC's Reply Memorandum in Further Support of its Motion for Summary Judgment. Citations to "DEx. _" refer to the exhibits to the Declaration of Renita Sharma, ECF No. 113. Citations to "Joint SUMF ¶ _" refer to the Joint Rule 56.1 Statement of Undisputed Material Facts, ECF No. 115.

of the benefits of their agreement." *Paper Corp. of U.S. v. Schoeller Tech. Papers, Inc.*, 807 F. Supp. 337, 346 (S.D.N.Y. 1992) ("The terms may be found in the writings either expressly or by reasonable implication.") *Id*. at 347.

Here, Bitdeer's assertion that Ayrton agreed to exclusivity for "nothing" does not survive the "reasonable implications" of the Term Sheet. For example, Ayrton's obligation to execute final transaction documents was "subject to the completion of due diligence, investment committee and other internal approvals and the execution and delivery of definitive transaction documentation…." DEx. 9 at -3002. The "reasonable implication" being that Ayrton would conduct "due diligence," seek "investment committee and other internal approvals," and work towards the "execution and delivery of definitive transaction documentation…." *Id*.[3]

The Term Sheet further required an initial deposit of $125,000, D. Opp. at 3, to facilitate Ayrton's retention of the lawyers and financial advisors necessary to conduct due diligence on a potential $100 million loan. Suppose that Ayrton accepted Bitdeer's deposit and did not negotiate in good faith or retain advisors, and then refused to return the deposit. Bitdeer would have an iron-clad cause of action, precisely because of Ayrton's failure to honor its implied obligations.

Bitdeer also asserts that "Ayrton's position is inconsistent with the black-letter principle that '[u]nless both parties to a contract are bound, so that either can sue the other for a breach, neither is bound." D. Opp. at 1. This argument is puzzling since Bitdeer asserts (just a few pages later) that Ayrton failed to fulfill its obligations under the Term Sheet and separately has counter-

[3] Conversely, the Term Sheet does not, as Bitdeer suggests, disclaim any obligation on the part of Ayrton to conduct diligence or negotiate in good faith. Rather, it clarifies that the Term Sheet could not be "construed to compel Ayrton to commit to *purchase securities of the Company or secure financing on behalf of the Company*…." DEx. 9 at -3002 (emphasis added). Thus, the specificity of the disclaimer actually highlights the obligation implied. The intent of the parties was to make clear that there was no obligation to *close* a Transaction *until* Ayrton had completed its work on diligence and approving it.

claimed against Ayrton. D. Opp. at 18; Amended Answer at 13–14.

Finally, Bitdeer's own lead negotiator readily conceded these expectations of good faith from counterparties including Ayrton towards consummating a transaction:

> Q: ". . . [W]hen you sought [redacted] out for financing, you expected that they would work in good faith towards closing that financing with you, right?
>
> A: Yes, I think we did…. I don't think that is controversial.
>
> *****
>
> Q: "You expected that Ayrton would deal with you in good faith towards closing a deal, right? They signed this term sheet committing to work with you, right? And you expected them to work in good faith, fair?"
>
> A: "Yes, I agree."

PEx. 78 at 85:23–86:7; PEx. 66 at 167:13–18. Having expressed an intent to be bound to exclusivity and conceded Ayrton's implied obligation towards closing a transaction, Bitdeer cannot now challenge the sufficiency of Ayrton's commitment.

## II. A RIGHT OF PARTICIPATION IS NOT AN UNENFORCEABLE PENALTY

The Opposition also repeats the argument Bitdeer made in moving for summary judgment—that Ayrton's right of participation is an unenforceable penalty. D. Opp. at 10. Bitdeer once again offers no authority to support its position. The Opposition baldly contends that any contractual right that "is triggered upon Bitdeer's breach" is "a penalty unless it is a liquidated damages clause." D. Opp. at 10. The cases that it cites say nothing of the sort. P. Opp. at 11.

Bitdeer complains that Ayrton's participation right *must* be a penalty because the Term Sheet triggers the participation right upon a "breach." D. Opp. at 11. That squarely places form over substance. It is functionally no different to say that the right of participation triggers upon the execution of a third-party transaction, just as it does with any other right of participation or right of first refusal provision. In any event, an "award of liquidated damages will not preclude

the recovery of actual damages when the former does not subsume the latter." *Creative Waste Mgmt., Inc. v. Capitol Env't Servs., Inc.*, 495 F. Supp. 2d 353, 359–60 (S.D.N.Y. 2007).

Bitdeer also recycles its misguided argument that Ayrton's expectation damages are the same as liquidated damages, albeit this time acknowledging that Ayrton's "penalty purports to require Ayrton to give Bitdeer cash...." D. Opp. at 11. Bitdeer contends that the "stock" Ayrton stood to receive "is worth tens of millions more than the cash," which is a classic penalt[y]." *Id.* But the value of the stock is irrelevant. Ayrton was entitled to 25% of the securities issued in the Tether Transaction on the same terms provided to Tether, nothing less, nothing more. That the value of those securities had increased when Bitdeer rejected Ayrton's participation demand does not render its failure to issue the securities to Ayrton valid. If Bitdeer had concerns about movements in its stock price, it could have resolved them by communicating a participation offer and requiring a response from Ayrton. It did not do so, on the instructions of its CEO.

## III. BITDEER FAILS TO RAISE OTHER GENUINE ISSUES OF MATERIAL FACT

### A. There Is No Triable Issue That Bitdeer Provided Ayrton Participation Or That Ayrton Failed To Perform Its Obligations

Bitdeer asserts that Ayrton "does not explain why Bitdeer's May 22, 2024 call notifying Ayrton of the Tether [T]ransaction did not satisfy Bitdeer's purported obligations under the Term Sheet." D. Opp. at 12–13. This is precisely why courts require a waiver of contractual rights to be unequivocal, and why market participants regularly seek and obtain waivers in writing.

Regardless, the testimony and the documents belie Bitdeer's assertion. Bitdeer's own witnesses confirmed that they did not even *think* to offer Ayrton participation rights in an equity transaction. PEx. 1 at 155:23–25; PEx. 5 at 257:2–9. In addition, Mr. LaBerge conceded that he did not provide Ayrton with the name of the counter-party, the terms of the transaction, or the draft transaction documents. PEx. 66 at 253:5–255:12. And Bitdeer's own communications with Tether

confirm negotiations carried on well after the May 22 call. PEx. 79 at -4921. In contrast, when Bitdeer closed another financing in August 2024, it contacted Ayrton to provide details about the transaction, connect Ayrton with the relevant banker, provide the transaction documents for Ayrton's review, and request a response from Ayrton by a date certain. DEx. 35.

Bitdeer also contends that Ayrton "advances an interpretation of the Term Sheet whereby it can choose whether or not to participate in Bitdeer's third-party transactions for an indefinite period of time." D. Opp. at 13. That is wrong. Ayrton demanded participation days after the announcement of the Tether Transaction, when it became clear that Bitdeer had no intention of closing a deal with Ayrton—*precisely because Bitdeer had obtained financing from Tether.* P. Opp. at 7. Bitdeer now portrays as preposterous that Ayrton could have participated in the Tether Transaction after the transaction closed, but provides no explanation to justify its position. *See, e.g.,* PEx. 81~~8~~3 ("The Concurrent Offering was upsized to accommodate Dundee Corporation… who informed the Company [five days after the announcement of closing] that it intends to exercise its participation right to maintain its equity ownership in the Company.").

Finally, Bitdeer claims that Ayrton "lured" it into an exclusivity trap and that a jury must decide whether Ayrton performed its obligations to negotiate towards closing. D. Opp. at 5. This is an incredible proposition coming from a party whose CEO instructed his employees to breach the Term Sheet, PEx. 36 at -3788, and separately plotted to "slow[]" or "pause[]" negotiations so that it could leverage better terms from Ayrton. PEx. 46 at -3819. Bitdeer's argument rests on the conclusory premise that Ayrton failed to negotiate and abandoned the transaction, which is wholly contradicted by the documents and the declaration of Jarryd Gross. PEx. 62 ¶¶ 10–11. *See Prospect St. Ventures I, LLC v. Eclipsys Sols. Corp.*, 804 N.Y.S.2d 301, 302 (1st Dep't 2005) ("conclusory allegation that defendants refused to negotiate a final purchase agreement in good

faith" insufficient to support nonperformance claim).

### B. The Date Of Breach Is The Date Bitdeer Refused Ayrton's Participation

Bitdeer contends that the date of breach is May 14, or at the latest, May 30. D. Opp. at 14. As to May 14, Bitdeer nonsensically argues that Ayrton's right to participate in the Tether Transaction was breached *before* Bitdeer had negotiated the transaction, finalized the transaction documents, or signed the deal. PEx. 4 at 167:19–22. In the alternative, Bitdeer argues that the breach can be no later than May 30, the date of closing of the Tether Transaction. D. Opp. at 14. Notably, Bitdeer does not point to language in the Term Sheet that there can be no post-closing participation. As noted, Bitdeer could have easily included Ayrton by amending the transaction.

That Ayrton's demand to participate came in the week after the transaction closed, when it realized it was being deceived by Bitdeer, does not make it guilty of a "wait and see" approach. D. Opp. at 16. Bitdeer asserts that "[m]uch like the plaintiff in *Oscar Gruss,* who opportunistically waited to exercise warrants it knew the defendant had never issued . . . Ayrton waited eight days for the Tether [T]ransaction to close . . . ." D. Opp. at 15. There, the Second Circuit held that the defendant's refusal "to deliver the warrants" was the breach. *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 197 (2d Cir. 2003). Here, Ayrton similarly asserts the date of breach as the date Bitdeer refused to "deliver" its participation rights. The remainder of Bitdeer's cases involve instances in which the plaintiff waited *years* to exercise an option, or held that a delay of months "wasn't unreasonable."[4] D. Opp. at 13.

[4] *See Willis v. Ronan*, 670 N.Y.S.2d 875, 876 (2d Dep't 1998) ("over two years" was unreasonable); *Breslin v. Frankel*, 90 N.Y.S.3d 99, 102 (2d Dep't 2018) ("19-year delay…was unreasonable"); *ADYB Engineered for Life, Inc. v. EDAN Admin Servs. (Ireland). Ltd.*, 2024 WL 2125431, *10 (S.D.N.Y. May 10, 2024) (four-month delay "wasn't unreasonable").

### C. Ayrton Is Entitled To Attorney's Fees

Bitdeer contends that, "[e]ven if this Court awards judgment in Ayrton's favor, Ayrton cannot recover its attorney's fees" because of the possibility that it might not be the "prevailing party." D. Opp. at 17. Bitdeer posits that the Court can limits damages and prevent Ayrton from its purported "primary objective of reaping a windfall." *Id.* at 17–18.

As an initial matter, Ayrton has not moved for the Court to make a determination on the amount of Ayrton's fees. To the extent Bitdeer seeks to challenge the reasonableness of Ayrton's fees, this is neither the time nor place. Moreover, New York courts have rejected the type of "limited success" argument Bitdeer attempts to advance, particularly where, as here, the "attorneys' fee provision nowhere references degree of success or results obtained in enforcing [] rights" under a contract. *Anstalt v. ShiftPixy, Inc.*, 2020 WL 1330216, at *4 (S.D.N.Y. Mar. 23, 2020); *see also* PEx. 27 at -1828; J. SUMF ¶ 8. If the Court enters judgment in Ayrton's favor, Ayrton is the prevailing party, regardless of the amount of damages awarded. *See Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Hum. Res.*, 532 U.S. 598, 603 (2001) ("prevailing party" is the "party in whose favor a judgment is rendered, regardless of the amount of damages awarded") (quoting Black's Law Dictionary 1145 (7th ed. 1999)).

### D. Bitdeer's Fraudulent Inducement Defense Fails

Bitdeer argues that its fraudulent inducement defense "will require a jury to weigh conflicting evidence regarding what Ayrton knew about Bitdeer's available collateral . . . and whether Ayrton had the ability and genuine interest in investing $100 million in Bitdeer . . . ." D. Opp. at 21. Labeling evidence as "conflicting" does not make it so.

Bitdeer calls Ayrton's statements concerning its expectations for closing "material misrepresentation[s] of a presently existing or past fact," *id.,* but the cases it relies on are inapposite. The court in *State Street* rejected defendant's fraudulent inducement theories. *State*

*St. Glob. Advisors Tr. Co. v. Visbal*, 431 F. Supp. 3d 322, 353 (S.D.N.Y. 2020). In *Deerfield*, the Court of Appeals recognized that a misrepresentation may be "a promise made with a preconceived and undisclosed intention of not performing it." *Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc.*, 68 N.Y.2d 954, 956 (1986). Bitdeer has not provided *any* evidence of a "preconceived and undisclosed intention" because it cannot show that Ayrton knew of the sale and transfer restrictions on Bitdeer's collateral or was unable to close a deal. It is not enough that "a jury may well find" a statement to be false. D. Opp. at 22. *See Wild Bunch, SA v. Vendian Entm't, LLC*, 2018 WL 1365690, at *3 n.1 (S.D.N.Y. Feb. 26, 2018).

Bitdeer also relies on *Wild Bunch, SA v. Vendian Ent., LLC*, 256 F. Supp. 3d 497, 506 (S.D.N.Y. 2017), to argue that "false statements about a party's present financial condition or currently ability to perform . . . will support a claim of fraudulent inducement." However, the contract in that case obligated the defendant to make a payment he could not honor. Here, the Term Sheet contained no such obligation. *See also GE Oil & Gas, Inc. v. Turbine Gen. Servs., LLC*, 93 N.Y.S.3d 5, 6 (1st Dep't 2019) (alleged "promise that [plaintiff] would provide funding as agreed in the term sheet . . . is not a misrepresentation of fact but a nonactionable statement of prediction or expectation"). *Centauro* is similarly distinguishable as the issue was defendant's ability to pay off a promissory note. *Centauro Liquid Opportunities Master Fund, L.P. v. Bazzoni*, 2019 WL 4464242, at *10 (S.D.N.Y. Sept. 18, 2019).

Nor does the Opposition establish scienter. Bitdeer argues that Ayrton was "admittedly aware of Bitdeer's leasehold interest in the property . . . given extensive conversations between Ayrton and Bitdeer." D. Opp. at 23. However, Mr. LaBerge could not recall a single conversation with Ayrton about the lease *restrictions* before the Term Sheet was signed. PEx. 66 at 204:6–10.

Bitdeer cites *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273 (2d Cir. 2006), and *In re Scholastic*

*Corp. Sec. Litig.*, 252 F.3d 63 (2d Cir. 2001), and claims that Mr. Gross "knew facts" that would constitute "circumstantial evidence of conscious misbehavior" concerning the lease restrictions. *See* D. Opp. at 23. But the totality of their evidence is that Mr. Gross was aware that the property had a lease and had access to public documents. That is insufficient.

Third, Bitdeer argues that it was reasonable for it to rely on Ayrton's statements that it could close in 2-3 weeks because the financing was "subject to the ***completion*** of due diligence" and not subject to "due diligence." D. Opp. at 23. Even reading the Term Sheet in this convoluted way does not render any reliance reasonable "given the express terms of the [Term Sheet]." *HP Hotel Sponsor, LLC v. Strategic Cap. Sols., LLC*, 2010 WL 3815242, at *5 (Sup. Ct. Aug. 26, 2010). Although Bitdeer cites *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 346 F. Supp. 3d 473, 484 (S.D.N.Y. 2018) to argue that if reliance is "subject to genuine dispute, courts are reluctant to summarily dispose of fraud claims," that is not the case here. D. Opp. at 24; *see GE Oil & Gas*, 93 N.Y.S.3d at 6 (no fraud claim where "term sheet explicitly required 'definitive documentation' before it would constitute a contractual commitment").

Finally, Bitdeer alleges that it suffered damages as it "paid the $125,000 due diligence deposit" and "received no valuable consideration." D. Opp. at 24. The parties negotiated the due diligence fees, and Ayrton hired counsel who attempted to resolve the issues with the Rockdale collateral. *See* PEx. 80 at -350–51. "Under the traditional principles of contract law, the parties to a contract are free to make their bargain, even if the consideration exchanged is grossly unequal or of dubious value." *Apfel v. Prudential-Bache Secs. Inc.*, 81 25 N.Y.2d 470, 475 (1993).

## CONCLUSION

For the foregoing reasons, Ayrton's Motion for Summary Judgment on liability should be granted.

Dated: December 5, 2025
New York, NY

Respectfully submitted,

**FRESHFIELDS US LLP**
*/s/ Andrew D. Gladstein*
Gayle R. Klein
Andrew D. Gladstein
Eunice Leong
Maylin Meisenheimer
FRESHFIELDS US LLP
3 World Trade Center
175 Greenwich Street
New York, New York 10007
(212) 277-4000

*Counsel for Plaintiff Ayrton Capital, LLC*