USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 09/30/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AYRTON CAPITAL LLC,

Plaintiff,

-v-

BITDEER TECHNOLOGIES GROUP,

Defendant.

24-cv-5160 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

Defendant Bitdeer Technologies Group ("Defendant" or "Bitdeer") moves, pursuant to Federal Rule of Civil Procedure 56, for summary judgment in its favor, including an order terminating the action. Dkt. No. 107. Plaintiff Ayrton Capital, LLC ("Plaintiff" or "Ayrton") moves, pursuant to Federal Rule of Civil Procedure 56, for partial summary judgment in its favor, including an order finding Bitdeer liable. Dkt. No. 117. For the reasons that follow, Bitdeer's motion for summary judgment is granted in part and denied in part, and Ayrton's motion for summary judgment is granted in part and denied in part.

## BACKGROUND

The following facts, in each instance construed in favor of the non-moving party, are assumed to be true except where otherwise indicated.

### I. The Relevant Parties

Ayrton is a registered investment manager founded in 2016 and based in Westport, Connecticut. Dkt. No. 147 ¶ 3. Ayrton is the investment manager for the Alto Opportunity Master Fund, SPC – Segregated Master Portfolio B (the "Alto Fund"). Dkt. No. 147 ¶ 4. The Alto Fund is organized under the laws of the Cayman Islands. Dkt. No. 147 ¶ 5. Waqas Khatri

is Ayrton's managing member. Dkt. No. 115 ¶ 4.

Bitdeer is a NASDAQ-traded technology company for blockchain and high-performance computing that operates mining datacenters throughout the world. Dkt. No. 147 ¶ 1. Bitdeer is based in Singapore and organized under the laws of the Cayman Islands. Dkt. No. 147 ¶ 2. Jihan Wu ("Wu") is the Chief Executive Officer of Bitdeer, holds 75.1% of its voting power, and, with the exception of the audit committee, is the chairman of every executive committee at Bitdeer. Dkt. No. 115 ¶ 2; Dkt. No. 136 ¶¶ 2–3.[1] Bitdeer's flagship datacenter is a 563-megawatt capacity facility in Rockdale, Texas. Dkt. No. 122-10 at 4 (2024 Annual Report (Form 20-F); next largest facility has a 100-megawatt capacity).[2] In 2024, Bitdeer had plans to grow its capacity significantly at existing and new facilities across the globe over the next two years. *Id.*

## II. The Term Sheet

Ayrton and Bitdeer first met in March 2024. Dkt. No. 115 ¶ 5. Jarryd Gross ("Gross"), a Senior Analyst at Ayrton, was introduced to Haris Basit ("Basit"), Bitdeer's Chief Strategy Officer, and Jeff LaBerge ("LaBerge"), Bitdeer's Head of Capital Markets and Strategy Initiatives, at a capital markets conference hosted by Roth Capital Partners, LLC on March 19, 2024. Dkt. No. 115 ¶ 5; Dkt. No. 147 ¶¶ 12–13.

After their initial meeting and throughout April 2024, Ayrton and Bitdeer negotiated a term sheet for a possible debt investment by Ayrton in Bitdeer. Dkt. No. 147 ¶ 14. Ayrton circulated the initial draft of the term sheet on April 7, 2024. Dkt. No. 136 ¶ 7; Dkt. No. 123-7. LaBerge responded to Gross's email with the initial draft on the same day, asking "[w]hat is your

[1] Citations are to Bitdeer's response to Ayrton's Local Rule 56.1 statement.
[2] Citations to this docket entry use ECF pagination.

timeframe to close?" Dkt. No. 110-8 at 12.[3] Gross responded the next morning, noting that the "[t]imeframe to close is typically 2–3 weeks after execution of the term sheet." *Id.* at 11. On April 11, 2024, Gross shared a "revised term sheet" that adjusted terms to a "9 month non-amortization period, low MOIC over the course of 3 years and low warrant coverage" to "set this proposal apart from others." *Id.* at 6–7. The next day, LaBerge asked "what would your timing and process be to close? Realistically? How much more due diligence do you guys need to do?" *Id.* at 6. On Saturday, April 13, Gross replied: "Realistically 2–3 weeks after signing the term sheet to complete the process." *Id.*

As discussions between the parties were ongoing, Bitdeer was also in communication with a non-party investor, among others, as a potential alternative financing partner. Dkt. No. 136 ¶ 4. On April 18, 2024, LaBerge sent an email to Wu "recommending that [Bitdeer] move forward with the [non-party investor's] senior secured debt [financing] at $100 million." Dkt. No. 123-14 at 3.[4] Wu signed a finalized term sheet from the non-party investor on April 19, 2024. *Id.* at 2.

That same day, Gross sent Bitdeer a revised term sheet on behalf of Ayrton, and LaBerge responded the next day, on April 20, asking, "How sure are you this can close? How much more diligence do you guys need?" Dkt. No. 110-8 at 4. LaBerge responded shortly, stating: "We'd be able to provide documents within a week with an expected time to close approximately 2 weeks thereafter. Given the key assets are located in the US, I don't expect the process to take much longer than ~3 weeks overall." *Id.* at 3.

On April 25, 2024, the non-party investor decided not to move forward with a transaction

[3] Citations to this docket entry use ECF pagination.
[4] Citations to this docket entry use ECF pagination.

with Bitdeer and did not countersign. Dkt. No. 136 ¶ 6. On or shortly before April 26, 2024, LaBerge sent a text to Gross: "I need to get comfortable that [Ayrton] can close despite the fact that you have not viewed the data room yet." Dkt. No. 110-14 at 3.[5] Gross screenshot the text thread and replied via email on April 26, 2024, writing: "We can discuss this morning however I don't see this being an issue as there is adequate information in the public domain at this time, which we frequently rely on. I'll come back to you with revised terms sheets a bit later on." *Id.* at 2.

On April 29, 2024, after the potential non-party investor's financing fell through, Ayrton and Bitdeer executed a revised version of the term sheet dated as of April 26, 2024 (the "Term Sheet"). Dkt. No. 110-9; Dkt. No. 115 ¶ 6; Dkt. No. 147 ¶ 15. The Term Sheet contemplates a transaction whereby Ayrton, or any of its affiliates, would invest $100 million in Bitdeer in the form of non-convertible notes for the principal amount of $105 million that it would purchase for $100 million (the "Notes"). Dkt. No. 110-9 at 3.[6] The terms of the offering set forth in the Term Sheet included the principal amount of the notes, the interest to be paid on them, their ranking, the maturity date, the principal amortization amount, a redemption right for Ayrton in the event of a change of control, the negative pledge that would accompany the Notes, the covenants that Bitdeer was to include in the Notes, a right of Bitdeer to prepay the Notes, and a provision for a future investment partnership between the two companies. *Id.* at 3–4. Among other things, the Term Sheet provided that the Notes were to mature on the 48-month anniversary of issuance and to be repaid in quarterly installment payments of $2.5 million with the balance due upon maturity; that they were to bear interest at the Secured Overnight Financing Rate (SOFR) plus

[5] Citations to this docket entry use ECF pagination.
[6] Citations to this docket entry use ECF pagination.

eight percentage points per annum, with a floor of 13%, to be paid monthly in cash; and that Bitdeer would pledge not to create any new encumbrances on any of its or its subsidiaries' assets without Ayrton's prior consent. *Id.* The Term Sheet further provided: "The Investor [defined as Ayrton or any of its affiliates] will have a right to participate in up to 25% of any subsequent financing conducted by the Company [defined as Bitdeer] while the Notes remain outstanding." *Id.*

The Term Sheet explicitly bound Bitdeer to obligations of confidentiality and exclusivity. Bitdeer was forbidden to disclose the terms of the Term Sheet to any other person or entity or to solicit, negotiate or accept any other term sheets or proposals while the parties were negotiating the transaction and for thirty days thereafter. A section entitled "Confidentiality and Exclusivity" (the "Exclusivity Provision") specified:

> The Company [Bitdeer] will not disclose the terms contained herein to any other person or entity unless approved by Ayrton. The Company and/or its agents will not solicit, negotiate or accept any term sheets, proposals, transaction documents or agreements whether binding or non-binding from any other party with respect to a financing transaction nor will the Company close a financing transaction until 30 business days following the date the parties hereto agree in writing to cease negotiations of the transaction contemplated by this Term Sheet (the 31st day thereafter defined as the "Termination Date"). From the date hereof until the Termination Date, if the Company breaches any of the confidentiality and exclusivity prohibitions outlined in this section, the Company agrees to (a) pay Ayrton a break-up fee of 0.75% of the Redemption Value of the Notes (along with any collection or enforcement fees thereof) and (b) provide Ayrton the right to participate for 25% in any third party transaction executed by the Company from the date hereof until the 180 day anniversary of the Termination Date (such transaction a "Competing Transaction"). Upon execution of the Term Sheet by the Company, this Confidentiality and Exclusivity section shall be binding and the Investor shall have the right to pursue all remedies available to it at law or in equity with respect to this section including, without limitation, a decree of specific performance, injunctive relief and money damages. Any Competing Transaction shall not include any terms designed to circumvent the provisions of this Section or otherwise preclude Ayrton's participation including but not limited to representation/warranties or amendment rights in such Competing Transaction. The Company will promptly reimburse the Investor for all costs, including attorney's fees, paid or incurred by the Investor with respect to any claims arising

> as a result of a breach of the provisions under this section. Any unpaid amounts pursuant to this Term Sheet shall accrue interest at an annualized rate of 18% from the date such payment was due. By executing this term sheet, the Company represents and warrants that this term sheet has been duly authorized, executed and delivered.

Dkt. No. 115 ¶ 8.

Bitdeer also agreed to pay Ayrton's due diligence and legal fees up to $350,000 with the remainder of its diligence costs and fees to be paid out of the closing amounts. The section of the Term Sheet entitled "Diligence and Legal Fees" (the "Diligence Provision") states in full:

> The Company will pay for all of the Investor's due diligence and legal fees in relation to the transaction proposed in the Term Sheet, with an initial deposit of $125,000. Upon additional requests from the Investor, the Company will be required to make additional deposits, provided the total amount shall not exceed $350,000.
>
> Any fees in excess of $350,000 will be withheld from the closing amounts and the Investor shall be required to provide documentation to the Company with respect thereof.

*Id.* ¶ 9. The Term Sheet establishes that it is governed by the laws of the State of New York (the "Governing Law Provision"). *Id.* ¶ 10.

A preamble to the Term Sheet addresses the document's binding effect. The preamble, the "Confidentiality and Exclusivity" section, and the sections captioned "Diligence and Legal Fees" and "Governing Law" were binding and the others were not. The preamble recites:

> This term sheet (the "Term Sheet") dated as of 4.26.2024 is intended for discussion purposes only and does not represent or constitute an offer, undertaking or commitment on the part of Ayrton Capital LLC or any of its affiliates ("Ayrton", "Investor" or "Investors") to arrange or provide financing to Bitdeer Technologies Group (the "Company" or "BTDR") or any of its affiliates or any other person. Except for this preamble, the epilogue at the end of the Term Sheet captioned "Confidentiality and Exclusivity" and the sections captioned "Diligence and Legal Fees" and "Governing Law", all terms set out herein are non-binding and any obligation or commitment of Ayrton or any of its affiliates is subject to the completion of due diligence, investment committee and other internal approvals and the execution and delivery of definitive transaction documentation (the "Definitive Documentation"), in each case as may be satisfactory to Ayrton at its sole discretion. The Company acknowledges its understanding that this Term Sheet

> is intended to be a summary of economic terms only and not a comprehensive abstract of the Definitive Documentation. Nothing herein shall be construed to compel Ayrton to commit to purchase securities of the Company or secure financing on behalf of the Company by third parties, ensure that Ayrton executes agreements with the Company, or guarantee the obligations of Ayrton under any definitive documentation by and among the Company and itself. This Term Sheet does not constitute an offer by any person to sell or the solicitation by any person of an offer to buy any securities in the United States, Australia, Canada, New Zealand, the United Kingdom or any jurisdiction in which such offer, solicitation or sale would be unlawful prior to registration or qualification under the applicable securities laws.

Dkt. No. 115 ¶ 7.

Wu signed the Term Sheet on behalf of Bitdeer on April 29, 2024, and Waqas Khatri signed for Ayrton "as Investment Manager" for the Alto Fund. Dkt. No. 110-9 at 5; Dkt. No. 136 ¶ 13. After the parties executed the Term Sheet, Bitdeer paid the initial diligence deposit of $125,000 as required by the Diligence Provision. Dkt. No. 147 ¶ 36.

## III. Events Following the Execution of the Term Sheet

Two days later, on May 1, 2024, Gross emailed LaBerge, inquiring whether the data room was "set up." Dkt. No. 123-24 at 5.[7] Later that day, Gross confirmed that he had accessed the data room that Bitdeer had created for Ayrton's due diligence of the proposed transaction. Dkt. No. 136 ¶ 15; *see also* Dkt. No. 123-24 at 2 (May 1, 2024 email from Gross to LaBerge stating, "I'm in and have access"). Gross sought to understand how others, including potential consultants, could access the data room as needed to conduct due diligence. Dkt. No. 123-24 at 2; *see also id.* at 3–4 (Gross indicated an NDA had been executed with FTI Consulting and that he would connect FTI Consulting with LaBerge; asked if LaBerge would be able to "provide data room access to them"); Dkt. No. 110-3 at 90:5–93:19 (discussing Ayrton's conversations with FTI Consulting).

[7] Citations to this docket entry use ECF pagination.

Shortly thereafter, in early May, Ayrton claimed to have identified problems with Bitdeer's lease documents. Dkt. No. 147 ¶ 37. One of Bitdeer's key assets was a lease that its wholly owned indirect subsidiary, Dory Creek LLC, had on the Rockdale facility. Dkt. No. 136 ¶ 34. The lease, however, contained a provision giving the landlord the right to terminate the lease if there was a change of control in the tenant. Dkt. No. 137-6 § 35.01(a). Ayrton expressed a concern that, in light of the anti-assignment provision, the lease would not be able to serve as collateral. *See* Dkt. Nos. 123-25, 123-27; Dkt. No. 137-1 at 265:15–266:16.

On Monday May 6, 2024, in an internal communication to Basit and Wu, among others, LaBerge updated the key executives about Ayrton's concerns. Dkt. No. 123-25 at 2.[8] At that point, according to LaBerge, Ayrton was "conducting an in-depth due diligence of [Bitdeer's] key assets, including Rockdale." *Id.* LaBerge wrote that the "issue with Rockdale" was that the facility's lease "contains an anti assignment and a change of control clause that could allow the landlord to terminate the lease if we pledge it as collateral." *Id.* In the email, LaBerge acknowledged that since the Rockdale facility is one of Bitdeer's "largest and most valuable assets, this would likely be an issue for any senior secured lender. We are working hard on solutions and hope to have more information by the end of the day." *Id.*

The next day, on May 7, 2024, LaBerge emailed Gross, with a subject line of "Rockdale Lease," to say that he "spoke with [Bitdeer's] attorneys" and thought "it would be a good idea to connect them with [Ayrton's] attorneys to discuss this." Dkt. No. 123-27 at 3.[9] Gross replied that same day and said Ayrton's "attorneys are currently reviewing the lease documents with an expected turnaround time of 3–5 days given the length of the documents inclusive of all the

[8] Citations to this docket entry use ECF pagination.
[9] Citations to this docket entry use ECF pagination.

amendments." *Id.* at 2. He noted further that "[Ayrton] would look to put a leasehold mortgage and a landlord estoppel in place." *Id.* at 2.

Two days later, on Thursday, May 9, 2024, Ayrton sent Bitdeer a draft term sheet for an alternative convertible note transaction for Ayrton to invest $100 million in Bitdeer. Dkt. No. 147 ¶ 42; Dkt. No. 110-15 (Gross's email to LaBerge and Basit). The alternative transaction would have Ayrton purchase the same $105 million in principal amount of notes, but the notes would be convertible, would be payable over a 36-month period (rather than 48 months), and would bear a 9% interest rate per annum. Dkt. No. 110-15 at 3.[10] It also contained different redemption rights upon a change of control and miscellaneous provisions. *Id.* In other respects, the term sheets were materially identical. Ayrton's note to Bitdeer which accompanied the draft term sheet stated that the convertible note option "does not replace the original term sheet" and that Ayrton was "willing to proceed on the original terms [of the Term Sheet] and work with the landlord to obtain the appropriate consent & security as is required for a senior secured instrument," but the convertible note option presented "an alternative path and can be closed swiftly." Dkt. No. 110-15 at 2. Over the ensuing eight days, the parties negotiated the terms of the alternative term sheet. *See, e.g.*, Dkt. Nos. 110-17, 110-18, 110-19. Around and during this time, Bitdeer discussed internally the implications of the Exclusivity Provision, including any potential breach, Dkt. No. 136 ¶ 17, and was in communication with Randoll Sze ("Sze"), a Managing Director of China Renaissance, regarding the fact that Bitdeer had entered into an exclusive term sheet, *id.* ¶ 18. *See also id.* Dkt. No. 129-24 at 3 (May 8, 2024 email from Sze to LaBerge, stating that "there is a way to get out of the exclusivity").[11]

[10] Citations to this docket entry use ECF pagination.
[11] Citations to this docket entry use ECF pagination.

On May 13, 2024, Bitdeer notified Ayrton that it was terminating the Term Sheet as it reviewed the alternative term sheet. Dkt. No. 115 ¶ 11; Dkt. No. 147 ¶ 44. Bitdeer's email to Ayrton stated the following:

> We are in the process of reviewing the revised term sheet internally and with our legal team. As discussed earlier, we believe it makes sense to terminate the initial term sheet dated 4/26/2024 and begin the tolling period on the exclusivity as of May 9, 2024, which is the date we received the new term sheet. We will continue negotiating the new term sheet in good faith and believe that Ayrton can continue its due diligence, including the analysis of the Rockdale lease, as it will be relevant to the additional $50M contemplated in the new term sheet.
>
> As I said, we remain confident we can reach an agreement on the new term sheet and look forward to finalizing terms as soon as possible.

Dkt. No. 110-20; Dkt. No. 192-13. Ayrton did not respond. Dkt. No. 147 ¶ 45.

On May 14, 2024, Matt Kong, Bitdeer's Chief Business Officer, wrote to Vicky Zhu, Bitdeer's Vice President of Finance, that Wu "told me today to breach the [Ayrton] agreement." Dkt. No. 136 ¶ 19; Dkt. No. 123-4 at 161:16–19; Dkt. No. 123-26.[12]

## IV. The Tether Transaction

On the morning of May 15, 2024 (in Bhutan local time), Bitdeer had discussions with Tether International, Ltd. ("Tether") about an agreement for Tether to invest $100 million in Bitdeer through an equity transaction and reached an agreement on the core business terms of such a transaction. Dkt. No. 115 ¶ 13; Dkt. No. 123-4 at 167:17–168:19; Dkt. No. 137-3 at 135:3–20.

Ayrton and Bitdeer dispute whether all of the material terms of the investment were agreed upon on May 15, 2024, but it is undisputed that some negotiations continued until May

[12] In its response to Ayrton's Local Rule 56.1 statement, Bitdeer disputes completeness. Dkt. No. 136 ¶ 19. The message from Kong to Zhu reads in full: "[Wu] is not happy with Ayrton changing back and forth. He told me today to breach the agreement, a bit impulsive." Dkt. No. 123-36 at 15 (translation of messages sent in Mandarin between Kong and Zhu).

28, 2024, and focused on an anti-dilution mechanism for Tether's one-year warrant to purchase five million additional shares at a $10 strike price. Dkt. No. 136 ¶ 22; *see* Dkt. 123-55. Bitdeer agreed that if it issued equity in the future, Tether would have the right to purchase additional shares at a lower price to protect its equity interest in Bitdeer from being diluted. Dkt. No. 137-2.

Bitdeer informed Ayrton of the transaction on May 22, 2024. Dkt. No. 147 ¶¶ 60–62. Without revealing the identity of the investor, LaBerge of Bitdeer told Gross of Ayrton that Bitdeer had attracted a marquee or flagship investor to make a $100 million equity investment. Gross congratulated Bitdeer without claiming that Bitdeer had breached the Term Sheet. *Id.*

On May 31, 2024, Bitdeer and Tether announced that they had closed a $100 million private placement on May 30, 2024, pursuant to which, for a payment of $100 million, Tether acquired 18,587,360 unregistered common shares (priced at the stock's closing price on May 14, 2024 of $5.38 per share) with a one-year warrant to purchase up to five million additional shares at $10 per share (the "Tether Transaction"). Dkt. No. 115 ¶ 14; *see* Dkt. No. 123-53. As of June 3, 2024, the parties continued to negotiate a debt financing transaction. Dkt. No. 136 ¶ 26. On June 7, 2024, Bitdeer filed a registration statement on Form F-3 to register the shares issued in the Tether Transaction. *Id.* ¶ 24.

On June 10, 2024, LaBerge and Gross had a conversation. *Id.* ¶ 27; Dkt. No. 147 ¶ 63. There is some dispute as to its contents. Dkt. No. 136 ¶ 27. Gross testified that he said to Bitdeer that it had "breached exclusivity" and asked "to participate in the [Tether] transaction." Dkt. No. 123-2 at 114:16–115: 17. Bitdeer disputes Gross's testimony. It points to LaBerge's testimony that LaBerge was hoping that, with Tether's additional capital infusion, Ayrton would agree to the debt transaction proposed in the Term Sheet. Dkt. No. 136 ¶ 27; Dkt. No. 137-5 at

271:4–273:4.

On June 12, 2024, Gross emailed LaBerge stating "[i]n light of the company's breach of the Confidentiality and Exclusivity provisions outlined in the executed term sheet attached, Ayrton wishes to exercise the right to participate in the financing transaction announced on 5/30/2024. In addition, a break fee of $787,500.00 is owed to us." Dkt. No. 115 ¶ 15.

Further communications occurred through counsel. On June 18, counsel for Ayrton wrote to Bitdeer's counsel indicating a willingness to resolve "the matter and avoid[] litigation." Dkt. No. 123-59 at 4–5.[13] Ayrton noted that Bitdeer "still has time to honor Ayrton's participation right in the recently announced private placement on the same terms and conditions provided to the investor" in the Tether Transaction, and that it was "prepared to enforce its rights absent significant progress toward a resolution." *Id.* at 5. That same day, Bitdeer filed a request to accelerate the effectiveness of its Form F-3 registration for the Tether-related equity issuance. Dkt. No. 136 ¶ 29.

On June 19, Bitdeer rejected Ayrton's views that it had violated the Term Sheet's Exclusivity Provision or that Ayrton was entitled to participate in in the Tether Transaction on the same terms as Tether. Dkt. No. 123-59 at 4. It claimed that Ayrton had already been given an opportunity to participate because it had been informed of the transaction and expressly declined to participate. *Id.* Bitdeer committed to offering a "proposal" to resolve the dispute by June 21. *Id.* Bitdeer's Form F-3 registration with the SEC became effective on June 20. Dkt. No. 136 ¶¶ 29–30.

On June 21, 2024, Bitdeer offered Ayrton an opportunity to make an equity investment via a purchase of stock, priced at the prior day's closing price but with the same absolute dollar

[13] Citations to this docket entry use ECF pagination.

discount that Tether was given. Dkt. No. 123-59 at 3 (offering Ayrton 906,000 shares at $9.30 per share, incorporating a $0.56 per share discount against the prior day's closing price). By that time, however, Bitdeer's share price had increased substantially beyond what Tether had paid. *Id.* (noting that the "Tether deal price was $5.38 per share").[14] A few weeks later, Ayrton formally declined Bitdeer's compromise offer and initiated the present lawsuit. *Id.* at 2.

**PROCEDURAL HISTORY**

Ayrton filed its complaint on July 8, 2024, bringing one cause of action for breach of contract. Dkt. No. 1. Bitdeer answered the complaint and filed a counterclaim against Ayrton on October 14, 2024. Dkt. No. 19. Ayrton answered the counterclaim on November 6, 2024. Dkt. No. 26. On May 12, 2025, the Court issued a memorandum and order granting Bitdeer leave to file an amended answer, affirmative defenses, and counterclaim. Dkt. No. 79; *see also Ayrton Cap. LLC v. Bitdeer Techs. Grp.*, 2025 WL 4686913 (S.D.N.Y. May 12, 2025). On that same day, Bitdeer filed its amended responsive pleading. Dkt. No. 80. On May 27, 2025, Ayrton filed its answer to Bitdeer's single counterclaim for a declaratory judgment that the Exclusivity Provision is an unenforceable penalty. Dkt. No. 84.

On November 12, 2025, Bitdeer and Ayrton filed their respective motions for summary judgment. Dkt. Nos. 107 (Bitdeer's motion); 117 (Ayrton's motion). Bitdeer filed a memorandum of law and the declaration of Renita Sharma, attaching exhibits, in support of its motion. Dkt. Nos. 108, 110–11, 113. It also filed a Local Rule 56.1 statement. Dkt. Nos. 109, 112. Ayrton filed a memorandum of law and the declaration of Andrew D. Gladstein, attaching

[14] The parties dispute the date that would trigger Bitdeer's requirement to offer a right of participation to Ayrton and the date of "Bitdeer's rejection of Ayrton's election to participate." Oral Arg. Tr. at 70:8–71:22; 73:9–74:4. Ayrton claims June 21, 2024, as the rejection of its participation demand, triggering breach of the right of participation, while Bitdeer claims as early as May 14, when the Tether Transaction was first negotiated. *Id.*

exhibits, in support of its motion. Dkt. Nos. 119–20, 122–23. It also filed a Local Rule 56.1 statement. Dkt. Nos. 118, 121. The parties also filed a joint statement of undisputed facts. Dkt. No. 115.

On November 26, 2025, Bitdeer filed a memorandum of law in opposition to Ayrton's motion for summary judgment and a counterstatement to Ayrton's Local Rule 56.1 statement, as well as a declaration of Renita Sharma, attaching additional exhibits. Dkt. Nos. 135–40. Ayrton also filed a memorandum of law in opposition to Bitdeer's motion for summary judgment, a counterstatement to Bitdeer's Local Rule 56.1 statement, and the declaration of Andrew D. Gladstein, attaching additional exhibits. Dkt. Nos. 143–48.

Bitdeer filed a reply memorandum of law in further support of its motion for summary judgment on December 5, 2025. Dkt. No. 161. Ayrton also filed a reply memorandum of law in further support of its motion for summary judgment, along with a declaration of Andrew D. Gladstein. Dkt. Nos. 163–66. The Court heard oral argument on the motions on September 24, 2026.

## LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113–14 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The movant bears the burden of 'demonstrat[ing] the absence of a genuine issue of material fact.'" *Id.* at 114 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). In deciding a motion for summary judgment, the Court must "construe the evidence in the light most favorable to the non-moving party, and draw

all reasonable inferences in its favor." *Gilman v. Marsh & McLennan Cos., Inc.*, 826 F.3d 69, 73 (2d Cir. 2016).

"If, as here, 'both sides move for summary judgment, neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it.'" *Envy Branding, LLC v. William Gerard Grp., LLC*, 2024 WL 869156, at *7 (S.D.N.Y. Feb. 29, 2024) (quoting *Heublin, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)). "When faced with cross-motions for summary judgment, a district court is not required to grant judgment as a matter of law for one side or the other." *Heublin, Inc.*, 996 F.2d at 1461; *accord Morales v. Quintel Ent. Inc.*, 249 F.3d 115, 121 (2d Cir. 2001). "Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales*, 249 F.3d at 121.

## DISCUSSION

### I. Ayrton's Motion for Summary Judgment

Ayrton moves for partial summary judgment on its single breach of contract claim, arguing that it is entitled to summary judgment that Bitdeer breached the Exclusivity Provision and deprived it of the right to participate in 25% of Bitdeer's financing transactions. Dkt. No. 1 ¶¶ 38–42.

"Under New York law, a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." *Lamda Sols. Corp. v. HSBC Bank USA, N.A.*, 574 F. Supp. 3d 205, 213 (S.D.N.Y. 2021) (quoting *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011)). "The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent." *Greenfield v. Philles Recs., Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002).

The issue whether the Term Sheet constitutes a binding contract is suitable for summary judgment. "Where a question of intention is determinable by written agreements, the question is one of law, appropriately decided on a motion for summary judgment." *Brown v. Cara*, 420 F.3d 148, 153 (2d Cir. 2005) (alteration omitted) (quoting *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 73 (2d Cir. 1989)); *cf. Am. Exp. Bank Ltd. v. Uniroyal, Inc.*, 562 N.Y.S.2d 613, 614 (1st Dep't 1990) ("Where the intent of the parties can be determined from the face of the agreement, interpretation is a matter of law and the case is ripe for summary judgment."). Likewise, "[u]nder New York law, whether a binding agreement exists is a legal issue, not a factual one." *Vacold LLC v. Cerami*, 545 F.3d 114, 123 (2d Cir. 2008) (citing *Shann v. Dunk*, 84 F.3d 73, 77 (2d Cir. 1996)); *Brown*, 420 F.3d at 156 (where "intention of the parties to create" a binding preliminary agreement is "patent in the language" of the document, the court is "present[ed] . . . with a pure issue of law"); *see also LPD New York, LLC v. Adidas Am., Inc.*, 295 F. Supp. 3d 275, 285 (E.D.N.Y. 2017). Accordingly, "summary judgment is appropriate where . . . 'the evidentiary foundation for determining the formation of the parties' contract is undisputed,' and the only dispute concerns 'the legal significance of the facts.'" *Schoninger v. Green*, 763 F. App'x 1, 4 (2d Cir. 2019) (summary order) (alterations adopted) (quoting *Vacold LLC*, 545 F.3d at 123).

Ayrton asserts that Bitdeer breached the Exclusivity Provision, thus entitling it to the break-up fee and the participation right. That breach is undisputed. Bitdeer negotiated terms of a financing with another party within the thirty-day period following the end of negotiations over the Term Sheet's contemplated transaction—the Tether Transaction negotiations occurred within two days of Bitdeer's announcement that it was terminating the Term Sheet with Ayrton. Dkt. No. 115 ¶¶ 13–14; Dkt. No. 136 ¶ 19–24. Bitdeer, instead, disputes the Exclusivity Provision's

enforceability and the enforceability of its consequences, contending that the Exclusivity Provision is invalid for lack of consideration or, alternatively, that the participation right and the break-up fee which it contends goes with the participation right are impermissible penalties in violation of New York public policy. *See* Dkt. No. 108 at 1–2. The parties' dispute centers on the "legal significance of the facts," permitting the Court to resolve these issues on summary judgment. *Vacold LLC*, 545 F.3d at 123.

### A. The Exclusivity Provision Is Enforceable

Bitdeer argues initially that the Exclusivity Provision is unenforceable because it is not supported by consideration. Dkt. No. 136 at 8–12. In response, Ayrton contends that the Term Sheet obligates it to conduct due diligence in good faith. Dkt. No. 146 at 6; Transcript of September 24, 2026 Oral Argument ("Oral Arg. Tr.") at 83:22–85:5.

A contract is "a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." *Lauture v. Int'l Bus. Machines Corp.*, 216 F.3d 258, 261 (2d Cir. 2000) (quoting Restatement (Second) Contracts § 1 (1979)). For those promises to be unenforceable, there must be consideration as well as an offer and acceptance and a meeting of the minds. *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004) ("To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound." (citation omitted)). "As first-year law students learn, 'consideration' is 'a performance or return promise' that is 'bargained for in exchange for the other party's promise.'" *Advanced Water Techs., Inc. v. Amiad U.S.A., Inc.*, 457 F. Supp. 3d 313, 319–20 (S.D.N.Y. 2020) (alterations adopted) (quoting Restatement (Second) of Contracts § 71 (1981)). Under New York law, "[a] valuable consideration, in the sense of the law, may consist either in some right, interest, profit, or benefit accruing to the one party, or some forbearance, detriment, loss, or responsibility given, suffered, or undertaken by

the other." *Lebedev v. Blavatnik*, 142 N.Y.S.3d 511, 517 (1st Dep't 2021) (quoting *Hamer v. Sidway,* 27 N.E. 256, 257 (N.Y. 1891)). A promise of a gift without any expectation of receiving anything in return may support a claim for reliance damages in promissory estoppel if it is relied upon, but it is not enforceable as a contract. *See Drummond v. Akselrad*, 2023 WL 3173780, at *6 (S.D.N.Y. May 1, 2023). In determining whether the Exclusivity Provision is supported by consideration and is binding, the Court is bound "by the law of New York as interpreted by the New York Court of Appeals," *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 739 F.3d 45, 48 (2d Cir. 2013), and follows the "rulings from [state intermediate appellate] courts" except to the extent the Court "is convinced by other persuasive data that the highest court of the state would decide otherwise," *DiBella v. Hopkins*, 403 F.3d 102, 112–113 (2d Cir. 2005) (quoting *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940)). "Under the traditional principles of contract law, the parties to a contract are free to make their bargain, even if the consideration exchanged is grossly unequal or of dubious value." *Apfel v. Prudential-Bache Sec. Inc.*, 616 N.E.2d 1095, 1097 (N.Y. 1993). "Absent fraud or unconscionability, the adequacy of consideration is not a proper subject for judicial scrutiny." *Id.*

In *RDF Agent, LLC v. Electric Red Ventures, LLC*, 211 N.Y.S.3d 283 (1st Dep't 2024), the Appellate Division, First Department, confronted a question similar to that presented here. The plaintiff had entered into a preliminary term sheet with defendants, which gave the plaintiff the exclusive right to provide a loan for a period of sixty days, which would be extended to the extent of any delays attributable to the defendants or if the defendants were not prepared to close on the terms set out in the term sheet. *Id.* at 286. During that period, defendants agreed not to directly or indirectly solicit, make, accept, negotiate, entertain, or otherwise pursue another financing transaction. *Id.* The term sheet provided that it was not binding except for certain

paragraphs, including the exclusivity provision. *Id.*; *see also RDF Agent, LLC v. Elec. Red Ventures, LLC*, Index No. 656537/2022, Dkt. No. 3 (N.Y. Sup. Ct. filed May 28, 2022); Dkt. No. 113-35 (copy of term sheet from *RDF Agent*). Plaintiff sued for breach of contract after defendants engaged in a financing transaction with another lender that violated the exclusivity provision. The court rejected defendants' argument that the exclusivity provision was unenforceable for lack of consideration and mutuality of obligation. *RDF Agent*, 211 N.Y.S.3d at 287.[15] The court recited the proposition that the law disfavors an interpretation that would "'render[] a contract illusory and therefore unenforceable . . . particularly where . . . the parties have expressed their intent to be contractually bound in a writing.'" *Id.* (quoting *Credit Suisse First Bos. v. Utrecht-Am. Fin. Co.*, 915 N.Y.S.2d 531, 535 (1st Dep't 2011)). That obligation was not "so insubstantial as to impose no obligation." *Id.* (quoting *Lend Lease (US) Constr. LMB Inc. v. Zurich Am. Ins. Co.*, 71 N.E.3d 556, 562 (N.Y. 2017)). The term sheet in *RDF Agent* included express language concerning good faith. *See* Dkt. No. 120 at 10; Dkt. No. 113-35 at 9. But the decision did not turn on that fact. The language of the good faith provision on its face did not speak to specific obligations,[16] and after stating that the contract required plaintiff to proceed in good faith, the court concluded that, "[i]n any event," the law would abhor an interpretation that rendered a provision that the parties intended to create a contractual obligation to be illusory. *RDF Agent*, 211 N.Y.S.3d at 287.

The Term Sheet here did not include an express obligation for Ayrton to conduct due

[15] The court also rejected defendants' argument that the exclusivity provision was unenforceable because it survived forever. *RDF Agent*, 211 N.Y.S.3d at 287.
[16] Dkt. No. 113-35 at 9 (stating under the "Exclusivity" section, *inter alia*, that "Agent is proceeding in good faith towards consummating the Loan" and that "unless Agent shall have failed to pursue in good faith the transaction contemplated herein, Borrower and Guarantor shall, on demand, pay" liquidated damages for a breach as the "sole and exclusive remedy").

diligence, but such a duty can be implied from the content of the Term Sheet and the fact of the Exclusivity Provision. *See Alessi Equip., Inc. v. Am. Piledriving Equip., Inc.*, 578 F. Supp. 3d 467, 500 (S.D.N.Y. 2022) ("exclusivity terms impliedly obligate both parties to 'use their best efforts'" (quoting *Vinifera Imports Ltd. v. Societa Agricola Castello Romitorio SRL*, 2020 WL 1184962, at *6 (E.D.N.Y. March 12, 2020))); *see also Vacuum Concrete Corp. of Am. v. Am. Mach. & Foundry Co.*, 321 F. Supp. 771, 772 (S.D.N.Y. 1971) (Mansfield, J.) ("It is settled law that the court will imply a duty on the part of an exclusive licensee to exploit the subject matter of the license with due diligence, where such a covenant is essential as a matter of equity to give meaning and effect to the contract as a whole."). The Term Sheet is "instinct with an obligation." *Wood v. Lucy, Lady Duff-Gordon*, 118 N.E. 214, 214 (N.Y. 1917) (Cardozo, J.). As in *RDF Agent*, the parties here expressed their intent to be contractually bound in a writing. The Term Sheet expresses the unambiguous intent of the parties that the preamble, "Confidentiality and Exclusivity," "Diligence and Legal Fees" and "Governing Law" sections of the Term Sheet would create binding legal obligations enforceable by Ayrton. Dkt. No. 110-9 at 3–4. It states that all of the terms in the Term Sheet except for the preamble, "Confidentiality and Exclusivity," "Diligence and Legal Fees" and "Governing Law" sections were non-binding, that upon execution of the Term Sheet by Bitdeer, the "Confidentiality and Exclusivity" paragraph would be binding, and that Ayrton would have "the right to pursue all remedies available to it in law or in equity" if Bitdeer breached its obligations. *Id.*

Ayrton could not just sit back and do nothing in exchange for Bitdeer's agreement to keep the terms of the Term Sheet confidential and not to solicit, negotiate, or accept any other terms sheets for a financing transaction. It assumed a responsibility to conduct due diligence with respect to the proposed transaction. "[I]t is well-settled that 'the courts will not adopt an

interpretation that renders a contract illusory when it is clear that the parties intended to be bound thereby.'" *Lebowitz v. Dow Jones & Co.*, 847 F. Supp. 2d 599, 604 (S.D.N.Y. 2012) (quoting *Horowitz v. N.Y. Blood Ctr., Inc.*, 2003 WL 22287468, at *3 (N.Y. Sup. Ct. Oct. 2, 2003)), *aff'd*, 508 F. App'x 83 (2d Cir. 2013) (summary order). "Courts presume that parties do not make empty promises," so where "it is necessary to read an obligation of good faith in order to avoid rendering a contract promise illusory—in the words of the cases, where necessary so as not to deprive a contracting party of the 'fruits of the contract'—the courts will not hesitate to infer an obligation to act in good faith." *S. Telecom Inc. v. ThreeSixty Brands Grp., LLC*, 520 F. Supp. 3d 497, 507 (S.D.N.Y. 2021); *see Advanced Water Techs.*, 457 F. Supp. 3d at 319–20 (finding an "implied condition" to exercise reasonable efforts in order to prevent a contractual undertaking from becoming illusory and unenforceable). The Term Sheet presumes that Ayrton will act in good faith and will conduct due diligence.

The Term Sheet has the features of a Type II agreement to agree. *See Tchrs. Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 498 (S.D.N.Y. 1987) (Leval, J.) ("*Tribune*") ("Preliminary contracts with binding force can be of at least two distinct types."); *Arcadian Phosphates*, 884 F.2d at 72 ("In *Tribune*, Judge Leval identified two types of preliminary agreements.").[17] It "expresses mutual commitment to a contract on agreed major

[17] As this Court has noted, "[w]hile not disagreeing with the 'federal line of cases,' the New York Court of Appeals has stated that it has not found 'the rigid classification into "Types' useful" in every case.'" *JKN Universe, LLC v. VVV Glob. Ent. LLC*, 2026 WL 2086260, at *9 (S.D.N.Y. July 20, 2026) (quoting *IDT Corp. v. Tyco Grp.*, 918 N.E.2d 913, 915 n.2 (N.Y. 2009)). Nevertheless, the Second Circuit has continued to distinguish between Type I and Type II agreements. *See, e.g.*, *Murphy v. Inst. of Int'l Educ.*, 32 F.4th 146, 150–51 (2d Cir. 2022); *Javelin Glob. Commodities (UK) Ltd. v. Lexington Coal Co., LLC*, 2026 WL 1210102, at *2 (2d Cir. May 1, 2026) (summary order). Regardless of terminology, "courts are consistent on the ultimate proposition that two parties can form an agreement to negotiate in good faith" that might vary by its terms as to how binding the contract is. *JKN Universe*, 2026 WL 2086260, at *9; *see also Rubinstein v. Clark & Green, Inc.*, 395 F. App'x 786, 789 (2d Cir. 2010) (summary

terms, while recognizing the existence of open terms that remain to be negotiated'" within the agreed scope. *Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 206 n.3 (2d Cir. 2002) (quoting *Tribune*, 670 F. Supp. at 498). It contains extensive detail on what would be all the material terms of a financing, including the principal amount of the Notes, the form they were to take ("non-convertible"), the price that Ayrton would pay for the Notes and the investment it was to make in Bitdeer ($100 million), the interest Bitdeer was to pay, the ranking of the Notes, their maturity and principal amortization amount, Ayrton's redemption right, Bitdeer's negative pledges, Bitdeer's prepayment rights, the covenants to which Bitdeer was to agree, and the right of Ayrton to participate in future financings. Dkt. No. 110-9 at 3–4. Indeed, Bitdeer does not identify a single material term of a financing that is not set forth in the Term Sheet. Moreover, the Term Sheet includes provisions that are expressly marked as binding. "[T]he intention of the parties to create a 'Type II' preliminary agreement is patent in the language . . . presenting [the Court] with a pure issue of law." *Brown*, 420 F.3d at 156.

The Term Sheet reflects the commitment on the part of Ayrton (and not just Bitdeer) "to proceed in good faith toward consummating the [financing]." *RDF Agent*, 211 N.Y.S.3d at 287. The preamble states that "any obligation or commitment of Ayrton or any of its affiliates is subject to the completion of due diligence, investment committee and other internal approvals and the execution and delivery of definitive transaction documentation," thereby presuming that Ayrton or its affiliates will conduct some due diligence. Dkt. No. 110-9 at 3. The reference to due diligence would have been unnecessary if Ayrton was not going to conduct due diligence. *See Cambridge Cap. LLC v. Ruby Has LLC*, 565 F. Supp. 3d 420, 444 (S.D.N.Y. 2021)

---

order) (differentiating between a "fully binding preliminary agreement" and a "binding preliminary agreement").

(reference to "conditions to the consummation of the ultimate contractual objective," including "approval from the Investment Committee of Cambridge Capital," "would have been unnecessary surplusage if . . . no obligation of any sort . . . was created by the" preliminary agreement to agree (internal quotation marks omitted)). It further provides that Bitdeer would "pay for all of [Ayrton's] due diligence and legal fees in relation to the transactions proposed in this Term Sheet," thereby further presuming that Ayrton will conduct due diligence and incur legal fees. Dkt. No. 110-9 at 4. Indeed, it goes so far as to also obligate Bitdeer to make an initial deposit to Ayrton of $125,000 for diligence and legal expenses. *Id.* That provision cannot reasonably be considered to be a gift. It envisioned that Ayrton would conduct due diligence.

To be sure, the Term Sheet did not commit Ayrton to the "ultimate contractual objective" of making a $100 million investment in Bitdeer. *Tribune*, 670 F. Supp. at 498. The Term Sheet reflects that it was "for discussion purposes only" and was "not a comprehensive abstract of the Definitive Documentation," and that Ayrton was not committing itself to "purchase securities of [Bitdeer] or secure financing on behalf of [Bitdeer] by third parties." Dkt. No. 110-9 at 3. The Term Sheet did not "represent or constitute an offer, undertaking or commitment" on the party of Ayrton to provide financing to Bitdeer or any of its affiliates. *Id.* But neither did the term sheet in *RDF Agent* commit the lender to extend a loan. It is in the nature of a Type II agreement that it does not commit the parties to the final transaction. *Tribune*, 670 F. Supp. at 498; *Brown*, 420 F.3d at 157–58; *Cambridge Cap.*, 565 F. Supp. 3d at 441. That does not foreclose an interpretation that would subject the parties each to obligations enforceable in contract. *See Tribune*, 670 F. Supp. at 499–500. Indeed, what is conspicuous in the Term Sheet is that Ayrton found it necessary to state that it was not committing itself to purchase securities of Bitdeer or to secure financing for Bitdeer. On the interpretation Bitdeer now puts on the Term Sheet, Ayrton

was not committing itself to *anything*. The language regarding purchasing securities or providing financing would be surplusage or at least conspicuously incomplete on Bitdeer's interpretation. *Cambridge Cap.*, 565 F. Supp. 3d at 444 ("It can plausibly be argued that all of this language would have been unnecessary and surplusage if, as [defendant] would have it, no obligation of any sort and with respect to any matter (except for exclusivity) was created by the [preliminary agreement].").

"These conclusions are further reinforced by the particular facts of the negotiation." *Tribune*, 670 F. Supp. at 500. Exclusivity was not a present that Bitdeer offered for nothing. It gave exclusivity because it needed the financing. Bitdeer was in discussions with multiple potential investors during the same time it was in back-and-forth negotiations with Ayrton. The parties exchanged multiple iterations of the Term Sheet from April 7 to April 26, adjusting provisions including the break-up fee, right of participation, and exclusivity period. Dkt. No. 136 ¶ 8–12; *see also* Dkt. No. 110-8 (thread of communications between Gross and LaBerge from April 7 to April 22, 2024). At the time Bitdeer signed the Term Sheet, its alternative non-party investor had pulled out of a proposed financing for $100 million. Dkt. No. 136 ¶ 6. Bitdeer signed the Term Sheet only after it received repeated assurances from Ayrton—since at least April 8, 2024—that Ayrton thought it would be able to close in "2–3 weeks," Dkt. No. 147 ¶ 41, and that Ayrton believed that there was "adequate information" in the "public domain" for it to be able to close, *id.* ¶ 40. *See* Dkt. No. 110-8. Ayrton indicated that it was focused on Bitdeer's "key assets . . . located in the" United States for due diligence and contemplated "site visits" by a "consulting firm." *Id.* at 2–3. In this context, there would have been no reason for Bitdeer to have agreed to exclusivity, and thereby not have entertained competing term sheets, if Ayrton was not required to do the due diligence that would be necessary for it to reach a final

conclusion on whether to purchase the Notes.

Although "[a] party's partial performance does not necessarily indicate a belief that the other side is bound," in this instance, both Ayrton and Bitdeer followed through on their side of the bargain and complied with the agreement as though it were mutually binding. *Tribune*, 670 F. Supp. at 502. Partial performance weighs in favor of enforceability where a party "expend[s] significant time and energy" and the counterparty is "contemporaneously aware of this performance." *Brown*, 420 F.3d at 155. Within two days of signing the Term Sheet, Ayrton followed up with Bitdeer on access to the data room, accessed the repository, and inquired about consultants' access thereto. *See* Dkt. No. 123-24. And within seven days of the Term Sheet's execution, Ayrton's diligence revealed the anti-assignment issue with the Rockdale facility's lease, and Bitdeer was promptly made aware of its concerns. *See* Dkt. No. 123-25 (LaBerge's email on May 6 informing Wu and others of Ayrton's "issue with Rockdale"); Dkt. No. 137-5 at 248:11–18 (LaBerge: "I am saying that this was Ayrton's concern."). Bitdeer also understood the Term Sheet to be legally binding. When Bitdeer did decide to entertain financing from other sources, Bitdeer acknowledged that it would be in breach of the Term Sheet—in fact, Wu told Kong to "breach." Dkt. No. 136 ¶ 19; *see also* Dkt. No. 123-29 at 3 (May 9, 2024 message from Kong to LaBerge asking if "Ayrton will sue us if we breach the 25% provisions"). The parties' partial performance bolsters the Court's determination.

Bitdeer's arguments for why Ayrton was not committed to due diligence are unconvincing. Bitdeer relies in the first instance on the Term Sheet's "sole discretion" language to insist that Ayrton does not have any enforceable obligations to Bitdeer. As will be recalled, the Term Sheet provides that "any obligation or commitment of Ayrton or any of its affiliates is subject to the completion of due diligence, investment committee and other internal approvals

and the execution and delivery of definitive transaction documentation (the 'Definitive Documentation'), in each case as may be satisfactory to Ayrton at its sole discretion." Dkt. No. 115 ¶ 7. Bitdeer argues that any implied obligation would contradict such discretion, rendering it null. Dkt. No. 135 at 8–9; Oral Arg. Tr. at 41:16–21 ("This 'sole discretion' language gets rids of any concrete obligation, any implied obligation.").

The Court will not imply a duty of good faith and fair dealing where it would "negate a[n] expressly bargained-for clause that allows a party to exercise its discretion." *Paxi, LLC v. Shisdeido Ams. Corp.*, 636 F. Supp. 2d 275, 286 (S.D.N.Y. 2009). The New York Court of Appeals has held, however, that "a party's 'sole discretion' with respect to a right does not exculpate that party from complying with the implied covenant with respect to that right," *111 W. 57th Inv. LLC v. 111 W57 Mezz Inv. LLC*, — N.E.3d —, 2026 WL 1502410, at *4 (N.Y. May 28, 2026), which manifests in "[e]very contract," *id.* at *3 (citing *Singh v City of New York*, 217 N.E.3d 1, 5 (N.Y. 2023)). A party who is given "sole discretion" may not use that discretion in a manner that would frustrate its counterparty's "right to receive the fruits of the contract." *Id.* at *6. In other words, "the language 'sole discretion'" does not operate as a talismanic "be-all and end-all of whether the covenant of good faith and fair dealing applies" and does not erase the covenant in the Term Sheet. *S. Telecom*, 520 F. Supp. 3d at 507; *id.* ("No magic words can *ipso facto* and without review of the contract as a whole relieve a contracting party of th[e] obligation" to exercise a "contractual right" to exclusivity "in good faith."). The court must "determine the meaning of a contract term and then, after looking at both that term in isolation and the contract as a whole, . . . decide (1) whether the covenant would negate the terms of the bargained-for clause; and (2) if not, whether application of the covenant is necessary to preserve

the fruits of the contract and prevent it from being illusory." *Id.* at 507.[18]

The language to which Bitdeer points did not give Ayrton the option not to conduct any diligence at all or give any consideration to the proposed transaction. When read in context, *see, e.g.*, *1995 CAM LLC v. W. Side Advisors, LLC*, 277 N.E.3d 1040, 1043 (N.Y. 2025), it gave Ayrton the right not to consummate a transaction if it deemed the due diligence that it conducted not to be satisfactory. The language immediately follows the statement that the terms other than those such as "Confidentiality and Exclusivity" are non-binding, and that Ayrton is not committing itself to arrange or provide financing for Bitdeer, and thus is most reasonably read in reference to the non-binding "obligations or commitments." *Id.* Indeed, there would be no reason to refer to due diligence—or for there to be any need for the sentence at all—if Ayrton were not subject to any binding obligations. The implication of a duty of good faith thus would not negate the terms of the bargained-for "sole discretion" here. The implied obligation requires Ayrton in good faith to conduct some due diligence and to consider the transaction reflected in the Term Sheet, yet Ayrton still retains all discretion with respect to how to conduct such diligence, and to what extent, and whether the diligence is deemed sufficient to support closing the transaction. *See WCA Holdings III, LLC v. Panasonic Avionics Corp.*, 704 F. Supp. 3d 473, 495–96 (S.D.N.Y. 2023) (holding that contract language giving party discretion whether to

[18] At oral argument, Bitdeer claimed that under the New York Court of Appeals' decision in *Moran v. Erk*, 901 N.E.2d 187 (N.Y. 2008), the language of "sole discretion" forecloses the recognition of an implied obligation. Oral Arg. Tr. at 42:12–21. Any such argument, however, is squarely foreclosed by the Court of Appeals' subsequent decision in *111 W. 57th Inv. LLC*. Moreover, *Moran* does not stand for the broad proposition that the parties can wipe out the implied obligation through language of "sole discretion." "*Moran* . . . stands for the more limited but still important proposition that where application of the covenant of good faith and fair dealing would 'negate a[n] expressly bargained-for clause that allows a party to exercise its discretion,' it cannot be said that its application of the covenant is necessary to preserve the 'fruits of the contract.'" *S. Telecom*, 520 F. Supp. 3d at 507 (quoting *Paxi, LLC*, 636 F. Supp. 2d at 286).

"provide or not provide" "demonstration flights" did not "operate in a vacuum"—there was "at least an obligation to provide *some* demonstration flights"). As discussed, such interpretation is necessary to honor the expressed intentions of the parties that the Exclusivity Provision, as well as the other requirements imposed on Bitdeer, be binding.

Next, Bitdeer relies on the testimony of Gross, as Ayrton's Rule 30(b)(6) corporate representative, that "Aryton is not legally bound under this term sheet to do anything," and that it was "Ayrton's position, intention and belief after [it] signed this term sheet" that it can "effectively do nothing more towards consummating a deal." Dkt. No. 110-3 at 204:8–13, 205:5–21. It argues that if Ayrton believed that it was not legally obligated to do anything under the Term Sheet, the Court cannot and should not imply a contractual obligation for it to do something. A party's post hoc denial of its obligation to act in good faith, however, cannot relieve it of an implied obligation to act in good faith. "To determine whether the parties intended to enter into a contract, courts apply an objective test, looking to the manifestation of a party's intention rather than the party's actual intention as controlling." *Kosher Provisions, Inc. v. Blue & White Food Prods. Corp.*, 2005 WL 1890039, at *2 (E.D.N.Y. Aug. 9, 2005). "What matters are the parties' expressed intentions, the words and deeds of the parties which constitute objective signs in a given set of circumstances." *Bitumenes Orinoco, S.A. v. New Brunswick Power Holding Corp*., 2007 WL 485617, at *12 (S.D.N.Y. Feb. 13, 2007) (alteration adopted) (quoting *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 74 (2d Cir. 1984)). "Subjective evidence of intent, on the other hand, is generally not considered." *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 549 (2d Cir. 1998). If Bitdeer were to have sued Ayrton for failure to honor an implied obligation to consider the transaction in good faith, Ayrton would not be excused from that obligation because of the after-the-fact testimony of its corporate

representative. *See 111 W. 57th Inv. LLC*, 2026 WL 1502410, at *8; *Wood*, 118 N.E.2d at 214–15. The conclusion is no different where, as here, it is Bitdeer that is arguing that Ayrton had no obligation as a means to avoid the consequences of its breach of the Exclusivity Provision. In any event, Gross's testimony did not go as far as Bitdeer would take it. Gross testified that Ayrton was permitted "not to move forward with this deal," Dkt. No. 110-3 at 205:5–21, and with respect to Ayrton's position, Gross has averred that when he "stated that Ayrton had no obligation under the Term Sheet, I was referring to the obligation to close the contemplated financing. That was precisely the topic that we were discussing," Dkt. No. 145-1 ¶ 9. Ayrton's actual conduct was consistent with the existence of a duty to consider the transaction. It is undisputed that it conducted due diligence after the parties signed the Term Sheet, and that even after it discovered the issue with respect to the Rockdale lease, it stated that it was willing to "proceed on the original terms" of the Term Sheet and work with the Rockdale facility's landlord to obtain the appropriate consent. Dkt. No. 110-15 at 2.

Bitdeer also relies on the Commercial Division's decision in *SPG Capital Partners LLC v. Cascade 553 LLC*, 180 N.Y.S.3d 524, 2023 WL 126127 (N.Y. Sup. Ct. 2023) (unpublished table decision). A real estate investment and finance corporation and a real estate development company signed a term sheet which contemplated that the finance corporation would extend a first mortgage loan to the development company and provided for the payment of a break-up fee if the development company obtained first mortgage lending from another lender. *SPG Cap. Partners LLC*, 2023 WL 126127, at *1. When the development company obtained financing from a party other than the finance corporation, the finance corporation sued for the break-up fee. *Id.* at *2. The court rejected plaintiff's contract claim, after concluding that the term sheet was nonbinding. *Id.* at *5. *SPG Capital Partners* does not do the necessary work for Bitdeer. In

the first instance, the decision is that of the New York State Supreme Court and, to the extent it is inconsistent with the appellate decision in *RDF* Agent, the Court follows *RDF Agent*. The case also is distinguishable on its facts. The term sheet in *SPG Capital Partners*, unlike the Term Sheet here, contained broad language indicating that the material terms of the transaction "may change and also will be subject to such other terms and conditions as determined by" the lender. *Id.* at *3 (alterations adopted). In particular, the document was stated to be a "proposed" term sheet and reflected that the finance company retained the discretion to change the loan terms. *Id.* at *4; *see also Adjustrite Sys.*, 145 F.3d at 549 (two-page "proposal" of "desires" found to be nonbinding); *Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 81 (2d Cir.1985) ("proposed agreement" found to be nonbinding); *cf. Vacold LLC*, 545 F.3d at 125 (binding preliminary agreement found where the document was "not a proposal, a draft, an expression of desires, or a memorandum of understanding"). Unlike in this case, there was "no statement that render[ed] the [exclusivity] provision enforceable notwithstanding the nonbinding nature of the term sheet." *SPG Cap. Partners LLC*, 2023 WL 126127, at *6. The court went out of its way to note that "[w]here the parties agree that an exclusivity provision shall survive the term sheet and is binding regardless of the binding nature of the term sheet . . . courts have enforced the provision." *Id.*[19]

[19] Bitdeer also argues that *Chiapparelli v. Baker, Kellogg & Co.*, 169 N.E. 274 (N.Y. 1929), supports its contention that Ayrton is vested with so much discretion as to render the Term Sheet void at Ayrton's election. *See* Dkt. No. 108 at 10; Dkt. No. 135 at 9. But *Chiapparelli* stands for the proposition that statements suggesting a willingness to agree on potential terms during negotiations, couched in the language of what each side "would" want and find potentially "satisfactory," do not give rise to a contract that can be accepted by unilateral performance. 169 N.E. at 275–77 (no consideration "assuming a present promise was in fact made by the defendant" to employ and compensate the plaintiff in a potential third-party loan negotiation that was ultimately consummated without the plaintiff's offered services). *See also AAR Allen Servs. Inc. v. Feil 747 Zeckendorf Blvd LLC*, 599 F. App'x 23, 24 (2d Cir. 2015) (summary order) (citing *Chiapparelli* for the principle that "an invitation to commence negotiations . . . does not

Finally, at oral argument, Bitdeer argued that the Exclusivity Provision was not supported by consideration because the Term Sheet did not specify a time period during which Ayrton was required to act in good faith. Dkt No. 135 at 13–14; Oral. Arg. Tr. at 48:1–13.[20] The specification of a time for completion of diligence weighs in favor of the recognition of Type II obligations. *Cambridge Cap.*, 565 F. Supp. 3d at 442. However, Bitdeer identifies no case holding that a term sheet *must* include a deadline for diligence in order to be supported by consideration. Cases have recognized Type II obligations even where the term sheet has not specified a date by which definitive documents are to be signed. *Givaudan SA v. Conagen Inc.*, 128 F.4th 485, 496 (2d Cir. 2025) (applying Delaware law); *EQT Infrastructure Ltd. v. Smith*, 861 F. Supp. 2d 220, 229 (S.D.N.Y. 2012) (recognizing that obligation to negotiate in good faith may extend beyond the exclusivity period); *Tribune*, 670 F. Supp. at 494–95, 499 (commitment letter constituted a binding preliminary agreement absent timeline to "conclude a final loan agreement"). In the absence of an express term, the duration of a contractual obligation "may be fairly and reasonably fixed by the surrounding circumstances and the parties' intent." *Hagshama Manhattan 10 Gold, LLC v. Strulovitz*, 2021 WL 1178028, at *6 n.4 (S.D.N.Y. Mar. 28, 2021)

---

constitute an offer"); *cf. Frio Energy Partners, LLC v. Fin. Tech. Leverage, LLC*, 2024 WL 4493644, at *17 (S.D.N.Y. Oct. 15, 2024) (no expectation of recouping labor expenses in service of closing a deal where such expenses were not agreed to as reimbursable). Clear, unambiguous terms of contract will be enforced unless an "agreement completely relieved [the counterparty] of its obligation to perform." *Lyons v. Sigma Mgmt. Holdings, LLC*, 252 N.Y.S.3d 130, 131 (1st Dep't 2026). Ayrton was not relieved of its obligation to perform and intended to be bound.

[20] Bitdeer does not make the argument that the Term Sheet fails for lack of definiteness—that is, a contractual obligation incapable of being applied by the court. In such a scenario, "the terms of the agreement are so vague and indefinite that there is no basis or standard for deciding whether the agreement had been kept or broken, or to fashion a remedy, and no means by which such terms may be made certain, [that] there is no enforceable contract." *Caro Cap., LLC v. Koch*, 2021 WL 1595843, at *6 (S.D.N.Y. Apr. 23, 2021) (quoting *Foros Advisors LLC v. Digital Globe, Inc.*, 333 F. Supp. 3d 354, 360 (S.D.N.Y. 2018)). Since Bitdeer did not argue that the Term Sheet was indefinite, the issue is waived and the Court does not consider it.

(quoting *Bennett v. Atomic Prods. Corp.*, 18 N.Y.S.3d 443, 445 (2d Dep't 2015)); *see also Venza v. Cath. Charities of Diocese of Rockville Ctr.*, 228 N.Y.S.3d 250, 255 (2d Dep't 2025).

### B. The Enforceability of the Participation Right

Bitdeer argues that, even if the Exclusivity Provision is supported by consideration and therefore creates binding obligations, the relief that Ayrton seeks for breach of that provision is an unenforceable penalty. Dkt. No. 108 at 12–21; Dkt. No. 135 at 10–12. Ayrton responds: (1) Ayrton's participation right is a "separate obligation"—akin to a right of first refusal or an option—and not a liquidated damages clause, Dkt. No. 146 at 12; (2) penalties are a "fixed cost that a counterparty must pay in the event of a breach" and that "a contractual provision that operates without respect to the payment of a fixed sum for a breach is not a penalty provision," Dkt. No. 120 at 10–11; and (3) the value of the participation right is not grossly disproportionate to the loss suffered by Ayrton upon Bitdeer's breach of the Exclusivity Provision, Dkt. No. 146 at 14–16.

#### 1. The Participation Right Cannot Be Analogized to a Right of First Refusal

Ayrton argues first that the participation right should not be considered a liquidated damages provision at all. Rather, in Ayrton's view, the participation right should be considered an option or a right of first refusal giving Ayrton the right (but not the obligation) to participate in any third-party transaction upon the contingency that a third-party transaction close during exclusivity. Dkt. No. 146 at 12; Oral Arg. Tr. at 92:10–13. Ayrton claims its "participation right was a separate obligation, one that was triggered by the execution of the Tether Transaction." Dkt. No. 146 at 12.

New York law recognizes the common law concept of alternative performance contract, *see Cahn v. Squires*, 824 N.Y.S.2d 728, 729 (2d Dep't 2006) (mem.) (citing *Trinity Church v.*

*Vanderbilt*, 98 N.Y. 170, 174–75 (1885)); *Hurd v. Kelly*, 78 N.Y. 588, 595 (1879), but Ayrton understandably does not rely upon that concept. "An alternative performance provision manifests an intention to provide a real choice between reasonably equivalent choices." 11 Corbin on Contracts § 58.18 (2026). It lets a promisor "elect which of the two alternatives" will be performed to "satisf[y]" a contract's obligations, and the "promisor could be charged only upon a breach of both" alternatives, since the failure to comply with one alternative still leaves open another path to make the counterparty whole. *Trinity Church*, 98 N.Y. at 174–75. *See also* 11 Corbin on Contracts § 58.18 (2026) ("In an alternative contract the performance of either alternative completely discharges the promisor's duty and earns the performance that was promised in exchange."); *Eagle Star Ins. Co. v. Seneca Ins. Co.*, 1995 WL 733642, at *3 (S.D.N.Y. Dec. 12, 1995) ("An alternative contract is one in which a party promises to render some one of two or more alternative performances, either one of which is mutually agreed upon as the bargained-for equivalent given in exchange for the return performance by the other party." (quoting 5 Corbin on Contracts § 1079)). Courts do not consider the alternative means of performance to constitute liquidated damages.

The paradigmatic example is the cellphone company that offers a consumer the option of either paying a monthly flat rate or a yearly discounted rate. *See Minnick v. Clearwire U.S., LLC*, 275 P.3d 1127, 1129–30 (Wash. 2012). A consumer who opts for the year-long commitment can be relieved of that obligation but only if she pays an early termination fee ("ETF"). *See id.* An ETF is not considered liquidated damages and the early-terminating consumer is held to the bargain she struck because, at the time of contracting, the consumer is given "a real choice between two reasonably equivalent choices"—meaning that at the "time fixed for performance either alternative might prove more desirable" and the parties "did not

intend the device to assure the performance of the other option." *Id.* at 1131 (alteration adopted) (internal quotation marks omitted). "A customer signing up for a year-long (or two-year-long) commitment might be hesitant without having an escape from performance." *Id.* at 1132. "The ETF provides that escape. It allows customers to enjoy a discounted monthly premium due to signing up for a long-term plan while retaining some of the flexibility that existed with the month-to-month plan." *Id.* To determine whether there is a reasonable equivalence, the court looks to "the relative value of the options at the time of contracting." *Id.* "If the values are so disproportionate as to be unequal, then one option is a penalty and not an alternative performance." *Id.* (internal quotation marks omitted). In *Minnick*, the court found that the two options were of reasonably equivalent value because, depending on when the consumer on the long-term plan cancelled the contract, she might end up paying more or less than the remaining monthly payments. "[A] customer at the time of contracting could see value in canceling early and paying the ETF rather than paying the remaining monthly payments." *Id.* In that circumstance, the ETF is not appropriately characterized as a penalty for breach of contract but rather as a "charg[e] for canceling the contract early, a contingency provided for in the contract allowing a customer to retain their freedom from performance." *Id.* at 1132.

"[A] contract which is alternative in form cannot be used as a cloak for the enforcement of a penalty." *Hasbrouck v. Van Winkle*, 27 N.Y.S.2d 72, 75 (3d Dep't 1941), *aff'd*, 43 N.E.2d 723 (N.Y. 1942). If the agreement offers "no options with respect to . . . performance" and instead specifies what occurs in "the event that the contract was breached," then it is "not an alternative contract" because it never gave the promisor a real choice not to perform. *Bradford v. New York Times Co.*, 501 F.2d 51, 56 (2d Cir. 1974); *see also* Restatement (Second) of Contracts § 356(c) (1981) ("[A] court will look to the substance of the agreement to determine whether this

is the case or whether the parties have attempted to disguise a provision for a penalty that is unenforceable . . . . In determining whether a contract is one for alternative performances, the relative value of the alternatives may be decisive.”).

The Exclusivity Provision cannot be characterized as an alternative performance contract pursuant to which Bitdeer could perform by either (1) honoring the exclusivity period or (2) breaching exclusivity and giving Ayrton the right to participate in any future financing. The only value which Ayrton provided Bitdeer under the Term Sheet was Ayrton’s consideration of the proposed transaction and that consideration was only of value to the extent that Ayrton might consummate the contemplated transaction. Ayrton did not offer any separate or different value for an option. And, once Bitdeer breached confidentiality and exclusivity, Bitdeer would have been deprived of that value. *Spencer-Smith v. Ehrlich*, 347 F.R.D. 606, 632 (S.D.N.Y. 2024) (“[U]nder New York law, when one party commits a material breach, the other party is relieved or excused from future performance obligations.”). Ayrton was relieved of any continuing obligation to consider the transaction. Thus, Bitdeer would not have been offered two options of relatively equal value. The relative value between those two options would have been so disproportionate as to be plainly unequal. *Minnick*, 275 P.3d at 1132. Bitdeer could either perform and honor exclusivity and Ayrton would consider the transaction—or Bitdeer could opt not to perform, dishonor exclusivity, and gain nothing. In these circumstances, the “option” to not perform can only be considered what the Term Sheet called it: a breach. *Bradford*, 501 F.2d at 56. *See Am. Soil Processing, Inc. v. Iowa Comprehensive Petroleum Underground Storage Tank Fund Bd.*, 586 N.W.2d 325, 333 (Iowa 1998) (“[N]o ‘real option’ because the buyer would be paying for nothing.” (citing *Superfos Invs. Ltd. v. FirstMiss Fertilizer, Inc.*, 821 F. Supp. 432, 437, 439 (S.D. Miss. 1993)). Bitdeer can be held to the Term Sheet’s consequences for that

breach only if the provision is a valid liquidated damages clause. Ayrton is correct that a party can purchase a contingent participation right or a right of first refusal. Dkt. No. 146 at 11. But that is not what the parties did here. The only value that Ayrton provided and the only consideration that Bitdeer received was that Ayrton would consider a transaction if, but only if, Bitdeer honored confidentiality and exclusivity. And the only way that the participation right would be triggered would be if Bitdeer breached confidentiality and exclusivity. If Bitdeer honored confidentiality and exclusivity, Ayrton would have had no rights under the Term Sheet to any right to participate given that, under the Term Sheet, neither Bitdeer nor Ayrton was required to close a transaction. Under these circumstances, the right to participate (*i.e.*, the right of first refusal) that Ayrton would obtain upon a breach can only be considered to be liquidated damages or a penalty for that breach. The Court accordingly turns to that question next.

### 2. A Penalty Can Be in the Form of Cash or Property

Ayrton argues that the participation right cannot function as a penalty because it is not a "fixed cost that a counterparty must pay in the event of a breach." Dkt. No. 120 at 10. It argues that "a contractual provision that operates without respect to the payment of a fixed sum for a breach is not a penalty provision." *Id.* at 11.[21] Although it may true that in many instances, penalty provisions are structured to require the breaching party to pay a fixed sum, that is not the only form a penalty may take either under the common law or the law of New York.

A liquidated damages provision can require a breaching party to compensate the non-breaching party through the forfeiture of property rather than through the payment of a fixed sum of money. *Bradford*, 501 F.2d at 57. The characterization of a clause as a liquidated damages

[21] Ayrton backs away from this argument in its later briefing making the empirical (but not legal) claim that "[c]hallenges to liquidated damages overwhelmingly arise in the context of provisions requiring the payment of a fixed sum upon the occurrence of a breach." Dkt. No. 146 at 11.

provision does not turn upon the form the liquidated damages take. *Id.* It follows necessarily then that the determination whether the provision is enforceable or instead functions as a penalty does not turn alone on whether the breaching party agrees to compensate the non-breaching party through cash or through chattel. *See* Restatement (First) of Contracts § 340 (1932) ("a sum of money or other property deposited by a promisor as security for performance by him and against loss to the other party, to be forfeited in case of breach, may be either a penalty or liquidated damages"); 11 Corbin on Contracts § 58.4 (2026) ("To attain the same purpose as a clause providing for the forfeiture or payment of money for a breach, the provision may be for the forfeiture of property, instead of for the payment or forfeiture of money."); *Norman v. Durham*, 380 S.W.2d 296, 301–02 (Mo. 1965) (provision calling for forfeiture of land invalidated as penalty after consideration as liquidated damages). In the particular case, the fact that the value of the chattel is variable may support the conclusion that the liquidated damages clause is valid, *Bradford*, 501 F.2d at 57, but in all cases the analysis will turn generally upon consideration of "the nature of the contract and the circumstances," *JMD Holding Corp. v Congress Fin. Corp.*, 828 N.E.2d 604, 609 (N.Y. 2005), and specifically on whether the "amount liquidated [whether paid in cash or in property] bears a reasonable proportion to the probable loss and the amount of actual loss is incapable or difficult of precise estimation," *Truck Rent-A-Ctr., Inc. v. Puritan Farms 2nd, Inc*., 361 N.E.2d 1015, 1018 (N.Y. 1977).[22]

---

[22] The cases cited by Ayrton do not support a contrary conclusion. In *Kirby v. United States ex rel. Crow Tribe of Indians*, 260 U.S. 423 (1922), the lessees of lands for the grazing of cattle agreed to pay rent of $31,950 per year for the right to graze up to 11,500 head of cattle and to pay $4.50 per head for each and every head in excess of that number. The Supreme Court rejected the argument that the payment for the additional heads of cattle to be grazed was "neither a penalty nor liquidated damages" because it "was not to be paid for any breach of contract, but as compensation for particular grazing contemplated in the lease and not covered by the rental otherwise fixed." *Id.* at 427. And, in *CDS Bus. Servs., Inc. v. H.M.C. Inc.*, 2023 WL 3847415 (E.D.N.Y. Apr. 28, 2023), the court rejected the proposition that a fee that was a

The courts have held that the forfeiture of a membership interest in a business, land, and chattel can all function as a penalty if disproportionate to the probable loss from the breach of contract. *See, e.g.*, *Atlantis Mgmt. Grp. II LLC v. Nabe*, 190 N.Y.S.3d 13, 15 (1st Dep't 2023) (invalidating penalty permitting plaintiff to buy back defendant's interest in a business at below-market rate of $1.00 as "grossly disproportionate to the actual damages"); *In re O.P.M. Leasing Servs., Inc.*, 23 B.R. 104, 114–15 (Bankr. S.D.N.Y 1982) (invalidating penalty permitting plaintiff to renew a lease at a below-market rent); *Man O War Restaurants, Inc. v. Martin*, 932 S.W.2d 366, 368 (Ky. 1996) (invalidating as a penalty terms of an agreement "which require a return of the stock at the price paid, without interest or appreciation, . . . [as] a form of unreasonably excessive liquidated damages" (internal quotation marks omitted)); *Norman*, 380 S.W.2d at 302 (invalidating as a penalty the required conveyance of lots that were disproportionate to actual damages). A personal services contract that required the forfeiture of an arm or a leg upon a breach of contract or, perhaps less colorfully, the performance of hard labor over an extended period of time also no doubt could function as a penalty. There is no reason here to believe that a contractual provision that would give Ayrton, as the non-breaching party, a part of Bitdeer (through equity) if Bitdeer needed any financing could not also function as a penalty. *See Ebbert v. Mercantile Tr. Co. of California*, 2 P.2d 776, 777 (Cal. 1931) ("A penalty need not take the form of a stipulated fixed sum; any provision by which money or property would be forfeited without regard to the actual damage suffered would be an unenforceable penalty.").

---

monthly charge from "day one" constituted a penalty "because it operated without respect to damages for a breach." *Id.* at *7 (internal quotation marks omitted). If anything, *CDS Business Services* tends to support Bitdeer because the penalty here operates only in the case of a breach.

Ayrton argues that its "participation right did not require Bitdeer to pay Ayrton *anything* but only provided "Ayrton the right to *pay Bitdeer*," Dkt. No. 120 at 11, and that the participation right required Bitdeer "to forfeit nothing," Dkt. No. 146 at 11. From that argument, one might wonder why the parties have so vigorously litigated this lawsuit. In fact, the argument restates, in somewhat different language, Ayrton's principal argument that a penalty must always be in the form of cash. It is true that in order to enjoy the benefits of the participation right Ayrton would have to make an investment in Bitdeer. But it manifestly is not true that Bitdeer would "forfeit nothing." Upon the exercise of the participation right, Bitdeer would have to turn over a significant stake in its business—and, on Ayrton's view, at whatever discounted price Bitdeer found necessary to offer the other party it was attempting to entice to make an investment to the detriment of all of Bitdeer's other investors who would be diluted as a result. Bitdeer's payment would not be in cash but may more significantly be in stock.

**3. The Participation Right Is an Unenforceable Penalty**

Ayrton next argues that the participation right is not grossly disproportionate and therefore not a penalty. Dkt. No. 146 at 14–16. Reiterating the same points it made in support of the notion that the participation right is not a penalty at all, it claims that the participation right imposed no cost on Bitdeer (and thus presumably no value for Ayrton), and that absent the participation right, Bitdeer's only consequence for breach is payment of "Ayrton's small break-up fee." *Id.* at 15.

"Whether a liquidated damages provision is enforceable 'is a question of law, giving due consideration to the nature of the contract and the circumstances.'" *Magtoles v. United Staffing Registry, Inc.*, 665 F. Supp. 3d 326, 339 (E.D.N.Y. 2023) (quoting *HLT Existing Franchise Holding LLC v. Worcester Hosp. Grp., LLC,* 609 F. App'x 669, 672 (2d Cir. 2015) (summary

order)).[23] "Parties to a contract have the right, under New York law, to specify within a contract the damages to be paid in the event of a breach, so long as such a clause is neither unconscionable nor contrary to public policy." *Rattigan v. Commodore Int'l Ltd.*, 739 F. Supp. 167, 169 (S.D.N.Y. 1990). A provision that operates as "an estimate, made by the parties at the time they enter into their agreement, of the extent of the injury that would be sustained as a result of breach of the agreement" may eliminate the need for a jury to calculate damages and is generally enforceable. *Truck Rent-A-Ctr.*, 361 N.E.2d at 1018. On the other hand, "[i]f such a clause is intended to operate as a means to compel performance, it will be deemed a penalty and will not be enforced." *Brecher v. Laikin*, 430 F. Supp. 103, 106 (S.D.N.Y. 1977). "A clause which provides for an amount plainly disproportionate to real damage is not intended to provide fair compensation but to secure performance by the compulsion of the very disproportion. A promisor would be compelled, out of fear of economic devastation, to continue performance and his promisee, in the event of default, would reap a windfall well above actual harm sustained." *Truck Rent-A-Ctr.*, 361 N.E.2d at 1018. As the New York Court of Appeals has reiterated, "to permit parties, in their unbridled discretion, to utilize penalties as damages, 'would lead to the most terrible oppression in pecuniary dealings.'" *Id.* (quoting *Hoag v. McGinnis*, 22 Wend. 163, 166 (N.Y. Sup. Ct. 1839)).

"The burden is on the party seeking to avoid liquidated damages . . . to show that the stated liquidated damages are, in fact, a penalty." *172 Van Duzer Realty Corp. v. Globe Alumni Student Assistance Ass'n, Inc.*, 25 N.E.3d 952, 957 (N.Y. 2014) (quoting *JMD Holding Corp.*,

---

[23] "[T]he limited enforcement of clauses where parties have agreed to specified measures of damages is a judicial check on the freedom of contract based on public policy notions of the courts of equity." *Brecher v. Laikin*, 430 F. Supp. 103, 106 (S.D.N.Y. 1977).

828 N.E.2d at 609). The New York Court of Appeals has "cautioned generally against interfering with parties' agreements." *JMD Holding Corp.*, 828 N.E.2d at 609. The parties' stipulated damages provision will be honored as long as it "do[es] not clearly disregard the principles of compensation." *Id.* (quoting 3 Farnsworth on Contracts § 12.18, at 303–04 (3d ed. 2004)). "A contractual provision fixing damages in the event of breach will be sustained if the amount liquidated bears a reasonable proportion to the probable loss and the amount of actual loss is incapable or difficult of precise estimation." *Truck Rent-A-Ctr.*, 361 N.E.2d at 1018. "The soundness of such a clause is tested in light of the circumstances existing as of the time that the agreement is entered into rather than at the time that the damages are incurred or become payable." *In re United Merchs. & Mfrs., Inc.,* 674 F.2d 134, 141 (2d Cir. 1982) (quoting *Walter E. Heller & Co. v. Am. Flyers Airline Corp.*, 459 F.2d 896, 898 (2d Cir. 1972)). It is not enough that the parties are sophisticated business entities represented by counsel; that alone does not preclude a finding that a clause operates as a penalty. *See Trs. of Columbia Univ. in City of New York v. D'Agostino Supermarkets, Inc.*, 162 N.E.3d 727, 729 (N.Y. 2020).[24]

Bitdeer does not dispute that the amount of Ayrton's loss at the time of contracting was incapable or difficult of precise estimation. Dkt. No. 146 at 11–12; *see Truck Rent–A–Ctr.*, 361 N.E.2d at 1018. At the most basic level, and as discussed above, the Term Sheet contemplated that in exchange for exclusivity and confidentiality, Ayrton would invest its "time and resources

[24] Some courts have considered it relevant whether the parties are sophisticated and represented by counsel. *See Magtoles*, 665 F. Supp. 3d at 339 ("[I]n determining whether one side is exacting an unconscionable penalty, courts should also consider factors such as the sophistication of the parties, whether they were represented by counsel, and whether the contract was negotiated at arm's length"). In *Trustees of Columbia University*, however, the court invalidated the liquidated damages clause as an impermissible penalty notwithstanding that it was negotiated by "well-counseled sophisticated parties." 162 N.E.3d at 739 (DeFiore, C.J., dissenting).

towards executing a financing transaction with Bitdeer." Dkt. No. 146 at 14. At the moment of contracting, the time and resources necessary for such diligence would not necessarily have been easy to calculate. Nor would the opportunity costs incurred by Ayrton in not being able to look at alternate transactions while considering the Bitdeer transaction.

The participation right, however, functions as a penalty because it bears no reasonable relationship to the probable loss incurred by Ayrton upon a breach of Bitdeer's confidentiality and exclusivity promises and therefore could not have constituted "an estimate, made by the parties at the time they enter into their agreement, of the extent of the injury that would be sustained as a result of breach." *Truck-A-Ctr.*, 361 N.E.2d at 1018. The only loss for which Ayrton would be entitled to damages would be that "flowing directly" from Bitdeer's breach of its confidentiality or exclusivity obligations. *Trs. of Columbia Univ.*, 162 N.E.3d at 733. Under New York law, it is not entitled to expectation damages representing the loss from a transaction it never had a contractual right to consummate. *See Goodstein Const. Corp. v. City of New York*, 604 N.E.2d 1356, 1362 (N.Y. 1992) ("Here—where the claims are founded only on an agreement to negotiate—awarding plaintiff lost profits based on the projected improvements would be even more 'irrational' and 'illogical and without any basis.'" (quoting *Kenford Co. v. Cnty. of Erie*, 537 N.E.2d 176, 180 (N.Y. 1989))); *Cambridge Cap. LLC v. Ruby Has LLC*, 675 F. Supp. 3d 363, 417 (S.D.N.Y. 2023) ("New York law categorically prohibits expectation damages in the absence of an agreement on all material terms"). The value of the participation right to Ayrton and its cost to Bitdeer, however, would bear no relationship whatsoever to the loss suffered by Ayrton as a result of Bitdeer's breach. The participation right gives Ayrton an option to free-ride off of any financing transaction that Bitdeer would choose to engage in for a six-month period regardless of the size of that transaction or whether it was even contemplated

during the period of exclusivity. If, four months after the breach of exclusivity, a marquee investor offered to invest $500 million in Bitdeer in exchange for convertible notes, Bitdeer could not accept the offer unless it also offered Ayrton $125 million in notes at the same price as part of the contemplated $500 million, potentially leaving the investor with only $375 million. *See* Dkt. No. 1 ¶ 5; Oral Arg. Tr. at 18:16–22.[25] If just before the 180-day term ended, Bitdeer also decided to finance itself by engaging in an initial public offering of $1 billion in equity, it would have to reserve at least 25% of that offering for Ayrton.

The liquidated damages / penalty clause here is distinctive in that, at the time of contracting and even at the time of breach, its value is not readily and easily reduceable to a sum certain. Its value is a function of the transactions that Bitdeer chooses to engage in over a six-month-plus period following the end of negotiations between Bitdeer and Ayrton. But that does not make it enforceable. The enforceability of a damages clause is a function of its disproportion "to real damage" flowing from the breach of contract. *Truck Rent-A-Ctr.*, 361 N.E.2d at 1018. The specific relationship between the actual damages estimated to have been suffered from the breach and the contractual amount that is liquidated may be probative of whether the clause is a penalty, but no party argues that it is dispositive. "The element common to most liquidated damages clauses that get struck down as penalty clauses is that they specify the same damages regardless of the severity of the breach." *XCO Int'l Inc. v. Pac. Sci. Co.*, 369 F.3d 998, 1004 (7th Cir. 2004).[26] "One can see the problem: if a contract provides that breaches of different gravity

---

[25] For the Tether Transaction, Ayrton contends that the right of participation should have permitted it to stake out $25 million of the transaction—in other words, Tether, despite negotiating for $100 million, could have been diluted to $75 million at Ayrton's choice. Oral Arg. Tr. at 18:16–22 ("[I]nstead of Tether having a $100 million [investment], Tether has 75 million, and we have 25 million. It's the same deal. There's no difference in value.").

[26] New York courts have cited Judge Posner's analysis with apparent approval. *See, e.g.*, *JMD Holding Corp.*, 828 N.E.2d at 610; *Zarsky v. L. Off. of Maury B. Josephson*, 831 N.Y.S.2d 363

shall be sanctioned with equal severity, it is highly likely that the sanction specified for the mildest breach is a penalty (that, or the sanctions for all the other possible breaches must be inadequate)." *Id.*; *see Checkers Eight Ltd. P'ship v. Hawkins*, 241 F.3d 558, 562 (7th Cir. 2001) ("If the amount of damages is invariant to the gravity of the breach, the clause is probably not a reasonable attempt to estimate actual damages and thus is likely a penalty."); *cf. JMD Holding Corp.*, 828 N.E.2d at 611 (weighing in favor of liquidated damages, rather than a penalty, that the agreement's "early termination fee of between 1% and 2% of the . . . maximum credit" accounted for "the percentage decreasing as the Agreement's term approached"). As Bitdeer appropriately framed it at oral argument, it is difficult to conclude that the parties attempted to estimate the likely damages upon the occurrence of a breach when the contract provides the same financial sanction regardless of the nature of material breach. Oral Arg. Tr. at 54:3–12 ("[T]his provision does not represent any good-faith effort by the parties to approximate Ayrton's damages from any of the predicate breaches.); *id.* at 58:23–59:2 ("[W]here there is [a] disjuncture between the full list of obligations that trigger the penalty, that is evidence of a lack of effort by the parties to craft a provision that reasonably approximates damages.").

Yet, under the Exclusivity Provision, any material breach of confidentiality or exclusivity by Bitdeer, no matter its nature and no matter when it occurred, would give Ayrton rights equivalent to many of the rights that Ayrton would have obtained from the Term Sheet if reduced to definitive documents—without Ayrton incurring any of the cost contemplated by the transaction in the Term Sheet.[27] The participation right is stated to be triggered "[i]f the

(N.Y.C. Civ. Ct. 2006) (unpublished table decision); *see also 4 Third Ave. Leasehold, LLC v. Permanent Mission of United Arab Emirates to United Nations*, 133 F. App'x 768, 770 (2d Cir. 2005) (summary order).

[27] Because the Term Sheet does not provide otherwise, "the presumed intent of the parties is that a liquidated damages provision will apply only to material breaches." *United Air Lines, Inc. v.*

Company [Bitdeer] breaches any of the confidentiality and exclusivity prohibitions outlined in this section." Dkt. No. 110-9 at 4. The confidentiality restrictions include the prohibition that Bitdeer not disclose the terms of the Term Sheet "to *any* other person or entity unless approved by Ayrton." *Id.* (emphasis added). On its face, the provision would apply to the disclosure to a person not remotely interested in a competing transaction with Bitdeer, including potentially to counsel or an auditor. It is triggered not only if Ayrton agrees to a competing transaction but also if it even accepts any term sheets, even if those term sheets or proposals are non-binding, are not solicited, and do not lead to a negotiation. It applies for a full thirty business days following the date the parties agree in writing to cease negotiation of the transaction contemplated in the Term Sheet. And it gives Ayrton the right to determine when negotiations are at a conclusion. The same financial sanction is imposed, regardless whether a non-binding proposal is received on day one of the thirty days (and Ayrton terminates its consideration of a transaction on that day) or day twenty-nine. And it gives Ayrton rights to participate in "any third party transaction executed by the company from the date of the Term Sheet until the 180 day anniversary of the Termination Date," *id.*—regardless of the size or form of that transaction, regardless whether Bitdeer's breach was of the confidentiality or exclusivity prohibitions, and regardless whether the third-party financing transaction was discussed during the negotiation of the Term Sheet, the thirty-day exclusivity window thereafter, or first proposed and executed on the 179th day after the Termination Date (*i.e.*, the 209th day after the parties have mutually agreed, in writing, that

---

*Austin Travel Corp.*, 867 F.2d 737, 741 (2d Cir. 1989) (citing *Hackenheimer v. Kurtzmann*, 138 N.E. 735, 738–39 (N.Y. 1923)). A "material[] interfer[ence]," not an "insignificant variation," would trigger the clause. *Hackenheimer*, 138 N.E. at 738. "If a contract with many terms of varying degrees of importance provides that the liquidated damage clause will be enforceable for any breach of the contract, serious or trivial, the liquidated damages clause will be viewed as a penalty and, as such, be unenforceable as to any breach." *Brecher*, 430 F. Supp. at 106.

negotiations have ceased). *See Atlantis Mgmt. Grp. II LLC*, 190 N.Y.S.3d at 15 (clause found to be a penalty where $1.00 "buyback" of a membership interest in a business is "trigger[ed]" by "any act in contravention of the [contract], without limitation" such that the clause "imposes a draconian remedy for [even] a trivial breach").

It thus is facile for Ayrton to claim that the participation right protected its investment of time and resources on doing diligence on Bitdeer by prohibiting Bitdeer from simultaneously negotiating a competing transaction with another financier. The effect of the participation right is to hamstring Bitdeer's rights to raise capital for an indeterminate period of 210 days from the date on which *Ayrton* determines that negotiations are at an end. The participation right's wide breadth and exacting punishment—applying to breaches of either exclusivity or confidentiality without respect to the harm Ayrton suffers—fails to "bear[] a reasonable proportion to the probable loss." *Cf. Leasing Serv. Corp. v. Just.*, 673 F.2d 70, 73 (2d Cir. 1982). Accordingly, the Court "cannot enforce such an obviously and grossly disproportionate award without offending [New York's] public policy against 'the imposition of penalties or forfeitures for which there is no statutory authority.'" *Trs. of Columbia Univ.*, 162 N.E.3d at 734 (quoting *Truck Rent-A-Ctr.*, 361 N.E.2d at 1018). In sum, the Court finds that the participation right operates *in terrorem* and is an unenforceable penalty.[28]

[28] When a portion of a contract is void for public policy reasons, the contract is enforced to the extent permitted. *See* Restatement (Second) of Contracts §§ 178, 184. The Exclusivity Provision's break-up fee comports with New York public policy and remains applicable notwithstanding the unenforceability of the participation right. *See BDO Seidman v. Hirshberg*, 712 N.E.2d 1220, 1226–27 (N.Y. 1999); *Ashland Mgmt. Inc. v. Altair Invs. NA, LLC*, 869 N.Y.S.2d 465, 473 (1st Dep't 2008), *aff'd as modified*, 925 N.E.2d 581 (N.Y. 2010).

### C. Bitdeer's Argument That the Break-Up Fee Is Unenforceable Is Without Merit

The Exclusivity Provision also provides that in the event of a breach, Bitdeer will pay to Ayrton a "break-up fee of 0.75% of the Redemption Value of the Notes." Dkt. No. 110-9 at 4. Ayrton argues that, regardless whether the participation right is enforceable, it would be entitled to the break-up fee for a breach. It notes that the amount contemplated by the Exclusivity Provision—0.75% or $787,500—is below the typical range of one to two percent for liquidated damages that New York courts have routinely upheld as bearing a reasonable proportion to a failed transaction. Dkt. No. 120 at 16; *see, e.g.*, *FCS Advisors, Inc. v. Fair Fin. Co.*, 378 F. App'x 65, 68 (2d Cir. 2010) (summary order). It also argues that the full loss caused by breach to Ayrton is difficult to ascertain. *See* Dkt. No. 146 at 13–16; Oral Arg. Tr. at 15:23–16:5 (discussing Ayrton's "opportunity cost"). Bitdeer makes only a limited argument against the enforceability of the break-up fee. It argues that, in conjunction with the participation right and attorneys' fees, the break-up fee contributes to the "30 percent of the value of the $100-million financing contemplated by the Term Sheet" that Ayrton seeks as damages. Dkt. No. 135 at 12 (emphasis omitted); *see also* Oral Arg. Tr. at 90:7–17 ("Our position has always been that the entire penalty, which includes the breakup fee and the right to participate, that that is assessed as one package."). Bitdeer's argument is without merit.

The Term Sheet imposed two separate obligations on Bitdeer, both triggered upon a breach of the Exclusivity Provision: an obligation to pay the break-up fee and an obligation to offer a right to participate. *Music Royalty Consulting, Inc. v. Reservoir Media Mgmt., Inc.*, 598 F. Supp. 3d 158, 184 (S.D.N.Y. 2022) ("If two promises are independent, breach of one does not excuse performance of the other." (quoting *Pfizer, Inc. v. Stryker Corp.*, 348 F. Supp. 2d 131, 147 (S.D.N.Y. 2004))). But neither obligation was dependent upon the other. *See Gallagher's*

*NYC Steakhouse Franchising, Inc. v. N.Y. Steakhouse of Tampa, Inc.*, 2011 WL 6034481, at *5 (S.D.N.Y. Dec. 5, 2011) ("Promises within the same instrument are not necessarily related or dependent."); *see also Music Royalty Consulting*, 598 F. Supp. 3d at 184 ("The question of whether covenants are to be held dependent or independent of each other is to be determined by the intentions or the parties *and* by the application of common sense." (internal quotation marks omitted)). Bitdeer could offer the participation right if it did not pay the break-up fee, and it also could pay the break-up fee if it did not offer the participation right. And, even if the participation right was not triggered or Ayrton opted not to take advantage of its right to participate, Ayrton was entitled under the provisions of the Term Sheet to be paid the break-up fee. The breach of either could constitute a breach of the Term Sheet. *Network Apps, LLC v. AT&T Mobility LLC*, 778 F. Supp. 3d 610, 628 (S.D.N.Y. 2025) ("[U]nder . . . New York law, a contract containing distinct obligations can give rise to separate, independent causes of action for breach."). The satisfaction of one would not relieve Bitdeer of the obligation to satisfy the other.

Bitdeer's argument rests on an unacceptable proposition. It is premised on the view that the enforceability of the break-up fee must be considered in conjunction with the value of the transaction (or transactions) in which Ayrton claims a right to participate. It is unenforceable if the combined impact of the two exceed any reasonable impact of a breach. Bitdeer does not dispute that the break-up fee would be enforceable if judged in isolation. But, under the Term Sheet, the obligation to give Ayrton a right to participate was a continuing obligation that did not end until 180 days after the Termination Date. In other words, the parties might not know whether there was a right to participate for Ayrton to exercise for 180 days after the Termination Date and would not know the full value of that right until it expired 180 days after the Termination Date (even if there was a financing transaction sooner than that). Thus, as Bitdeer

would have it, Bitdeer could delay payment of the break-up fee for a full half year after the breach on the notion that it might within that period engage in a financing transaction, in which case it would owe neither the break-up fee nor a right of participation. If Bitdeer did not engage in a transaction during that time period, it might be liable for the break-up fee. But if it did engage in such a transaction, it would have to pay nothing. The parties struck an agreement that gave Ayrton the right to both a break-up fee and the right to participate. The failure of the participation right thus does not relieve Bitdeer of the obligation to pay the break-up fee.

## II. Bitdeer's Motion for Summary Judgment and Affirmative Defenses

Having found that Bitdeer has breached and may be required to pay the break-up fee, the Court turns to Bitdeer's defenses. *See* Dkt. No. 80 at 9–12 (fourteen affirmative defenses). Ayrton challenged each as legally or factually deficient, but Bitdeer's opposition focuses only on two issues that the Court has not yet fully addressed: Bitdeer's claim that Ayrton (1) violated its good-faith obligation and (2) fraudulently induced the Term Sheet. Dkt. No. 135 at 18–24.[29] Bitdeer's other affirmative defenses, which it does not defend in its opposition brief, are deemed abandoned. *See Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014); *Blue Castle (Cayman) Ltd. v. Miller*, 772 F. Supp. 3d 416, 423 n.4 (S.D.N.Y. 2025).

### A. Violation of Obligation to Negotiate in Good Faith

As signatory to the Term Sheet, Bitdeer had an obligation to negotiate in good faith on the terms of the transaction and was prevented "from renouncing the deal, abandoning negotiations, or insisting on conditions that do not conform to the preliminary agreement."

---

[29] Bitdeer also argued that, if the participation right is found to enforceable, then it has presented sufficient evidence that it has complied with that right with respect to the Tether Transaction and to raise a triable issue that Ayrton would not have exercised the right with respect to that transaction for the purpose of calculating damages. Dkt. No. 135 at 12–14, 24–25. Because the participation right has been found to be void, the Court need not address these arguments.

*Tribune*, 670 F. Supp. at 498; *see also BAE Sys. Info. & Elec. Sys. Integration Inc. v. L3Harris Cincinnati Elecs. Corp.*, 716 F. Supp. 3d 206, 221 (S.D.N.Y. 2024); *Cambridge Cap.*, 565 F. Supp. 3d at 441. It was not obligated to close a transaction. In the case of a Type II agreement, "if a final contract is not agreed upon, the parties may abandon the transaction as long as they have made a good faith effort to close the deal and have not insisted on conditions that do not conform to the preliminary writing." *Adjustrite Sys.,* 145 F.3d at 548; *see also Vacold LLC*, 545 F.3d at 124 ("If the parties 'fail to reach such a final agreement after making a good faith effort to do so, there is no further obligation.'" (quoting *Tribune*, 670 F. Supp. at 498)). Bitdeer argues that a jury may find that Ayrton did not comply with its obligation to negotiate and conduct due diligence in good faith under the Term Sheet. Bitdeer contends that Ayrton's focus on the Rockdale facility was a "bad-faith delay tactic" and that Ayrton took "virtually no steps to obtain" the capital contemplated by the $100 million debt financing. Dkt. 135 at 18–21. The summary judgment record does not contain evidence from which a reasonable jury could find that Ayrton violated its obligations to Bitdeer.

Bitdeer's claim turns on its contention that, in identifying problems with the anti-assignment provision in the Rockdale lease within days of signing the Term Sheet, Ayrton failed to negotiate in good faith and effectively abandoned the transaction between the parties. In early May 2024, Ayrton identified for Bitdeer what it claimed to be an issue with respect to the anti-assignment and change of control clauses of the Rockdale lease. Dkt. No. 123-25 at 2. The problem was that the landlord was permitted to terminate the lease if it was pledged as collateral. *Id.* Bitdeer indicated that it was working on a solution to the problem and that if that did not work, it would have to get consent from the landlord. *Id.* Shortly thereafter, on May 9, 2024, Ayrton sent Bitdeer a term sheet for an alternative financing while indicating that it was willing

to proceed on the original terms of the Term Sheet and to "work with the landlord to obtain the appropriate consent & security as is required for a senior secured instrument," but the convertible note option presented "an alternative path and can be closed swiftly." Dkt. No. 110-15 at 2. Four days later, after negotiating with Ayrton the terms of the alternative transaction, Bitdeer announced that it was terminating the Term Sheet. Dkt. No. 115 ¶ 11; Dkt. No. 147 ¶ 44.

Even construed favorably to Bitdeer, the evidence does not support the conclusion that Ayrton failed to negotiate in good faith, that it renounced the deal, abandoned negotiations, or insisted on a condition that did not conform to the Term Sheet. The Term Sheet itself reflected that the Notes were to serve as "senior secured obligations of [Bitdeer] & its subsidiaries," and that Ayrton would have to conduct and be satisfied with due diligence before it could commit to the transaction. Dkt. No. 110-9 at 3. It also contained a negative pledge that "[p]rior to all outstanding amounts under the Notes being repaid in full, [Bitdeer] w[ould] not create any new encumbrances, on any of its or its subsidiaries' assets without the prior written consent of [Ayrton]." *Id.* It was implicit, if not necessary, in the Term Sheet that Ayrton would conduct due diligence on the assets that would be subordinate to Ayrton in seniority and thus available to satisfy Bitdeer's obligations to Ayrton. Ayrton would not have been obligated to consummate a transaction if there were no assets available to Bitdeer to pay off the Notes as they became due. It follows that there would have been no violation of the duty of good faith for Ayrton to inquire into the ability of the lease to serve as collateral for the loan (or an asset that could be used to satisfy the senior obligations of Bitdeer). Any implied obligation to the contrary—to not explore the availability of the asset—would have negated the terms of the bargained-for Term Sheet.

It also necessarily follows that Ayrton's message that it would continue negotiations on the Term Sheet and work with the landlord to obtain the necessary consent did not violate

Ayrton's obligations under the Term Sheet. Bitdeer has offered no evidence that there were no circumstances under which the landlord would have consented. Bitdeer itself considered an approach to the landlord as being an option. The email did not constitute a constructive abandonment.

Bitdeer has offered no other evidence to support the contention that Ayrton failed to satisfy its obligations under the Term Sheet. It complains that Ayrton slow-walked the transaction and took "virtually no steps to obtain" the capital contemplated by the $100 million debt financing. Dkt. 135 at 18–21. But the Term Sheet itself did not contain a timetable on which Ayrton was to complete its diligence or specify the number of hours or days it was to devote to the process. It was obligated simply to act in good faith and not to cut off negotiations. Nor did the Term Sheet contain a provision for when Ayrton was to obtain the capital necessary for the transaction. That it did not do so before it identified the anti-assignment provision that both sides identified to be an issue, or before Bitdeer itself terminated the Term Sheet, does not show bad faith. After Ayrton signed the Term Sheet, Ayrton inquired about the status of the data room for continued diligence within two days, had discussions with consultants, notified Bitdeer of its concerns with the lease agreement shortly thereafter, then engaged counsel to assess the lease's covenants, and attempted to find a solution while also offering an alternative path forward—all within less than two weeks of the Term Sheet's execution. Dkt. Nos. 123-24, 123-25, 123-27. These actions comport fully with Ayrton's obligations.

**B. Fraud in the Inducement**

Lastly, the Court turns to Bitdeer's claim that Ayrton fraudulently induced it to sign the Term Sheet. To establish a claim of fraudulent inducement, Bitdeer must prove that Ayrton (1) made "a material misrepresentation or omission of a fact" (2) with "knowledge of that fact's falsity," and (3) with "an intent to induce reliance," (4) upon which Bitdeer justifiably relied (5)

giving rise to damages. *Grain D'Or LLC v. Wizman*, 2023 WL 5609101, at *11 (S.D.N.Y. Aug. 30, 2023) (quoting *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 170 (2d Cir. 2015)). "At summary judgment as well as at trial, a plaintiff must prove each element of a fraud claim by 'clear and convincing' evidence." *N. Fork Partners Inv. Holdings, LLC v. Bracken*, 2023 WL 3871903, at *5 (S.D.N.Y. June 7, 2023) (quoting *Estrada v. Dugow*, 2016 WL 7017412, at *10 (S.D.N.Y. Nov. 30, 2016)); *see Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 13 F.4th 247, 259–60 (2d Cir. 2021); *AT&T Enters., LLC v. Atos IT Sols. & Servs., Inc.*, 2026 WL 1090227, at *9 (S.D.N.Y. Apr. 22, 2026) (application of summary judgment standards "must be guided by the substantive evidentiary standards that apply to the case" (quoting *Anderson*, 477 U.S. at 255)). "This evidentiary standard demands a high order of proof . . . and forbids the awarding of relief whenever the evidence is loose, equivocal or contradictory." *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 219 (S.D.N.Y. 2007) (quoting *Abrahami v. UPC Const. Co.*, 638 N.Y.S.2d 11, 13 (1st Dep't 1996)), *aff'd*, 354 F. App'x 496 (2d Cir. 2009) (summary order). "Clear and convincing evidence may, however, be circumstantial, even on summary judgment," and "summary judgment should be denied when the plaintiff demonstrates the existence of specific facts from which a jury might infer that a defendant engaged in a scheme or plot to defraud the plaintiff." *Id.* at 219–20.

Bitdeer identifies two sets of pre-signing misrepresentations that it alleges Ayrton made that induced Bitdeer to sign the Term Sheet. First, at various points in April 2024, Ayrton made statements to the effect that it would be able to close a transaction with Bitdeer within 2–3 weeks. *See* Dkt. No. 147 ¶ 41 (Ayrton's statements on time to close, including, *inter alia*: "[t]imeframe to close is typically 2–3 weeks after execution"; "[r]ealistically 2–3 weeks after signing the term sheet to complete the process"; and Ayrton would "be able to provide

documents within a week with an expected time to close approximately two weeks thereafter" (internal quotation marks omitted)). Second, in response to LaBerge's text that he needs to "get comfortable" with whether Ayrton "can close," Gross stated that "there is adequate information in the public domain at this time, which we frequently rely on." Dkt. No. 110-14 at 2. Bitdeer argues that Ayrton's representations were false, that Ayrton had neither the ability nor the intent to close the transaction, and that it made the false representations to induce Bitdeer to sign the Term Sheet with its onerous provisions that, in effect, gave Ayrton an option with respect to any of Bitdeer's future financing transactions.

Bitdeer has failed to present evidence sufficient for a jury to find that the first set of alleged misrepresentations was false and misleading. Bitdeer identifies four alleged misrepresentations: On April 8, 2024, Ayrton stated that "[t]imeframe to close is typically 2–3 weeks after execution of the term sheet." Dkt. No. 110-8 at 11. On April 13, 2024, Ayrton stated that it would take "[r]ealistically 2–3 weeks after signing the term sheet to complete the process," adding that "[w]e'll need to complete our due diligence during this time but we are typically able to move much fast than other lenders with respect to due diligence, IC approval etc." *Id.* at 6. On April 20, 2024, Ayrton represented that it would "be able to provide documents within a week with an expected time to close approximately 2 weeks thereafter," adding that "[g]iven the key assets are located in the US, I don't expect the process to take much longer than ~3 weeks overall." *Id.* at 3. And on April 22, 2024, Ayrton represented that its diligence vendor's "turnaround time is 2–3 weeks including site visits." *Id.* at 2. Bitdeer does not argue or present evidence that Ayrton's statements regarding the typical timeframe for due diligence, or its vendor's typical turnaround time, were false or misleading. It argues instead that the statements were false and misleading because they carried with them the implicit—but in

Bitdeer's view, false—representation that Ayrton would be capable of closing within several weeks. Oral Arg. Tr. at 64:15–65:19, 65:20–66:3; *see* Dkt. No. 135 at 22.

"New York law is clear that, at a minimum, false statements about a party's present financial condition or current ability to perform, made in order to induce a party to enter into a contract, will support a claim of fraudulent inducement." *SAT Aero Holdings, Inc. v. Aerolinea del Estado Mexicano*, *S.A. de C.V.*, 2025 WL 3012989, at *4 (S.D.N.Y. Oct. 28, 2025) (quoting *Wild Bunch, SA v. Vendian Ent., LLC*, 256 F. Supp. 3d 497, 506 (S.D.N.Y. 2017)). A reasonable jury could find that Ayrton's statements carried within them the implicit representation that Ayrton could sign definitive documents for the purchase of the Notes and close the transaction within 2–3 weeks and thus that it would have access to (or the ability to obtain) the assets necessary to close a $100 million transaction within that time. But Bitdeer has not presented evidence that Ayrton lacked access to the assets necessary for such a transaction or that its statements were false. Bitdeer argues that a jury could find that Ayrton would not have been able to close the transaction on the timetable it referenced on the basis of the following evidence: (1) Ayrton's assets under management (AUM) ranged from $203 to $231 million during the relevant period, Dkt. No. 147 ¶ 48; (2) Ayrton had never invested $100 million in a single company using Alto Fund assets, Dkt. No. 147 ¶ 50; (3) Ayrton's largest debt investment topped out at $35 million at the time, Dkt. No. 148-3 at 41:9–20; and (4) there is no evidence that Ayrton solicited any third-party capital beyond one discussion with a potential co-investor mentioned by Khatri, *id.* at 31:4–34:20. *See* Oral Arg. Tr. at 64:19–65:12. At the time of entering the Term Sheet, of its over $200 million in AUM, the Alto Fund had "roughly a hundred million" available in liquid assets such as cash and tradeable securities. Dkt. 147 ¶ 52; 110-3

at 127:23–128:2; *see also* Dkt. No. 110-37 (Alto Fund's bank balances). Those facts, construed separately and together, fail to create a genuine issue of material fact.

Bitdeer does not claim nor would the evidence support that Ayrton told Bitdeer that the investment would be funded solely from the Alto Fund. Although Khatri signed the Term Sheet in his capacity as the Investment Manager for the Alto Fund, Dkt. No. 110-9 at 5, the body of the Term Sheet itself anticipates that the funding for the transaction might come from Ayrton Capital LLC or any of its affiliates or from "third parties," *id.* at 3. It explicitly states that the Term Sheet is not a commitment by Ayrton that it will secure financing on behalf of Bitdeer "by third parties." *Id.* Bitdeer thus could not have understood that the financing would come only from the Alto Fund. In addition, the evidence is undisputed that Ayrton had over $100 million in liquid assets that it could have sold to finance the transaction. Dkt. 147 ¶ 52; 110-3 at 127:23–128:2. That Ayrton would have had to sell all or most of its liquid assets to purchase the Notes—if it proceeded without co-investors—hardly establishes that it would have been unable to close the transaction. Bitdeer relies on the fact that Ayrton never made an investment as large as $100 million. But Bitdeer does not claim that Ayrton ever represented to Bitdeer that it had a track record of transactions in the $100 million range. For April 2024, the Alto Fund reported an AUM of $226 million to investors, with annualized returns of over 32% since inception, generated by a focus on a "small and mid-cap companies using single-name credit, equity and volatility securities with asymmetric return profiles." *See* Dkt. No. 110-21. The fact that Ayrton had yet to make a single investment as large as $100 million does not mean that it could not do so. There is always a first. Finally, Bitdeer notes that Ayrton had, at most, reached out to one investor, yet Khatri testified that that one investor "manage[s] over 13 billion," dwarfing the Alto Fund's size, and could have singlehandedly provided enough "funding." 148-3 at 34:5–9.

Moreover, Bitdeer has offered no evidence with respect to the time frame it would have taken Ayrton to find co-investors. In the absence of such evidence, no inference can be drawn from the fact that Ayrton did not reach out to additional investors in the week or two after it signed the Term Sheet.

Bitdeer's second claim of fraudulent inducement is based on Gross's response to LaBerge's text on April 26, 2024, immediately before Bitdeer signed the Term Sheet. LaBerge text messaged Gross: "Also, I need to get comfortable that you guys can close despite the fact that you have not viewed the data room yet." Dkt. No. 147 ¶ 40; *see* Dkt. No. 110-14. Gross responded: "I don't see this being an issue as there is adequate information in the public domain at this time, which we frequently rely on." *Id*. Bitdeer argues that Gross's representation that he did not believe that Ayrton's lack of prior access to the data room would be an issue was false and misleading. Within days of obtaining access to the data room, Ayrton raised concerns that the anti-assignment provision of the lease on the Rockdale facility presented an obstacle to a closing, leading Ayrton, within two weeks of Bitdeer having signed the Term Sheet, to propose an alternate term sheet. Dkt. No. 147 ¶¶ 37, 42; Dkt. No. 110-15. But, Bitdeer notes, Gross was aware of Bitdeer's leasehold interest in the Rockdale facility before executing the Term Sheet and had reviewed Bitdeer's annual report on Form 20-F for the fiscal year 2023, which referenced the Rockdale lease, as early as April 4, 2024. Dkt. No. 147 ¶ 39. Bitdeer's U.S.-based leases were exhibits to the SEC filings. *See* Dkt. No. 110-12 at 138–40. Therefore, Bitdeer claims it could not have been true that Gross believed that there was adequate information in the public domain in order to close.

Bitdeer has not proffered evidence from which a reasonable jury could find, by clear and convincing evidence, that Gross's statement that he did not see the lack of access to the data

room to date as "being an issue" was false and misleading. The law requires, that to be actionable, a "false representation . . . must relate to a past or existing fact, or something equivalent thereto, as distinguished from a mere estimate or expression of opinion." *Zanani v. Savad*, 630 N.Y.S.2d 89, 90 (2d Dep't 1995). "In considering whether a given statement is properly characterized as one of fact or of opinion, courts must consider '(1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether . . . the full context of the communication in which the statement appears' suggests to its audience that 'what is being read or heard is likely to be opinion, not fact.'" *Verdonck v. Howard*, 217 N.Y.S.3d 474 (N.Y. Sup. Ct. 2024) (unpublished table decision) (quoting *Gross v. New York Times Co.*, 623 N.E.2d 1163, 1167 (N.Y. 1993)). Understood in the context of his ongoing dialogue with LaBerge, Gross's statement was one of opinion and was forward-looking: he did not "see" lack of access to the data room as being an issue. It was not and could not have been seen as a statement of fact. Ayrton had not yet had access to the data room. It did not know yet what it did not know. *See Davidoff v. Hershfield*, 224 N.Y.S.3d 468, 470 (2d Dep't 2024) ("[A] representation of opinion or a prediction of something which is hoped or expected to occur in the future will not sustain an action for fraud." (quoting *Platus Corp. Pension Plan v. Nazareth*, 705 N.Y.S.2d 649, 650 (2d Dep't 2000))). Indeed, Ayrton made clear simultaneously that it expected to conduct at least $125,000 of due diligence and that it would not be able to close unless that due diligence was satisfactory to it. Dkt. No. 110-9; *see also* 123-8 at 11 (April 11, 2024 draft of the Term Sheet sent from Gross to LaBerge providing that the agreement is "non-binding" and "subject to the

completion of due diligence," among other conditions listed in the preamble, in an identical fashion as the executed Term Sheet).[30]

A statement of opinion or forward-looking statement can support a claim for fraudulent inducement only when there is evidence (1) that the speaker did not believe the statement at the time he made it; or (2) there was no basis for the speaker to have made the statement. *M&T Bank Corp. v. McGraw Hill Cos., Inc.*, 5 N.Y.S.3d 783, 785 (4th Dep't 2015) (opinion is "actionable" for fraud if "the speaker either did not in fact hold the opinion stated or because the speaker subjectively was aware that there was no reasonable basis for it"); *see also Gross*, 623 N.E.2d at 1168. Bitdeer has not proffered evidence to support either claim. Bitdeer hinges its claim on the fact that Ayrton had reviewed the Form 20-F which referenced the Rockdale lease and Gross admitted he was aware of the lease. *See* Dkt. No. 147 ¶ 39. But all that the body of the Form 20-F says about the Rockdale lease is its assignment history: that "Dory Creek, LLC, our subsidiary . . . entered into the Lease Agreement with Alcoa USA Corp.," which later assigned the lease to "SLR Property I, LP," and that the lease had been subject to at least seven amendments. Dkt. No. 110-12 at 69–70. It did not disclose the anti-assignment provision. There is nothing in Ayrton's annotations of the Form 20-F that would indicate that Ayrton had reviewed the underlying lease itself or was aware of its anti-assignment provision. *See* Dkt. Nos. 110-12, 110-13 (Form 20-F spanning over 200 pages, including financial statements but not including hyperlinked exhibits such as leases). And Gross affirmatively testified, without contradiction, that he did not see the lease which, in any event, was over fifty pages long, without considering the nearly thirty additional pages of attached exhibits and excluding its various amendments. Dkt. No. 140-6 (June 2018 lease). Indeed, Gross testified that he had been

---

[30] Citations to this docket entry use ECF pagination.

told by Bitdeer that the Rockdale facility could be sold, but after "comb[ing] through hundreds of pages of lease documents" with counsel, "it was made abundantly obvious" that the Rockdale facility was rendered, "from [Ayrton's] collateral point of view, worthless" due to the anti-assignment provision. Dkt. No. 110-3 at 263:6–264:3. LaBerge also testified that, during his conversations with Gross, his "belief was that [Bitdeer] could sell [its] assets, including the Rockdale" and that it could be "monetize[d] . . . through a sale." Dkt. No. 148-4 at 183:5–8. Were that evidence not sufficient, at the time Ayrton raised the issue regarding the anti-assignment provision with Rockdale, Ayrton also stated that it was prepared to work with the landlord to be able to use the collateral. *See* Dkt. No. 147 ¶ 43. Thus, no reasonable jury could understand Gross's statement to be a misrepresentation.

Even if Bitdeer had offered evidence of a misrepresentation, it has offered no evidence of reasonable reliance. "Where sophisticated parties engage in a high-stakes transaction, a party lacking information cannot reasonably rely on oral representations from a negotiator on the other side of a proposed transaction, and must be expected to demand documented confirmation or otherwise perform basic due diligence." *Rojo v. Deutsche Bank*, 2010 WL 2560077, at *5 (S.D.N.Y. June 23, 2010) (internal quotation marks omitted), *aff'd*, 487 F. App'x 586 (2d Cir. 2012) (summary order). Bitdeer and Ayrton are sophisticated parties. As discussed, at the time, Ayrton ran a hedge fund with over $200 million in AUM that generated supra-market returns on an annualized basis, while Bitdeer operated in the high-tech bitcoin mining space across the globe with an annual revenue of approximately $368.6 million for fiscal year 2023. Dkt. No. 110-12 at 86. The parties had exchanged multiple drafts of the term sheet before landing on the executed version, and each made clear that the transaction could not close without due diligence, and none contained a timeline for closing. *See, e.g.*, Dkt. No. 123-7 at 4 (April 7, 2024 initial

draft term sheet); Dkt. No. 123-8 at 11 (April 11, 2024 draft term sheet); Dkt. No. 123-16 at 15 (April 22, 2024 draft term sheet).[31] The final Term Sheet followed the same template: it explicitly indicated that Ayrton was going to conduct due diligence and relieved it of any obligation to sign definitive documents if the diligence was not satisfactory. Gross also informed LaBerge that diligence would be needed on "key assets [that] are located in the US" and that FTI Consulting's "turnaround time is 2–3 weeks including site visits." Dkt. No. 110-8 at 2–3. In the face of all of these statements, made over the course of weeks of negotiations over the Term Sheet, no reasonable company in Bitdeer's position could have understood Ayrton's statements regarding the time it typically takes to complete due diligence and to fund a transaction, or Gross's statement regarding his expectations with respect to due diligence, to constitute a representation or warranty that diligence would only take 2–3 weeks, that it would be satisfactory, or that Bitdeer would, in fact, close within several weeks of the signing of the Term Sheet. If Bitdeer had wanted an explicit assurance that Ayrton had reviewed the Rockdale facility and had no concerns, it was free to ask for that representation before entering the Term Sheet or seek a carveout from the Term Sheet's due diligence language. *Rojo*, 2010 WL 2560077, at *6 (no reasonable reliance where sophisticated banker "readily agreed" to the contract "without asking for any further information"); *see also Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 58 F. Supp. 2d 228, 259 (S.D.N.Y. 1999) ("Sophisticated parties may well be under a duty to make affirmative efforts to protect themselves from misrepresentations and cannot be heard to complain when they fail to make diligent inquiries." (internal citation omitted)).

[31] Citations to these docket entries use ECF pagination.

Finally, Bitdeer has failed to proffer evidence that would suggest that Ayrton made its statements with the requisite intent to defraud. A party "may establish scienter by either showing [evidence of] . . . motive and opportunity to commit fraud or by showing evidence of conscious misbehavior or recklessness." *Aguirre v. Best Care Agency, Inc.*, 961 F. Supp. 2d 427, 451 (E.D.N.Y. 2013) (internal quotation marks omitted).[32] To preclude summary judgment, Bitdeer must offer some evidence that Ayrton's statements were knowingly false, or said with reckless disregard as to the truth, in an effort to defraud. *See Great Lakes Reinsurance (UK) SE v. Herzig*, 764 F. Supp. 3d 164, 186–87 (S.D.N.Y. 2025); *Piccirilli v. Benjamin*, 209 N.Y.S.3d 653, 657 (3d Dep't 2024). "As scienter is generally a question of fact, '[t]he Second Circuit has been lenient in allowing scienter issues to withstand summary judgment based on fairly tenuous inferences.'" *Waran v. Christie's Inc.*, 315 F. Supp. 3d 713, 719 (S.D.N.Y. 2018) (quoting *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999)). Nevertheless, "[s]ummary judgment is . . . appropriate where a [party] has failed to make a showing of wrongful intent . . . sufficient for a reasonable jury to find" on scienter. *Id.* (internal quotation marks omitted).

The thrust of Bitdeer's fraudulent inducement claim is that Ayrton had an intent to ensnare it in the Term Sheet's coercive Exclusivity Provision and that Ayrton's concern with the Rockdale facility was pretextual, seeing as Ayrton had said it already had "adequate information" from the "public domain," to induce Bitdeer to agree to an exclusivity period, the violation of which would give Ayrton an inordinate windfall. Dkt. No. 135 at 22–23; Dkt. No. 110-14 at 2. But Bitdeer's evidence does not support that supposition. First, as noted, there is no

[32] "The standard for evaluating whether plaintiffs have presented sufficient evidence of scienter is the same under New York common law as it is under Section 10(b) of the Securities Exchange Act of 1934." *King Cnty., Wash. v. IKB Deutsche Industriebank AG*, 916 F. Supp. 2d 442, 447 (S.D.N.Y. 2013).

evidence that Ayrton was aware of the anti-assignment provision of the Rockdale lease or that Ayrton lacked the ability to close within a two-to-three-week time frame. Bitdeer's theory speaks of "fraud by hindsight." *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978). In Bitdeer's view, because Ayrton failed to close, it never intended to close. Second, Bitdeer's LaBerge confirmed that both sides understood that Ayrton would rely on *only* "public information" for its due diligence as it assessed the contemplated transaction so that Ayrton would not be subject to any trading restrictions. Dkt. No. 137-5 at 178:16–179:23 (LaBerge testifying that Ayrton was never provided "material nonpublic information," and that Ayrton "at all times . . . wanted to use only public information"). If Gross had already had "adequate information" from the "public domain" to close, Dkt. No. 110-14 at 2, there would be no need for this type of diligence at all, despite the express language of the executed Term Sheet and its prior iterations, which were shared with Bitdeer starting from April 7, 2024. *See* Dkt. No. 123-7 at 4; Dkt. No. 123-8 at 11; Dkt. No. 123-16 at 15. Third, Ayrton's actions following the Term Sheet's execution undermine any inference of scienter. If, in fact, Ayrton's objectives were solely to have Bitdeer sign the Term Sheet, there would have been no need for Ayrton to do anything after Bitdeer signed the Term Sheet. It need only have waited until Bitdeer became frustrated with Ayrton's lack of action and breached exclusivity to enjoy the fruits of the alleged fraud. But that is not what happened. Ayrton spent time and resources to close the transaction. Two days after executing the Term Sheet on April 29, 2024, Gross reached out to LaBerge, asking whether the data room was ready and how FTI Consulting might access the diligence documents, thereby demonstrating a willingness to move forward. Dkt. No. 123-24. Then, once the Rockdale lease's anti-assignment clause was identified, Ayrton engaged counsel and coordinated with Bitdeer to resolve its concern, including by offering an alternative financing under a separate term sheet

that did not foreclose the operative Term Sheet and by noting that it would be willing to coordinate with the landlord on the collateral. If Ayrton intended not to close and simply to enjoy the participation right, it need never have taken any of those actions. *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 463 (S.D.N.Y. 2000) (granting summary judgment where a party's "view of the facts defies economic reason [and so] . . . does not yield a reasonable inference of fraudulent intent" (quoting *Atl. Gypsum Co. v. Lloyds Int'l Corp.*, 753 F. Supp. 505, 514 (S.D.N.Y. 1990))); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 596–97 (1986).

Therefore, the Court finds that the fraud-in-the-inducement affirmative defense fails. Bitdeer thus may not evade the Term Sheet to the extent that it is enforceable.

**III. Attorneys' Fees**

Having addressed the merits, the Court turns lastly to the parties' dispute over attorneys' fees. The Exclusivity Provision expressly provides that "[Bitdeer] will promptly reimburse the Investor for all costs, including attorney's fees, paid or incurred by the Investor with respect to any claims arising as a result of a breach of the provisions under this section." Dkt. No. 110-9 at 4. Pursuant to this language, Ayrton requests that the Court find "Bitdeer liable for Ayrton's attorney's fees and costs, subject to findings on the issue at a later date." Dkt. No. 120 at 15. Bitdeer opposes and, anticipating the present scenario where the Court might find the Term Sheet enforceable but strike down the participation right, raises only one argument: that Ayrton "cannot recover its attorney[s'] fees" since it is not the "prevailing party," having "failed in its primary objective of reaping a windfall from" the participation right. Dkt. No. 135 at 17–18.

"The baseline 'American Rule' proscribes fee-shifting between attorneys 'unless a statute or contract provides otherwise.'" *SING for Serv., LLC v. DOWC Admin. Servs., LLC*, 2023 WL 3294279, at *3 (S.D.N.Y. May 5, 2023) (quoting *Marx v. Gen. Revenue Corp.*, 568 U.S. 371,

382 (2013)); *see Hooper Assocs., Ltd. v. AGS Computs., Inc.*, 548 N.E.2d 903, 904 (N.Y. 1989) ("[P]arties to a contract [may] include a promise by one party to hold the other harmless for a particular loss or damage and counsel fees are but another form of damage which may be indemnified in this way."). To determine whether to shift fees, the Court is guided by the relevant clause so long as the intention of the parties is "*unmistakably clear* from the language of the promise." *U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34, 75 (2d Cir. 2004) (quoting *Hooper Assocs.*, 548 N.E.2d at 905). "[A] court applying New York law 'should not infer a party's intention to provide counsel fees as damages for a breach of contract unless the intention to do so is unmistakably clear from the language of the contract.'" *Zero Carbon Holdings, LLC v. Aspiration Partners, Inc.*, 2024 WL 3409278, at *2 (S.D.N.Y. July 15, 2024) (quoting *AT&T Corp. v. Publ'g Concepts L.P.*, 2010 WL 1191380, at *5 (S.D.N.Y. Mar. 29, 2010) (Chin, J.)). "To ensure that fees are not awarded in the absence of an express agreement, the courts have interpreted such provisions strictly." *Wistron NeWeb Corp. v. Genesis Networks Telecom Servs., LLC*, 2023 WL 5211352, at *5 (S.D.N.Y. Aug. 14, 2023) (quoting *Nationwide Auction Co. v. Lynn*, 1996 WL 148489, at *9 (S.D.N.Y. Apr. 1, 1996)). Moreover, "[t]here is no general rule against one-way attorney's fees provisions. Rather, 'a contract provision that one party to a contract pay the other party's attorneys' fees in the event of breach is enforceable so long as those amounts are not unreasonable.'" *Keybanc Cap. Markets, Inc. v. Extreme Steel, Inc.*, 710 F. Supp. 3d 239, 247 (S.D.N.Y. 2024) (quoting *Weiwei Gao v. Sidhu*, 2013 WL 2896995, at *5 (S.D.N.Y. June 13, 2013)).

From these principles and the plain language of the Exclusivity Provision, Ayrton is entitled to some attorneys' fees. The clause declares, without reservation, that Bitdeer will "reimburse [Ayrton] for all costs, including attorney's fees, paid or incurred . . . with respect to

any claims arising as a result of breach." Dkt. No. 110-9 at 4. It is not qualified by the degree of success on the claim or the final damages award, and the language does not incorporate a "prevailing party" standard. "Notwithstanding the strict construction rule enunciated in *Hooper*," courts hold parties to their bargain, including to the "expansive" language of an indemnification clause. *Wistron NeWeb Corp.*, 2023 WL 5211352, at *8 (internal quotation marks omitted) (collecting New York cases); *TAG 380, LLC v. ComMet 380, Inc.*, 890 N.E.2d 195, 201 (N.Y. 2008) (finding entitlement to attorneys' fees pursuant to broad language of lease's indemnification clause). The "attorneys' fees provision nowhere references degree of success or results obtained in enforcing [Ayrton's] rights." *Anstalt v. ShiftPixy, Inc.*, 2020 WL 1330216, at *4 (S.D.N.Y. Mar. 23, 2020). And since Ayrton has proven that there was a breach of the Exclusivity Provision and that it is entitled to liquidated damages in the form of the break-up fee, Ayrton has established its entitlement to fees. Dkt. No. 110-9 at 4.

Bitdeer attempts to avoid this straightforward result by contending that Ayrton's damages are greatly diminished by the Court's ruling that the participation right is unenforceable. It cites to the corpus of New York law that concerns how and when a party can be considered a "prevailing party." Dkt. No. 135 at 17–18.[33] But Bitdeer offers only one case for the proposition that the "prevailing party" standard applies in the face of language that is unmistakably clear. Dkt. No. 135 at 17 (citing *Nestor v. McDowell*, 615 N.E.2d 991 (N.Y. 1993)). *Nestor* does not go quite so far. There, the plaintiff had not achieved "the central relief sought, that is, a

[33] Ordinarily, "[t]o be considered a prevailing party, one must simply prevail on the central claims advanced, and receive substantial relief in consequence thereof." *Adstra, LLC v. Kinesso, LLC*, 2025 WL 1070034, at *3 (S.D.N.Y. Apr. 9, 2025) (quoting *Sykes v. RFD Third Ave. I Assocs., LLC*, 833 N.Y.S.2d 76, 77–78 (1st Dep't 2007)). That analysis may require an understanding of "the true scope of the dispute litigated and what was achieved within that scope." *Free People of PA LLC v. Delshah 60 Ninth, LLC*, 92 N.Y.S.3d 882, 882 (1st Dep't 2019).

possessory judgment." *Nestor*, 615 N.E.2d at 994. Here, Ayrton has achieved at least some of the "central relief" it seeks—establishing a breach of contract and its right to the break-up fee. *SING for Serv., LLC*, 2023 WL 3294279, at *5 ("[W]here a party sues 'to enforce the subject contract' and the court determines that the contract must be enforced in that party's favor, the suing party has prevailed." (quoting *Carousel Ctr. Co., LP v. Kaufmann's Carousel, Inc.*, 142 N.Y.S.3d 699, 701 (4th Dep't 2021))). It thus is entitled to at least some of its attorneys' fees. The parties have not briefed, nor need the Court address, whether Ayrton is entitled to all of its attorneys' fees or how, if at all, its lack of success with respect to the participation right should affect the quantum of fees it should be awarded.

## CONCLUSION

For the foregoing reasons, Bitdeer's motion for summary judgment is GRANTED IN PART and DENIED IN PART, and Ayrton's motion for summary judgment is GRANTED IN PART and DENIED IN PART. The Court concludes that the Exclusivity Provision constitutes an unenforceable penalty to the extent it awarded Ayrton a right of participation but that the break-up fee is permissible as liquidated damages under New York law.

The parties are directed to meet and confer and update the Court with proposed next steps in this case via joint letter filed by October 9, 2026. Such a letter should reflect the parties' joint or separate position statements with respect to the timetable for a motion by Ayrton for the award of attorneys' fees.

The Clerk of Court is respectfully directed to close Dkt. Nos. 107 and 117.

SO ORDERED.

Dated: September 30, 2026
New York, New York

LEWIS J. LIMAN
United States District Judge